# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| SJUNDE AP-FONDEN, Individually and on behalf of all others similarly situated, | Civil Case No. 1:23-cv-01921-FB-JRC |
| Plaintiff, | **CORRECTED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS** |
| vs. | |
| JOSEPH J. DEPAOLO, ERIC HOWELL, FRANK SANTORA, JOSEPH SEIBERT, SCOTT A. SHAY, VITO SUSCA, STEPHEN D. WYREMSKI, and KPMG LLP, | CLASS ACTION |
| Defendants. | **JURY TRIAL DEMANDED** |

**TABLE OF CONTENTS**

**Page**

I.    SUMMARY OF THE ACTION ................................................................. 2

II.   JURISDICTION AND VENUE ............................................................. 10

III.  PARTIES ................................................................................................ 11

      A.    Lead Plaintiff ........................................................................... 11

      B.    SBNY Defendants..................................................................... 11

      C.    KPMG ....................................................................................... 13

      D.    Non-Party SBNY ..................................................................... 13

IV.   SUMMARY OF DEFENDANTS' FRAUD............................................ 14

      A.    SBNY's Background and Operations Leading into the Class Period............... 14

      B.    With Growth Stalled, Defendants Successfully Lobbied to Rollback
            Banking Regulations, Clearing the Way for the Bank's Expansion................ 15

      C.    Defendants Transformed SBNY into a "Crypto-Friendly" "Deposit
            Machine".................................................................................. 18

      D.    Defendants Pursued Unprecedented Deposit Growth Leading into
            and During the Class Period ..................................................... 20

      E.    Defendants' Expansion of the Bank's Loan Offerings Also Created
            New Liquidity Risks ................................................................. 25

      F.    Prior to and Throughout the Class Period, Defendants Knew—and
            Were Repeatedly Told by Regulators—that SBNY Lacked Critical
            Liquidity and Risk Management Controls ................................. 26

            1.    Leading into the Class Period, Defendants Knew—and Were
                  Repeatedly Told by Regulators—that the Bank Could Not
                  Identify, Analyze or Address the Bank's Liquidity Problems
                  and Risks ......................................................................... 26

                  a.    The 2019 Examination Cycle: "SBNY's Practices
                        Were Not Commensurate with the Institution's
                        Complexity, Risk Profile, and Scope of Operations" ............... 27

                  b.    The 2020 Examination Cycle: "[I]nadequate
                        Liquidity Contingency Planning, Liquidity Stress

Testing, and Internal Controls Continued to Impede Management's Ability to Identify and Establish Appropriate Mitigating Plans Against the Potential Volatility of Uninsured Deposits" ............................................ 31

2.  During the Class Period, Defendants Continued to Recklessly Grow the Bank, Knowing Full Well of its Myriad Internal Problems and Lack of Even the Most Basic Liquidity Risk Management ................................................ 34

    a.  2021 Examination Cycle: Defendants Knew or Were Reckless to Disregard Myriad Then-Existing Problems and Risk Failures in 2021 ......................................... 36

    b.  2022 Examination Cycle: Defendants Knew or Were Reckless to Disregard Myriad Then-Existing Problems and Risk Failures in 2022 ......................................... 39

G.  By Driving Deposit Growth, Defendants DePaolo, Shay, and Howell Knew They Could Trigger Millions of Dollars of Compensation After the Board Significantly Altered Their Incentive Compensation Plan ......................................................... 42

H.  Defendants Repeatedly Misled Investors About the Bank's Liquidity, Deposits, Depositors, and Risk Management Practices .................. 43

I.  As the Truth Was Slowly Revealed, Defendants Continued to Mislead Investors ....................................................................... 48

    1.  The Bank Revealed Declining Deposits Following Crypto Turmoil, but Defendants Continued to Mislead Investors .................. 48

    2.  Defendants Revealed Even More Deposit Exoduses, but Again Falsely Reassured Investors ...................................... 50

    3.  Defendants Continued to Falsely Reassure Investors in the Face of Cryptocurrency Market Volatility ............................. 52

    4.  Defendants Stunned Investors by Announcing an Abrupt Shift Away from Digital Assets .......................................... 56

    5.  Defendants Continued to Tout the Bank's "Robust" Liquidity Position and Low Risk Profile in 2023 ................................. 58

J.  Defendants Repeatedly Misled Regulators About the Liquidity and Risk Management Deficiencies That Led to the NYDFS's Takeover of the Bank. ..................................................................... 59

1. With No Viable Risk and Liquidity Management System in Place, Defendants Misstated SBNY's Available Collateral ................ 62

2. Defendants Hid Exponentially Increasing Withdrawal Requests ..................................................................................... 63

3. Defendants Made False Claims About Large Deposit Inflows ....................................................................................... 64

4. Defendants Repeatedly Misstated SBNY's Liquidity Projections and, Knowing the Projections Were False, Included "CYA" Disclaimers to Protect Themselves ......................... 65

K. After Entering Receivership, Signature Bank's Stock Falls to $0.13 .............. 68

L. In the Aftermath of SBNY's Collapse, Regulators Issue Reports Detailing the Severe Risk Management Failures that Caused the Bank's Collapse ..................................................................... 69

1. The FDIC Report Detailed that Defendants Knew the Bank Was Subject to "Several Repeat Criticisms," But Were "Slow" to Respond and Did Not Prioritize "Appropriate Risk Management Practices and Internal Controls" ..................... 70

2. The FDIC Report Concluded that Defendants Knew of Risks Related to Overreliance on Uninsured Deposits, But Did Not Implement Systems to Ensure the Stability of Deposits .................. 71

3. The FDIC Report Confirmed Defendants Failed to Manage Risks Related to Crypto Exposure ....................................... 72

V. DEFENDANTS' MATERIALLY FALSE OR MISLEADING STATEMENTS AND OMISSIONS OF MATERIAL FACT ................... 73

1. January 21, 2021 – Form 8-K ............................................. 73

2. March 1, 2021 – 2020 Form 10-K ...................................... 74

3. March 5, 2021 – Wells Fargo Banks in Tech Forum ........................... 76

4. April 21, 2021 – Form 8-K and Earnings Call .................................... 79

5. May 10, 2021 – Form 10-Q ................................................ 82

6. June 16, 2021 – Morgan Stanley US Financials, Payments and Commercial Real Estate Conference ............................... 83

7. July 20, 2021 – Form 8-K and Earnings Call ...................................... 83

8. August 9, 2021 – Form 10-Q .............................................. 85

9.      October 19, 2021 – Form 8-K and Earnings Call ................................ 86

10.     November 9 and 10, 2021 – Form 10-Q and Bank of America Banking and Financial Conference ......................................... 87

11.     December 8, 2021 – Goldman Sachs US Financial Services Conference ........................................................................................ 90

12.     January 18, 2022 – Form 8-K ............................................................ 91

13.     March 1, 2022 – 2021 Form 10-K ..................................................... 92

14.     March 11, 2022 – UBS Digital Asset Day ......................................... 93

15.     April 19, 2022 – Form 8-K ................................................................ 94

16.     May 10, 2022 – Form 10-Q ............................................................... 94

17.     May 16, 2022 – Mid-Quarter Update ................................................ 95

18.     July 19, 2022 – Form 8-K and Earnings Call .................................... 96

19.     July 28, 2022 – Financial Times Article ............................................ 98

20.     August 9, 2022 – Form 10-Q ............................................................ 99

21.     October 18, 2022 – Form 8-K and Earnings Call ............................ 100

22.     November 9, 2022 – Form 10-Q ...................................................... 101

23.     November 15, 2022 – Press Release ................................................ 101

24.     December 6, 2022 – Goldman Sachs US Financial Services Conference ...................................................................................... 103

25.     January 17, 2023 – Form 8-K .......................................................... 105

26.     January 23, 2023 – Press Release .................................................... 106

27.     March 1, 2023 – 2022 Form 10-K .................................................... 107

28.     March 9, 2023 – Form 8-K .............................................................. 108

VI.     DEFENDANTS' SEC FILINGS VIOLATED GAAP ............................................... 109

VII.    KPMG'S ISSUANCE OF CLEAN AUDIT OPINIONS THROUGHOUT THE CLASS PERIOD VIOLATED THE EXCHANGE ACT .................................... 112

        A.      KPMG Falsely Certified SBNY's Financial Statements as GAAP Compliant .......................................................................................... 115

B.  KPMG's Audit Opinions Lacked a Reasonable Basis ................................... 116

C.  KPMG Was Aware of Increasing Risks Facing the Bank and SBNY's Foundational and Widespread Weaknesses with its Risk Management Functions ................................................................. 119

D.  Events in March 2023 Exposed SBNY's Material Weaknesses in Internal Controls Over Financial Reporting, Which Were Known by KPMG ................................................................................. 121

E.  Following SBNY's Collapse, KPMG Faced Intense Scrutiny for Its Audits ................................................................................. 122

VIII.  KPMG'S MATERIALLY FALSE OR MISLEADING STATEMENTS AND OMISSIONS OF MATERIAL FACT ................................................. 123

1.  March 1, 2021 – 2020 Form 10-K ...................................... 123

2.  March 1, 2022 – 2021 Form 10-K ...................................... 124

3.  March 1, 2023 – 2022 Form 10-K ...................................... 125

IX.  ADDITIONAL ALLEGATIONS OF DEFENDANTS' SCIENTER ...................... 126

A.  Defendants Had Actual Knowledge that SBNY Lacked Critical Liquidity and Risk Management Controls and Could Not Identify, Analyze or Address the Bank's Liquidity Problems and Risks ...................... 127

B.  Defendants Were Specifically Responsible for the Bank's Risk and Liquidity Management Functions ................................................. 129

C.  Defendants Repeatedly Spoke About the Issues at the Center of the Fraud ................................................................................. 130

D.  SBNY's Liquidity and Risk Management Controls Were Critical to the Bank ............................................................................. 131

E.  Defendants DePaolo and Howell Issued Specific Denials About SBNY's Weakening Liquidity ...................................................... 132

F.  Defendants Controlled the Contents of SBNY's Public Statements and Had Unfettered Access to Information Contrary to Their Statements ........................................................................... 133

G.  Defendants Monitored Signature's Liquidity Risks on a Regular Basis ................................................................................. 134

H.  Defendants Had Motive and Opportunity to Mislead Investors ...................... 134

1. By Driving Deposit Growth from 2020 to 2022, Defendants DePaolo, Shay, and Howell Increased Their Compensation by Millions of Dollars .......................................................... 134

2. Defendants DePaolo, Shay, Susca, and Howell Engaged in a Series of Suspicious Stock Transactions During the Class Period, Netting Them Millions in Proceeds ........................................ 135

X. ADDITIONAL ALLEGATIONS OF KPMG'S SCIENTER ................................... 141

A. KPMG Had Actual Knowledge of SBNY's Deposit Concentrations and Failing Risk Management Systems .......................................... 141

B. KPMG's Conflicts of Interest with Key SBNY Personnel Are Further Indicia of Scienter ............................................... 143

XI. LOSS CAUSATION ....................................................................................... 144

A. May 16, 2022 – Mid-Quarter Update ............................................. 146

B. July 19, 2022 – Earnings Report and Earnings Call ...................... 147

C. December 6, 2022 – Goldman Sachs Investor Conference ............ 149

D. March 12, 2023 – SBNY Is Shuttered ........................................... 150

XII. A PRESUMPTION OF RELIANCE APPLIES ........................................ 151

XIII. THE STATUTORY SAFE HARBOR AND BESPEAKS CAUTION DOCTRINE DO NOT APPLY ............................................................... 152

XIV. CLASS ACTION ALLEGATIONS ............................................................ 153

XV. CAUSES OF ACTION ............................................................................. 155

COUNT I ............................................................................................................ 155

COUNT II ........................................................................................................... 156

COUNT III .......................................................................................................... 157

XVI. PRAYER FOR RELIEF ........................................................................... 158

XVII. JURY TRIAL DEMANDED ..................................................................... 158

Court-appointed Lead Plaintiff Sjunde AP-Fonden ("AP7" or "Lead Plaintiff"), by and through its undersigned counsel, brings this federal securities class action on behalf of itself and a class ("Class") consisting of all persons or entities that purchased or otherwise acquired Signature Bank (referred to herein as "SBNY," "Signature," the "Bank," or the "Company") common stock between January 21, 2021 and March 12, 2023, inclusive (the "Class Period"), and were damaged thereby. Lead Plaintiff asserts claims for violations of Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78j(b), and the rules and regulations promulgated thereunder, including United States Securities and Exchange Commission ("SEC") Rule 10b-5, 17 C.F.R. § 240.10b-5, against Defendants (defined below) and KPMG.

Lead Plaintiff alleges the following based upon personal knowledge as to itself and its own acts, and upon information and belief as to all other matters. Lead Plaintiff's information and belief is based on the ongoing investigation of their undersigned counsel ("Lead Counsel"). This investigation includes review and analysis of, among other things: (i) public filings made by SBNY with the SEC and Federal Deposit Insurance Corporation ("FDIC"); (ii) transcripts of the Company's conference calls with analysts and investors; (iii) SBNY presentations, press releases, and other public statements issued by Defendants; (iv) research reports issued by securities and financial analysts; (v) news and media reports and other publicly available information concerning SBNY and Defendants; (vi) reports and findings issued by government and regulatory agencies, including the FDIC's Supervision of Signature Bank, April 28, 2023 ("FDIC Report"), New York Department of Financial Services ("NYDFS") Internal Review of the Supervision and Closure of Signature Bank, April 28, 2023 ("NYDFS Report"), U.S. Government Accountability Office ("GAO") Report, Preliminary Review of Agency Actions Related to March 2023 Bank Failures ("GAO Report"), and Office of Inspector General's Material Loss Review of Signature Bank of New York ("OIG Report"); (vii) publications from the Public Company Accounting Oversight

Board ("PCAOB"); (viii) economic analyses of the movement and pricing of the Company's publicly traded securities; and (ix) statements from former employees ("FEs") of SBNY. Lead Counsel's investigation into the factual allegations continues, and many of the relevant facts are known only by Defendants or are exclusively within their custody or control. Lead Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I.   SUMMARY OF THE ACTION

1.      This case stems from Defendants' misstatements to SBNY investors about several concealed deficiencies that ultimately caused the Bank to collapse—the third largest bank failure in U.S. history.

2.      Prior to and throughout the Class Period, the Bank's principal regulators, the FDIC's New York Regional Office ("NYRO") and the NYDFS (the "Regulators"), repeatedly informed the Defendants named in this Action of critical problems and deficiencies in the Bank's risk profile and liquidity risk management controls. Rather than heed these warnings, Defendants ignored them and massively expanded the Bank's liquidity risks by taking on billions of dollars in uninsured and volatile deposits from the cryptocurrency industry. All the while, Defendants failed to implement the essential controls to analyze, model and mitigate these risks. At the same time, Defendants completely misled the Bank's investors about the ticking time bomb they had created by issuing a series of false statements attesting to the soundness and safety of the Bank's risk profile, risk management practices and liquidity.

3.      By way of background, SBNY was once a staid New York-centric bank specializing in the New York real estate, law firm and taxi medallion spaces. It had enjoyed steady growth for a long time. That changed beginning in 2018 when Defendants launched SBNY on a new growth initiative by courting the nascent digital asset (or cryptocurrency) industry. This

market had largely been ignored by established banks because of its reputation for volatility and as a haven for illicit activities.

4.      As SBNY's deposits grew, so too did its risks. Between December 31, 2018 and December 31, 2021, SBNY doubled its uninsured deposits such that these uninsured deposits represented **92%** of Signature's total deposits. Much of this deposit growth came from the crypto industry, and over time, SBNY's deposits became increasingly concentrated in fewer clients. As the FDIC would later discover, in 2022, 60 clients held deposit account balances in excess of $250 million each, representing over 40% of SBNY's total deposits. In addition, just four SBNY clients accounted for a staggering 14% of the Bank's total deposits.

5.      That SBNY's uninsured deposit growth was concentrated in a small number of very large depositors was an extraordinary concentration risk that Defendants did not disclose in SBNY's public filings. It was also extraordinarily dangerous, as many of these large account balances were held by crypto banking clients. At the end of 2019, less than 5% of SBNY's $43.86 billion in deposits were from the crypto industry, but by year end 2021, that figure had ballooned to 27%, or $28.7 billion in crypto-related deposits. Further, and unbeknownst to investors, three of the four clients who accounted for 14% of SBNY's total deposits were involved in the crypto industry. Defendants, however, were incentivized by a compensation plan tied to deposit growth, and the digital asset market provided a doorway to achieve that growth. The volatility of these deposits was extreme, and there was a significant risk that the deposits would evaporate if the cryptocurrency market suffered a downturn—which could in turn place the Bank into a liquidity crisis.

6.      The liquidity risks created on the liability side of SBNY's balance sheet were compounded on the asset side as Defendants chased yield in the form of so-called "Capital Call" loans to venture capital firms. Defendants were informed by the FDIC and NYDFS that these types

of assets could not be pledged as collateral in the event that the Bank needed to raise liquidity. Nonetheless, SBNY's portfolio of Capital Call loans grew immensely during the Class Period and ultimately constituted 25% of the Bank's total assets—assets that would provide no relief whatsoever if the Bank faced a liquidity crunch.

7.      Despite the extraordinary concentration of risk on SBNY's balance sheet, SBNY's financial statements failed to disclose these risks in violation of Generally Accepted Accounting Principles ("GAAP").   Its auditor, KPMG LLP, whose lead audit partner became SBNY's CFO during the Class Period, looked the other way and repeatedly gave SBNY a clean bill of health.

8.      Defendants' pursuit of volatile and concentrated deposits tied to the crypto industry put the Bank—and unwitting investors—at the precipice of a catastrophe if the crypto industry crashed. Yet, through repeated misleading statements and false assurances to investors during the Class Period, Defendants dismissed concerns that SBNY's growth strategy was increasing its risks and created the illusion of prudent risk management and responsible growth. For example, on March 5, 2021, when asked about the value and sensitivity of the Bank's crypto deposits, Howell falsely assured investors that Defendants had conducted an analysis using "a couple of different modeling tools" and concluded that the Bank's deposits were "quite stable." Similarly, when DePaolo was asked on November 10, 2021 about the Bank's position in the digital asset industry, DePaolo assured investors that "*we cap our deposits by client, because of concentrations . . . we're very conscious of concentrations.*"[1] Howell doubled-down on this claim, representing that "*we do have rules around the size of deposits, concentration of deposits by issuer, which stablecoin issuer it is and how much we'll be willing to invest.*" And, repeatedly, Defendants told the market these deposits were "sticky" (i.e., reliable and stable).

---

[1] All emphasis is added and all original emphasis is omitted unless otherwise noted.

9.     Securities analysts credited Defendants' insistence that the Bank maintained appropriate risk controls over its digital asset concentrations. For example, after meeting with Defendants DePaolo and Howell, Wedbush reported on May 6, 2021 that: "SBNY has internal controls to avoid having concentration risk in regards to a single client or industry." Similarly, JP Morgan wrote on November 10, 2021: "Signet deposit balances can be ~$10B more if Signature wanted them to be, but are not because of concentration limits." Similarly, on December 8, 2021, Wells Fargo commented that "the growth profile here remains very impressive, with management saying balances could grow by $10-20 [billion] immediately if they lifted internal concentration limits."

10.     Defendants' representations were flat out false. As the FDIC and NYDFS later revealed, these deposits were not stable, and Defendants had no basis to state otherwise. As Defendants knew, the Bank had not conducted a sufficient deposit study, and did not have accurate or working models to analyze deposits. Further, contrary to their statements, Defendants did not comply with the Bank's digital asset-related concentration limits. Instead, they blew past them in order to facilitate continued and reckless deposit growth. Indeed, when SBNY reached its internal 10% concentration limit for digital asset deposits, rather than turn away more deposits, Defendants chased them. They simply increased the concentration limit to a staggering 35%, and, as the FDIC subsequently concluded, "there was no evidence of appropriate analysis or stress testing being completed to support the limit increase."

11.     Defendants made a host of additional statements about the Bank's supposedly low risk profile and supposedly strong liquidity risk management framework.  For instance, in their SEC filings, Defendants touted the "low risk profile of the Bank's balance sheet" and assured investors that they "continue to monitor and stress test its capital in a manner consistent with the safety and soundness expectations of the federal banking agencies and in accordance with

5

applicable internal processes." Also, in July 2021, Defendant Shay claimed that, "we remain prudent in the deployment of new funds."  And, when during earnings calls and presentations Defendants were asked about the risk associated with their new business endeavors, Howell stated, unequivocally, "So, we've really put on little to no risk."

12.    These statements by Defendants are contradicted by the contemporaneous facts they knew through repeated warnings from the FDIC and NYDFS. The Regulators conducted extensive examinations of SBNY's risk controls and liquidity risk management practices prior to and throughout the Class Period. The Regulators communicated their findings to Defendants and KPMG through periodic and annual reports and meetings. These findings sounded alarm bells for Defendants regarding their need to take significant actions to fix gross deficiencies and inadequacies in SBNY's liquidity controls and risk management practices. As the FDIC wrote to the SBNY Board, including, specifically Defendants DePaolo and Shay, at the conclusion of its 2020 examination, the Bank's "[o]n-balance sheet liquidity had increased year over year from 11 percent to 25 percent of total assets, ***but inadequate* liquidity contingency planning, liquidity stress testing, and internal controls <u>continued to impede</u> management's ability to identify and establish appropriate mitigating plans against the potential volatility of uninsured deposits**."

13.    Moreover, by the start of the Class Period, the FDIC's 2020 examination report revealed to Defendants and KPMG that, "[m]anagement had made limited progress in addressing findings" of deficiencies originally identified by the FDIC during its prior 2019 examination. For example, Defendants had not "identified an appropriate liquidity buffer, demonstrated the ability to adequately measure and control the impact of deposit volatility during stress events, or properly assessed the likelihood of and survival requirements for a variety of idiosyncratic and macroeconomic stress events." Equally alarming, the Bank's "underlying deposit assumptions had not been finalized," and it lacked a "complete [] deposit study to identify trends in depositor

behavior from regression analyses." Further, liquidity "model documentation had not been finalized, and the model had not been validated." In short, by the time the Class Period began, Defendants had completely failed to implement an adequate liquidity risk management framework at the Bank, despite multiple warning by Regulators to do so, thus putting investors in the Bank's stock at great risk.

14.     Beginning in the second quarter of 2022, the digital asset industry was hit by significant market turmoil referred to as "Crypto Winter," which included a significant drop in crypto asset values and the implosion of large crypto companies. The Bank's investors were keen to understand whether these gyrations in the industry were being adequately managed by Defendants and whether there was reason for concern.  In response, Defendants doubled-down on their false assurances.  For example, DePaolo assured investors that SBNY could even withstand the death of Bitcoin and its ilk: "Every month we model with an assumption that every single last crypto deposit is withdrawn."

15.     As would be later revealed, in stark contrast to this claim, according to the FDIC's findings, "management ***had not developed*** appropriate and sufficient funds management policies or an adequacy contingent funding plan" and, once more, the Bank's "underlying deposit assumptions had not been finalized."

16.     As the Crypto Winter persisted in 2022, customers began pulling deposits from the Bank. In response to investor questions, Defendants continued to falsely minimize any liquidity concerns, claiming that SBNY had adequate controls and sufficient modeling to protect the Bank from any liquidity issues. For example, when the trading platform, FTX, declared bankruptcy in November 2022, Defendants assured investors that SBNY's exposure to FTX was minimal, that the Bank's digital asset deposits "remained stable," and that "Signature Bank is a well-diversified institution that ***employs appropriate risk management strategies that help us navigate the current***

7

*challenging digital asset landscape*." Defendants went on to assure investors that the Bank's "strong capital, solid earnings and overall diversification, continues to provide a source of strength for our depositor clients."

17.     At the precise time of this press release, however, the NYDFS was holding its management exit meeting with multiple Defendants "to summarize the findings of the 2021 examination cycle."  The findings that were communicated to Defendants were, again, grim. During this examination cycle, regulators found that the Bank's "liquidity risk management practices continued to need improvement," and the significant liquidity contingency planning deficiencies identified originally during the 2019 examination cycle remained outstanding and unresolved by Bank management.  None of these known, long-running critical deficiencies were disclosed in the Bank's reassuring press release.

18.     Just weeks later, on December 6, 2022, Defendants announced that they were scaling back the Bank's reliance on the crypto deposits they had long touted as stable. This was a reversal from Defendants' prior statements regarding their exposure to the digital asset market and the safety and stability of those important deposits. It was an implicit acknowledgement, in part, that Defendants' assessment of these deposits and their risks was potentially unreliable. In response to this news, the price of SBNY common stock fell approximately 7%, opening December 6, 2022 at $125.70 per share and closing December 7, 2022 at $116.99 per share.

19.     Investors, however, would be blindsided by the calamity that would soon unfold in March 2023. This calamity transpired just weeks after SBNY filed its Form 10-K for the year ended December 31, 2022, and KPMG certified that SBNY's financial statements complied with GAAP.

20.     On March 2, 2023, after crypto-friendly Silvergate Bank announced it was delaying filing its year-end 2022 financial statements and made a set of comments that raised concern about

its ability to continue as a going concern, SBNY sought to reassure investors that it was not facing similar issues. The Bank issued a press release entitled, *Mid-Quarter Financial Update for Its 2023 First Quarter*, stating that the Bank had cut digital asset-related deposits by another $1.5 billion so far in 2023 and had seen an increase in its traditional depositor base during this same period.

21.     On March 9, 2023, after further turmoil hit the banking sector, SBNY management reassured investors that the Bank was not at risk. In a press release, Defendants DePaolo and Howell "reiterated [the Bank's] strong, well-diversified financial position and limited digital-asset related deposit balances" and highlighted its "strong liquidity position." Howell further affirmed the Bank's purported "commit[ment] to our depositors' safety, first and foremost" and claimed that SBNY "intentionally maintain[s] a high level of capital, strong liquidity profile and solid earnings[.]" *Bloomberg* said that the financial update amounted to an "[e]ffort to [c]alm [investors] [n]erves" and had succeeded in helping the Bank "pare[] premarket losses."

22.     Yet, by the end of the day on Friday, March 10, SBNY had seen over 1,600 withdrawal requests, prompting the FDIC to enter the picture and assess the situation.  Given that it was a Friday and the Bank would be closed over the weekend, there seemed to exist ample time for SBNY to raise any necessary liquidity. Over that weekend, Defendants repeatedly lied to regulators about, among other things, the sources of available liquidity, as the Regulators would later document in their post mortem reports. Ultimately, the critical risk management deficiencies that had been concealed from investors throughout the Class Period prevented the Defendants from generating enough liquidity to open the Bank's doors on Monday morning.  As the NYDFS concluded in its report about the reasons for closing SBNY over the weekend of March 11-13:

> By Sunday afternoon, it was clear there was ***no reasonable possibility*** that Signature could continue operating in a safe and sound manner on Monday, March 13. Signature ***repeatedly provided unreliable information*** to the Regulators over the weekend, and ***its final liquidity projections were not credible***. The Regulators assessed that Signature ***would not have enough liquidity to satisfy known and expected withdrawals on Monday, much less be able to satisfy any additional***

***unknown withdrawals that could reasonably be anticipated in light of market conditions.*** DFS sought to identify potential acquirers over the weekend but found that without federal loss-sharing, potential partners were not interested in acquiring Signature.

Once it became clear there were ***no other viable alternatives***, and in order to avoid a disorderly mid-day Monday shutdown and to stop any further panic and contagion across the broader banking system, DFS took possession of Signature at approximately 5:30 p.m. on Sunday and immediately appointed the FDIC as receiver.

23.     Much like NYDFS, the FDIC concluded that "SBNY management's lack of a well-documented and thoroughly tested liquidity contingency plan and its lack of preparedness for an unanticipated liquidity event"—all of which contradicted Defendants' reassuring statements—"***were the root cause of the bank's failure***."

24.     With the takeover of SBNY by the FDIC, SBNY ceased to exist as an independent entity and investors in SBNY were wiped out.  SBNY's stock price collapsed on Monday, March 13, 2023, causing Nasdaq to halt trading in the stock at a last sale price of $70.00 "until Signature Bank ha[d] fully satisfied Nasdaq's request for additional information."

25.     When trading resumed on March 28, 2023, the stock was trading under a dollar, and closed at $0.13. This amounted to a 99.81% drop and erased billions of dollars in shareholder value. This action seeks to recover those losses for defrauded investors.

## II.     JURISDICTION AND VENUE

26.     The claims asserted herein arise under Section 10(b) of the Exchange Act, 15 U.S.C. §§ 78j(b), and SEC Rule 10b-5, promulgated thereunder (17 C.F.R. § 240.10b-5).

27.     This Court has jurisdiction over the subject matter of this action under Section 27 of the Exchange Act (15 U.S.C. § 78aa). In addition, because this is a civil action arising under the laws of the United States, this Court has jurisdiction under 28 U.S.C. §§ 1331 and 1337.

28.     Venue is proper in this District under Section 27 of the Exchange Act (15 U.S.C. § 78aa), and 28 U.S.C. § 1391(b), because SBNY's principal executive offices were throughout the

Class Period located in New York, New York, and because many of the acts and conduct that constitute the violations of law asserted herein, including the dissemination to the public of materially false and misleading information, occurred in this District.

29.     In connection with the acts, conduct, and other wrongs alleged herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the United States mails, interstate telephone communications, and the facilities of the national securities markets.

## III.    PARTIES

### A.    Lead Plaintiff

30.     Lead Plaintiff AP7 is a Swedish public pension fund, established under law as a Swedish governmental agency, with approximately $100 billion in assets under management. As set forth in the certification attached hereto as Exhibit A, AP7 purchased or otherwise acquired SBNY's common stock at artificially inflated prices during the Class Period and suffered damages as a result of the violations of the federal securities laws alleged herein.

### B.    SBNY Defendants

31.     Defendant Joseph J. DePaolo ("DePaolo"), together with Scott A. Shay and John Tamberlane, founded SBNY in 2001. DePaolo served as SBNY's President and Chief Executive Officer ("CEO") at all times prior to and throughout the Class Period and was responsible for all strategic and business aspects of the Bank. He also served as a Director on SBNY's Board of Directors (the "Board") from when the Bank went public in 2004 through the end of the Class Period.

32.     Defendant Scott A. Shay ("Shay") co-founded the Bank in 2001 and served as the Chairman of SBNY's Board throughout the Class Period.

33.     Defendant Eric Howell ("Howell") served as SBNY's Senior Executive Vice President and Chief Operating Officer ("COO") from June 2021 to March 12, 2023. In this role, Howell was primarily responsible for overseeing SBNY's day-to-day operations. Additionally, beginning in 2022, Howell served as a member of SBNY's Board. Prior to these roles, Howell served as SBNY's Senior Executive Vice President—Corporate & Business Development from April 2013 to June 2021.

34.     Defendant Stephen D. Wyremski ("Wyremski") served as SBNY's Senior Vice President and Chief Financial Officer ("CFO") from June 30, 2021, to March 2023. In this role, Wyremski was primarily responsible for managing SBNY's finances and overseeing the Bank's financial reporting. Prior to this role, Wyremski served as SBNY's Controller from 2015 to 2021.

35.     Defendant Vito Susca ("Susca") served as SBNY's Executive Vice President and CFO from 2013 to June 30, 2021. In June 2021, Susca was promoted to the position of Chief Administrative Officer ("CAO") at SBNY. In this role, Susca took on "various operational responsibilities, including overseeing risk and compliance, facilities, security and special projects as well as serving as a liaison for internal audits and regulators."

36.     Defendant Frank Santora ("Santora") served as SBNY's Chief Payments Officer from September 2020 to March 2023. In this role, Santora managed the operations and technology associated with the Bank's payment functions. Before becoming SBNY's Chief Payments Officer, Santora was SBNY's Director of Digital Asset Solutions from December 2018 to September 2020.

37.     Defendant Joseph Seibert ("Seibert") served as SBNY's Managing Group Director, Senior Vice President of Digital Asset Banking from January 2018 to April 2023. In this role, Seibert led SBNY's Digital Asset Banking Team and was responsible for onboarding, monitoring, and servicing the Bank's digital asset industry clientele. Prior to joining SBNY in 2018, Seibert worked at Metropolitan Commercial Bank in New York as its Vice President and Market Sales

Manager from 2014 to December 2017. In this role as well, Seibert "specialize[d] in serving companies engaged in digital asset banking and blockchain technology."

38.     These former Directors and/or senior executives and officers of SBNY (collectively referred to herein as "Defendants"), because of their positions within the Bank, possessed the power and authority to control, and did in fact control, SBNY's public statements to the market, including in filings with the FDIC and SEC, press releases, the Bank's website, and presentations to securities analysts, money and portfolio managers, institutional investors, and the media. In their respective roles, each Defendant was directly involved in preparing, reviewing, and approving the Bank's public statements and disclosures to the market.

### C.     KPMG

39.     KPMG LLP ("KPMG") is a Delaware limited liability partnership headquartered in New York, New York. KPMG served as the auditor of SBNY's financial statements from 2001 until the Bank was shut down in 2023.

### D.     Non-Party SBNY

40.     Prior to its stunning collapse in March 2023, SBNY was a New York state-chartered, full-service commercial bank co-founded in 2001 by Defendants DePaolo and Shay, and John Tamberlane. On March 12, 2023, the NYDFS closed SBNY and forced it into receivership. SBNY's common stock and preferred stock traded on the NASDAQ from the beginning of the Class Period until March 28, 2023, and traded over-the-counter under the ticker symbols "SBNY" and "SBNYP," respectively. During the Class Period, the Bank's stock price closed at an all-time high of $360.00 on January 12, 2022, before falling to just $70.00 at the close of trading on March 10, 2023—the last full trading day before the Bank collapsed. On March 28, 2023, SBNY stock resumed trading in the over-the-counter market at $0.41 per share, before closing at just $0.13 per share. This decline wiped out billions of dollars in market capitalization,

with many investors losing the entire value of their investments in the Bank. All told, SBNY's failure constituted the third largest bank failure in United States history.

## IV.    SUMMARY OF DEFENDANTS' FRAUD

### A.    SBNY's Background and Operations Leading into the Class Period

41.    Prior to the Class Period, the Bank, which was headquartered in New York City, was considered the "go-to" banking institution for New York real estate companies and investors. In this respect, much of the Bank's operations from 2001 to 2017 revolved around providing banking services to participants in the New York real estate market. SBNY employed a traditional operational strategy focused on generating interest from loans in the commercial real estate ("CRE") and commercial and industrial ("C&I") sectors. The Bank funded these loans primarily through cash deposited by its clients.

42.    During this time, SBNY's client list primarily consisted of mid-sized companies and wealthy families, whom the Bank served through a single-point-of-contact model wherein clients were fully serviced by veteran private client banking teams. Defendant DePaolo stamped this model as "the hallmark of our franchise[.]" Many New York real estate owners and operators and real estate management companies held "sizable deposits with the bank," including some of New York's "most prominent real-estate families" like the Trumps, the Kushners, and the Kaufmans.

43.    SBNY's loan portfolio, in turn, was heavily concentrated in lending to "New York developers and owners of multifamily buildings, office towers, retail property and other commercial real estate." By 2016, SBNY was "the leading originator of commercial real estate loans in New York City." A large portion "of the commercial mortgage dollars originated by" the Bank's portfolio stemmed from "multifamily properties." As of December 31, 2016, SBNY held $15.17 billion in multifamily loans and $23.58 billion in total CRE loans, accounting for 80% of

its total loan portfolio. Moreover, true to form as a New York-centric bank, 11.45% of SBNY's

C&I loan portfolio ($627 million in total) constituted taxi medallion loans at the end of 2016.

44.     The New York-centric model served the Bank well for many years. Between 2009

and 2016, the Bank's total assets rose from $9.146 billion to $39.048 billion, while total deposits

increased from $7.22 billion to $31.86 billion. Revenues also rose dramatically during this time.

The success of SBNY's business was reflected in its rising stock price, with its market

capitalization increasing from $1.53 billion on February 25, 2010, to $8.46 billion by February 28,

2017.

**B.     With Growth Stalled, Defendants Successfully Lobbied to Rollback Banking Regulations, Clearing the Way for the Bank's Expansion**

45.     In 2017, after years of steady growth, the Bank's deposits and revenues stagnated.

During the Bank's earnings calls and in its SEC filings, Defendants DePaolo and Howell attributed

this slowdown to problems within SBNY's CRE and multifamily loan generation business and its

taxi medallions business. Specifically, they confirmed that the downturn in CRE was due to a

general "slowdown" in the CRE industry and that the taxi medallions had become "troubled in

terms of usage, acceptance, and regulatory support." Analysts were concerned with the slowdown.

For example, on July 19, 2017, a Wells Fargo analyst stated that it expected "meaningful

underperformance" in the stock based on quarterly results "dominated by the New York taxi

portfolio" and other "negatives" related to "loan growth" and "deposit growth."

46.     At the end of fiscal year 2017, as Defendants considered ways to reinvigorate and

continue growing the Bank, they ran into another obstacle: any efforts to materially expand the

Bank's balance sheet would expose it to a significant increase in regulatory scrutiny. Indeed, at

year-end 2017, the Bank held $43 billion in total assets, and once its total assets crossed the $50

billion threshold, it would be subjected to the rigorous capital adequacy and stress testing

requirements of the Dodd-Frank Wall Street Reform and Consumer Protection Act (the "Dodd-Frank Act").

47.    The Dodd-Frank Act, which Congress enacted in the aftermath of the financial crisis, required banks with more than $50 billion in assets to implement strict compliance and risk management processes. It also required those banks to perform company-run annual stress tests designed to "ensure that institutions have robust, forward-looking capital planning processes that account for their unique risks and to help ensure that institutions have sufficient capital to continue operations throughout times of economic and financial stress."

48.    The Dodd-Frank Act stress tests are designed to "assess[] whether banks are sufficiently capitalized to absorb losses during stressful conditions while meeting obligations to creditors and counterparties and continuing to be able to lend to households and businesses." These stress tests must be performed annually—both externally by the Federal Reserve and internally by each regulated bank—to assess how a hypothetical macroeconomic recession would impact the bank's capital levels, and the results of those stress tests are publicly disclosed to the market. In addition to these quantitative assessments, banks subject to the Dodd-Frank Act are (and were during the Class Period) required to undergo a qualitative assessment of capital adequacy, where the Federal Reserve assesses whether each bank has robust forward-looking capital planning processes that account for its unique risks.

49.    Defendant Shay, among others, publicly campaigned against the prospect of enhanced regulatory requirements, stating in February 2018: "We find it ridiculous and unacceptable that by virtue of . . . growing one day past $50bn, we will be burdened with rules intended for the mega 'too big to fail' banks." He was not alone. Silicon Valley Bank CEO Greg Becker likewise told a Senate panel in 2015 that the Dodd-Frank Act "burdens and the related compliance costs and necessary management time and other human resources are significant, and

will require us to divert resources and attention from making loans to small and growing businesses that are the job creation engines of our country, even though our risk profile would not change."

50.     To avoid these enhanced risk management requirements, Defendants rallied around a bill known as the Economic Growth, Regulatory Relief, and Consumer Protection Act, which had been introduced in November 2017 by Senator Mike Crapo (along with Senators Heidi Heitkamp, Joe Donnelly, and Jon Tester). The legislation sought to increase the threshold for Dodd-Frank's enhanced standards from $50 billion to ***$250 billion*** in assets.

51.     One of the most vocal supporters of Senator Crapo's bill was former-Congressman Barney Frank, who, along with Senator Christopher Dodd, was an original co-sponsor of the Dodd-Frank Act. At this time, however, Frank ***was serving on the Board of Directors of SBNY***—which stood to benefit dramatically from the rollbacks. Frank had been paid over $1 million by the Bank by the end of 2017. After the rollback was announced, in March 2018, Frank voiced his public support. As reported in an article entitled, *What Barney Frank really thinks about the rollback of Dodd-Frank*, he called the Dodd-Frank Act's $50 billion threshold a "mistake" and stated that the proposed rollbacks were "fairly small." Frank went so far as to say the rollbacks would not increase the risk of bank failures or a financial crisis, and even warned Democratic senators that they could be voted out of office if they failed to vote in favor of the rollbacks.

52.     While the rollback bill was in the works, the *Financial Times* reported that "individuals connected . . . [with] Signature Bank, [] donated $112,000 to Democratic senators so far in the 2017-2018 election cycle," which was "about eight times as much as people affiliated with the New York-based bank gave to Democrats in the entire 2015-2016 cycle." The Signature-linked donations were "split between Joe Donnelly of Indiana and Heidi Heitkamp of North Dakota" (two of the co-sponsors of the bill). When asked about these donations, Defendant Shay stated that "he admired [them]," including specifically "***for their backing of the Crapo bill***."

53.     On March 14, 2018, the rollbacks cleared the Senate. Democratic senators who voted for it justified their decision by pointing to Frank's public comments in support of the rollbacks. Immediately after the bill was signed into law on May 24, 2018, the threshold for Dodd-Frank stress testing increased from $50 billion to $100 billion, with a further increase to $250 billion slated to take effect eighteen months later. Thus, due at least in part to Defendants' lobbying efforts, SBNY was spared from having to face heightened regulatory scrutiny.

### C.     Defendants Transformed SBNY into a "Crypto-Friendly" "Deposit Machine"

54.     Following the Dodd-Frank Act rollbacks, Defendants promptly announced that the Bank was shifting its focus away from New York CRE and into numerous new, exotic industries in an effort to fuel deposit growth. To carry out these growth initiatives, Defendants hired experienced bankers from these industries and formed them into private client groups ("PCGs"). Starting in 2018, Defendants expanded the geographic footprint of these PCGs and announced the opening of many west coast offices to further diversify the Bank's New York-centric roots.

55.     The lynchpin of Defendants' rapid growth strategy was a major pivot into the nascent cryptocurrency and blockchain industries. The Bank began courting cryptocurrency banking clients and other participants in the tech industry to facilitate their expansion. In 2018, Defendants oversaw the formation of a "Digital Asset Banking Group" at the Bank. Indeed, Defendant Seibert, who was hired to lead the Digital Asset Banking Group, recalled: "coming to Signature was the aspect that we were going to be ***global and crypto friendly***."

56.     Becoming "crypto friendly" was seen as a controversial move by market commentators. While the digital asset industry had begun to boom at this time (the price of Bitcoin had reached as high as $19,783.21 by late 2017), as *The Wall Street Journal* reported in a May 2018 article entitled *Small Banks' New Money Maker: Bitcoin*, most "[b]ig banks [we]re avoiding cryptocurrencies" because digital assets "remain[ed] unpredictable, defined by wild price swings,

18

increasing regulatory scrutiny and a relative lack of transparency that banks in a postcrisis world tend to shun." SBNY, along with only a handful of other banks, sought to capitalize on the big banks' conservatism by, as *The Wall Street Journal* put it, "taking a calculated risk" to differentiate itself.

57.     To assuage investors regarding the emerging risks related to this new initiative, Defendant DePaolo assured them that the Bank would carefully manage and limit the risks associated with its exposure. For example, during a July 19, 2018 earnings call DePaolo told investors that, "from a risk perspective, you can only dedicate a certain portion [to digital assets], if you're mindful of how you run your balance sheet. You don't want to be over concentrated in any particular areas. So I can tell you that ***we're on top of this from a risk and compliance standpoint***."

58.     Part and parcel to the Bank's expansion into the digital asset space was the 2019 launch of Signet, SBNY's proprietary, blockchain-based digital payments platform. Signet enabled SBNY customers to settle USD payments globally 24 hours a day/7 days a week/365 days a year within the Bank with fellow SBNY customers. By allowing their customers to instantly settle crypto transactions through dollar deposits held at the Bank, Defendants intended for Signet to attract new cryptocurrency depositors. Signet was also designed to keep SBNY competitive with another prominent crypto-friendly bank, Silvergate Bank, which had developed a similar functionality called the Silvergate Exchange Network, or SEN.

59.     Beyond the digital asset initiative, Defendants made investments to branch out into the technology sector more generally. In 2019, the Bank launched a Venture Banking Group to "[s]erve venture capital firms and the portfolio companies in which they invest." DePaolo heralded the move as "indicative of our continued abilities to pursue complementary areas of growth and expansion for the Bank."

60.     Also in 2019, SBNY formed the Fund Banking Group to provide financing and banking services to the private equity industry. The Fund Banking Group mainly would provide capital call facilities—basically revolving credit lines to private equity firm general partners and private equity companies. This Group initially consisted of nine members and was led by bankers recruited from Silicon Valley Bank. After forming this team, Howell touted the facilities to investors as particularly safe, stating during a first quarter 2020 earnings call that they were made to "very, very well-established fund companies" that would "not . . . panic and draw down on lines" in the case of a market downturn.

61.     After rolling out these new initiatives, Defendants expressed confidence in the Bank's ability to transform from a staid, real-estate focused bank into a cutting-edge, high-growth banking institution. Indeed, on January 21, 2020, before the start of the Class Period, DePaolo told investors in no uncertain terms: "We are truly a commercial bank that chose privately owned businesses that wants to be -- has been and wants to continue *to be a deposit machine*."

### D.     Defendants Pursued Unprecedented Deposit Growth Leading into and During the Class Period

62.     For many years, as noted above, SBNY's business model was focused on the core features of the New York City economy, such as real estate companies and law firms. During this period, the Bank held longstanding and personal ties with many of its depositors. As a result, the Bank was a rather straightforward enterprise, with risk management that reflected its basic complexity.

63.     However, the Bank's mass expansion, driven by the initiatives introduced above, fundamentally changed SBNY's risk profile, vastly expanding its balance sheet and reshaping its business model. In particular, the Bank experienced tremendous deposit growth, more than doubling the Bank's size. Specifically, total deposits grew by 57.07% in 2020 (to $63.32 billion), and another 67.93% in 2021 (to $106.13 billion), the first year of the Class Period. Thus, over this

two-year period, the Bank's deposit base grew by a staggering *163%*. According to the GAO Report, "[r]apid growth can be an indicator of risk in a bank's business" and raises concerns as to whether "a bank's risk management practices can maintain pace with rapid growth." As set forth below, SBNY's rapid and uncontrolled growth quickly outpaced its already-deficient risk infrastructure.

64.     Further amplifying these risks, Defendants relied largely on uninsured deposits to fuel deposit growth. Uninsured deposits are those that exceed the FDIC's insurable limit of $250,000 per depositor. They are considered to be a less stable source of funding for banks, as uninsured deposits are more likely to be withdrawn during times of stress. For example, a depositor who deposits $50,250,000 with an FDIC insured bank risks losing $50 million if the bank fails. As a result, in the eyes of investors and regulators, it is critical for banks with a large proportion of uninsured deposits to actively monitor this risk and to ensure that there is an adequate liquidity plan in place to mitigate the risk of deposit outflows during times of market stress.

65.     Many of the Bank's new deposits were linked to the nascent and volatile cryptocurrency industry and tied to only a handful of large depositors. This was especially problematic for SBNY, given that even in 2019, before the start of the Class Period, $33.3 billion (or 82%) of Signature's deposits were uninsured. As the FDIC Report indicates, these "[u]ninsured deposits are considered higher risk as they are more prone to rapid runoff during reputational or financial stress than insured deposits." The GAO Report similarly advises, "[u]ninsured deposits can be unstable because customers with uninsured deposits may be more likely to withdraw their funds during times of stress[.]" This potentially unstable source of funding created heightened liquidity risks for the Bank, which were compounded by the Bank's increasingly tech-focused loan portfolio.

66.     At the end of 2020, SBNY held *$55.9 billion* in uninsured deposits—88% of its total deposits. Just one year later, at the end of 2021, that figure *nearly doubled* to a staggering *$97.6 billion*, meaning that 92% of the Bank's total deposits were uninsured. As discussed below in Section IV.F, while Defendants disclosed the Bank's uninsured deposit figure in the Bank's annual reports, they never disclosed that, among other failures, the Bank had no systems or controls in place to identify and mitigate the risks that these uninsured deposits posed to the Bank's liquidity and financial condition.

67.     To complicate matters further, the public also did not know that the uninsured deposit risk was amplified through the Bank's increasing concentration in a small number of large depositors. At the end of 2020, 55% of SBNY's total deposits ($35 billion) were held by just 196 clients. By the end of 2021, just 60 clients accounted for 40% of the Bank's total deposits. Even more startlingly, by the end of 2021, just *four* depositors comprised *14%* of SBNY's total assets— over *$16 billion*. This funding concentration created heightened risks to the Bank because, as is stated in FDIC guidance, large deposits must be categorically considered less stable liabilities "due to the effect the loss of a large deposit account could have on an institution's overall funding position." To manage and mitigate the "potentially volatile concentrations" in large deposits, the FDIC counsels that banks implement adequate "funds management policies and strategies that reflect consideration of . . . cash flow fluctuations, pledging requirements, affiliated relationships, and the narrow interest spreads that may be associated with large deposits." But, as further discussed below, Defendants never implemented adequate funds management policies or strategies to manage risks related to the run-off of the Bank's large deposits.

68.     The Bank's exposure to uninsured deposits dwarfed nearly all of its peers. Indeed, during the 2020-2021 time period, the median percentage of uninsured deposits to total assets for

a group of peer banks ranged from *just 31% to 41%*. At the end of 2021, only one of SBNY's peer

banks—Silicon Valley Bank—held a larger proportion of uninsured deposits:

| Bank | Total Deposits (in Thousands) | % of Total Deposits Uninsured |
|---|---|---|
| Silicon Valley Bank | 175,378,000 | 95% |
| Signature Bank | 106,153,818 | 92% |
| First Republic Bank | 156,321,243 | 75% |
| The Huntington National Bank | 146,382,512 | 71% |
| BMO Harris Bank National Association | 137,817,391 | 66% |
| HSBC Bank USA, National Association | 151,179,446 | 65% |
| Fifth Third Bank, National Association | 176,175,460 | 64% |
| MUFG Union Bank, National Association | 101,482,402 | 58% |
| Manufacturers and Traders Trust Company | 133,685,640 | 55% |
| Keybank National Association | 155,074,869 | 54% |
| Citizen Bank, National Association | 156,829,177 | 50% |
| Morgan Stanley Bank, National Association | 164,020,000 | 47% |
| UBS Bank USA | 111,602,591 | 43% |
| Regions Bank | 141,129,000 | 40% |
| Morgan Stanley Bank, Private Bank, National Association | 125,670,000 | 33% |
| Ally Bank | 145,765,000 | 14% |
| American Express National Bank | 85,493,447 | 14% |
| Discover Bank | 75,525,799 | 11% |
| USAA Federal Savings Bank | 105,070,590 | 8% |

69.     Defendants' decision to accept tens of billions of dollars in deposits from

participants concentrated in the high-risk digital asset industry left SBNY even more vulnerable to

liquidity, reputation and regulatory risk due to the uncertainty and volatility of the digital asset

space. At the end of 2019, digital asset deposits only constituted $1.7 billion of SBNY's $43.86

billion deposit balance, or less than 5% of total deposits. These figures increased exponentially

over 2020 and 2021. In 2020, digital asset deposits increased *429%* to $9 billion and comprised

14% of the Bank's $63.3 billion in total deposits by year end. The Bank's digital asset deposits

increased another *218%* to $28.7 billion during 2021, and comprised 27% of the Bank's total

deposits at year-end 2021. This deposit growth was primarily driven by large uninsured deposits gathered by the Digital Asset Banking Group. Moreover, of the four depositors mentioned above that comprised 14% of the Bank's total assets at the end of 2021, **three** were (still unidentified) digital asset-related clients.

70.     By the end of 2021, SBNY's digital asset portfolio consisted of digital asset exchanges (44%), stable coin issuers (23%), mining operations (9%), and digital custody platforms, digital lenders, and other businesses related to the digital asset industry (24%). Signature banked many of the largest crypto exchanges and trading platforms, including: Binance, Bitstamp, Coinbase, FTX, Galaxy Digital Trading, Huobi, Kraken (Payward Trading LTD), Okcoin, and Truecoin LLC. Signature also banked: (i) crypto-trading firm Alameda Research, (ii) digital lenders Celsius Network, Genesis Global Capital, and Nexo Services OU, (iii) stablecoin issuers TrueUSD and Circle, (iv) crypto infrastructure firms Curv, Fireblocks Inc., and Prime Trust, and (v) bitcoin mining company Marathon Digital.

71.     The Bank's exposure to a high concentration of uninsured digital asset deposits was a key for the Bank and its liquidity, as several Regulators would later report when dissecting the reasons for SBNY's collapse. As discussed below, however, rather than stop accepting digital asset-related deposits when the Bank reached its internal 10% concentration limit (i.e., digital asset deposits could not exceed 10% of the Bank's total assets), Defendants disregarded and materially increased the limit without performing proper analyses. Indeed, according to the FDIC Report, "[*t]here was no evidence of appropriate analysis or stress testing being completed to support the limit increase*."

72.     Notably, and problematically for Defendants, the rise in the digital asset deposits that SBNY aggressively courted aligned with the boom in the cryptocurrency industry during the 2020-2021 time period, during which the total market capitalization of cryptocurrencies increased

by 280% from $785 billion to $3 trillion. This was driven by a number of factors, including institutional adoption, increased interest from retail investors, and the development of new decentralized finance and non-fungible token applications. In this context, the Bank's inability to identify and plan for potential volatility and adverse market conditions within the digital asset market was an even greater problem—and one that was concealed from investors.

### E. Defendants' Expansion of the Bank's Loan Offerings Also Created New Liquidity Risks

73.     During the Bank's expansion, SBNY's assets grew to $73.9 billion in 2020 and $118.45 billion in 2021. Over the course of these two years, Defendants significantly increased SBNY's exposure to its new Fund Banking capital call lines of credit. In 2019, SBNY only had $4.42 billion in Fund Banking loans. This figure increased to $11.24 billion in 2020 and then $26.3 billion in 2021, with these loans accounting for the preponderance of SBNY's loan growth. By the second quarter of 2022, Fund Banking capital call loans grew to over $31 billion, which represented over *25% of SBNY's total assets*.

74.     As is further detailed below, however, Defendants rapidly increased exposure to these loans created additional risks, including concerns over the Bank's ability to pledge these loans as collateral at the Federal Reserve discount window. By way of background, banks establish plans for funding operations in times of stress, which are formally referred to as contingency funding plans. One aspect of devising an adequate contingency funding plan is ensuring that a bank has enough available sources of short-term borrowings from central banks to address any immediate need for liquidity that may appear down the road.

75.     One oft-used and important short-term borrowings program is offered through the Federal Reserve discount window, through which any insured depository institution that maintains deposits subject to reserve requirements are able to pledge certain assets (including illiquid assets such as loan portfolios) as collateral in exchange for immediate cash. But the Federal Reserve

restricts whether certain collateral can be pledged at the discount window, including when loans are provided to foreign obligors, and thus a bank should consider such restrictions.

76.      At all times throughout the Class Period, investors were completely unaware that Defendants increasing reliance on these loans presented the Bank with known, concrete liquidity risks. Many of these loans were extended to entities with foreign limited partners, and were therefore potentially ineligible to be pledged at the discount window. Given the sizeable portion of SBNY's balance sheet these loans constituted, Defendants' acceptance of this risk, as detailed in Section IV.J below, would have devastating consequences.

F.      **Prior to and Throughout the Class Period, Defendants Knew—and Were Repeatedly Told by Regulators—that SBNY Lacked Critical Liquidity and Risk Management Controls**

1.      **Leading into the Class Period, Defendants Knew—and Were Repeatedly Told by Regulators—that the Bank Could Not Identify, Analyze or Address the Bank's Liquidity Problems and Risks**

77.      Unbeknownst to investors, as Defendants touted Signature's new business endeavors and promised the very growth the market had clamored for, the Bank was completely ill-prepared for that growth—a reality Defendants knew even before the start of the Class Period.

78.      Prior to and throughout the Class Period, Signature was subject to comprehensive examination by the NYRO, FDIC's New York Regional Office, and the NYDFS. The Regulators jointly supervised Signature under a continuous examination program. Pursuant to this program, Regulators conducted a series of onsite target reviews during each annual examination cycle where they assessed the Bank's risk management systems, including liquidity risk management, corporate governance, and model risk management. Throughout the review process and at the conclusion of these target reviews, the Regulators presented the target review findings to Bank management and provided a comprehensive Report of Examination ("ROE") and Supervisory Letters memorializing all of the findings from that examination cycle. Further, "[t]he Bank was

required to provide written responses to the Supervisory Letter[s] within 45 days" to show that the regulators' concerns "were being adequately addressed."

79.     In these reviews, Regulators repeatedly identified and communicated to SBNY's Board and senior management, including Defendants DePaolo, Shay, and Howell, critical problems and "repeat criticisms" imperiling the Bank across a variety of these areas. Moreover, "the same criticisms were levied in 2020, 2021, and 2022, as the Bank more than doubled in size and its risk profile increased." Defendants, however, concealed these problems from investors during the Class Period, while making a number of misleading statements designed to falsely reassure investors.

        **a.**      **The 2019 Examination Cycle: "SBNY's Practices Were Not Commensurate with the Institution's Complexity, Risk Profile, and Scope of Operations"**

80.     The 2019 examination cycle commenced January 2, 2019 and included ongoing monitoring and six target reviews. As the FDIC Report confirms:

> [S]ince the 2019 examination cycle, SBNY's management and board were aware that the bank's fund management practices needed improvement. SBNY's practices were not commensurate with the institution's complexity, risk profile, and scope of operations due to weaknesses with liquidity contingency planning, liquidity stress testing, and internal controls.

81.     Indeed, at the conclusion of the 2019 examination cycle (completed on October 2, 2020), the Bank had ***7 open matters requiring board attention ("MRBAs") and 88 open supervisory recommendations ("SRs")***. These represented pressing issues that SBNY's senior management and Board needed to remediate. Indeed, MRBAs "***represent significant issues that necessitate immediate board attention***, and boards are required to place high priority on remediating such issues." According to NYDFS guidelines, "[r]emediation of all MRBAs is critical to the overall risk management and internal control processes of a bank." SRs "are material issues that require remediation by senior management but do not rise to the level of MRBAs."

82.     Starting in 2019, as reflected in the FDIC Report, "[t]he FDIC downgraded SBNY's Liquidity component rating to level 3." As defined by the *RMS Manual of Examination Policies*, pursuant to which the FDIC operates, the FDIC's liquidity component scale has a high of level 1, signifying "strong liquidity levels and well-developed funds management practices," and a low of level 5, signifying "liquidity levels or funds management practices so critically deficient that the continued viability of the institution is threatened."  A level 3 rating "indicates liquidity levels or funds management practices [at the subject institution are] in need of improvement. Institutions rated 3 may lack ready access to funds on reasonable terms or may evidence significant weaknesses in funds management practices." Similarly, the FDIC report described "numerous liquidity-related SRs and two liquidity-related MRBAs during our period of review, including an MRBA related to Liquidity Contingency Planning that remained outstanding from 2019 through SBNY's failure."

83.     Indeed, in their 2019 and 2020 ROEs, Regulators identified "numerous, recurring liquidity risk management concerns" and noted that SBNY's "liquidity risk management practices were not commensurate with the institution's complexity, risk profile, and scope of operations due to weakness with liquidity contingency planning, liquidity stress testing, and internal controls." As the NYDFS Report states, the Bank's "liquidity stress test results, when combined with the weaknesses identified with the Bank's funds management practices, were inconsistent with the Board's 'low' liquidity risk appetite."

84.     According to the NYDFS Report, during 2019 and 2020—and thereafter during the Class Period—the Bank shockingly did not have in place a sufficient plan to address, much less the ability to withstand, numerous liquidity stress events, including "net cash outflows"—i.e., depositors pulling their money out of the Bank:

> Regulators observed that a critical component of the Bank's liquidity risk profile was the ability to fund operations in the event of a liquidity stress event. The liquidity stress test results showed that the Bank forecasted significant net cash outflows over a 30-day period that would significantly exceed all available sources

of primary and secondary liquidity. Although Signature projected that it could rely on the sale of a material portion of its loan portfolio to fund operations once primary and secondary liquidity was exhausted, the Regulators assessed that Signature's assumption about its ability to sell a material portion of its loan portfolio was ***not supported with any empirical analysis***. More importantly, due to the lack of documentation supporting Signature's LST, the Regulators were not confident that Signature was adequately capturing and planning for the magnitude of a potential stress scenario.

85.    As the FDIC Report confirms, "[t]hese weaknesses prevented the bank from appropriately understanding the potential effects of adverse liquidity events and emergency cash flow needs":

> The board needed to strengthen funds management practices to better identify, measure, monitor, and control the bank's daily funding needs to cover both expected and unexpected deviations from normal operations, including its reliance on the uninsured deposit funding concentration. Improvement was also needed in the development of the deposits modeling framework, including assumption testing, model documentation, and model validation.

86.    According to the FDIC Report, "[b]eginning with the 2019 roll-up ROE, examiners began reporting concerns about the level of uninsured deposits concentrated in a small number of depositors, with very large deposits, including digital asset-related deposits."

87.    The Report of Examination for the 2019 examination cycle (the "2019 ROE") stated, according to the FDIC Report and NYDFS Report, that "SBNY's most critical liquidity exposure came from the potential volatility associated with the high-level of uninsured deposits, identified as a funding concentration, representing 82 percent of deposits and 66 percent of total assets. As of December 31, 2019, there were 128 clients with deposit account balances exceeding $50 million, or 40 percent of total deposits." In fact, the FDIC "identified SBNY's large percentage of uninsured deposits as a potentially volatile funding concentration within every roll-up ROE since at least 2017." In the NYDFS Report, the NYDFS corroborated those findings, stating that "Regulators noted significant weaknesses in the Bank's liquidity contingency planning, ***including that the risk exposure presented by the concentration of uninsured deposits was not sufficiently***

29

*identified, measured, and monitored*[,]" and, in fact, "the liquidity position's most critical exposure comes from the potential volatility associated with the high level of uninsured deposits." The NYDFS Report confirmed that findings from the Regulators' liquidity target review were presented to the Bank's senior management on June 16, 2020.

88.     In a July 6, 2020 supervisory letter, Regulators deemed the Bank's liquidity risk management deficiencies a "critical" new finding, and issued Defendants with a MRBA and 18 related SRs. The MRBA demanded remediation to "ensure that adequate liquidity contingency planning" was put in place. Adequate liquidity contingency planning required, as stated in the MRBA, "a well-developed and supported liquidity stress test (LST) framework and a comprehensive contingency funding plan." In other words, Regulators demanded that Defendants set in place systems to identify liquidity risks, and to devise appropriate mitigation measures in case those risks materialized.

89.     According to the FDIC Report and NYDFS Report, the SRs also demanded specific remediation with respect to *eighteen* different aspects Bank's liquidity risk management processes, including requiring:

- Better support the assumptions for deposit run-off, in adverse liquidity stress testing scenarios.

- Develop documented support for the deposits quantitative risk rating framework.

- Consider depositor's sensitivity to the bank's condition as part of the deposit rating framework.

- Improve the liquidity stress testing model documentation, so that its utilization, limitations, and key assumptions are clear.

- Consider the potential impact on capital from actions taken to raise liquidity.

- Improve the internal controls relating to liquidity risk management, including the internal audit of the liquidity function.

- Consider the impact of high-rate deposits in the Prompt Corrective Action Liquidity Stress Test ("LST") scenario and ensure that the calculation and applicability of the local rate cap is appropriate.

- Establish metrics and limits to ensure that the level of liquidity is sufficient at each intervening time interval, up to and including the final time period.

- Conduct sensitivity testing of key assumptions in the LST.

- Ensure that an adequate validation of the LST is performed that includes effective challenge.

- Expand and document their process for identifying specific liquidity risks and developing and selecting LST scenarios.

- Complete more frequent liquidity stress tests for scenarios that significantly impact the liquidity position.

- Lengthen the time horizon of LSTs to ensure that they include the entirety of the stress event.

- Improve the system of effective challenge for the liquidity stress modeling methodology.

- Support the assignment of the average sampled depositor runoff to the remaining un-sampled deposit portfolio.

- Review and support the deposit growth assumption in the Prompt Corrective Action stress test scenario.

90.     Notably, Regulators held an exit meeting with management on September 23, 2020 to summarize the findings of the 2019 examination cycle. On October 2, 2020, Regulators then sent a letter to SBNY's Board with the findings and a copy of the 2019 ROE. During a meeting on October 21, 2020, those findings were presented to and discussed with the Board, which included at least Defendants DePaolo and Shay.

          **b.     The 2020 Examination Cycle: "[I]nadequate Liquidity Contingency Planning, Liquidity Stress Testing, and Internal Controls Continued to Impede Management's Ability to Identify and Establish Appropriate Mitigating Plans Against the Potential Volatility of Uninsured Deposits"**

91.     The situation grew even worse for SBNY during the 2020 examination cycle, which commenced January 1, 2020 and included ongoing monitoring and four targeted reviews. The

31

NYRO provided ongoing monitoring findings related to the status of corrective actions taken by bank management to address outstanding MRBA and SRs to SBNY's senior management and Board via Supervisory Letters dated October 19, 2020, and January 19, 2021.

92.     The Report of Examination for the 2020 examination cycle (the "2020 ROE"), as reflected in the FDIC Report, again "concluded that funds management practices required improvement," and detailed the debilitating problems and deficiencies within the Bank throughout 2020. The Bank's "[o]n-balance sheet liquidity had increased year over year from 11 percent to 25 percent of total assets," giving the misleading impression of the Bank's strong liquidity, "***but inadequate liquidity contingency planning, liquidity stress testing, and internal controls <u>continued to impede</u> management's ability to identify and establish appropriate mitigating plans against the potential volatility of uninsured deposits***." According to the NYDFS Report, "***Regulators emphasized that [the] sufficiency of Signature's liquidity was unclear and could not be accurately assessed due to the outstanding issues with the Bank's liquidity stress testing***." The FDIC Report further states: "the 2020 Liquidity targeted review concluded more time was required to develop and implement an appropriate liquidity Contingency Funding Plan commensurate with the bank's risk profile."

93.     The 2020 Liquidity Supervisory Letter provided to SBNY "noted that examiners expected development of appropriate timeframes, frequencies, and metrics, in addition to stress scenario testing, to occur after SBNY implemented a new liquidity model." As discussed below in Section IV.F.2, these developments and implementations never occurred, at any point, during the Class Period.

94.     The Letter further made clear to SBNY's senior management and Board that they had no ability to identify, assess, or analyze their own deposits or liquidity:

> Liquidity stress testing did not enable identification, measurement, monitoring, or control of funding risk; thus, management could not establish an appropriately-

sized liquidity buffer. Moreover, management had not developed a metric to identify the impact of adverse events to capital levels or the limitations of remediation plans. In addition, deposit assumptions remained in development, sensitivity testing had not been completed, and accurate rate caps had not been modeled. Model documentation continued to lack a complete description of model operations, approach, testing, and outcome analysis, which were critical to ensuring the continued relevance of the model.

95.     Making matters worse, the Bank's single-funding source concentration grew even larger in 2020 with uninsured deposits representing 88% of total deposits and 76% of total assets, as confirmed by the FDIC Report. While the Bank did disclose its overall concentration of uninsured deposits, as the FDIC Report further confirmed, SBNY's senior management and Board knew, but never disclosed, that throughout 2020 "there were 196 clients with balances that exceeded $50 million as of year-end 2020, accounting for $35 billion, or 55 percent of total deposits." Moreover, "[d]igital assets-related deposits accounted for the largest deposit growth with $7.3 billion or approximately 32 percent of total 2020 deposit growth." And, "[a]n MRBA related to liquidity contingency planning and SRs related to liquidity stress testing and assumption documentation, as well as internal controls and effective challenge, were outstanding."

96.     Given the foregoing facts, at all relevant times prior to the Class Period, Defendants, including DePaolo and Shay by virtue of their membership on SBNY's Board of Directors, knew of pervasive and systematic risk management failures and problems that imperiled the Bank's liquidity and operations.

97.     The liquidity risk management and modeling deficiencies identified by Regulators at this time are further corroborated by former Bank employees who had first-hand knowledge of them. FE-1[2] was a departmental leader in the Risk Management department from before the Class Period until the spring of 2022. With respect to the Bank's funds management and liquidity

---

[2] All FEs are identified be the male pronoun to protect their identities.

models, FE-1 recounted that throughout his tenure, the Bank's approach to the models was "loose" and the assumptions were "weak." FE-1 recalled that the Bank lacked any assumptions and/or differentiation between digital asset deposits and other deposits at the Bank within its analytical modeling framework. FE-1 further stated that he was not aware of any internal analysis concerning the price of Bitcoin (or any other digital asset) in the Bank's modeling frameworks, nor was the volatility of digital asset trading analyzed. FE-1 further reported that the Bank's existing liquidity risk management models lacked the ability to adequately backtest, meaning that the Bank lacked the ability to compare modeling projections to actual results, and explained this deficiency prevented the Bank from ensuring the rigor of its liquidity model. Further, as to internal controls, FE-1 stated that when the Bank would increase risk limits relating to deposits or concentrations, it did so without documented analysis.

  **2.**  **During the Class Period, Defendants Continued to Recklessly Grow the Bank, Knowing Full Well of its Myriad Internal Problems and Lack of Even the Most Basic Liquidity Risk Management**

  98.  Despite repeated warnings and criticisms from Regulators prior to and throughout the Class Period, Defendants continued the Bank's untrammeled growth, knowingly full well that the Bank lacked basic risk management practices. As Regulators would later disclose, SBNY never adequately addressed the myriad liquidity risk management problems Regulators had identified during 2019 and 2020 cycles. The FDIC Report concluded in no uncertain terms that that "[t]hese weaknesses figured prominently into the bank's failure."

  99.  As discussed in the following sections, during the 2021 and 2022 examination cycles, which took place during the Class Period, the facts behind the scenes at the Bank were far different than the public picture of stability and prudence that Defendants painted for investors.

  100.  With respect to the Bank's ballooning volume of highly concentrated uninsured deposits, according to the FDIC Report, there was "little acknowledgement on the part of SBNY

management about how risky and potentially volatile it was to have such a large concentration of uninsured deposits, without sufficient funds management contingency plans, in case of unanticipated financial market stress." To this end, the FDIC found that, "[d]espite the significant volume of uninsured deposits and the concentration of deposits in a few key accounts, SBNY management did not acknowledge the risks this profile presented. When the FDIC raised concerns about the deposit concentrations, SBNY management did not heed the FDIC's concerns and responded that the close relationship that SBNY cultivated with these large depositor clients made them less likely to leave SBNY." Even when Regulators provided management with "a white paper about the risks of maintaining high levels of uninsured deposits as it related to the failures of Washington Mutual Bank and IndyMac Bank in 2008, SBNY management emphasized how different its bank's profile was from those two banks as they were failing."

101.    The FDIC Report further determined that, including during the Class Period:

> SBNY's overreliance on this funding source was the primary driver of the bank's elevated liquidity risk profile. However, SBNY did not sufficiently establish policies and controls to address this key risk. Establishing a limit on the allowable level of uninsured deposits was not considered a viable solution, as management's strategy was based on the generation of large commercial deposits. In fact, SBNY targeted potential clients for PCGs based on the clients' ability and willingness to place large deposits with the bank.

102.    Regulators likewise determined that Defendants' pursuit of digital asset deposits "increased the volatility and susceptibility of SBNY's more traditional depositor sources to event shocks and depositor runs" as reflected in the FDIC Report. Specifically, the FDIC found that "SBNY's board and management employed a strategy of rapid growth and expansion into the digital asset markets," which "exposed SBNY to greater susceptibility to liquidity, reputation, and regulatory risk due to the uncertainty and volatility of the digital asset space."

103.    During the Class Period, as reflected in the FDIC Report:

> SBNY never fully developed liquidity stress testing deposit assumptions or a deposit runoff framework to substantiate this assumption. SBNY management

35

should have gathered applicable industry and bank-specific uninsured deposits data that could have been used to model the potential degree of uninsured deposit volatility during adverse liquidity events.

104.    Making matters worse, "management never developed appropriate and sufficient funds management policies or an adequate contingency funding plan." In sum, from a liquidity and risk management perspective, the situation at SBNY was a ticking time bomb waiting to explode.

>       a.    **2021 Examination Cycle: Defendants Knew or Were Reckless to Disregard Myriad Then-Existing Problems and Risk Failures in 2021**

105.    The 2021 examination cycle commenced January 1, 2021, and included ongoing monitoring and seven targeted reviews. Five Supervisory Letters were issued to the Bank in 2021 based on results of the targeted reviews, wherein Regulators continued to identify material problems with Defendants' liquidity risk management, including concerns about (i) ongoing monitoring findings related to the status of corrective actions taken by bank management to address outstanding MRBA (on September 13, 2021); and (ii) the results of the third quarter 2021 continuous monitoring reviews of private equity and CRE lending (on January 31, 2022). The results revealed damning and debilitating problems both new and old, all of which were present throughout 2021.

106.    According to the FDIC Report, during this period, the Bank's "[f]unds management practices remained hampered by the lack of a comprehensive contingency funding plan and the lack of a validated stress testing model with institution-specific underlying assumptions[.]" By the 2021 examination cycle, the FDIC Report confirms that the Bank's contingency funding plan "still required improvement," as it "did not identify metrics that would measure the impact of stress events to liquidity and capital to ensure the institution could survive the entire stress time horizon." According to the FDIC Report, at this point in time:

The need for strong funds management practices was underscored by the institution's funding risk profile, which had increased throughout 2020 and 2021. Since the prior year, SBNY's balance sheet grew rapidly by 60 percent due to a significant increase in large uninsured deposits and digital asset industry deposits. ***The combination of rapid deposit growth, increasing funding concentrations, and unknown deposit stability had contributed to an increasing liquidity risk profile, which highlighted the urgent need for robust risk management practices that enable the board and management to adequately control liquidity risk and limit potential adverse financial impacts on the bank.***

107. But, contrary to their representations to investors, Defendants continued to intentionally or recklessly disregard the "urgent need for robust risk management practices." Indeed, the FDIC reported that despite the many warnings and the extended period of time to remedy the well-known failings within the Bank, "[m]anagement had made limited progress in addressing findings from the 2019 Liquidity targeted review. Management had not identified an appropriate liquidity buffer, demonstrated the ability to adequately measure and control the impact of deposit volatility during stress events, or properly assessed the likelihood of and survival requirements for a variety of idiosyncratic and macroeconomic stress events."

108. Equally alarming, the Bank's "underlying deposit assumptions had not been finalized." Thus, the Bank lacked a "complete a deposit study to identify trends in depositor behavior from regression analyses." Furthermore, liquidity "model documentation had not been finalized, and the model had not been validated." In short, the Bank completely lacked an adequate liquidity risk management framework, putting investors in the Bank's stock at great risk.

109. At the same time, during 2021, uninsured deposits had increased to 92% of total deposits and 82% of total assets. The FDIC Report confirms that, as discussed above, the Bank continued to maintain "a concentration of very large depositors." "Approximately 60 clients held deposit account balances in excess of $250 million, representing about 40 percent of total deposits. In addition, roughly 290 clients held deposit account balances exceeding $50 million for a total of $65 billion, which represented 61 percent of total deposits." Notably, the FDIC concluded that

"*management's assumptions [about the stability of those deposits] were not well documented and had not been substantiated*."

110.    Digital asset-related deposits totaled 24% of total assets, resulting in its own independent concentration:

> Those deposits had grown rapidly in 2021 by $19.7 billion and totaled $28.7 billion on December 31, 2021. The portfolio consisted of digital asset exchanges (44 percent), stable coin issuers (23 percent), mining operations (9 percent), digital custody platforms, digital lenders, and other businesses related to the digital asset industry. Many of the depositors also utilized the Signet platform. ***The other large depositor concentration included four single depositors, each comprising greater than 2 percent of total assets, totaling 14 percent of total assets. Three of the depositors were digital asset-related clients***.

111.    Further (and again) highlighting the undisclosed risks associated with the Bank's digital asset exposure, according to the FDIC Report, Defendants shockingly had disregarded or replaced critical risk limits, undermining and contradicting the same risk limits that Defendants were simultaneously touting to investors. Specifically, throughout 2021:

> [D]igital asset-related deposits rose well above the key risk indicator set for those deposits at 10 percent of total assets. Instead of decreasing deposits to meet the previously prescribed limit, SBNY management increased the limit to 35 percent of total assets in December 2021. ***There was no evidence of appropriate analysis or stress testing being completed to support the limit increase***.

112.    At the conclusion of the examination cycle, there was an outstanding MRBA related to liquidity contingency planning. Several SRs related to liquidity stress testing and assumption documentation, as well as internal controls and effective challenge, were also outstanding.

113.    Also in 2021, on August 18, 2021, the Bank responded to the Regulators concerning the 2020 examination cycle findings, according to the NYDFS Report, and acknowledged the outstanding SRs on liquidity. Not long after, on November 19, Regulators convened the management exit meeting to summarize the findings of the 2020 examination cycle. On November 19, 2021, Regulators then sent a letter to SBNY's Board with the findings and a copy of the 2020

ROE. Those findings were presented and discussed with the Board on December 15, 2021, according to the NYDFS Report.

>    **b.**    **2022 Examination Cycle: Defendants Knew or Were Reckless to Disregard Myriad Then-Existing Problems and Risk Failures in 2022**

114.    Regulators findings during their 2022 examination cycle further establish Defendants' knowledge of the many severe and pervasive internal failures and the material risks to which the Bank was exposed, without the ability to protect itself. As both the FDIC Report and NYDFS Report confirm, nearly all of the problems and failures identified in the 2019, 2020, and 2021 examination cycles—all of which were known by SBNY's senior management and Board— continued to hamper the Bank in 2022.

115.    For example, during the 2022 examination cycle, Regulators again determined that "SBNY funds management practices continued to require improvement." Among other reasons, the FDIC Report confirms that, throughout 2022:

> Underlying assumptions for the liquidity stress test and deposit outflow methodology were not fully developed and documented. In addition, significant deficiencies were identified in the independent review of liquidity and funds management, including the relevance of the internal audit procedures and evaluation. This was of heightened importance given SBNY's high reliance on uninsured deposits, and the elevated level of digital asset deposits that drove the high-risk liquidity profile of the bank.

116.    According to the NYDFS Report, on June 7, 2022, Regulators met with the Bank's senior management and Board to discuss the Regulators' liquidity risk management findings. On July 28, 2022, according to the NYDFS Report, Regulators issued a supervisory letter detailing their findings regarding the Bank's liquidity risk management deficiencies. On December 13, 2022, at the conclusion of the 2021 examination cycle, according to the NYDFS Report, the Regulators issued a ROE for the 2021 examination cycle to the Bank. In sum, Defendants were specifically aware of the crippling liquidity and risk management problems facing the Bank,

including by virtue of Defendants DePaolo, Howell, and Shay's membership on SBNY's Board of Directors.

117.    As the OIG Report revealed, Regulators had specifically told Defendants during the 2022 corporate governance review, which focused on SBNY's Digital Assets Banking Group, that digital asset exposure and risks could spill over to the Bank's non-digital asset deposits. The 2022 corporate governance review began on March 21, 2022, and Regulators presented the review findings to the Bank's management during a May 19, 2022 meeting and January 23, 2023 supervisory letter, according to the NYDFS report. As is reported in OIG Report, the 2022 corporate governance target review stated:

> The Board and executive management have adopted a strategic position of rapid growth and expansion into digital asset markets; a strategy that creates greater susceptibly (sic) to liquidity, reputation, and regulatory risk as the digital asset markets and any related contagions can impact access to needed capital and funding markets.

118.    The FDIC Report further confirmed a number of material and adverse facts that existed within the Bank during 2022, including that: (i) "[a]s of September 30, 2022, the uninsured deposits concentration was 82 percent of total assets," with digital asset deposits representing a concentration at 21 percent of total assets; (ii) "SBNY had experienced volatility in deposit levels, and reputation risks from media exposure had elevated liquidity risk;" and (iii) the Bank's "[l]iquidity risk did not align with the board-approved low risk appetite." In 2022, Regulators found SBNY to have two liquidity-related MRBAs and 19 liquidity-related SRs outstanding, as confirmed by a Supervisory Letter issued by Regulators. In fact, the "weaknesses emerging from the 2022 targeted reviews" were so severe, and Defendants' efforts to remediate these weaknesses were so deficient, that the FDIC was considering pursuing an enforcement action against SBNY "related to longstanding funds management deficiencies as well as other risk management weaknesses."

119.    The risks related to the Bank's growing digital asset concentration is further confirmed by reports from former employees of the Bank. FE-2 was a member of Signature's Digital Asset Banking Team from April 2022 until the Bank's closure. FE-2 recalled that the volatility of digital asset-related deposits was "significantly more" than other types of deposits. FE-2 reported that it was a normal occurrence to see billion-dollar swings fairly regularly for large digital asset clients when there was big news in the crypto markets or a major move on the pricing of Bitcoin. FE-2 specifically recalled that the volatility of the Bank's digital asset deposits were discussed with Howell. FE-2 likewise recalled that he conducted risk assessments of digital asset clients, but was not asked to review the potential volatility of a prospective client's balances in this risk assessment.

120.    FE-3 was a manager in SBNY's audit department from 2017 until the spring of 2022. In 2022, before FE-3 left the Bank, he worked on an audit of the Bank's liquidity risk management processes. During this audit, FE-3 concluded that SBNY's liquidity risk management function was inadequate, in part because it was missing key components and was not supported by an adequate modeling structure. FE-3 further recalled that, during this audit, management pointed to weekly reviews of deposits over $250 million as the main control for managing liquidity risk. FE-3 recalled that DePaolo and other Bank personnel, such as the Treasurer and Controller, would receive the weekly review of deposits, which was tracked on an Excel spreadsheet.  The reviews would be reviewed even more than weekly, including on a daily basis FE-3 added, as issues arose. FE-3 considered management's reliance on the deposit spreadsheet to be an ineffective control because it was essentially like "looking in the rearview mirror." FE-3 further recalled that during this risk management review in 2022, he noticed that the prior audit did not look at future projections of liquidity risk and funding. During this audit, FE-3 became concerned over the

concentration of uninsured deposits and the Bank's liquidity risk, which was "obviously the biggest problem."

### G. By Driving Deposit Growth, Defendants DePaolo, Shay, and Howell Knew They Could Trigger Millions of Dollars of Compensation After the Board Significantly Altered Their Incentive Compensation Plan

121.    On the heels of SBNY's decision to pursue unrestrained deposit growth—and despite the Bank's many known severe problems and failings, documented herein—Defendants DePaolo, Shay, and Howell had motive to chase deposit growth at all costs. By doing so, each stood to cash in on their lucrative incentive-based compensation package and Long-Term Incentive ("LTI") plan, which were dramatically adjusted in 2019 when the Bank's Board of Directors altered the compensation plan of the Bank's named executive officers ("NEOs").

122.    In prior years, as the Bank's March 1, 2019 Proxy Statement reflects, these executives' compensation was tied to the Bank achieving pre-set targets for return on equity, return on assets, and pre-tax earnings growth. However, for the full year 2019, the Bank began using a new set of performance metrics to judge the performance of its named executive officers. Namely, they adopted "deposit growth" as a core driver of bonuses. Under Signature's revised plan, these Defendants operated under both short-term and long-term incentive-based compensation plans that enriched them if the Bank hit "[a]ctual [d]eposit [g]rowth" goals. From 2020 to 2022, at least half of the LTI plan was triggered by that growth.

123.    Ultimately, as discussed further below, by pursuing unrestrained deposit growth at all costs, Defendants DePaolo, Shay, and Howell would reap millions, achieving almost the entirety of their dual compensation packages. For example, SBNY's public disclosures regarding its executive payouts suggest that between 2020 and 2022: (i) DePaolo earned nearly $4 million in PSUs, over $2 million in restricted stock, and over $975,000 in cash payouts; (ii) Shay earned over $2.5 million in PSUs, nearly $1.3 million in restricted stock, and approximately $600,000 in

cash payouts; and (iii) Howell earned over $1.6 million in PSUs, nearly $850,000 in restricted stock, and approximately $420,000 in cash payouts. In sum, Defendants' pursuit of untrammeled and irresponsible growth during the Class Period allowed them to line their pockets with millions of dollars of bonus payments.

**H.     Defendants Repeatedly Misled Investors About the Bank's Liquidity, Deposits, Depositors, and Risk Management Practices**

124.    During the Class Period, investors and analysts were hyper focused on the Bank's liquidity, the nature and stability of its deposits and deposit base, the sufficiency of SBNY's risk management practices, including risk and concentration limits with its digital asset exposure, and the Bank's standing with regulators.

125.    At every turn, Defendants kept investors completely in the dark about the Bank's debilitating and persistent risk management failures and the numerous material risks to which its expansion exposed it. Rather than disclose the persistent material deficiencies that Regulators had been telling them about for years, Defendants falsely reassured investors and quelled their concerns through material misrepresentations and omissions.

126.    For example, on March 5, 2021, when Wells Fargo analysts specifically asked about the value and sensitivity of the Bank's digital asset deposits, Howell falsely assured investors that they were "quite stable" and, based on "a couple of different modeling tools," the Bank has a "pretty stable deposit base." Equally misleading, Howell told investors the Bank's depositor base was not "tied to the value of Bitcoin." These assertions gave investors the false impression that price and market volatility in the digital asset market was not a problem for SBNY. Weeks later, on April 21, 2021, Analyst Ebrahim Huseini Poonawala ("Poonawala") of Bank of America Securities pressed DePaolo about the stability of the Bank's cryptocurrency related deposits. In response, DePaolo likewise stated: "So we feel the stickiness is there," and "we're not worried about the big players nor are we worried about the stickiness of the deposit." The "stickiness"—

or stability—of digital asset deposits was a frequent topic of analysts' reports, with UBS writing in a February 23, 2021 report that: "the question increasingly is how much of these inflows are 'sticky'. To the extent there are major drawdowns in crypto asset prices in the future, there is risk SBNY could see outflows as a result." DePaolo went on to promise "*continued deposit growth*" and represented that "*we've had to turn down deposits because we have limitations or we set internal limitations on concentrations. So we've had to turn away deposits*." He further assured investors that "we do keep a decent amount of liquidity[.]"

127.    None of these statements was true. Throughout this Period, Defendants knew that, among other things, the Bank did not have any deposit study, model, or assumptions to support their assertions about the stability or stickiness of deposits. *See* Section IV.F.2. Nor had the Bank conducted any specific or sufficient analysis of its depositor base, or tested whether it could withstand adverse market liquidity events. As the FDIC concluded, "*management's assumptions [about the stability of those deposits] were not well documented and had not been substantiated*." Among other reasons why, the FDIC Report establishes that:

> SBNY never fully developed liquidity stress testing deposit assumptions or a deposit runoff framework to substantiate this assumption. SBNY management should have gathered applicable industry and bank-specific uninsured deposits data that could have been used to model the potential degree of uninsured deposit volatility during adverse liquidity events.

128.    Further, at the same time Defendants were assuring investors that "internal limitations on concentrations" were in place at the Bank, they were knowingly or recklessly blowing past those limits in their pursuit of unrestrained growth.  Indeed, when the Bank breached its 10% limit on digital asset deposits, Defendants simply increased the limit to a staggering 35%, permitting the dangerous growth. According to the FDIC Report, "[*t]here was no evidence of appropriate analysis or stress testing being completed to support the limit increase*." As a general matter, with respect to uninsured deposits, the FDIC concluded that "SBNY's overreliance on this

funding source was the primary driver of the bank's elevated liquidity risk profile," that "SBNY did not sufficiently establish policies and controls to address this key risk," and that "[e]stablishing a limit on the allowable level of uninsured deposits was not considered a viable solution, as management's strategy was based on the generation of large commercial deposits. In fact, SBNY targeted potential clients for PCGs based on the clients' ability and willingness to place large deposits with the bank."

129.     Defendants made similar false assurances to investors regarding the Bank's risk management practices and depositor stability during the Class Period. As Howell stated on June 16, 2021, "*we've seen absolutely zero correlation between the price of Bitcoin and our deposit flows*." Seibert repeated that refrain in March 2022, responding to a UBS analyst question about the Bank's digital asset business by stating: "*Again, the price of Bitcoin doesn't have anything to do with our growth one way or the other. But we're just adding more clients, more prospects that we deem a fit for our ecosystem*."

130.     These statements were misleading and, again, made without any reasonable basis, as the Bank never conducted any specific or sufficient analysis of its depositor base, the stability of its deposits, or its ability to withstand adverse market liquidity events.

131.     Defendants likewise falsely assured investors that the Bank maintained adequate risk and concentration limits, including over digital asset deposits. For example, Defendant DePaolo was asked on November 10, 2021 by a Bank of America analyst about the Bank's position in the digital asset industry. DePaolo assured the analyst that "*we cap our deposits by client, because of concentrations, but our deposit balances could be $10 billion more if we wanted them to be. And we're very conscious of concentrations.*" Howell doubled-down on this claim, representing that "*we do have rules around the size of deposits, concentration of deposits by issuer, which stablecoin issuer it is and how much we'll be willing to invest*."

132.    On December 8, 2021, DePaolo was again asked, specifically, "How big do you think these deposits can get? And are there any concentration limits or other risks that you guys are considering related to them?" In response, DePaolo proclaimed: "***We're spending a lot of time on risk and compliance, and we have concentration limits on our clients. So we don't want to take a client that's going to be -- I can't give you the percentages. I can't divulge those, but we have limits.***" These statements were materially false or misleading, including because Defendants did not maintain sufficient limits or, in the case of deposit concentration, they arbitrarily blew through and increased them at a whim and maintained dangerously high levels of concentrations in a limited number of depositors.

133.    Analysts credited Defendants' insistence that the Bank maintained appropriate risk controls over its digital asset deposit concentrations. After meeting with Defendants DePaolo and Howell, Wedbush reported on May 6, 2021 that: "SBNY has internal controls to avoid having concentration risk in regards to a single client or industry." Crediting Defendants' public statements noted above, JP Morgan wrote on November 10, 2021: "Signet deposit balances can be ~$10B more if Signature wanted them to be, but are not because of concentration limits." Similarly, on December 8, 2021, Wells Fargo commented that "the growth profile here remains very impressive, with management saying balances could grow by $10-20B immediately if they lifted internal concentration limits."

134.    Alongside these misstatements, Defendants consistently misrepresented that the Bank had in place rigorous risk management practices. For example, from day one of the Class Period, in public filings with the FDIC, Defendants touted the "***relatively low risk profile of the Bank's balance sheet***" and assured investors that they "***continue to monitor and stress test its capital in a manner consistent with the safety and soundness expectations of the federal banking agencies and in accordance with applicable internal processes***." Also, in July 2021, Defendant

Shay claimed that, "*[w]hile our deposit growth has been truly extraordinary, we remain prudent in the deployment of new funds*." And, when during earnings calls and presentations Defendants were asked about the risk associated with their new business endeavors, Howell stated, unequivocally, "[w]e've grown cash, we've grown securities, and we've grown well-secured fund banking loans. *So, we've really put on little to no risk*." None of these statements was complete or accurate, particularly in light of the severe risk management deficiencies that persisted at the Bank before and during the Class Period.

135.    Likewise, at numerous times, Defendants also were asked and chose to speak about the Bank's relationship and interaction with its Regulators. Each time, they gave investors the materially misleading impression that, as DePaolo stated on March 5, 2021 in response to an analyst question, "*[t]hey've been very good to us*." Calling the NYDFS a "very strong partner," Defendant Santora doubled-down, misleadingly saying: "*They're comfortable with us. They know our risk and compliance framework. They are happy to work with us to have the innovation come out of our bank because they want this*." Similarly, on November 10, 2021, DePaolo told analysts that Signature had "*2 regulators that are supportive, led by the New York Department Financial Services. They're leading edge. They want their banks to be on the leading edge. They're very supportive to us. The FDIC has been asking a lot of questions and it's been supportive of us as well*. . . ."

136.    These representations were materially misleading, as leading into and throughout the Class Period, these same Regulators had repeatedly issued severe and negative findings to SBNY management, including finding their liquidity risk management was a "critical" problem and slapping the Bank with multiple MRBAs and dozens of SRs. These deficiencies directly concerned the Bank's management of emerging risks related to deposit growth, including related digital asset deposits.

137.     Analysts credited Defendants' misstatements about the Bank's purportedly good standing with its Regulators. For example, UBS wrote on November 3, 2021 that "SBNY's close working relationship with the NYDFS is also an advantage, as the NYDFS has proven to be the 'first-mover' among regulators" and that "[m]anagement views sensible regulation as a positive catalyst that likely produces more interest (e.g. investment dollars) and broadens use cases to payments and other mainstream financial products while adding a halo of legitimacy to the sector." Also crediting Defendants' representations regarding regulator support, JP Morgan wrote on November 10, 2021 that "[NYDFS] and the FDIC have been supportive so far as they want banks to be at the forefront of new technology." Piper Sandler similarly commented on November 19, 2021 that "[m]anagement didn't sound concerned about the regulatory environment" and that Defendants "seemed to sing the praises of its regulators, suggesting that they have been highly supportive."

I.     **As the Truth Was Slowly Revealed, Defendants Continued to Mislead Investors**

1.     **The Bank Revealed Declining Deposits Following Crypto Turmoil, but Defendants Continued to Mislead Investors**

138.     During the second quarter of 2022, the value of key cryptocurrency assets declined precipitously. Terraform Labs' stablecoin TerraUSD and associated token Luna plummeted. Stablecoins, like TerraUSD, tout themselves as stable investment vehicles relative to other cryptocurrency assets because they are pegged to the value of a real-world asset (the "reference asset"), such as the US dollar. Instead of serving as a store of value and a "safe haven," however, the TerraUSD stablecoin was wiped out in the span of a few days when investors panicked and tried to pull their money out, causing a "vicious, self-enforcing bank run." This run, in turn, caused investors to question the purported stability of this investment vehicle and other related digital assets. The collapse of TerraUSD had a cascading effect. Terraform Labs held billions of dollars

48

of bitcoin as a safeguard for TerraUSD and had to deploy more than $3 billion of that to defend Terra's peg to the US dollar. Other firms sold other crypto assets themselves to defend TerraUSD's peg. In sum, the fallout from Terra's collapse caused the price of Bitcoin to fall to below $29,000 (i.e., 50% from its highs in November 2021).

139.    Despite Defendants' repeated assurances about the minimal impact any volatility in the digital asset industry would have on the Bank's deposits, before market open on May 16, 2022, SBNY issued a press release in specific response to market concern surrounding the stablecoin issuers. In the *Mid-Quarter Update*, Howell denied that the Bank had "onboarded stablecoin administrators that have algorithmic backing, or those that do not hold a 1:1 reserve of USD or USD equivalents to coin outstanding." Nevertheless, Howell also in the *Mid-Quarter Update*, disclosed that "[d]eposit balances are lower by approximately $1.39 billion quarter-to-date."

140.    On the news of SBNY's deposit outflows, the price of SBNY common stock fell by 7.1%, from a closing price of $201.20 per share on Friday May 13, 2022, to close at $186.93 per share on May 16, 2022.

141.    The *Mid-Quarter Update* called into question Defendants' earlier representations about the absence of a correlation between Bitcoin prices and deposits, and their methods for predicting and managing risks related to digital asset deposit run-off. In a contemporaneous publication, CNBC reported that investors were likely concerned because "Signature is known for serving crypto institutions, and swings in crypto prices can be reflected in its crypto-related deposit and transaction volume growth." On May 16, 2022, Janney wrote "[t]he most notable impact to our margin estimate is we expect lower deposit balances to lead to reduced excess liquidity, which has been a drag on [net interest margin]." On May 20, 2022, an analyst from Piper Sandler commented that "on Monday [SBNY] indicated that deposits were down approximately $1.39

billion quarter-to-date. This follows the prior 4 quarters when deposits grew by an average of about $8.8 billion per quarter." Piper Sandler further commented that: "Given the developments in the cryptospace, we would logically expect SBNY to see some pressure on deposit flows in coming quarters. How much remains a tough question to answer since we are in unchartered waters."

142.     Notwithstanding the disclosures, Defendant Howell falsely downplayed the Bank's exposure to these external cryptocurrency market factors and concealed its unknown deposit stability, Defendants' inadequate "contingency funding plan," and Defendants' unsupported decision to blow past its key risk limit for digital asset concentration. Defendant Howell assured investors that the Bank's "*[b]alances ha[d] not been meaningfully affected by current events in the digital asset trading space*," and that the Bank "*remain[ed] well-positioned for deployment of excess cash, and reiterate[d] guidance for interest-earning asset growth in the $4-7 billion range for the 2022 second quarter*."

## 2. Defendants Revealed Even More Deposit Exoduses, but Again Falsely Reassured Investors

143.     Approximately two months later, on July 19, 2022, more bad news came to light that undermined Defendants' Class Period statements. On that day, the Bank reported its full 2022 second quarter results. The Bank revealed, in relevant part, that "total deposits in the second quarter declined $5.04 billion" and that "the decline was primarily driven by client balances of the New York Banking Teams, which decreased $2.4 billion and the Digital Asset Banking Team, which declined $2.4 billion." The Bank further revealed that loans increased $5.6 billion, and that free cash and cash equivalents had fallen to $14.5 billion, representing a 44% reduction from the prior quarter. On the earnings call held the same day, Defendant Howell revealed, with respect to the $5.6 billion increase in loans, "that the Fund Banking Division once again led the charge with growth of $3.5 billion, followed by $1.3 billion in growth from our CRE banking team." Defendant

Howell also revealed that "clearly, there are people leaving th[e] [digital asset] space and therefore deposits leaving."

144.    On this news, the price of SBNY common stock fell by 4.5%, from a closing price of $196.12 on July 18, 2022 to close at $187.28 on July 19, 2022.

145.    Analyst were, again, surprised. Casey Haire ("Haire"), analyst at Jefferies, wrote that the drop in deposits "will increase investor angst about funding future loan growth with [the] excess cash position now exhausted." The *Financial Times* also reported that "Signature has also faced speculation that its rapid growth and embrace of a controversial industry may have attracted the attention of regulators" and that there existed "concerns raised in private by investors relate[d] to liquidity: as Signature banks eight of the 12 largest crypto brokers, for instance, an implosion of the industry in a credit crunch could see their deposits rapidly evaporate." Patrick Jenkins of the *Financial Times* commented: "There is a chunk about asset exposure (e.g. fund lending). But the main concern seems to be funding and liquidity relating to the stability of the deposit base…. That can kill a bank just as much as a credit crisis."

146.    Rather than confirm investor concerns that the Bank's digital asset deposit concentration was exposing it to greater liquidity and reputational risk and that the Bank lacked the processes to manage and mitigate these risks, Defendant DePaolo went on a campaign to falsely reassure investors about the mounting risks facing the Bank. During the July 19, 2022 earnings call, Defendant DePaolo reassured investors that the Bank was well-diversified and faced minimal risk from digital asset value fluctuation because the Bank "hold[s] no cryptocurrencies."

147.    Defendant DePaolo's false reassurances continued into the following week. In a July 28, 2022, *Financial Times* article, Defendant DePaolo was quoted as stating that the Bank could withstand the death of Bitcoin and its ilk: "Every month we model with an assumption that every single last crypto deposit is withdrawn." By reassuring investors regarding the Bank's

assumptions over digital asset deposits, Defendant DePaolo was distorting the reality that, behind the scenes, "management [had not] developed appropriate and sufficient funds management policies or an adequate contingency funding plan."

> **3.      Defendants Continued to Falsely Reassure Investors in the Face of Cryptocurrency Market Volatility**

148.    During the third quarter of 2022, there was continued weakness in the cryptocurrency market. The fallout of the TerraUSD collapse and what market commentators were now calling the "crypto winter" continued, with additional digital asset-related companies filing for bankruptcy. In early July, lenders to Three Arrows Capital, including BlockFi, Celsius, Babel Finance, and Voyager Digital, learned that the Company would not be able to repay their loans. This led to the collapse of Voyager Digital, which froze customer funds on July 1, 2022, and, just four days later, on July 5, 2022, declared bankruptcy. Other market participants, such as Coinbase, Blockchain.com, and Crypto.com, were less severely impacted, but still were forced to lay off substantial numbers of employees to stay afloat.

149.    These market events continued to hamper SBNY's digital asset deposits. As SBNY disclosed in another *Mid-Quarter Update* on September 2, 2022, it experienced a digital asset deposit outflow of $4.27 billion quarter-to-date. SBNY revealed that the "deposit outflows [we]re driven by the recent 'crypto winter', or the downturn in cryptocurrency markets[.]" Nevertheless, SBNY stated that, "excluding the digital asset banking team," deposits had "increased $2.64 billion quarter-to-date." Analysts credited SBNY's representations. For example, on September 6, 2022, Wedbush commented that "crypto outflows continue" but were "mitigated by core growth." Wedbush further stated that "this should be viewed as a relief for investors who may have been bracing for more challenging outflows."

150.    Behind the scenes, however, Defendants were scrambling to bring in the core deposits to offset outflows to digital asset deposits. According to FE-4, a Managing Group Director

based in New York who started in mid-2022, SBNY's executives were laser focused on onboarding new deposits, even if it meant skirting compliance and regulatory obligations. According to FE-4, SBNY's executives "just wanted the deposits, and it didn't matter where they were coming from." FE-4 recounted a specific example shortly after his arrival at the Bank in mid-2022, a Group Director was looking to onboard a real estate client with $70 million in deposits. During the onboarding process, FE-4 grew uncomfortable with information that was disclosed concerning the client because, among other reasons, the prospective client had opened approximately 30 accounts with different names that "felt like shell companies." FE-4 raised his concerns with Andrew Corado, a senior SBNY executive, who said he would look into it. FE-4 recalled that Defendant DePaolo and Corado overrode his concerns regarding this client and approved them as a SBNY customer. As FE-4 recounted, "[t]he account got opened because they were promising $70 million in deposits and did not care where those deposits came from or which companies they were affiliated with."

151.    The onboarding of non-digital asset deposits during this period temporarily quelled investor concerns regarding the Bank's digital asset exposure throughout the third quarter of 2022. In SBNY's third quarter 2022 earnings, Defendants revealed a total of $1.3 billion in net deposit outflows, which included a $3 billion decline in digital asset deposits. Signature further reported that cash and cash equivalents had fallen another 21% to $11.5 billion, and now constituted just 10% of total assets.

152.    During SBNY's third quarter earnings call held on October 18, 2022, Howell touted the Bank's stability and its belief in its digital asset business in the face of continued challenges. In response to a question from analysts about SBNY's liquidity position, DePaolo falsely reassured investors both that the Bank was actively monitoring the situation and that there had been no signs of problems, stating: "We—right now, *we've been monitoring it as we should on a minute-by-*

*minute basis* and we feel comfortable that we'll be at about that [sic] we want at any point in time. **We haven't had any issues for liquidity at all**." In truth, DePaolo knew that the Bank still had not developed liquidity stress testing or contingency funds planning to test the specific risks facing the Bank, and that, as a result, the Bank could not adequately assess the Bank's liquidity position, especially in light of coupling risks related to the Bank's digital asset exposure.

153.    Market concerns regarding SBNY's digital asset exposure bubbled over again in November 2022 as troubles facing industry icon Sam Bankman-Fried's cryptocurrency exchange FTX were publicly revealed.  As investors knew that FTX was a SBNY client through a press release the Bank issued earlier in the year, there were immediate concerns about SBNY's exposure. In a November 10, 2022 report, Compass Point Research & Trading, LLC stated that "[r]ecent disruption in the digital asset space, fueled by the unfolding demise of FTX, has once again raised uncertainty around the health of the digital asset space overall, prompting questions from investors regarding potential impacts on SBNY and SI fundamentals, specifically as it relates to deposit flows in the space." Further, Compass pointed to SBNY's relationship with FTX specifically, who was "a client of SBNY and likely has some level of deposits with the bank," as a factor in modeling for increased depositor run-off in the back-half of 2022.  Similarly, Stephens analysts issued a report on November 10, 2022, outlining their assumptions for "increased deposit run-off as well as lower cash and securities levels" at the Bank arising from its "partners[hip] with FTX."

154.    On November 11, 2022, Bankman-Fried declared the bankruptcy of FTX and its affiliates, who all deposited with SBNY. In response to the FTX news, on November 15, 2022, SBNY issued a press release, entitled *Signature Bank Provides Digital Asset Banking Update*. In this release, the Bank told investors that the Bank's "deposit relationship with FTX and their related companies is less than 0.1 percent of the Bank's overall deposits as of November 14, 2022." SBNY further represented that the Bank's digital asset deposits "remained stable."

155.    In this same release, DePaolo falsely assured investors that "Signature Bank is a well-diversified institution that ***employs appropriate risk management strategies that help us navigate the current challenging digital asset landscape***. Our strong capital, solid earnings and overall diversification, continues to provide a source of strength for our depositor clients." DePaolo's representations were flatly undermined by the Regulators' findings just months earlier.

156.    In truth, the FDIC communicated to the Bank's executives as early as May 19, 2022 in a corporate governance target review that:

> The Board and executive management have adopted a strategic position of rapid growth and expansion into digital asset markets; a strategy that creates greater susceptibly (sic) to liquidity, reputation, and regulatory risk as the digital asset markets and any related contagions can impact access to needed capital and funding markets.

157.    Moreover, the FDIC Report has since revealed that "[m]anagement was not sufficiently prepared to ameliorate the risks posed by its concentration of deposits and lending relationships in the digital assets marketplace and seemed unaware of the potential damage it could inflict on its more traditional depositor customers." According to the FDIC Report, and discussed in more detail below, "SBNY's significant client concentration of digital asset companies put it in a precarious position when the 'crypto winter' hit in 2022." As the Bank would later admit, "[i]n 2022, as interest rates began to rise and deposits began to contract due to volatility in the digital assets market, the bank decided to reduce its digital asset-related deposits. SBNY experienced $17.6 billion in deposit outflow in 2022, mostly in the fourth quarter, ***with digital asset-related deposits representing 62 percent of the 2022 outflow***."

158.    In addition, as only revealed after the Class Period in the NYDFS Report, NYDFS held its management exit meeting "to summarize the findings of the 2021 examination cycle" on November 15, 2022, the same day SBNY issued its press release assuring the market its assets were "stable." The findings were grim. During this examination cycle, Regulators found that the

Bank's "liquidity risk management practices continued to require improvement." The MRBA on liquidity contingency planning remained outstanding and unresolved by Bank management, and had remained unresolved since the 2019 examination cycle. In addition, over 40 SRs "remained open at the end of the 2021 examination cycle." None of these concerns were disclosed in the Bank's reassuring press release.

159.   As reflected in analyst reports issued after the press release, the Bank's press release served its intended purpose to falsely reassure investors. After this press release, Deutsche Bank commented that "[m]anagement's clear message on SBNY's crypto exposure" was "that crypto-related exposure only pertains to dollar-denominated deposits from crypto ecosystem participants (with FTX exposure minimal), and no exposure to credit or investments" and that "no crypto credit or investment risk, should help limit overall risk and concerns." JP Morgan stated that the "volatility in SBNY's share price is partly due to a lack of understanding of the bank's exposure and role in the digital asset ecosystem."

### 4.   Defendants Stunned Investors by Announcing an Abrupt Shift Away from Digital Assets

160.   On December 6, 2022, after years of positive statements and false assurances about the Bank's digital asset exposure, deposits, customers and initiatives, Defendants reversed course in stunning fashion during an investor conference hosted by Goldman Sachs in New York.

161.   During this conference, Howell announced that the Bank would be "shrink[ing] its deposits tied to cryptocurrencies by $8 billion to $10 billion." Howell further suggested to the market, for the first time, that SBNY was holding deposits of individual digital asset clients that amounted to more than 2% of SBNY's total deposits, stating: "We're going to put in at least -- no [one] client can have more than 2% in deposits. We're going to, over time, look to lower that as well." Howell further stated that Defendants would be analyzing the Bank's digital asset deposits "in a much more thoughtful manner moving forward."

162.    On this news, the price of SBNY common stock fell approximately 7%, opening December 6, 2022 at $125.70 per share and closing December 7, 2022 at $116.99 per share. SBNY's stock dropped 11.2% during the week after the announcement was made.

163.    Nevertheless, Defendants continued to mislead investors regarding SBNY's mounting risks related to its digital asset exposure by stating that SBNY was "not just a crypto bank." Howell added: "we can easily take care of any deposits leaving, any and all deposits if they were to leave the ecosystem, the crypto ecosystem for us. So it's a nonevent."

164.    None of these statements disclosed the Bank's ongoing problems with ameliorating the risks posed by its concentration of digital asset deposits, including that Defendants could not ascertain the potential damage the Bank's digital asset exposure could inflict on its more traditional depositor customers due to ongoing severe risk management failings. For example, as they were repeatedly told by Regulators throughout the Class Period, Defendants failed to reveal and distorted that, contrary to Howell's assurance that the reduction in crypto customers was a "nonevent," that Defendants lacked the necessary contingency funding plans and stress testing to substantiate how the Bank's operations would fare in response to shifts in the Bank's deposit makeup.

165.    Analysts and market commentators reacted strongly and negatively to the news. On December 20, 2022, Deutsche Bank responded that "SBNY has decided to reduce its overall concentration in its crypto related deposit portfolio" and expected that this move would "lead[] to a 10-15% reduction in our FY23 EPS." The *Financial Times* reported that the announcement was a surprising "U-Turn for [the] US lender that achieved rapid growth after aggressively courting digital assets." CryptoSlate noted it was a clear attempt on the part of the bank to "distanc[e] itself from the crypto industry." CoinDesk noted that it was a clear "move away from the digital asset

industry for [a] bank that until recently had been one of the most crypto-friendly companies on Wall Street."

### 5. Defendants Continued to Tout the Bank's "Robust" Liquidity Position and Low Risk Profile in 2023

166.    On January 17, 2023, SBNY released earnings for Q4 2022 and FY-2022. The Bank reported that deposits contracted by a staggering $14.2 billion, attributable to $7.4 billion in digital asset deposit outflows. Total deposits declined to $74.9 billion. The Bank reported just $6.1 billion in cash and cash equivalents and approximately $24 billion in U.S. Treasury and Agency securities, representing 34% of total deposits, while uninsured deposits represented 90% of total deposits.

167.    Analysts from Stephens considered the Bank's earnings particularly troublesome. It wrote that: "the hard truth is that for 2023, SBNY appears to be a franchise in reverse and the list of investor concerns are longer here than most other banks." Stephens advised further that: "Growth business lines from 2020-2021, including capital call lines and digital asset banking, have not played out as expected with crypto deposits commanding higher-than-anticipated deposit rates while also adding regulatory risk (in our view), and Fund Banking adding low-margin loans with disappointing results on the funding front (~400% loan-to-deposit ratio in this business line)." Stephens considered "questions around crypto exposure/regulator snags" to support a "near-term bear case."

168.    DePaolo continued to mislead investors in the Form 8-K announcing earnings, therein stating: "The arduous rate environment, along with challenges in the digital asset space, led to deposit declines, which *we overcame with little difficulty, given our robust liquidity position*." Also, in this Form 8-K, Defendants repeated their prior false assertion that "strong risk-based capital ratios reflect the *relatively low risk profile of the Bank's balance sheet*."

J.      **Defendants Repeatedly Misled Regulators About the Liquidity and Risk Management Deficiencies That Led to the NYDFS's Takeover of the Bank.**

169.    On March 2, 2023, after crypto-friendly Silvergate Bank announced it was delaying filing its year-end 2022 financial statements and made a set of comments that raised concern about its ability to continue as a going concern, SBNY sought to reassure investors that the Bank was not facing similar issues. The Bank issued a press release entitled, *Mid-Quarter Financial Update for Its 2023 First Quarter*, stating that the Bank had cut crypto-related deposits by another $1.5 billion so far in 2023 and had seen an increase in its traditional depositor base during this same period.

170.    On March 9, 2023, after further turmoil hit the banking sector, Defendants DePaolo and Howell issued a press release reassuring investors that the Bank was not at risk. In the press release, the Bank "reiterated its strong, well-diversified financial position and limited digital-asset related deposit balances" and highlighted its "strong liquidity position." In a statement included in the release, Howell further stated: "Since we opened our doors, we have been a 'deposit-first' institution and have always been committed to our depositors' safety, first and foremost. As shown by our current metrics, we intentionally maintain a high level of capital, strong liquidity profile and solid earnings." Bloomberg said that the financial update amounted to an "[e]ffort to [c]alm [investors] [n]erves" and had succeeded in helping the Bank "pare[] premarket losses."

171.    Despite Defendants' false assurances the day before, by the end of the day on Friday, March 10, 2023, "Signature had received more than 1,600 withdrawal requests totaling approximately $18.6 billion, representing more than 20 percent of Signature's total deposits." The withdrawal of nearly $20 billion, or over 20% of SBNY's total deposits, on Friday, March 10, 2023 "placed the Bank at risk of a technical default on its payment obligations" and "placed a significant strain on Signature's available liquidity," according to the NYDFS Report. To close a cash deficit of $3.9 billion at the end of the day, the Federal Reserve Bank of New York

("FRBNY") had to loan $5.6 billion to the Bank, secured by $6.5 billion in assets that were already pledged to the Federal Home Loan Board of New York ("FHLB"), because SBNY did not have arrangements in place to pledge additional collateral. SBNY simply could not handle the activity, and the Federal Reserve kept Fedwire—the electronic service used to process withdrawals—open until 11:30 p.m., four and a half hours past its regular 7:00 p.m. close, so that SBNY could "avoid a technical default on its payment obligations" on Friday.

172.    In its report, NYDFS observed that, "[g]iven the size of the run on deposits, the negative news, and significant uncertainty about the amount of liquidity available to Signature, *it is likely that Signature would have failed if the run had occurred on any other day of the week*. That the run occurred on a Friday meant that the Regulators and the Bank had time over the weekend to assess Signature's condition and come to a considered view as to whether the Bank could safely open on Monday."

173.    NYDFS's goal was to find a way for the Bank to continue operating. However, as described below, this proved impossible because, as SBNY's management knew, the Bank's risk and liquidity management systems were either non-existent or woefully deficient. As explained below, the Bank's risk and liquidity management systems were so lacking that the Bank initially could not even produce essential information about its assets and its liquidity, and when it belatedly did, that information was facially and obviously false. All of these facts further demonstrated that – as Regulators had been telling Bank management for years – Defendants' representations that the Bank possessed appropriate and adequate risk management architecture were false.

174.    As one initial example, the NYDFS Report relates that on an early afternoon call on Saturday, March 11, Regulators made clear to Defendants and the Board "that the Bank's viability was uncertain and that the Regulators needed timely, accurate, and complete information to assess the condition of the Bank." After a "frank conversation," "the Regulators pushed

Signature to provide the data no later than 4:00 p.m. that day." Given the complete lack of risk and liquidity management systems, Signature was unable to timely produce this information—even as the very existence of the Bank depended on it. Indeed, "Signature only **started** producing information in response to the Regulators requests data until 4:44 p.m. on Saturday"—nearly an hour after the Regulators' deadline. Critical items were further delayed, including a "comprehensive liquidity plan" that was not received until Sunday, March 12 at noon.

175.    Despite years of Defendants touting the Bank's liquidity and risk management practices, Regulators found that "**Signature was unable to provide reliable and consistent data** about its available liquidity or the amount of pending withdrawals." As soon as "Signature began providing any data on these key issues, the Regulators found **the data was inconsistent and that it continuously changed in material ways**."

176.    Moreover, over the weekend, Defendants and other members of SBNY's Board and senior management repeatedly misled Regulators about (i) the near-total absence of meaningful collateral and assets SBNY could use to satisfy existing withdrawal requests; (ii) the exponentially-growing billions of dollars in estimated withdrawal requests over the weekend; (iii) inflated deposit inflows from clients following the crash of SVB, which the Board and senior management doubled and presented on a false timeline; and (iv) projections for SBNY's liquidity, which NYDFS coined "inaccurate," "unreliable," and "not credible." Faced with Defendants' abject failure to produce truthful data on these critical issues, on Sunday afternoon, the Regulators concluded that "it was clear there was no reasonable possibility that the Bank could continue operating in a safe and sound manner on Monday, March 13," and NYDFS took possession of SBNY and appointed the FDIC as receiver soon thereafter.

1.     **With No Viable Risk and Liquidity Management System in Place, Defendants Misstated SBNY's Available Collateral**

177.    In order to "open in a safe and sound manner on Monday, March 13, [SBNY] needed to identify and pledge assets that were immediately acceptable to the FRBNY to raise the liquidity needed to meet outstanding and new deposit withdrawal requests." However, knowing that they did not have sufficient acceptable assets to cover the Bank's immediate liquidity needs, SBNY's Board and senior management deliberately pledged assets that they knew were unacceptable, pledged other assets that they knew would be unavailable for Monday, and falsely reported to Regulators that such assets were available on Monday.

178.    As the Regulators' reports would reveal, SBNY's Board and senior management sought to pledge to the FRBNY the $18 billion in Fund Banking capital call loans, discussed in Section IV.E above. According to the FDIC Report, SBNY had "pursued efforts to pledge these loans *for months, hiring two law firms to make the case for FRBNY to accept the loans*." During the weekend of March 10, as the NYDFS reported:

> *Signature knew . . . that the FRBNY would not accept these loans as collateral because of the involvement of foreign investors. Signature and its counsel had previously failed to convince the FRBNY to accept these loans as collateral.* Over the weekend, Signature implored Regulators to intercede on the Bank's behalf with the FRBNY.
>
> For other assets, such as the Bank's commercial real estate loan portfolio, the FRBNY advised the Regulators that it would take weeks for the FRBNY to review and value the portfolio. *Although the Bank knew the FRBNY would not accept this collateral in the immediate future, Signature continued to report to the Regulators that liquidity for these assets would be available as early as Monday, March 13.*

179.    In addition, SBNY executives greatly exaggerated the value of pledgeable assets that were available. On Saturday, March 11, "Bank executives insisted that Signature had over $5 billion in unpledged but valuable pledgeable securities available for Monday." The Regulators were immediately suspicious of the Board and senior management's assurance of unpledged

securities worth over $5 billion. As such, on Saturday, the Regulators "repeatedly asked for details about those assets," but the requested details "were not forthcoming." Finally, at 10:00pm on Saturday, "Bank executives reduced the estimate of unpledged securities from over $5 billion to just $900 million"—*more than 80% below the amount they insisted was correct that very same day.*

### 2. Defendants Hid Exponentially Increasing Withdrawal Requests

180.    In addition, SBNY's Board and senior management greatly misstated estimates of pending deposit withdrawals from SBNY, which they claimed would be "minimal." In truth, they knew that deposits were exponentially increasing. The NYDFS Report stated that, "[b]etween Saturday night and Sunday morning, SBNY deposit withdrawal estimate increased from $2 billion to $4 billion, and then nearly doubled again by Sunday evening. By that time, SBNY reported known pending deposit outflows of anywhere between $7.4 billion and $7.9 billion." Facing nearly $8 billion in pending withdrawals, SBNY had "just $4.27 billion in certain liquidity," or little more than enough to cover 50% of the estimated withdrawals. Moreover, these estimates "excluded any additional, unknown deposit withdrawal requests that Signature would receive on Monday," virtually guaranteeing that the Bank would imminently be in an even worse position.

181.    Nevertheless, the Board and senior management made every effort to downplay the exponentially increasing estimated withdrawals, including assurances that weekend withdrawal activity had been "*uneventful thus far.*" Regulators saw through this last-ditch lie, finding the Bank's predictions "unrealistic," particularly given that the "weekend of panicked news coverage" virtually guaranteed "another run of at least up to 20 percent of remaining deposits on Monday," or *another $11 billion of withdrawals on top of the nearly-$8 billion in estimated withdrawals over the weekend*.

> *Throughout the weekend, Signature insisted that additional deposit withdrawals would be minimal, with one executive stating on Saturday that weekend activity*

*had been "uneventful thus far."* The Regulators assessed that Signature's projection was *unrealistic*. Following the events that transpired at SVB, an unprecedented bank run on Signature, and a weekend of panicked news coverage, it was clear the Bank had to be prepared for another run of at least up to 20 percent of remaining deposits on Monday. *Another run of that size would amount to approximately $11 billion on top of the pending withdrawal requests*.

182.    In other words, the withdrawal activity a Bank executive coined as "uneventful" amounted to nearly $20 billion in estimated withdrawals over the weekend and on Monday. Such false statements to Regulators are strongly indicative of fraudulent intent. They also demonstrate that, contrary to their assurances to investors throughout the Class Period, Defendants never had appropriate risk and liquidity management systems in place to allow them to accurately assess withdrawals in a stress event.

### 3.    Defendants Made False Claims About Large Deposit Inflows

183.    On Saturday night and through Sunday afternoon, the Board and senior management advised Regulators that SBNY's "available liquidity on Monday would be bolstered by *substantial deposit inflows* from clients following SVB's failure." Because of the run that the Bank experienced following the failure of SVB, however, Regulators told executives that this was, at best, "overly optimistic."

184.    Moreover, the majority of SBNY's purported projected inflows were patently false. Signature claimed that *"$5 billion* of its projected $6 billion deposit inflow would come from a DFS-regulated virtual currency company." But because NYDFS regulated the entity that was the supposed source of the deposit inflows, it knew that SBNY's assurance of a $5 billion windfall of deposit inflows was simply not true. At most, the inflow was "approximately half what Signature was representing" and "the money would not be available until Tuesday at the earliest."

185.    Again, these untrue statements to Regulators show fraudulent intent, and demonstrate that Defendants never had appropriate risk and liquidity management systems in place to allow them to accurately assess inflows during a stress event.

4.      **Defendants Repeatedly Misstated SBNY's Liquidity Projections and, Knowing the Projections Were False, Included "CYA" Disclaimers to Protect Themselves**

186.    On Sunday, March 12, the Board and senior management provided four different liquidity projections that "repeatedly shifted" for the coming week, and the Regulators rejected them as wholly unreliable. NYDFS found these projections to be unreliable for many reasons, first and foremost of which were SBNY's own repeated disclaimers and statements that the projections were unreliable. For the last three of the four reports, including the final projection Signature provided (shown in ¶ 187 below), SBNY expressly disclaimed their accuracy, claiming they were prepared "solely for informational purposes" and warning that NYDFS ***"should not definitively rely upon it or use it to form the definitive basis for any decision, contract, commitment or action whatsoever, with respect to any proposed transaction or otherwise*.**"

187.    The final "Illustrative Liquidity Sources" projection provided by SBNY showed the following:

## Illustrative Liquidity Sources

| Liquidity Sources | Amount ($Bn) | Commentary |
|---|---|---|
| **Potential Monday Liquidity** | | |
| Cash at Fed | 3.70 | |
| FRB Capacity (Securities) | 0.57 | |
| Certain Capacity | 4.27 | |
| Securities Tri-Party Agreement | 7.40 | $8.7Bn of securities at 15% haircut |
| **Liquidity Sources - Very Likely** | 11.67 | |
| CRE Loans to FRB | 5.95 | $11.9Bn at 50% haircut |
| SF Loans to FRB | 3.19 | |
| **Liquidity Sources - Highly Likely** | 20.81 | |
| Less Wires Out | (3.73) | |
| Other Client Potential Withdrawals | (2.89) | |
| **Potential Monday Liquidity** | **14.19** | |
| **Other Potential Liquidity** | | |
| Large Deposit Inflows | 6.00 | Large portion in SVB transfer |
| **Total with Other Potential Liquidity** | **20.19** | |
| **Potential Tuesday Actions** | | |
| Cash from Sale of Unpledged AFS Securities | 1.22 | Currently unpledged securities |
| Cash from Sale of AFS Securities | 3.34 | Recapture of pledged security haircut and sale of other AFS |
| **Potential Tuesday Actions** | **4.56** | |
| **Potential Mid-Week Actions** | | |
| Cash from Sale of Residential Loans | 0.37 | $390MM on balance sheet; assumes 5% loss on sale |
| Cash from Sale of Capital Call Lines | 9.79 | $10Bn on balance sheet; assumes 5% loss on sale |
| **Potential Mid-Week Actions** | **10.16** | |
| **Total** | **34.90** | |

*Figure 12. Illustrative Liquidity Sources Provided by Signature at 3:09 p.m. EST March 12, 2023.*

188.   NYDFS swiftly found that SBNY's liquidity projections, as shown above, were riddled with inaccuracies and other unrealistic assumptions. Given, *inter alia*, SBNY's "lack of an established process for pledging collateral with the FRBNY" and "the difficulty Signature experienced in identifying pledgeable collateral," Regulators found these projections "inaccurate," "unreliable," and "not credible." For example, NYDFS concluded that there was "***no chance that any liquidity would be available***" from nearly $6 billion in loans that Bank executives stated had "Highly Likely" liquidity.

> While this projection shows "Highly Likely" liquidity of $20.81 billion in Monday liquidity, that number includes $5.95 billion in commercial real estate loans (referenced as "CRE Loans") that the FRBNY had, over the weekend, repeatedly indicated would take weeks to evaluate. ***There was, in short, no chance that any liquidity would be available from those loans on Monday***. The other two categories of Monday liquidity—"SF Loans" and "Securities Tri-Party

Agreement"— were items the FRBNY indicated it might accept but that it had no information to assess how much, if any, of these assets were eligible and, if they were, what haircut would apply.

189.    Based on these heavily-disclaimed liquidity projections, NYDFS found that "[a]t best, Signature would realize some liquidity from these assets, *but not in the amounts projected by the Bank*. At worst, Signature would be able to access substantially less liquidity from these assets and *possibly none at open of business on Monday*." The NYDFS summed up the Bank's liquidity projections as follows:

> Given Signature's *lack of an established process for pledging collateral* with the FRBNY, the difficulty Signature experienced in identifying pledgeable collateral on Friday, March 10, *and the fact that the FRBNY repeatedly advised Regulators that it did not trust Signature's numbers, the Regulators assessed Signature's projected liquidity from these sources as unreliable*.

190.    By Sunday afternoon, the Regulators concluded that "it was clear there was no reasonable possibility that Signature could continue operating in a safe and sound manner on Monday, March 13." Shortly thereafter, NYDFS took possession of SBNY and appointed the FDIC as receiver. This decision was then announced to the public at 6:26 p.m. on Sunday, March 12, 2023.

> By Sunday afternoon, it was clear there was no reasonable possibility that Signature could continue operating in a safe and sound manner on Monday, March 13. Signature *repeatedly provided unreliable information* to the Regulators over the weekend, and *its final liquidity projections were not credible*. The Regulators assessed that Signature would not have enough liquidity to satisfy known and expected withdrawals on Monday, *much less be able to satisfy any additional unknown withdrawals that could reasonably be anticipated in light of market conditions.* DFS sought to identify potential acquirers over the weekend but found that without federal loss-sharing, potential partners were not interested in acquiring Signature.

> Once it became clear there were *no other viable alternatives*, and in order to avoid a disorderly mid-day Monday shutdown and to stop any further panic and contagion across the broader banking system, DFS took possession of Signature at approximately 5:30 p.m. on Sunday and immediately appointed the FDIC as receiver. At 6:17 p.m., the Department of the Treasury, the Federal Reserve Board, and the FDIC issued a press release announcing the decision to invoke the systemic risk exception. DFS issued a press release announcing that it had taken possession

of Signature, and appointed the FDIC as receiver at 6:26 p.m. At 7:48 p.m., the FDIC announced the creation of Signature Bridge Bank.

191.    As only revealed after the Class Period, on March 11, 2023, the FDIC issued a "Interim Ratings Downgrades Letter" that "notified SBNY's board of directors that FDIC had decided to pursue a formal enforcement action *given the precipitous decline in the bank's condition and management's inadequate response to recent events*."

192.    Much like NYDFS, the FDIC Report concluded that "SBNY management's lack of a well-documented and thoroughly tested liquidity contingency plan and its lack of preparedness for an unanticipated liquidity event *were the root cause of the bank's failure*."

## K.    After Entering Receivership, Signature Bank's Stock Falls to $0.13

193.    On Sunday, March 12, after the NYDFS took possession of SBNY and appointed the FDIC as receiver, the FDIC issued a press release entitled *FDIC Establishes Signature Bridge Bank, N.A., As Successor to Signature Bank, New York, NY*.  In this press release, the FDIC stated that it had "transferred all the deposits and substantially all of the assets of Signature Bank to Signature Bridge Bank, N.A., . . . [t]o protect depositors." The FDIC further stated that, although depositors would be made whole, "[s]hareholders . . . will not be protected." Contrary to SBNY management's recent assurances that the Bank had a "strong liquidity position" and additional borrowing capacity "of approximately $29.01 billion," these Press Releases made it unequivocally clear to investors that SBNY did not have enough available liquidity to cover its obligations to depositors.

194.    On the news, SBNY's stock price collapsed at open on Monday, March 13, 2023, causing Nasdaq to halt trading in the stock at a last sale price of $70.00 "until Signature Bank ha[d] fully satisfied Nasdaq's request for additional information." When trading resumed on March 28, 2023, the stock was trading under a dollar, and closed at $0.13. This amounted to a 99.81% drop.

195.    On the news of the Bank's collapse, analysts quickly started dropping research coverage of the Bank. In a March 13, 2023 report, Janney dropped its coverage of SBNY and indicated that the Bank's failure stemmed from Regulators' determining that "the Bank was . . . conducting business in an unsafe manner given expeditious changes in its financial condition." Stephens published a report on the same day outlining lessons learned from the collapse of Silvergate, SVB, and SBNY, and specifically pointed to SBNY's low percentage of deposits worth less than $250,000 (just 6%) and high percentage of uninsured deposits (90%) as causes of the failure. Similarly, a Wedbush analyst report following the collapse noted SBNY's "significant crypto component" as a key contributor to the Bank's failure.

**L.      In the Aftermath of SBNY's Collapse, Regulators Issue Reports Detailing the Severe Risk Management Failures that Caused the Bank's Collapse**

196.    In the aftermath of the collapse of SBNY, Congress initiated an investigation into the events that led to its downfall. As part of this investigation, on March 18, 2023, U.S. Senator Elizabeth Warren wrote to the FDIC, the Federal Reserve, and the Department of Treasury, calling for a "thorough, independent investigation of the causes of the bank management and regulatory and supervisory problems" that resulted in the collapse.

197.    On April 28, 2023, the FDIC released the aforementioned Report, *FDIC's Supervision of Signature Bank*, "evaluating the agency's supervision of [the Bank] from 2017 until its failure in March 2023." The purpose of the report was to "identif[y] the causes of Signature Bank's failure and assess the FDIC's supervision of the Bank." In this inquiry, the FDIC concluded that "SBNY board and management pursued rapid, unrestrained growth without adequate risk management practices; funded growth through overreliance on uninsured deposits without implementing fundamental liquidity risk management practices; and failed to understanding the risk of its association with the crypto industry."

1.      **The FDIC Report Detailed that Defendants Knew the Bank Was Subject to "Several Repeat Criticisms," But Were "Slow" to Respond and Did Not Prioritize "Appropriate Risk Management Practices and Internal Controls"**

198.    The FDIC Report further issued sweeping conclusions regarding SBNY's failed risk management practices. According to the FDIC, the Bank's senior management and Board did not timely respond to FDIC's supervisory concerns and "did not prioritize appropriate risk management practices and internal controls." The FDIC Report further described SBNY's Board and senior management "as reactive, rather than proactive, in addressing bank risks and supervisory concerns" and that their "***primary focus on growth, deposits, and profits took priority over the responsibility to ensure sound risk management and responsiveness to SRs.***" FDIC officials, according to the Report, "indicated that SBNY executives were sometimes disengaged from the examination process and were generally dismissive of examination findings." When SBNY did take action to address examination findings, "SBNY's actions were more 'check-the-box' or done to assuage the examiners, versus management understanding and appreciating the importance of underlying findings or control weaknesses," as provided in the Report.

199.    The FDIC Report further confirmed that, "[i]n many instances, the FDIC documented and discussed repeat findings or SRs and MRBAs across multiple examination cycles, particularly related to liquidity risk management, BSA/AML, and MRM, without management effectively addressing the underlying supervisory concern." Indeed, SBNY's Board and senior management "failed to implement sufficient issues tracking processes that led to untimely remediation of numerous recommendations, findings, and deficiencies," according to the FDIC Report.

200.    The FDIC Report further acknowledged that "SBNY [being] subject to several repeat criticisms . . . reflected management's and the board's slow response to supervisory issues." The Report stated:

70

For example, since the 2019 examination cycle, SBNY's management and board were aware that the bank's fund management practices needed improvement. SBNY's practices were not commensurate with the institution's complexity, risk profile, and scope of operations due to weaknesses with liquidity contingency planning, liquidity stress testing, and internal controls. ***Yet, the same criticisms were levied in 2020, 2021, and 2022, as the bank more than doubled in size and its risk profile increased. Despite repeated criticisms from FDIC supervisors, SBNY never adequately addressed the liquidity risk management concerns. These weaknesses figured prominently into the bank's failure.***

**2.      The FDIC Report Concluded that Defendants Knew of Risks Related to Overreliance on Uninsured Deposits, But Did Not Implement Systems to Ensure the Stability of Deposits**

201.    The FDIC Report also concluded the Bank's failure was traceable to Defendants' failures to mitigate risks related to the uninsured deposit base. The FDIC Report specifically stated that "[n]otwithstanding the inherent riskiness of the bank's funding structure, management expressed its belief that the deposit base was largely stable based on its client-centric business model. . . . . However, SBNY never fully developed liquidity stress testing deposit assumptions or a deposit runoff framework to substantiate this assumption." The FDIC Report stated, as the FDIC had communicated to the Bank for years prior, that "SBNY management should have gathered applicable industry and bank-specific uninsured deposits data that could have been used to model the potential degree of uninsured deposit volatility during adverse liquidity events."

202.    Moreover, the FDIC Report related that "[d]espite the significant volume of uninsured deposits and the concentration of deposits in a few key accounts, SBNY management did not acknowledge the risks this profile presented." According to the FDIC Report, when the FDIC "raised concerns about the deposit concentrations, SBNY management did not heed the FDIC's concerns and responded that the close relationship that SBNY cultivated with these large depositor clients made them less likely to leave SBNY." And, according to the FDIC Report, the FDIC "presented a white paper about the risks of maintaining high levels of uninsured deposits as it related to the failures of Washington Mutual Bank and IndyMac Bank in 2008," to which "SBNY

management emphasized how different its bank's profile was from those two banks as they were failing." The FDIC Report thus concluded that "[t]here was little acknowledgement on the part of SBNY management about how risky and potentially volatile it was to have such a large concentration of uninsured deposits, without sufficient funds management contingency plans, in case of unanticipated financial market stress."

### 3.    The FDIC Report Confirmed Defendants Failed to Manage Risks Related to Crypto Exposure

203.    The FDIC also attributed the Bank's failings to Defendants' "strategy of rapid growth and expansion into the digital asset markets." According to the FDIC Report, "[t]he strategy exposed SBNY to greater susceptibility to liquidity, reputation, and regulatory risk due to the uncertainty and volatility of the digital asset space." The FDIC concluded that "[t]he growth fueled by its pursuit of digital marketplace players exposed SBNY to bank runs and contagion, particularly in regards to crypto-related entities such as FTX, Alameda, and Silvergate."

204.    According to the FDIC Report, SBNY's "pursuit of [the digital asset] strategy also increased the volatility and susceptibility of SBNY's more traditional depositor sources to event shocks and depositor runs." The FDIC concluded that "[m]anagement was not sufficiently prepared to ameliorate the risks posed by its concentration of deposits and lending relationships in the digital assets marketplace and seemed unaware of the potential damage it could inflict on its more traditional depositor customers." Because of this, according to the FDIC Report, "SBNY's significant client concentration of digital asset companies put it in a precarious position when the 'crypto winter' hit in 2022." Even after the Bank faced increasing risks related to its digital asset exposure, however, according to the FDIC report, "management did not acknowledge that its exposure to the crypto industry might entice other customers to pull or reduce their own deposits."

## V.      DEFENDANTS' MATERIALLY FALSE OR MISLEADING STATEMENTS AND OMISSIONS OF MATERIAL FACT

### 1.      January 21, 2021 – Form 8-K

205.      On January 21, 2021, SBNY issued a Form 8-K reporting its fourth quarter 2020 and FY-2020 earnings. Therein, Defendant Susca stated that Signature's "strong risk-based capital ratios reflect the ***relatively low risk profile of the Bank's balance sheet***."

206.      The statement set forth in ¶205 was materially false or misleading, omitted material facts necessary to render such statements not misleading, or lacked a reasonable basis in fact. At the time it was made, severe and pervasive risk management problems were plaguing the Bank, rendering Defendants unable to identify, analyze, much less characterize, the risk profile of the Bank and its balance sheet. At this time, the Bank had 7 open MRBAs and 88 SRs, including "numerous liquidity-related SRs and two liquidity-related MRBAs." Regulators had in July 2020 deemed the Bank's liquidity risk management deficiencies a "critical" new finding, and issued Defendants a MRBA and 18-related SRs. Indeed, throughout 2019 and 2020, as confirmed by Regulators, the Bank had "numerous, reoccurring liquidity risk management concerns," and its "liquidity risk management practices were not commensurate with the institution's complexity, risk profile, and scope of operations due to weakness in liquidity contingency planning, liquidity stress testing, and internal controls." The Bank did not have an adequate contingency funding plan to ensure that it had sufficient funds to cover liabilities in case of a liquidity crunch, or adequate processes to adequately manage, monitor, and mitigate risks related to the Bank's increasing uninsured deposit base. The material, adverse findings relating to the Bank's risk controls had led the FDIC in 2019 to downgrade SBNY's liquidity component rating to level 3. By 2020, the Bank's "[o]n-balance sheet liquidity had increased year over year from 11 percent to 25 percent of total assets, but inadequate liquidity contingency planning, liquidity stress testing, and internal controls ***continued to impede management's ability to identify and establish appropriate mitigating plans***

*against the potential volatility of uninsured deposits*." All told, as the NYDFS Report states, the Bank's "liquidity stress test results, when combined with the weaknesses identified with the Bank's funds management practices, were inconsistent with the Board's purportedly 'low' liquidity risk appetite." In addition, the Bank's balance sheet was at this time facing myriad, undisclosed risks, including that the risk exposure presented by the concentration of large uninsured deposits was not sufficiently identified, measured, and monitored. At the end of 2020, 55% of SBNY's total deposits were held by just 196 clients, accounting for $35 billion. Moreover, the Bank maintained a high concentration in Fund Banking capital lines of credit, approximately 15 percent of total assets, and had no understanding as to whether such loans were pledgeable as collateral to secure short-term borrowings from the Federal Reserve, if needed.

### 2.  March 1, 2021 – 2020 Form 10-K

207.    On March 1, 2021, SBNY filed its 2020 Annual Report on Form 10-K, which Defendants DePaolo, Shay and Susca signed.

208.    In a section of this Report entitled "Our Business Strategy," Defendants DePaolo, Shay, and Susca highlighted its "commit[ment] to a sound risk management process," stating:

> Risk management is an important element of our business. . . . *We have put internal controls in place that help to mitigate the risks that affect our business. In addition, we have policies and procedures that further help mitigate risk and regulatory requirements that mandate that we evaluate, test and opine on the effectiveness of internal controls*. . . . [W]e believe that our risk management processes will help keep our risks to a manageable level.

209.    The statement set forth in ¶208 was materially false or misleading, omitted material facts necessary to render the statement not misleading, or lacked a reasonable basis in fact because at the time it was made, Regulators had repeatedly deemed the Bank's risk "policies and procedures" and ability to "mitigate risk and regulatory requirements" severely deficient, as confirmed by the Bank's dozens of outstanding MRBAs and SRs. *See* Section IV.F, *supra*. As the Regulators concluded during the 2019 and 2020 examination cycles, the Bank's risk management

74

practices were not commensurate with its' complexity, risk profile, and scope of operations due to weakness with liquidity contingency planning, liquidity stress testing, and internal controls over liquidity risk management.

210.    In another section of the Annual Report entitled "Capital Planning and Stress Testing," Defendants DePaolo, Shay, and Susca further assured investors that it had "***developed a process to comply with the [relevant] stress testing requirements***" and that it would "***continue to monitor and stress test its capital in a manner consistent with the safety and soundness expectations of the federal banking agencies and in accordance with applicable internal processes***."

211.    The statements set forth in ¶210 were materially false or misleading, omitted material facts necessary to render such statements not misleading, and lacked a reasonable basis in fact. At the time they were made, Defendants had failed to establish adequate stress testing that reflected new risks facing the business, and thus were not "perform[ing]" stress testing that could inform the "safety and soundness" of the Bank's operations. Indeed, the Bank did not have a process to meet the "expectations of the federal banking agencies" because Regulators had specifically deemed the Bank's liquidity stress testing framework to be deficient and in need of remediation, as seen through the specific issuance of the MRBA and related SRs, which remained open and pending against the Bank. *See* Section IV.F, *supra*.

212.    In the section of the Annual Report entitled "Management's Report on Internal Control over Financial Reporting," Defendants DePaolo, Shay, and Susca stated:

> The management of Signature Bank (the "Company") is responsible for establishing and maintaining effective internal control over financial reporting. Our system of internal control is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of the Company's consolidated financial statements for external reporting purposes in accordance with U.S. generally accepted accounting principles.

213.     The statement set forth in ¶212 was materially false or misleading when made, omitted material facts necessary to render such statements not misleading, or lacked a reasonable basis in fact, because SBNY's financial statements were not issued in conformity with GAAP, as (i)  SBNY's financial statements did not disclose the Bank's concentration in large, uninsured deposits (*see* ¶67), which presented a "severe impact" that was "at least reasonably possible" to materialize "in the near term" due to the potential volatility of these deposits; and (ii) as Regulators communicated to SBNY, the Bank "did not sufficiently establish policies and controls to address this key risk." *See* Sections IV.F and VI.

### 3.     March 5, 2021 – Wells Fargo Banks in Tech Forum

214.     On March 5, 2021, Defendants DePaolo, Howell, Seibert and Santora participated in the Wells Fargo Banks in Tech Forum, which was held virtually and hosted by Jared David Wesley Shaw ("Shaw") of Wells Fargo Securities, LLC.

215.     During the conference, Shaw asked:

How do digital assets fit into the broader digital strategy? Why are customers in the digital asset or crypto space attracted to Signature and Signet? And how are you using that to attract new business?

216.     DePaolo responded:

***Jared, if I may add, the regulators have been very, very on top of things. They've been very good to us***. When we got approval for Signet, we kept them informed all along, prior to getting approval and subsequent to getting approval. And I think the Department of Financial Services of New York has to be given some credit because they want their banks to be a leader in this space.

217.     Shaw then asked:

You'd spoken earlier about the regulators and the regulators working with Signature as you build this out, and that's clearly a key concern in the crypto space. How do you see the regulatory backdrop progressing going forward? And do you see that continuing to become a differentiator and a benefit for Signet and Signature?

218.     Santora responded:

I know we all have comments on this. But I -- for one, I embrace regulation, right? I think it's great because regulation brings transparency, legitimacy. It brings stability to the industry, and that's what's really going to grow this industry and then grow our share of this industry. As Joe said earlier, when we built Signet, we went right away to our regulator, which is Department of Financial Services in New York. And they are at the forefront of litigation in the digital asset space. They created the BitLicense requirements. They're very savvy, and they want to be the premier regulator in the space. And as a result, they want to see the innovation take place in the banks in which they regulate, which is us, right? ***So we've developed a very strong partner with them. And we communicate. We collaborate on products and services. They're comfortable with us. They know our risk and compliance framework. They are happy to work with us to have the innovation come out of our bank because they want this.*** They want this industry to grow. It's a great industry for New York, for the country. And they're on the forefront of designing a robust regulatory framework here. And we're right on the front lines working with them on this, and I consider those guys partners. And everything we do with Signet, we work hand in hand with them. And we were able to get this thing off the ground in less than a year. And anyone who's dealt with regulators know that if you said that 3 years ago, they'd say impossible. But I think it's the testament to the partnership that we have that we're able to innovate and deliver timely in this space. So for me, I embrace the regulation in this industry.

219.    The statements set forth in ¶¶216, 218 were materially false or misleading, omitted material facts necessary to render such statements not misleading, or lacked a reasonable basis in fact because, as set forth in detail throughout Sections IV.F and IV.L, *supra*, at the time they were made, Regulators were far from "comfortable" with the Bank. As of March 2021, the Bank had open with its chief Regulators, the FDIC and NYDFS, ***3 MRBAs and 61 SRs***, having failed to correct myriad "critical" liquidity risk management deficiencies identified by Regulators, including an MRBA and 18-related SRs issued in July 2020. Thus, these statements, including that Regulators were "comfortable with" the Bank, and that they "know our risk and compliance framework," created the false impression with investors that the Bank was in good standing with Regulators and that Defendants had developed positive relationships with those Regulators.

220.    During the same conference, Howell was asked by an unidentified analyst:

Maybe just thoughts on the vision of the deposits and sensitivity to changes in value of bitcoin and the ecosystem. It's going to fluctuate even if the path of least resistance may be higher. And then how does that inform, I guess, the cadence and the flavor of securities investment going to undergo?

77

221.    Howell stated:

I'll hop in on that, guys. *I mean, what we found thus far is that the deposits are quite stable. And we're obviously in the early stages of this. And we're in the process where we use a couple of different modeling tools. We use bottom's-up approach, top-down approach in looking at the stability and duration of the deposits. But thus far, we've seen it to be a pretty stable deposit base and even more importantly, a stable ecosystem. A lot's been made over the last, I'd say, several weeks around the value of Bitcoin. Bitcoin falls. What happens to your deposit base? Well, Bitcoins fall, right? It's fallen quite a bit over the last 2 weeks. And guess what? Our deposits in this space went up. And what we're finding is when people sell Bitcoin, they put it into stablecoin. They put it into another form of coin. They hold it in cash. And hopefully, we've got all sides of the trade in the transaction. So we're not seeing us being tied to the value of Bitcoin. That's just not -- has not been the case. So we see it as a stable base.* We've got more work to do in modeling through it, seeing more history and more data. And the longer and longer each quarter that we go through this, we have more valuable data that we can use that can show the stability of the deposit base. And we'll be able to then lend against it or put it into securities that are a little bit longer dated as we gather that data. But thus far, it's proven to be a pretty stable base for us.

222.    The statement set forth in ¶221 was materially false or misleading, omitted material facts necessary to render the statement not misleading, or lacked a reasonable basis in fact because at the time it was made the Bank did not have any deposit study, model, or assumptions to support their assertions about the stability or stickiness of deposits. *See* Section IV.F. Nor had the Bank conducted any specific or sufficient analysis of its depositor base, or tested whether it could withstand adverse market liquidity events. *See id.* As the FDIC concluded, "***management's assumptions [about the stability of those deposits] were not well documented and had not been substantiated***." In fact, FDIC Report establishes that "SBNY never fully developed liquidity stress testing deposit assumptions or a deposit runoff framework to substantiate this assumption." Further, Defendants did not have a well-supported model and/or analytical framework to test the correlation between the price of Bitcoin and the Bank's deposit flows.

223.    Moreover, Defendant Howell's statement created the false impression that the Bank had the requisite tools to detect and mitigate the potential volatility of the Bank's digital asset deposits. In truth, Defendants could not model the Bank's daily funding needs in times of stress,

78

including stress stemming from potential volatility associated with the Bank's reliance on uninsured deposits as its primary funding source, could not accurately test the risk of these deposits fleeing the Bank in response to stress events, and did not have a contingency funding plan that informed the Bank's plan to cover deposits in the event depositors, including digital asset deposits, rapidly withdrew funds during times of stress.

### 4.      April 21, 2021 – Form 8-K and Earnings Call

224.      On April 21, 2021, SBNY released its 2021 first quarter results on Form 8-K.

225.      In the release, Defendant Susca emphasized the Bank's "strong risk-based capital ratios reflect the ***relatively low risk profile of the Bank's balance sheet***."

226.      The statement set forth in ¶225 was materially false or misleading when made, omitted material facts necessary to render the statement not misleading, or lacked a reasonable basis in fact for the reasons set forth in ¶206.

227.      Analyst Ebrahim Huseini Poonawala ("Poonawala") of Bank of America Securities pressed DePaolo about the stability of the Bank's cryptocurrency related deposits, asking:

> I think there's been a fair amount of conversation, Joe, around the stickiness of your crypto related deposits. So if you could touch upon that in terms of as we think about, one, your ability to deploy those funds into longer duration assets? And how do you see them in term of  if we get into higher rate environment, how rate sensitive are those deposits?

228.      In response to Poonawala's question, DePaolo stated:

> Now, within digital we're in all different areas of digital. We do stable coin reserves with the OTC desks, with the clients' digital asset exchanges, blockchain technology, digital miners and then we have those that use Signet in that and then we have some of the traditional. So, within Digital, we have a mix shift. And outside of digital we have a mix shift because of all the businesses. So, ***we feel that they are fairly sticky deposits***. I know it's early on, but we have a team, we have two teams, one that handles Signet, one that handles the clients and tries to get the business into the institution. And that team has been around for over 8 years and they have a knowledge base and they're key into getting the actual operating accounts. So, ***we feel the stickiness in there***. We've been asked what about the competition, like the big banks, the C[h]ase's and Citi's, if they get into digital in a big way. Well, we've been competing with them for 20 years. So, ***we're not worried***

***about the big players nor are we worried about the stickiness of the deposit***. Having said that, we do keep a decent amount of liquidity, we won't say what percentages are, but ***we do keep a decent amount of liquidity against these deposits***, because it's still early on, although we have a team that's been around for 8 years in the business. It's still early on in the crypto world.

229.    The statement set forth in ¶228 was materially false or misleading, omitted material facts necessary to render the statement not misleading, or lacked a reasonable basis in fact for the reasons set forth in ¶¶222-23.

230.    Analyst Poonawala then asked:

I guess just following up on the deposit comment, Eric, we've seen two quarters of close to $10 billion sequential deposit growth. Is it safe for us to assume that continues as we look forward given the momentum you've had? Or is there any reason to believe that, that $8 billion to $10 billion range is unlikely as we think about the second quarter or the rest of the year?

231.    In response, DePaolo stated:

Second quarter has kicked off very nicely. ***We expect continued deposit growth because we have all these new businesses, and they're all contributing. In fact, we've had to turn down deposits because we have limitations or we set internal limitations on concentrations. So we've had to turn away deposits***. So our expectation is that we'll continue to grow, maybe not at a $10.7 billion level, but there'll certainly be growth.

232.    The statement set forth in ¶231 was materially false or misleading, omitted material facts necessary to render the statement not misleading, or lacked a reasonable basis in fact, because at the time it was made, in reality, the Bank did not adhere to "internal limitations on concentrations." Rather, when digital asset deposits repeatedly breached the Bank's 10% concentration limit, Defendants increased that limit, including to as high as 35%. As Regulators confirmed in their Reports, "[*t]here was no evidence of appropriate analysis or stress testing being completed to support the limit increase*." As the FDIC concluded, "SBNY did not sufficiently establish policies and controls to address this key risk," and that "[e]stablishing a limit on the allowable level of uninsured deposits was not considered a viable solution, as management's strategy was based on the generation of large commercial deposits."

233.    Moreover, for the reasons set forth in ¶¶222-23, the statement set forth in ¶231 created the materially false or misleading impression that Defendants were actively managing and mitigating risk related to its digital asset deposit base.

234.    During this same earnings call, Analyst Haire of Jefferies asked SBNY management about the Bank's current capital ratios, stating: "[J]ust finishing up on capital CET1 ratio is in pretty solid shape here just under 11% but the deposit outlook sounds still very strong. I'm just curious as to, is CET1 ratio that you guys are looking at over TCE and at what level would you address capital?"

235.    In response to Haire's question, Howell stated:

Well, that's the level we can't really speak to, right? That depends on so many factors.  But we're primarily focused on the regulatory ratios and the risk-based ratios versus just the straight TCE ratio, given the nature of our growth, right?. ***We've grown cash, we've grown securities and we've grown well-secured fund banking loans. So, we've really put on little to no risk***. So we're not focused on the TCE for sure, but it's more of the CET1, the Tier 1 and total risk-based capital ratios.  That's our focus.  And we're well above our peers now in those level as well as the level that we need to be capitalized. So right now, we feel comfortable where - with where our capital ratios are today . . . .

236.    The statement set forth in ¶235 was materially false or misleading, omitted material facts necessary to render the statement not misleading, or lacked a reasonable basis in fact because, at the time it was made, Defendants had dramatically changed the risk profile of the Bank by taking on a myriad of significant risks all while operating with severely deficient risk management practices. Chief among those risks was "***the risk exposure presented by the concentration of uninsured deposits***," driven by digital asset deposits, which provided the vast majority of the Bank's cash. The FDIC and NYDFS Reports both confirm that this amplifying risk "***was not sufficiently identified, measured, and monitored***." By year end 2020, there were 196 clients with balances that exceeded $50 million, accounting for $35 billion, or 55 percent of total deposits. In addition, while Howell assured investors that "we've grown well secured fund banking loans," he

81

failed to disclose that these assets, which constituted approximately 15 percent of total assets at the end of the first quarter of 2021, were potentially not pledgeable as collateral to secure short-term borrowings from the Federal Reserve in the event of a liquidity crunch.

### 5.    May 10, 2021 – Form 10-Q

237.    On May 10, 2021, SBNY filed its quarterly report for the first quarter of 2021 on Form 10-Q, signed by Defendants DePaolo and Susca. This Form 10-Q incorporated by reference and repeated the same statements set forth in the Bank's 2020 Annual Report on Form 10-K that are identified in ¶¶208, 210, 212. Those statements were materially false or misleading, omitted material facts necessary to render such statements not misleading, or lacked a reasonable basis in fact, for the reasons set forth in ¶¶209, 211, 213.

238.    Further, in a section of the quarterly report related to "Liquidity," Defendants DePaolo and Susca stated:

> Our liquidity management is guided by policies developed and monitored by our asset/liability management committee and approved by our Board of Directors. The asset/liability management committee consists of, among others, our Chairman, President and Chief Executive Officer, Vice Chairman, Chief Operating Officer, Chief Financial Officer and Treasurer. ***These policies take into account the marketability of assets, the source and stability of deposits, our wholesale borrowing capacity and the amount of our loan commitments***.

239.    The statement set forth in ¶238 was materially false or misleading, omitted material facts necessary to render the statement not misleading, or lacked a reasonable basis in fact because at the time it was made, Defendants had failed to establish policies and controls to sufficiently and credibly analyze the stability of deposits, failed to establish adequate stress testing deposit assumptions or a deposit runoff framework to ensure deposits were stable, and had dangerously deepened the Bank's concentration of digital asset and uninsured deposits without regard for the source and stability of those deposits. Moreover, the Bank's policies did not take into account "our wholesale borrowing capacity and the amounts of our loan commitments," as they had no idea

whether SBNY's capital call loans, approximately 15 percent of total assets at the end of the first quarter of 2021, were pledgeable as collateral to secure short-term borrowings from the Federal Reserve in the event of a liquidity crunch.

> **6.    June 16, 2021 – Morgan Stanley US Financials, Payments and Commercial Real Estate Conference**

240.    On June 16, 2021, Defendants DePaolo and Howell participated in the Morgan Stanley US Financials, Payments and Commercial Real Estate Conference. This conference was held virtually and hosted by Morgan Stanley Executive Director Kenneth Allen Zerbe.

241.    During the conference, Zerbe asked:

All right. No, that's great. It's -- in terms of the digital customers that you have, obviously, Bitcoin took a bit of a stumble. I kind of know the answer to this already, just given your deposit growth has been so strong. But did you see any correlation between deposits at Signature maybe going down or slowing when Bitcoin was actually going down?

242.    In response, Howell stated:

Yes. Sure, Joe. Ken, *we've seen absolutely zero correlation between the price of Bitcoin and our deposit flows. I think that's one of the big misconceptions that we see out there.* I mean we're banking the entire cryptocurrency ecosystem, the entire digital ecosystem. And often, we'll see clients if they're buying Bitcoin. And others, they selling Bitcoin or others that are coming in and buying. The sales proceeds are going into stablecoin or other or Ethereum or other forms of cryptocurrency. So we're just garnering a larger and larger piece of deposits coming from an ever-growing ecosystem. *And we've really seen zero correlation between the price and our deposit flows.*

243.    The statement set forth in ¶242 was materially false or misleading, omitted material facts necessary to render the statement not misleading, or lacked a reasonable basis in fact for the reasons set forth in ¶¶222-23, 239.

> **7.    July 20, 2021 – Form 8-K and Earnings Call**

244.    On July 20, 2021, SBNY released its 2021 second quarter results on Form 8-K. In this release, Defendant Shay stated that "Signature Bank continues to fire on all cylinders as we stay true to our core principles of providing relationship-based, client-centric service and sleep-at-

night safety. While our deposit growth has been truly extraordinary, *we remain prudent in the deployment of new funds*."

245.    The statement set forth in ¶244 was materially false or misleading, omitted material facts necessary to render the statement not misleading, or lacked a reasonable basis because, by the second quarter of 2021, the Fund Banking capital call loans had grown to $15.9 billion, approximately 15 percent of total assets, and Defendants could not confirm whether these assets were pledgeable as collateral to secure short-term borrowings from the Federal Reserve in the event of a liquidity crunch. *See* Sections IV.E and IV.J.1.

246.    In this same Form 8-K, Defendant Wyremski stated that its "strong risk-based capital ratios reflect the *relatively low risk profile of the Bank's balance sheet*."

247.    The statement set forth in ¶246 was materially false or misleading when made, omitted material facts necessary to render the statement not misleading, or lacked a reasonable basis in fact for the reasons set forth in ¶206.

248.    Also on July 20, 2021, Defendants DePaolo and Howell participated in an earnings call to discuss Signature's financial results for the quarter.

249.    Analyst Steven A. Alexopoulos ("Alexopoulos") of JPMorgan asked DePaolo and Howell to explain the correlation between general digital asset prices and digital asset deposit inflows at the Bank, stating:

> I wanted to start at the digital asset side. I know in the past you guys have said that as the price of crypto assets such as bitcoin have fallen, you've actually seen an increase in volumes, right, as institutional customers step in and buy the dip. So when I think about your model, right, you're an on-ramp to the crypto economy. So we think about of that like a bridge keeper. Do the prices and fluctuations of the crypto assets matter really at all, as it relates to the growth potential of the business?

250.    In response to Alexopoulous' question, Howell emphatically assured investors that there was no correlation between digital asset prices and digital asset deposit flows at SBNY, stating:

*We've seen absolutely no correlation to the price in our deposit flows whatsoever.* And we've gone back over several years and taken a deeper dive and look at that, and *there's just no correlation*. There are periods when early on when prices went up and our deposits actually leveled off or went down. But mostly over the last 1.5 years we've seen the prices climb, we've climbed.  And with the latest dips that we've seen, we've seen our deposits continue to climb. So *we're just not seeing a correlation between the price of any of these digital currencies in our deposit flows*.

251.    The statement set forth in ¶250 was materially false or misleading when made, omitted material facts necessary to render the statement not misleading, or lacked a reasonable basis in fact for the reasons set forth in ¶¶222-23, 239. Moreover, at this time, the Bank's "underlying deposit assumptions had not been finalized" and the Bank did not have and thus could not rely on a "complete … deposit study to identify trends in depositor behavior from regression analyses." As the FDIC Report states, "SBNY never fully developed liquidity stress testing deposit assumptions or a deposit runoff framework to substantiate this assumption. SBNY management should have gathered applicable industry and bank-specific uninsured deposits data that could have been used to model the potential degree of uninsured deposit volatility during adverse liquidity events."

### 8.    August 9, 2021 – Form 10-Q

252.    On August 9, 2021, SBNY filed its quarterly report for the second quarter of 2021 on Form 10-Q, signed by Defendants DePaolo and Wyremski. This Form 10-Q incorporated by reference and repeated the same statements set forth in the Bank's 2020 Annual Report on Form 10-K that are identified in ¶¶208, 210, 212. Those statements were materially false or misleading when made, omitted material facts necessary to render such statements not misleading, or lacked a reasonable basis in fact, for the reasons set forth in ¶¶209, 211, 213.

253.    Further, in a section of the quarterly report related to "Liquidity," Defendants DePaolo and Wyremski stated:

Our liquidity management is guided by policies developed and monitored by our asset/liability management committee and approved by our Board of Directors. The asset/liability management committee consists of, among others, our Chairman, President and Chief Executive Officer, Vice Chairman, Chief Operating Officer, Chief Financial Officer, Chief Investment Officer and Treasurer. ***These policies take into account the marketability of assets, the source and stability of deposits, our wholesale borrowing capacity and the amount of our loan commitments***.

254.    The statement set forth in ¶253 was materially false or misleading when made, omitted material facts necessary to render the statement not misleading, or lacked a reasonable basis in fact for the reasons set forth in ¶239.

### 9.    October 19, 2021 – Form 8-K and Earnings Call

255.    On October 19, 2021, SBNY released its third quarter results for 2021 on Form 8-K.

256.    In that Form 8-K, Defendant Wyremski stated that its "strong risk-based capital ratios reflect the ***relatively low risk profile of the Bank's balance sheet***."

257.    The statement set forth in ¶256 was materially false or misleading when made, omitted material facts necessary to render the statement not misleading, or lacked a reasonable basis in fact for the reasons set forth in ¶206.

258.    Also on October 19, 2021, Defendants DePaolo and Howell participated in an earnings call to discuss SBNY's financial results for 3Q 2021.

259.    Analyst Matthew Breese ("Breese") of Stephens asked:

Great. Okay. And then now that the balance sheet is through $100 billion, should we expect any changes on the regulatory front or the stress test front? Or you guys operate without a holding company, does that exclude you from any of the Dodd-Frank Act stress test? Could you just maybe talk a little bit about that?

260.    In response, Howell stated:

Most of those would come into play at the $250 billion market can be considered systemically between $100 billion and $250 billion. I don't think we're doing anything that would render us to be systemically important. ***Our banking model is pretty straightforward and simple.*** So I highly doubt that the regulators would go there. But the 1 thing that we'll have to do is submit a resolution plan. We've got

86

some time to do that. So we feel ***very comfortable about our ability to do that. Again, we're pretty straightforward, simple banking model and structure. So it really shouldn't be difficult for us to put together a resolution plan.***

261.    The statement set forth in ¶260 was materially false or misleading, omitted material facts necessary to render such statements not misleading, or lacked a reasonable basis in fact because it created the materially false or misleading impression that Defendants were well-positioned to and could, in fact, meet increased scrutiny from the FDIC. In reality, Defendants still had not developed and thus did not have appropriate and sufficient liquidity risk management, funds management policies or an adequate contingency funding plan. Nor did the Bank have a process to meet the "expectations of the federal banking agencies." Rather, Regulators had specifically deemed the Bank's liquidity stress testing framework to be deficient and in need of remediation, as confirmed by the MRBAs and dozens of related SRs imposed by the Regulators on the Bank, the vast majority of which remained open and pending as of October 2021. *See* Section IV.F.

### 10.    November 9 and 10, 2021 – Form 10-Q and Bank of America Banking and Financial Conference

262.    On November 9, 2021, Signature filed its quarterly report for the third quarter of 2021 on Form 10-Q, signed by Defendants DePaolo and Wyremski. This Form 10-Q incorporated by reference and repeated the same statements set forth in the Bank's 2020 Annual Report on Form 10-K that are identified in ¶¶208, 210, 212. Those statements were materially false or misleading when made, omitted material facts necessary to render such statements not misleading, or lacked a reasonable basis in fact, for the reasons set forth in ¶¶209, 211, 213.

263.    On November 10, 2021, Defendants DePaolo and Howell participated in the Bank of America Banking and Financial Conference. This conference was held virtually and hosted by Bank of America analyst Ebrahim Poonawala.

264.    At one point during the conference, Poonawala asked:

Give us an update in terms of when you look at the deposit balances, you mentioned digital assets was another strong driver against quarter-to-date. I think we ended the quarter at about $23 billion, $24 billion. Give us an update on your positioning within that market. We've seen the ecosystem evolve, like a lot of banks are now trying to get into that. Give us an update on where things stand strategy-wise, hiring-wise, partnerships with digital asset companies?

265.   DePaolo first responded that:

No, I would disappoint you a little bit, because there are certain things we won't disclose. We always try to not tell you what we're going to do, but tell you what we've done. And we're working on enhancements to Signet. We will be coming out in the first or second quarter with another enhancement to it. We're very much looking at and speaking to our regulators about the recent news out of Washington, about stablecoins and what not. *We have 2 regulators that are supportive, led by the New York Department Financial Services. They're leading edge. They want their banks to be on the leading edge. They're very supportive to us. The FDIC has been asking a lot of questions and it's been supportive of us as well.*

266.   The statement set forth in ¶265 was materially false or misleading, omitted material facts necessary to render the statement not misleading, or lacked a reasonable basis in fact for the reasons set forth in ¶219. In addition, among other facts directly contradicting the assertion that the FDIC or NYDFS was "very supportive," the FDIC and NYDFS Reports confirm that during 2021, despite the many warnings and extended period of time the Regulators provided Defendants to remedy the many well-known failings within the Bank, "Management had made limited progress in addressing findings from the 2019 Liquidity targeted review. Management had not identified an appropriate liquidity buffer, demonstrated the ability to adequately measure and control the impact of deposit volatility during stress events, or properly assessed the likelihood of and survival requirements for a variety of idiosyncratic and macroeconomic stress events."

267.   DePaolo then continued:

Not only do we have the major clients, but there's a few of them that we've become their major bank, the operating bank. *Now they may keep money in other institutions, because we cap our deposits by client, because of concentrations, but our deposit balances could be $10 billion more if we wanted them to be. And we're very conscious of concentrations.* So it's all positive. It's just not -- we're not trying to be coy to make anyone feel that we're trying to hide anything.

268.    Later on in the conference, Poonawala asked:

Just tied to the stablecoins. When you look at the stablecoin deposits, I mean your tremendous amount of liquidity on the balance sheet today. But when you look at what the regulators are saying, these are all relatively recent in terms of the stablecoin deposit. What is your ability to invest these in longer-duration assets?

269.    Howell responded:

I mean I'm just going to say it's a bit of a moot point right now, because of the tremendous amount of liquidity, right? *So we do have rules around the size of deposits, concentration of deposits by issuer, which stablecoin issuer it is and how much we'll be willing to invest*.

270.    The statements set forth in ¶¶267, 269 were materially false or misleading, omitted material facts necessary to render such statements not misleading, or lacked a reasonable basis in fact because, contrary to "cap[ping] deposits by client," being "very conscious of concentrations," and "hav[ing] rules around the size of deposits," the Bank simply disregarded or replaced critical risk limits, including "rules around the size of deposits" and "concentrations of deposits by issuer." Throughout 2021, as the FDIC and NYDFS Reports confirm, "[d]igital asset-related deposits rose well above the key risk indicator set for those deposits at 10 percent of total assets. Instead of decreasing deposits to meet the previously prescribed limit, SBNY management increased the limit to 35 percent of total assets in December 2021. *There was no evidence of appropriate analysis or stress testing being completed to support the limit increase*." The FDIC Report confirms that, as discussed above, the Bank continued to maintain "a concentration of very large depositors. Approximately 60 clients held deposit account balances in excess of $250 million, representing about 40 percent of total deposits." The FDIC concluded that "*management's assumptions [about the stability of those deposits] were not well documented and had not been substantiated*." With respect to digital asset deposits, they had grown rapidly in 2021 by $19.7 billion and totaled $28.7 billion on December 31, 2021. Regulators found that during 2021, the Bank also had a depositor concentration of "*four single depositors, each comprising greater than 2 percent of total assets,*

*totaling 14 percent of total assets. Three of the depositors were digital asset-related clients*." Moreover, at this time, the Bank's "underlying deposit assumptions had not been finalized," the Bank did not have and thus could not rely on a "complete … deposit study to identify trends in depositor behavior from regression analyses."

### 11.   December 8, 2021 – Goldman Sachs US Financial Services Conference

271.   On December 8, 2021, Defendants DePaolo and Howell participated in the Goldman Sachs US Financial Services Conference. The conference was hosted by Ryan Matthew Nash of Goldman Sachs.

272.   During the interview, Nash asked:

Okay. And then just to follow up on that. Obviously, the growth in these products has been at an incredibly robust pace. You're well in excess of $20 billion. How big do you think these deposits can get? And are there any concentration limits or other risks that you guys are considering related to them?

273.   DePaolo responded:

*We're spending a lot of time on risk and compliance, and we have concentration limits on our clients. So we don't want to take a client that's going to be -- I can't give you the percentages. I can't divulge those, but we have limits.* I've said this at a couple of conferences. I know Eric has said it in a couple of investor meetings that we could have easily another $10 billion to $20 billion in deposits. In fact, right now, we can make a phone call and get $5 billion in deposits easily, but we're putting limits on them.

274.   The statement set forth in ¶273 was materially false or misleading, omitted material facts necessary to render the statement not misleading, or lacked a reasonable basis in fact for the reasons set forth in ¶270. In addition, by stating that they were "spending a lot of time on risk and compliance" Defendant DePaolo created a false impression that Defendants were identifying and mitigating risks surrounding the Bank's digital asset deposits and exposure when, at the time these statements were made, Regulators had repeatedly levied adverse findings on Defendants concluding that the Bank did not have adequate policies and controls to address, understand, or mitigate such risks.

### 12.    January 18, 2022 – Form 8-K

275.    On January 18, 2022, Signature Bank released its 2021 Fourth Quarter and Year-End Results on Form 8-K. In this release, Defendant Wyremski stated that its "strong risk-based capital ratios reflect the ***relatively low risk profile of the Bank's balance sheet***."

276.    The statement set forth in ¶275 was materially false or misleading, omitted material facts necessary to render the statement not misleading, or lacked a reasonable basis in fact for the reasons set forth in ¶206. In addition, as the FDIC Report provides, "[s]ince the prior year [2020], SBNY's balance sheet grew rapidly by 60 percent due to a significant increase in large uninsured deposits and digital asset industry deposits. The combination of rapid deposit growth, increasing funding concentrations, and unknown deposit stability had contributed to an increasing liquidity risk profile, which highlighted the urgent need for robust risk management practices that enable the board and management to adequately control liquidity risk and limit potential adverse financial impacts on the bank." But "[m]anagement had not identified an appropriate liquidity buffer, demonstrated the ability to adequately measure and control the impact of deposit volatility during stress events, or properly assessed the likelihood of and survival requirements for a variety of idiosyncratic and macroeconomic stress events." At the time this statement was made, the Bank's balance sheet was facing increasing, undisclosed risks related to the Bank's growing: (i) deposit concentration in large, uninsured deposits, including that, at the end of fiscal year 2021, just 60 clients accounted for 40% of the Bank's total deposits; (ii) deposit concentration in large, uninsured digital asset deposits, including that, by the end of FY-2021, just four depositors, three of which were digital asset deposits, comprised over $16 billion, or 14%, of the Bank's total assets; and (iii) concentration in Fund Banking capital lines of credit, which constituted approximately 20 percent of total assets, were potentially not pledgeable as collateral to secure short-term borrowings from the Federal Reserve. Still more, the FDIC concluded that "management's

assumptions [about the stability of those deposits] were not well documented and had not been substantiated." And, while touting the "low risk" associated with the Bank's balance sheet, Defendants had permitted the Bank to disregard and replace critical risk limits—according to the FDIC Report, "[t]here was no evidence of appropriate analysis or stress testing being completed to support the limit increase."

**13.   March 1, 2022 – 2021 Form 10-K**

277.   On March 1, 2022, SBNY filed its 2021 Annual Report on Form 10-K with the SEC. The 2021 10-K was signed by Defendants DePaolo, Shay, and Wyremski.

278.   In a section of this Report entitled "Our Business Strategy," Defendants DePaolo, Shay, and Wyremski highlighted SBNY's "commit[ment] to a sound risk management process," stating:

> Risk management is an important element of our business. . . . ***We have put internal controls in place that help to mitigate the risks that affect our business. In addition, we have policies and procedures that further help mitigate risk and regulatory requirements that mandate that we evaluate, test and opine on the effectiveness of internal controls***. . . . [W]e believe that our risk management processes will help keep our risks to a manageable level.

279.   The statement set forth in ¶278 was materially false or misleading when made, omitted material facts necessary to render the statement not misleading, or lacked a reasonable basis in fact for the reasons set forth in ¶276.

280.   In a section of the Annual Report entitled "Capital Planning and Stress Testing," Defendants DePaolo and Wyremski further stated that the Bank had "***developed a process to comply with the [relevant] stress testing requirements***" and that it would "***continue to monitor and stress test its capital in a manner consistent with the safety and soundness expectations of the federal banking agencies and in accordance with applicable internal processes***."

281.   The statement set forth in ¶280 was materially false or misleading, omitted material facts necessary to render the statement not misleading, or lacked a reasonable basis in fact for the

92

reasons set forth in ¶276. In addition, the FDIC Report confirms that throughout 2021 and 2022, "[u]nderlying assumptions for the liquidity stress test and deposit outflow methodology were not fully developed and documented. In addition, significant deficiencies were identified in the independent review of liquidity and funds management, including the relevance of the internal audit procedures and evaluation."

282.    In a section of the Annual Report entitled "Management's Report on Internal Control over Financial Reporting," Defendants DePaolo, Shay, and Wyremski stated:

> The management of Signature Bank (the "Company") is responsible for establishing and maintaining effective internal control over financial reporting. Our system of internal control is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of the Company's consolidated financial statements for external reporting purposes in accordance with U.S. generally accepted accounting principles.

283.    The statement set forth in ¶282 was materially false or misleading when made, omitted material facts necessary to render such statements not misleading, or lacked a reasonable basis in fact, because SBNY's financial statements were not issued in conformity with GAAP, as (i)  SBNY's financial statements did not disclose the Bank's concentration in large, uninsured deposits (*see* ¶67), which presented a "severe impact" that was "at least reasonably possible" to materialize "in the near term" due to the potential volatility of these deposits; and (ii) as Regulators communicated to SBNY, the Bank "did not sufficiently establish policies and controls to address this key risk." *See* Sections IV.F and VI.

### 14.    March 11, 2022 – UBS Digital Asset Day

284.    On March 11, 2022, Defendants DePaolo, Howell and Seibert participated in the UBS Digital Asset Day, which was held virtually.

285.    During the conference, Vilas T. Abraham, an analyst with UBS, asked:

Yes. Hey, guys, thanks for joining us again. So we do want to jump into the enhancement and get into that a little bit later on. But first, I did want to step back a little bit. Joe and Frank, you guys have been building this business at Signature

since 2018 or so. Joe, I know you've been banking in the crypto space for even longer than that. How would you characterize the growth of the industry over the last year and how it's contrasted to the past bull markets, not necessarily how much the market value has grown per se, but just the ways in which it's changed and how that contrasts to past cycles?

286.    In response, Defendant Seibert stated:

So some institutions are choosing to do custody, which I think helps adoption, and some are actually purely investing in certain digital assets. So we continue to see growth. ***Again, the price of Bitcoin doesn't have anything to do with our growth one way or the other. But we're just adding more clients, more prospects that we deem a fit for our ecosystem.*** And we're also continuing to say Signet is going to be that payment mechanism that they need to communicate with each other 24/7 for years to come.

287.    The statement set forth in ¶286 was materially false or misleading, omitted material facts necessary to render the statement not misleading, or lacked a reasonable basis in fact for the reasons set forth in ¶¶222-23, 251, 270.

### 15.    April 19, 2022 – Form 8-K

288.    On April 19, 2022, SBNY released its 2022 First Quarter Results on Form 8-K. In this Form 8-K, Defendant Wyremski stated that its "strong risk-based capital ratios reflect the ***relatively low risk profile of the Bank's balance sheet***."

289.    The statement set forth in ¶288 was materially false or misleading, omitted material facts necessary to render the statement not misleading, or lacked a reasonable basis in fact for the reasons set forth in ¶276.

### 16.    May 10, 2022 – Form 10-Q

290.    On May 10, 2022, SBNY filed its quarterly report for the first quarter of 2022 on Form 10-Q, signed by Defendants DePaolo and Wyremski. This Form 10-Q incorporated by reference and repeated the same statements set forth in the Bank's 2021 Annual Report on Form 10-K that are identified in ¶¶278, 280, 282. Those statements were materially false or misleading

when made, omitted material facts necessary to render such statements not misleading, or lacked a reasonable basis in fact, for the reasons set forth in ¶¶279, 281, 283.

291.    Further, in a section of the quarterly report related to "Liquidity," Defendants DePaolo and Wyremski stated:

> Our liquidity management is guided by policies developed and monitored by our asset/liability management committee and approved by our Board of Directors. The asset/liability management committee consists of, among others, our Chairman, President and Chief Executive Officer, Vice Chairman, Chief Operating Officer, Chief Financial Officer, Chief Investment Officer and Treasurer. ***These policies take into account the marketability of assets, the source and stability of deposits, our wholesale borrowing capacity and the amount of our loan commitments***.

292.    The statement set forth in ¶291 was materially false or misleading, omitted material facts necessary to render the statement not misleading, or lacked a reasonable basis in fact for the reasons set forth in ¶¶222-23, 270, 276.

### 17.    May 16, 2022 – Mid-Quarter Update

293.    On May 16, 2022, SBNY issued a press release and *Mid-Quarter Update*. The *Mid-Quarter Update* is attributable to Defendant Howell because, among other reasons, the press release announcing this update was issued in tandem with, and specifically referenced, Defendant Howell's appearance at a forthcoming investor conference: "[SBNY] issued a mid-quarter financial update in advance of [Howell's and Senior Vice President and Director of Investor Relations and Corporate Development Brian Wyremski's] participation in the upcoming 2022 Wells Fargo Financial Services Investor Conference."

294.    In the *Mid-Quarter Update*, Defendant Howell stated that: "[b]alances ha[d] not been meaningfully affected by current events in the digital asset trading space."

295.    Further in the *Mid-Quarter Update*, Defendant Howell stated that the "Bank remain[ed] well-positioned for deployment of excess cash and reiterate[d] guidance for interest-earning asset growth in the $4–7 billion range for the 2022 second quarter."

296.     The statements set forth in ¶¶294, 295 were materially false or misleading, omitted material facts necessary to render the statement not misleading, or lacked a reasonable basis in fact for the reasons set forth in ¶¶222-23, 232, 251, 270, 276.

**18.     July 19, 2022 – Form 8-K and Earnings Call**

297.     Also on July 19, 2022, SBNY released its 2022 second quarter results on Form 8-K. In this Form 8-K, Defendant Wyremski further stated that its "strong risk-based capital ratios reflect the ***relatively low risk profile of the Bank's balance sheet***."

298.     The statement set forth in ¶297 was materially false or misleading when made, omitted material facts necessary to render the statement not misleading, or lacked a reasonable basis in fact for the reasons set forth in ¶276.

299.     On July 19, 2022, Defendants DePaolo and Howell participated in an earnings call to discuss SBNY's financial results for the quarter.

300.     During the call, DePaolo stated:

During periods such as the Great Recession and now – and as well as the COVID pandemic, we find that clients rely on their banks the more so, and ***now that Signature Bank has diversified across many different businesses and has not relied on any single one area, we feel we are better positioned that ever before***."

301.     The statement set forth in ¶300 was materially false or misleading, omitted material facts necessary to render the statement not misleading, or lacked a reasonable basis in fact for the reasons set forth in ¶¶270, 276. Indeed, the FDIC communicated to the Bank's executives as early as May 19, 2022 in a corporate governance target review that "The Board and executive management have adopted a strategic position of rapid growth and expansion into digital asset markets; a strategy that creates greater susceptibly (sic) to liquidity, reputation, and regulatory risk as the digital asset markets and any related contagions can impact access to needed capital and funding markets." Moreover, as the FDIC Report establishes, "[m]anagement was not sufficiently prepared to ameliorate the risks posed by its concentration of deposits and lending relationships in

the digital assets marketplace and seemed unaware of the potential damage it could inflict on its more traditional depositor customers." According to the FDIC Report, "SBNY's significant client concentration of digital asset companies put it in a precarious position when the 'crypto winter' hit in 2022." In addition, as was reiterated to management during the management exit meeting with NYDFS "to summarize the findings of the 2021 examination cycle," throughout 2022, the Bank's "liquidity risk management practices continued to require improvement." The MRBA on liquidity contingency planning remained outstanding and unresolved by Bank management, and had remained unresolved since the 2019 examination cycle. In addition, over 40 SRs "remained open at the end of the 2021 examination cycle."

302.    On the call, Defendant DePaolo stated:

On the digital front, despite the significant decline in the value of cryptocurrencies and the latest digital winter, this quarter, our deposits were only down $2.4 billion, which includes the movement of $1.5 billion to off-balance sheet treasuries. ***This resulted in a minimal impact of $900 million. Some analysts say there is still confusion as to what to do in this – to what we do in this space. To make it clear, we hold no cryptocurrencies. I'll say that again, to make it clear, we hold no cryptocurrencies***.

303.    The statement set forth in ¶302 created the false impression that because the Bank held "no cryptocurrencies," it was not susceptible to risks related to the digital asset volatility when, in truth, Defendants (i) understood that its digital asset deposit concentration had exposed the Bank to greater susceptibility to liquidity, reputation, and regulatory risk due to the uncertainty and volatility of the digital asset space; and (ii) had still failed to implement fundamental liquidity risk management practices to mitigate and monitor risks related to its uninsured deposit concentration, which included many digital asset-related clients.

304.    During the same call, Alexopolous from JP Morgan asked:

I wanted to start first -- so on the deposits that you just called out from the exchanges, the decline of $1.8 billion, and I hear you on the larger transfer. But as we're all starting to learn about this business and how it impacts your company -- so if we think about crypto prices declined in the quarter, volumes were up a bit.

Walk us through how that drove deposit outflows for you guys, right? Are the exchanges just looking for a higher yield than you're willing to offer so they're moving to alternatives? Or are they seeing deposit outflows themselves and because of that, you're seeing deposit outflows? Hoping you could connect what's happening in their business to what's happening in your business.

305.    In response to this question, Defendant Howell stated:

It's kind of tough to answer, Steve. *I mean we saw a 65% decline in the price of Bitcoin and that -- we were hardly down, not even 10% in deposits in that space.* So clearly, there are people leaving that space and therefore deposits leaving. That was some of the headwinds. As we talked about, $1.5 billion went off-balance sheet, right? The off-balance sheet alternatives for yields are certainly there. So that's going to pressure us a bit.

So we're seeing people look for more yields, looking at off-balance sheet alternatives, coupled with people exiting the space a little bit. *But I think given the dramatic decline in values, we're pretty pleased with the fact that we only saw a less than 10% outflow in our deposit base there.*

306.    The statement set forth in ¶305 was materially false or misleading, omitted material facts necessary to render the statement not misleading, or lacked a reasonable basis in fact for the reasons set forth in ¶¶222-23, 270, 274, 276, 287, 301.

307.    During the same call, Vilas Abraham from UBS asked about the Bank's deposit growth, stating: "do you feel like it's going to be net inflows and deposit growth? Or could there still be some volatility for the rest of the year here to the downside?" In response to this question, DePaolo stated: "There's always choppiness. *But we feel really good* because we not only have EB-5, we believe we have the best team for EB-5."

308.    The statement set forth in ¶307 was materially false or misleading, omitted material facts necessary to render the statement not misleading, or lacked a reasonable basis in fact for the reasons set forth in ¶¶270, 276, 287, 301.

**19.    July 28, 2022 – Financial Times Article**

309.    On July 28, 2022, Defendant DePaolo issued statements that appeared in an article in the *Financial Times*. In the article, entitled *Signature Bank bet big on crypto-and must now*

*reckon with the crash*, Defendant DePaolo stated: "***Every month we model with an assumption that every single last crypto deposit is withdrawn***."

310.    The statement set forth in ¶309 was materially false or misleading when made, omitted material facts necessary to render the statement not misleading, or lacked a reasonable basis in fact, for the reasons set forth in ¶¶222-23, 270, 276, 287, 301. In addition, just weeks earlier, Signature's senior management and Board, including Defendant DePaolo, attended a meeting with Regulators to discuss the Bank's liquidity risk management deficiencies. This meeting was followed by the issuance of a liquidity risk management supervisory letter on July 28, 2022, which outlined that the problems and failures identified in the 2019, 2020, and 2021 examination cycles remained outstanding and had become increasing pressing given the Bank's growing reliance on uninsured deposits and digital asset-related depositors.

### 20.    August 9, 2022 – Form 10-Q

311.    On August 9, 2022, SBNY filed its quarterly report for the second quarter of 2022 on Form 10-Q, signed by Defendants DePaolo and Wyremski. This Form 10-Q incorporated by reference and repeated the same statements set forth in the Bank's 2021 Annual Report on Form 10-K that are identified in ¶¶278, 280, 282. Those statements were materially false or misleading when made, omitted material facts necessary to render such statements not misleading, or lacked a reasonable basis in fact, for the reasons set forth in ¶¶279, 281, 283.

312.    Further, in a section of the quarterly report related to "Liquidity," Defendants DePaolo and Wyremski stated:

> Our liquidity management is guided by policies developed and monitored by our asset/liability management committee and approved by our Board of Directors. The asset/liability management committee consists of, among others, our Chairman, President and Chief Executive Officer, Vice Chairman, Chief Operating Officer, Chief Financial Officer, Chief Investment Officer and Treasurer. ***These policies take into account the marketability of assets, the source and stability of deposits, our wholesale borrowing capacity and the amount of our loan commitments***.

313.    The statement set forth in ¶312 was materially false or misleading when made, omitted material facts necessary to render the statement not misleading, or lacked a reasonable basis in fact for the reasons set forth in ¶¶222-23, 270, 276, 301.

### 21.    October 18, 2022 – Form 8-K and Earnings Call

*314.*    On October 18, 2022, SBNY released its 2022 third quarter results on Form 8-K.

315.    In this release, Defendant Wyremski stated that its "strong risk-based capital ratios reflect the *relatively low risk profile of the Bank's balance sheet*."

316.    The statement set forth in ¶315 was materially false or misleading when made, omitted material facts necessary to render the statement not misleading, or lacked a reasonable basis in fact for the reasons set forth in ¶¶276, 301, 310.

317.    On October 18, 2022, Defendants DePaolo, Howell and Wyremski participated in an earnings call to discuss SBNY's final results for the quarter.  Analyst Poonawala asked the following concerning SBNY's diminishing cash balance:

> I guess, maybe, just first wanted to start in terms of how you're managing or thinking about deposits. One, maybe I request Steve talk to us in terms of visibility on deposit outlook, entire industries losing deposits. But given the client acquisition, how do you think about deposit growth overall and for digital asset deposits? And secondarily, how low do you think the cash balance is the declined over 10% of earning assets used to be about 4% pre-pandemic? Like how low do you think the cash balances get? And do we get there in the next quarter?

318.    In response to Poonawala's question, DePaolo stated that, "[r]ight now, we've been monitoring it as we should on a minute-by-minute basis, and we feel comfortable that we'll be at that we want at any point in time. *We haven't had any issues to liquidity at all*."

319.    The statement set forth in ¶318 was materially false or misleading when made, omitted material facts necessary to render the statement not misleading, or lacked a reasonable basis in fact, for the reasons set forth in ¶¶276, 287, 301, 310. In addition, just two months earlier, Regulators issued another risk management supervisory letter to SBNY's senior management and

Board, including Defendant DePaolo, which outlined that the problems and failures identified in the 2019, 2020, and 2021 examination cycles remained outstanding and had become increasing pressing given the Bank's growing reliance on uninsured deposits and digital asset-related depositors.

### 22.     November 9, 2022 – Form 10-Q

320.     On November 9, 2022, SBNY filed its quarterly report for the third quarter of 2022 on Form 10-Q, signed by Defendants DePaolo and Wyremski. This Form 10-Q incorporated by reference and repeated the same statements set forth in the Bank's 2021 Annual Report on Form 10-K that are identified in ¶¶278, 280, 282. Those statements were materially false or misleading when made, omitted material facts necessary to render such statements not misleading, or lacked a reasonable basis in fact, for the reasons set forth in ¶¶279, 281, 283.

321.     Further, in a section of the quarterly report related to "Liquidity," Defendants DePaolo and Wyremski stated:

> Our liquidity management is guided by policies developed and monitored by our asset/liability management committee and approved by our Board of Directors. The asset/liability management committee consists of, among others, our Chairman, President and Chief Executive Officer, Vice Chairman, Chief Operating Officer, Chief Financial Officer, Chief Investment Officer and Treasurer. ***These policies take into account the marketability of assets, the source and stability of deposits, our wholesale borrowing capacity and the amount of our loan commitments***.

322.     The statement set forth in ¶321 was materially false or misleading when made, omitted material facts necessary to render the statement not misleading, or lacked a reasonable basis in fact for the reasons set forth in ¶¶222-23, 270, 276, 301.

### 23.     November 15, 2022 – Press Release

323.     On November 15, 2022, SBNY issued a press release, entitled *Signature Bank Provides Digital Asset Banking Update*. In this release, DePaolo falsely assured investors that "Signature Bank is a well-diversified institution that ***employs appropriate risk management***

***strategies that help us navigate the current challenging digital asset landscape***. Our strong capital, solid earnings and overall diversification, continues to provide a source of strength for our depositor clients." DePaolo further stated that "the Bank's deposits in the digital asset arena remained stable."

324.     The statements set forth in ¶323 were materially false or misleading when made, omitted material facts necessary to render such statements not misleading, or lacked a reasonable basis in fact for the reasons set forth in ¶¶222-23, 270, 276, 287, 301, 310. Indeed, the FDIC communicated to the Bank's executives as early as May 19, 2022 in a corporate governance target review that "The Board and executive management have adopted a strategic position of rapid growth and expansion into digital asset markets; a strategy that creates greater susceptibly (sic) to liquidity, reputation, and regulatory risk as the digital asset markets and any related contagions can impact access to needed capital and funding markets." Moreover, as the FDIC Report establishes, "[m]anagement was not sufficiently prepared to ameliorate the risks posed by its concentration of deposits and lending relationships in the digital assets marketplace and seemed unaware of the potential damage it could inflict on its more traditional depositor customers." According to the FDIC Report, "SBNY's significant client concentration of digital asset companies put it in a precarious position when the 'crypto winter' hit in 2022." As the Bank would later admit, "[i]n 2022, as interest rates began to rise and deposits began to contract due to volatility in the digital assets market, the bank decided to reduce its digital asset-related deposits. SBNY experienced $17.6 billion in deposit outflow in 2022, mostly in the fourth quarter, ***with digital asset-related deposits representing 62 percent of the 2022 outflow***." In addition, on November 15, 2022, NYDFS held its management exit meeting "to summarize the findings of the 2021 examination cycle," which included findings that the Bank's "liquidity risk management practices continued to require improvement." The MRBA on liquidity contingency planning remained outstanding and

unresolved by Bank management and had remained unresolved since the 2019 examination cycle. In addition, over 40 SRs "remained open at the end of the 2021 examination cycle."

### 24. December 6, 2022 – Goldman Sachs US Financial Services Conference

325.     On December 6, 2022, Defendants DePaolo, Howell, and Wyremski participated in the Goldman Sachs US Financial Services Conference. The conference was hosted by Ryan Matthew Nash of Goldman Sachs.

326.     At the beginning of the conference, Nash posed the following question to DePaolo:

So Joe, as we always do, we're going to start with you. Maybe kick off with an update on how the fourth quarter has progressed. You gave a mid-quarter update where you noted digital deposits were stable at 23.5%. Can you maybe just give us a broader loan and deposit quarter-to-date update, what is driving loan balances? And also, how is digital doing more recently? And how is your asset growth trending relative to your $1 billion to $3 billion expectations? So a lot in there for you, Joe.

327.     DePaolo responded:

Yes, Ryan. It's a lot. Thank you. I appreciate you inviting us. On behalf of all my colleagues, we want to thank you and thank everyone in the audience for being here. It's interesting. We usually have something to say that's notable in these conferences, especially your conference. But we're not going to disappoint you. We're going to let both Steve and Eric get into the details. But I do want to say a few things. One, we're not a crypto bank. We're a commercial bank that has a lot of businesses that have been successful, primarily the businesses that have come on since the 2018 year. We've had businesses come on before that, particularly commercial real estate. But since 2018, we brought on quite a few successful businesses. We don't have any crypto loans. We have no credit exposure.…

When FTX went sideways, we were a safe haven. We got a tremendous amount of deposits on that weekend. But we also -- looking at our businesses, which are many, very successful, we also looked at the deposits from those businesses. ***And we don't want to be beholden to any 1 industry or any 1 individual client.*** And so, what we're doing is on the crypto space, where we have about 30% what we had – I'm sorry, we had a high of 30%. Right now, you mentioned it was 23.5%, Ryan, 23.5%. Well, actually, that 23.5%, you subtract $6.1 billion, $6.1 billion because we decided to limit the amount of deposits not only on a global basis but on an individual client basis.

328.     The statement set forth in ¶327 was materially false or misleading when made,

omitted material facts necessary to render the statement not misleading, or lacked a reasonable

basis in fact for the reasons set forth in ¶324.

329.     Later during the interview, Nash asked:

So just to be clear, should we not read this as an exit of the digital space? Is that
correct? It sounds like this is really about furthering the diversification efforts. And
finally, I don't think this is a base case that they would go to 0, but obviously, a lot
of investors have asked about that over time. Have you ever contemplated what
would happen if that did take place?

330.     In response to this question, Howell stated:

*I'll answer the latter part of that first. I mean, right now, we have between cash
and borrowing capacity, we can easily take care of any deposits leaving, any and
all deposits if they were to leave the ecosystem, the crypto ecosystem for us. So
it's a nonevent.* We would cover it without having to sell any securities. But
obviously, securities would be the last thing. What we look to do is potentially sell
those. *But we've got adequate capacity to cover all crypto deposits we leave in the
bank. So that's a nonevent.*

We're not exiting the space. We all know who the winners and losers are going to
be. We don't really particularly care, right? We saw Bitcoin fall, what, $60,000
down to where it is today. And quite frankly, if we wanted to be up this quarter in
deposits in crypto, we would be. I want to make that very clear. We could easily be
up this quarter in deposits if we chose to be, right? We're looking at this as an
opportunity to rationalize what we've got, right?

We recognize that in certain cases, especially as we look at stablecoin and other
parties in that space, but there's a better way for us to utilize our capital, right? We
had very high cost deposits that we had to keep in cash. For a while, we thought it
made sense, right, because we were garnering a reputation in this space. And that
allowed us to attract other players in that space to help us to broaden out our
presence there.

But now clearly, given what's happened, this now gives us the opportunity to take
a step back and say, "Wait a second. Do we really need to pay this much for those
deposits? Do we really have to pay on deposits that we keep in cash, right?" So
we're using that. *We also recognize that it's important for us to have a diversified
funding base. And as Joe said, we're not just a crypto bank and we want that to
come across loud and clear.*

331.     The statement set forth in ¶330 was materially false or misleading when made,

omitted material facts necessary to render the statement not misleading, or lacked a reasonable

basis in fact for the reasons set forth in ¶¶222-23, 270, 276, 301, 310, 324. Contrary to Defendant Howell's assertion that the Bank "can easily take care of any deposits leaving, any and all deposits if they were to leave the ecosystem," at this point, the Bank had still failed to implement "a comprehensive contingency funding plan" or "a validated stress testing model with institution-specific underlying assumptions" that would inform how the run-off of all digital asset deposits would affect the Bank's liquidity position, including related to the run-off of the Bank's non-digital asset deposits, and how the Bank could respond to these contingencies. Moreover, contrary to Defendant Howell's assurances that this risk was contained, the Regulators had specifically communicated that the Bank's digital asset exposure was "creat[ing] greater susceptibly (sic) to liquidity, reputation, and regulatory risk as the digital asset markets and any related contagions can impact access to needed capital and funding markets." *See* ¶324. These statements were false or misleading for the additional reason that they gave the false impression that the Bank's stunning shift away from the digital asset space was voluntary, well-planned, and strategic.  In truth, behind the scenes, Defendants implemented these measures in light of the volatility of these deposits and because they were wholly unprepared and unable to address related risks, as their liquidity risk management problems and deficiencies amplified.

### 25.   January 17, 2023 – Form 8-K

332.   On January 17, 2023, SBNY filed a Form 8-K reporting its 2022 Fourth Quarter and Year-End Results, signed by Defendant Wyremski.

333.   In this Form 8-K, Wyremski stated: "The arduous rate environment, along with challenges in the digital asset space, led to deposit declines, which *we overcame with little difficulty, given our robust liquidity position*."

334.   Also in this Form 8-K, Defendant Wyremski stated that its "strong risk-based capital ratios reflect the *relatively low risk profile of the Bank's balance sheet*."

335.    The statements set forth in ¶¶333-34 regarding the Bank's liquidity and strong balance sheet were materially false or misleading when made, omitted material facts necessary to render such statements not misleading, and lacked a reasonable basis in fact, for reasons set forth in ¶¶270, 276, 301, 310. In addition, as is confirmed by the FDIC Report, "[u]nderlying assumptions for the liquidity stress test and deposit outflow methodology were not fully developed and documented" and "significant deficiencies" still existed "in the independent review of liquidity and funds management, including the relevance of the internal audit procedures and evaluation." As is confirmed in the FDIC Report, these issues were "of heightened importance given SBNY's high reliance on uninsured deposits, and the elevated level of digital asset deposits that drove the high-risk liquidity profile of the bank."

### 26.    January 23, 2023 – Press Release

336.    On January 23, 2023, SBNY issued a Press Release entitled *Signature Bank Responds to Inaccuracies in Wall Street Journal Article*. In the Press Release, the Bank rebutted an allegation in a Wall Street Journal article that it was "rushing to stem a flood of customer withdrawals," stating that the outflow was actually due to the Bank's ***"intentional[]" decision to "manag[e] them to a lower level"*** and that the Bank was "***replacing these deposits primarily with advances from the Federal Home Loan Bank of New York (FHLBNY) in the short-term***." This press release is attributable to Defendants DePaolo and Howell because, among other reasons, their involvement is gleaned as the press release repeats the same or similar statements issued by DePaolo and Howell throughout the Class Period.

337.    The statements set forth in ¶336 were materially false or misleading when made, omitted material facts necessary to render such statements not misleading, or lacked a reasonable basis in fact, for the reasons set forth in ¶¶222-23, 270, 276, 301, 310, 324, 331, 335. In addition, Defendants statements created the false impression about the Bank's ability to secure short-term

borrowings to solidify its liquidity position. In truth, Defendants were struggling to secure short-term borrowings. As the FDIC Report revealed, leading up to March 2023, Defendants had "pursued efforts *for months*" to pledge Fund Banking capital call loans to the FRBNY for discount window lending, "hiring two law firms to make the case," but the FRBNY had rejected Defendants' attempts.

### 27.    March 1, 2023 – 2022 Form 10-K

338.    On March 1, 2023, SBNY filed its 2022 Annual Report on Form 10-K with the SEC. The 2022 10-K was signed by Defendants DePaolo, Shay, and Wyremski.

339.    In a section of this Report entitled "Our Business Strategy," Defendants DePaolo, Shay, and Wyremski highlighted its "commit[ment] to a sound risk management process," stating:

> Risk management is an important element of our business. . . . ***We have put internal controls in place that help to mitigate the risks that affect our business. In addition, we have policies and procedures that further help mitigate risk and regulatory requirements that mandate that we evaluate, test and opine on the effectiveness of internal controls***. . . . [W]e believe that our risk management processes will help keep our risks to a manageable level.

340.    The statement set forth in ¶339 was materially false or misleading when made, omitted material facts necessary to render the statement not misleading, or lacked a reasonable basis in fact for the reasons set forth in ¶335.

341.    In a section of the Annual Report entitled "Capital Planning and Stress Testing," Defendants DePaolo and Wyremski further stated that the Bank had "***developed a process to comply with the [relevant] stress testing requirements***" and that it would "***continue to monitor and stress test its capital in a manner consistent with the safety and soundness expectations of the federal banking agencies and in accordance with applicable internal processes***."

342.    The statement set forth in ¶341 was materially false or misleading, omitted material facts necessary to render the statement not misleading, or lacked a reasonable basis in fact for the reasons set forth in ¶¶270, 276, 301, 310, 335. In addition, the FDIC Report confirms that

throughout 2021 and 2022, "[u]nderlying assumptions for the liquidity stress test and deposit outflow methodology were not fully developed and documented. In addition, significant deficiencies were identified in the independent review of liquidity and funds management, including the relevance of the internal audit procedures and evaluation."

343.    In a section of the Annual Report entitled "Management's Report on Internal Control over Financial Reporting," Defendants DePaolo, Shay, and Wyremski stated:

> The management of Signature Bank (the "Company") is responsible for establishing and maintaining effective internal control over financial reporting. Our system of internal control is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of the Company's consolidated financial statements for external reporting purposes in accordance with U.S. generally accepted accounting principles.

344.    The statement set forth in ¶343 was materially false or misleading when made, omitted material facts necessary to render the statement not misleading, or lacked a reasonable basis in fact, because SBNY's financial statements were not issued in conformity with GAAP, as (i) SBNY's financial statements did not disclose the Bank's concentration in large, uninsured deposits (*see* ¶67), which presented a "severe impact" that was "at least reasonably possible" to materialize "in the near term" due to the potential volatility of these deposits; and (ii) as Regulators communicated to SBNY, the Bank "did not sufficiently establish policies and controls to address this key risk." *See* Sections IV.F and VI.

### 28.    March 9, 2023 – Form 8-K

345.    On March 9, 2023, SBNY issued a press release on Form 8-K, which is attributable to Defendants DePaolo and Howell for many reasons including because their quoted statements appear in the press release.

346.    In the press release, Defendants DePaolo and Howell "reiterated [the Bank's] strong, well-diversified financial position and limited digital-asset related deposit balances" and highlighted its "strong liquidity position."

347.    Also in the press release, Howell was quoted: "Since we opened our doors, we have been a 'deposit-first' institution and have always been committed to our depositors' safety, first and foremost. ***As shown by our current metrics, we intentionally maintain a high level of capital, strong liquidity profile and solid earnings***."

348.    The statements set forth in ¶¶346-47 were materially false or misleading when made, omitted material facts necessary to render such statements not misleading, and lacked a reasonable basis in fact, for the reasons set forth in ¶¶270, 276, 301, 310, 331, 335, 342. That Defendants' statements lacked a reasonable basis is further evidenced by Defendants' inability, just hours and days after issuance of these statements, to provide Regulators with basic projections and information regarding the Bank's liquidity position. As Regulators would later conclude, "***Signature was unable to provide reliable and consistent data*** about its available liquidity or the amount of pending withdrawals" during the weekend of March 10, 2023.  The Regulators further concluded that as soon as "Signature began providing any data on these key issues, the Regulators found ***the data was inconsistent and that it continuously changed in material ways***." When Defendants sent liquidity projections to Regulators on March 12, 2023, Defendants expressly disclaimed their accuracy, claiming they were prepared "solely for informational purposes" and warning that NYDFS ***"should not definitively rely upon it or use it to form the definitive basis for any decision, contract, commitment or action whatsoever, with respect to any proposed transaction or otherwise***." Regulators specifically concluded the projections were riddled with inaccuracies and other unrealistic assumptions. *See* Section IV.J.

## VI.   DEFENDANTS' SEC FILINGS VIOLATED GAAP

349.    The Bank released consolidated financial statements in Class Period filings dated March 1, 2021 (Form 10-K; signed by Defendants DePaolo, Shay and Susca), May 10, 2021 (Form 10-Q; signed by Defendants DePaolo and Susca), August 9, 2021 (Form 10-Q; signed by

Defendants DePaolo and Wyremski), November 9, 2021 (Form 10-Q; signed by Defendants DePaolo and Wyremski), March 1, 2022 (Form 10-K; signed by Defendants DePaolo, Shay and Wyremski), May 10, 2022 (Form 10-Q; signed by Defendants DePaolo and Wyremski), August 9, 2022 (Form 10-Q; signed by Defendants DePaolo and Wyremski), November 9, 2022 (Form 10-Q; signed by Defendants DePaolo and Wyremski),  and March 1, 2023 (Form 10-K; signed by Defendants DePaolo, Shay and Wyremski).

350.    In each filing, the signing Defendants stated that the "Consolidated Financial Statements of the Bank have been prepared in accordance with Generally Accepted Accounting Principles and practices within the banking industry." The signing Defendants also stated that: "We follow financial accounting and reporting policies that are in accordance with U.S. generally accepted accounting principles."

351.    These statements were materially false or misleading when made, omitted material facts necessary to render such statements not misleading, or lacked a reasonable basis in fact, because SBNY's financial statements were not issued in conformity or accordance with GAAP.

352.    GAAP "requires institutions to make disclosures in their financial statements about the risks and uncertainties existing as of the date of those statements" for various areas including "current vulnerability due to certain concentrations."  The American Institute of Certified Public Accountants' ("AICPA's") Audit and Accounting Guide for Depository and Lending Institutions discusses liquidity risk in relation to deposits as follows:

> The composition of an institution's deposits also affects liquidity and IRR because large volumes of deposits can be withdrawn over a short period of time. For example, institutions are also subject to reputation risk. If an institution receives adverse publicity, it may have difficulty retaining deposits and, therefore, become dependent on other forms of borrowing at a higher cost.

353.    Under GAAP, an institution may be required to disclose concentrations, including group concentrations, if a number of counterparties or items that have similar economic characteristics collectively expose the reporting entity to a particular kind of risk, including:

    a.    "Concentrations in the volume of business transacted with a particular customer, supplier, lender, grantor, or contributor."

    b.    "Concentrations in revenue from particular products, services, or fundraising events."

    c.    "Concentrations in the market or geographic area in which the entity conducts its operations."

354.    GAAP also recognizes that "[v]ulnerability from concentrations arises because an entity is exposed to risk of loss greater than it would have had it mitigated its risk through diversification. Such risks of loss manifest themselves differently, depending on the nature of the concentration, and vary in significance."   Concentration disclosure is required when, based on information known to management before the financial statements are issued or available to be issued, all the following criteria are met:

    a.    "The concentration exists at the date of the financial statements."

    b.    "The concentration makes the institution vulnerable to the risk of a near-term severe impact."

    c.    "It is at least reasonably possible that events that could cause the severe impact will occur in the near term."

355.    Concentration disclosures are required to be disclosed "if known to management" and when they meet the definition of "Severe Impact":

A significant financially disruptive effect on the normal functioning of an entity. Severe impact is a higher threshold than material. Matters that are important enough to influence a user's decisions are deemed to be material, yet they may not be so significant as to disrupt the normal functioning of the entity. Some events are material to an investor because they might affect the price of an entity's capital stock or its debt securities, but they would not necessarily have a severe impact on (disrupt) the entity itself. The concept of severe impact, however, includes matters that are less than catastrophic. Matters that are catastrophic include, for example, those that would result in bankruptcy.

356.     SBNY's concentrations of large, uninsured deposits noted in ¶67 were known to Defendants based upon, inter alia, the findings of the Bank's Regulators. Regulators identified this risk as early as July 6, 2020, and SBNY never mitigated this risk. The concentration in large deposits was a near-term "Severe Impact" as it carried the clear possibility of having a "financially disruptive effect on the normal functioning" of the Bank, including as to the Bank's liquidity position in light of the potential for "large volumes of deposits" being "withdrawn over a short period of time." Moreover, it was "at least reasonably possible that events could cause the severe impact in the near term" due to risks concerning the Bank's depositor makeup and reliance on uninsured depositors and digital asset customers, which had exhibited widespread volatility in values. That the deposit concentration presented these material risks in the near-term is further evidenced by SBNY's failure to properly manage these risks, as Regulators communicated to Defendants and KPMG when concluding that the Bank "did not sufficiently establish policies and controls to address this key risk." *See* Section IV.F.2.

## VII.   KPMG'S ISSUANCE OF CLEAN AUDIT OPINIONS THROUGHOUT THE CLASS PERIOD VIOLATED THE EXCHANGE ACT

357.     KPMG served as SBNY's independent auditor for decades, including throughout the Class Period. According to the SEC, independent auditors such as KPMG are meant to play "an important gatekeeper role in supporting high-quality financial reporting and the protection of investors." Section 10A of the Exchange Act "imposes requirements on auditors related to the detection of illegal acts during the audit." "Areas that have historically been a focus for auditors— the tone at the top of a company and the effectiveness of internal controls—appear to be key factors in either exacerbating or mitigating such pressures, opportunities, or rationalizations for fraud."

358.     As SBNY's independent auditor, KPMG was responsible for expressing an opinion on whether the Bank's financial statements "present fairly, in all material respects, an entity's financial position, results of operations, and cash flows in conformity with [GAAP]." GAAP are

principles recognized by accounting profession as the conventions, rules, and procedures that define accepted accounting practice at a particular time. In the United States, GAAP is established through accounting standards issued by the Financial Accounting Standards Board ("FASB"). GAAP enhances the usefulness of the information in the financial statements by making it relevant, comparable, complete, timely, neutral and unbiased, representative of the economic transactions entered into, and useful for decision-making purposes. Specifically, FASB states "[t]he objective of general purpose financial reporting, is to provide financial information about the reporting entity that is useful to existing and potential investors, lenders, and other creditors in making decisions about providing resources to the entity."

359.    KPMG was also required by law and SEC regulations to follow the standards of the PCAOB. The PCAOB, established by the Sarbanes-Oxley Act of 2002 to oversee independent auditors, is responsible for establishing professional audit standards applicable to audits of publicly-traded companies (the "PCAOB Standards"), including SBNY. The PCAOB Standards set the level of ethical, performance and quality that auditors are expected to achieve. They are intended to "provide a measure of audit quality and the objectives to be achieved in an audit." Under PCAOB Standards, "auditors for issuers have a responsibility to consider fraud and to obtain reasonable assurance about whether the financial statements are free of material misstatement, whether caused by fraud or error." PCAOB Standards also require auditors to evaluate "whether the company's controls sufficiently address identified risks of material misstatement due to fraud and controls intended to address the risk of management override of other controls."

360.    During the Class Period, KPMG audited the Bank's financial statements and internal controls over financial reporting and issued audit opinions thereon in SBNY's 2020 Form 10-K (filed March 1, 2021), 2021 Form 10-K (filed March 1, 2022), and 2022 Form 10-K (filed March 1, 2023). In each of these audit opinions, including the final opinion which KPMG issued

just 11 days before SBNY failed, KPMG "expressed an unqualified opinion on the effectiveness of the Company's internal control over financial reporting" and opined that "the consolidated financial statements present fairly, in all material respects, the financial position of the Company … and the results of its operations and its cash flows for each of the years … in conformity with U.S. generally accepted accounting principles."  KPMG assured investors that it conducted each "audit[] in accordance with the standards of the PCAOB."

361.    KPMG's audit opinions of SBNY were materially false or misleading. Section 36(h) of the Federal Deposit Insurance Act (12 U.S.C. § 1831m(h)) requires each bank and savings institution to provide its independent auditor with copies of the institution's "report of condition," "report of examination," or "any supervisory memorandum of understanding" issued by the Bank's regulators. Through the information contained within these reports, as is reflected in detailed summaries throughout the various Regulator reports issued after the Bank's collapse, KPMG knew or was reckless to disregard the material risks facing SBNY and the Bank's many related deficiencies, including its many risk management failures as fully described in Section IV.F above. These serious, known risks were eventually exposed and directly contributed to the Bank's failure. By failing to identify these issues during the course of its audits and in the audit opinions it issued concerning SBNY, KPMG knowingly and/or recklessly misled investors about whether the Bank's financial statements complied with GAAP and the sufficiency of SBNY's internal control over financial reporting, including the risk of material misstatement in SBNY's financial statements.

362.    KPMG's knowledge of issues rendering their audit opinions false is readily apparent as KPMG received contemporaneous information related to SBNY's fundamental risk management failings.

### A.       KPMG Falsely Certified SBNY's Financial Statements as GAAP Compliant

363.    KPMG failed to identify the Bank's GAAP violation with respect to failing to disclose depositor concentrations. As noted above, GAAP "requires institutions to make disclosures in their financial statements about the risks and uncertainties existing as of the date of those statements" for various areas including "current vulnerability due to certain concentrations." The AICPA's Audit and Accounting Guide for Depository and Lending Institutions specifically discusses liquidity risk in relation to deposits, as detailed fully above, because "[t]he composition of an institution's deposits also affects liquidity and IRR because large volumes of deposits can be withdrawn over a short period of time."

364.    Under GAAP, an institution may be required to disclose concentrations under certain conditions. These conditions are fully detailed above, but include "[c]oncentrations in the volume of business transacted with a particular customer, supplier, lender, grantor, or contributor" and "[c]oncentrations in the market or geographic area in which an entity conducts its operations." GAAP recognizes that "[v]ulnerability from concentrations arises because an entity is exposed to risk of loss greater than it would have had it mitigated its risk through diversification. Such risks of loss manifest themselves differently, depending on the nature of the concentration, and vary in significance."

365.    As is further described in Section VI above, GAAP requires a concentration disclosure when, based on information known to management before the financial statements are issued or available to be issued, when the concentration "makes the institution vulnerable to the risk of a near-term severe impact" and "[i]t is at least reasonably possible that events that could cause the severe impact will occur in the near term." Under GAAP, as fully detailed above, "Severe Impact" is "[a] significant financially disruptive effect on the normal functioning of an entity. Severe impact is a higher threshold than material. Matters that are important enough to influence

a user's decisions are deemed to be material, yet they may not be so significant as to disrupt the normal functioning of the entity."

366.    SBNY's concentrations of large, uninsured deposits noted in ¶67 were known to management and KPMG based upon, *inter alia*, the findings of the Regulators, which identified this risk as early as July 6, 2020 and confirmed that SBNY never mitigated this risk. The concentration in large deposits was a near-term "Severe Impact" as it carried the clear possibility of having a "financially disruptive effect on the normal functioning" of the Bank, including as to the Bank's liquidity position in light of the potential for "large volumes of deposits" being "withdrawn over a short period of time." Moreover, it was "at least reasonably possible that events could cause the severe impact in the near term" due to risks concerning the Bank's depositor makeup and reliance on uninsured depositors and digital asset customers, which had exhibited widespread volatility in values. That the deposit concentration presented these material risks in the near-term is further evidenced by SBNY's failure to properly manage these risks, as Regulators communicated to Defendants and KPMG when concluding that the Bank "did not sufficiently establish policies and controls to address this key risk." *See* Section IV.F.2.

### B.    KPMG's Audit Opinions Lacked a Reasonable Basis

367.    KPMG expressed "an unqualified opinion on the effectiveness of the Company's internal control over financial reporting" without a reasonable basis because the opinions did not account for, or reveal, the serious and adverse facts facing the Bank's control environment, which were each known to KPMG throughout the Class Period. Indeed, PCAOB Standards required KPMG to fully assess, among other things, the Bank's "control environment" and "risk assessment process" during the course of its audits, but KPMG either failed to do so or was reckless in overlooking the Bank's fundamental flaws.

368.     PCAOB Standard 2201 describes the process for identifying entity-level controls: "The auditor must test those entity-level controls that are important to the auditor's conclusion about whether the company has effective internal control over financial reporting." Under PCAOB Standard 2201, entity-level controls include:

a.     "Controls related to the control environment";

b.     "Controls over management override";

c.     "The company's risk assessment process";

d.     "Centralized processing and controls, including shared service environments";

e.     "Controls to monitor results of operations";

f.     "Controls to monitor other controls, including activities of the internal audit function, the audit committee, and self-assessment programs";

g.     "Controls over the period-end financial reporting process"; and

h.     "Policies that address significant business control and risk management practices."

369.     Further, under this auditing standard: "the auditor must evaluate the control environment at the company" because of "its importance to effective internal control over financial reporting." As part of evaluating the control environment, the auditor must assess:

a.     "Whether management's philosophy and operating style promote effective internal control over financial reporting";

b.     "Whether sound integrity and ethical values, particularly of top management, are developed and understood"; and

c.     "Whether the Board or audit committee understands and exercises oversight responsibility over financial reporting and internal control."

370.     PCAOB Auditing Standard 2201 dictates that an "auditor's evaluation of entity-level controls can result in increasing or decreasing the testing that the auditor otherwise would have performed on other controls."

371.     PCAOB Auditing Standard 2110 describes the specific actions an auditor must take to assess the control environment of the entity, the high-level set of policies and actions of senior management, the board and the audit committee that set the tone regarding and internal controls

for the entire organization. PCAOB Auditing Standard 2201.09 further provides that when planning to test internal controls, an auditor should evaluate whether the following matters (among others) are important to the internal controls over financial reporting:

a.  "Matters affecting the industry in which the company operates, such as financial reporting practices, economic conditions, laws and regulations, and technological changes";

b.  "Matters relating to the company's business, including its organization, operating characteristics, and capital structure";

c.  "Control deficiencies previously communicated to the audit committee or management";

d.  "Legal or regulatory matters of which the company is aware"; and

e.  "Public information about the company relevant to the evaluation of the likelihood of material financial statement misstatements and the effectiveness of the company's internal control over financial reporting."

372.    Additionally, under PCAOB Auditing Standard 2110, an "auditor should obtain an understanding of the company and its environment to understand the events, conditions, and company activities that might reasonably be expected to have a significant effect on the risks of material misstatement." This understanding of the company includes "relevant industry, regulatory, and other external factors" and could include communications between Signature and regulatory authorities.

373.    PCAOB Standards 2201 and 2110 required that KPMG consider, among other things, SBNY's "risk assessment" and "control deficiencies" in assessing the Company's internal control over financial reporting. PCAOB Standard 2110 states, "Risks of material misstatement can arise from a variety of sources, including external factors, such as conditions in the company's industry and environment…" As detailed in Sections IV.F, IV.L, SBNY's risk assessment procedures were deficient, and there were significant control deficiencies with respect to SBNY's management of material risks. KPMG's clean audit opinions of SBNY during the Class Period were thus issued without regard for these fundamental deficiencies that KPMG was required to consider under PCAOB Standards. If KPMG had appropriately considered the Bank's deficiencies

consistent with PCAOB Standards, KPMG would have, for instance, revealed there was an amplified risk of fraud in the Bank's financial statements and operations, and would not have issued an "unqualified opinion on the effectiveness of the Company's internal control over financial reporting."

C.  **KPMG Was Aware of Increasing Risks Facing the Bank and SBNY's Foundational and Widespread Weaknesses with its Risk Management Functions**

374.    As noted above, Section 36(h) of the Federal Deposit Insurance Act (12 U.S.C. § 1831m(h)) requires each bank and savings institution provide its independent auditor with copies of the institution's "report of condition," "report of examination," or "any supervisory memorandum of understanding" issued by the Bank's regulators. Through the information contained within these reports, as is reflected in detailed summaries throughout the various Regulator reports issued after the Bank's collapse, KPMG knew or was reckless to disregard the material risks facing SBNY and the Bank's many related deficiencies, including its many risk management failures as fully described in Sections IV.F, IV.L above. KPMG similarly knew or was reckless to disregard that Defendants, along with SBNY's Board and other senior management, pursued rapid, unrestrained growth without developing and maintaining adequate risk management practices and controls appropriate for the size, complexity and risk profile of the institution, did not prioritize good corporate governance practices, and failed to adequately respond to, address, or remediate the FDIC's many MRBAs and SRs during the Class Period.

375.    KPMG learned all of these and other adverse facts in real-time. By way of example only, KPMG was aware that by July 6, 2020, the Bank's liquidity risk management framework was completely deficient since, by this time, Regulators had issued the Bank an MRBA and 18 related-SRs stemming from the Bank's "liquidity contingency planning," which the Regulators called "a critical finding." KPMG further understood that the Bank had "significant weaknesses in

the Bank's liquidity contingency planning, including that the risk exposure presented by the concentration of uninsured deposits was not sufficiently identified, measured, [or] monitored." KPMG also knew that the Bank's risk management practices were not "commensurate with the institution's complexity, risk profile, and scope of operations due to the weaknesses with liquidity contingency planning, liquidity stress test, and internal controls."

376.   KPMG further knew that as of July 9, 2021 that the Company's risk management function had remained deficient. KPMG further understood by this point that SBNY's "funds management practices and liquidity contingency planning required improvement" and that "management needed to identify, document, and review stress scenarios that were relevant to the Bank and presented a range of liquidity and funding challenges to be approved by the Board." During this examination cycle, the Regulators continued to raise concerns with SBNY's uninsured deposit concentration, and specifically flagged that "196 clients with balances exceeded $50 million as of year-end 2020, account[ed] for $35 billion, or 55 percent of total deposits."

377.   By June 2022, KPMG further learned that SBNY's "management and the Board needed to implement corrective actions to remediate the funds management weaknesses in order to adequately control liquidity risk and limit potential adverse impacts on the financial condition of the Bank." KPMG understood that, at this point, "[m]anagement [had] not identif[ied] an appropriate liquidity buffer, did not demonstrate the ability to adequately measure and control the impact of deposit volatility during stress events, and did not properly assess the likelihood of and survival requirements for a variety of idiosyncratic and macroeconomic stress events." During this examination cycle, the Regulators reiterated concerns that "management's assumptions [regarding the stability of deposits] was not well documented and not been substantiated." The Regulators flagged their concern that "60 clients held deposit account balances in excess of $250 million, representing about 40 percent of total deposits" and that "other large depositor concentration

included four single depositors, each comprising greater than 2 percent of total assets, totaling 14 percent of total assets." Regulators noted that "[t]hree of the depositors were digital asset-related clients."

### D. Events in March 2023 Exposed SBNY's Material Weaknesses in Internal Controls Over Financial Reporting, Which Were Known by KPMG

378.    SBNY's failure in March 2023 exposed what KPMG knew months and years earlier: SBNY's internal controls and risk management framework were deficient. During the March 10-12 weekend, the Bank's deficient internal controls prevented it from providing reliable data on its assets or pending withdrawals (and therefore, its liquidity position) to Regulators. For example, the Bank "was unable to provide reliable and consistent data about its available liquidity or the amount of pending withdrawals." Indeed, the Bank "could not produce timely, accurate or complete information to allow the Regulators to assess the condition of the Bank." When it eventually able provided data, the data was "inconsistent and that it continuously changed in material ways."

379.    Moreover, because of its internal control weaknesses, SBNY "struggled to identify readily available liquidity" during the March 10-12 weekend. For example, the Bank again asked Regulators to accept the $18 billion it held in capital call loans despite knowing that Regulators would not accept these loans as collateral because of the involvement of foreign investors. The Bank also reported that liquidity sourced from its CRE loan portfolio would be available Monday, March 13, but neglected to consider that it would take weeks before the CRE portfolio could be adequately reviewed and valued. And while the Bank's executives insisted that SBNY had over $5 billion in unpledged but valuable pledgeable securities available for Monday, March 13, they failed to provide details for those assets and eventually "reduced the estimate of unpledged securities from over $5 billion to just $900 million."

**E.      Following SBNY's Collapse, KPMG Faced Intense Scrutiny for Its Audits**

380.      In the aftermath of SBNY's collapse, KPMG's work in auditing SBNY came under severe public scrutiny. KPMG also faced scrutiny due to its auditing work for two other failed banks, Silicon Valley Bank and First Republic Bank.

381.      KPMG's role in the bank collapses was highlighted by market commentators. On March 13, 2023, *The Wall Street Journal* reported that KPMG "face[d] scrutiny" as "Signature Bank went down 11 days after the accounting firm signed off on its audit." In its reporting, *The Wall Street Journal* recounted that, among other things, KPMG was required "to warn investors if companies are in trouble" and "to evaluate developments that occurred after the balance-sheet date so the company's financials were presented fairly." *The Wall Street Journal* noted SBNY's "bet on the crypto industry led to a surge in deposits, which went into reverse as that market struggled" and that "[a] large amount of its deposits were uninsured, making it more likely the customers would flee at any sign of trouble."

382.      On May 4, 2023, Stephen Foley of the *Financial Times* wrote regarding the bank failings that "[t]he trio of bank failures since March has cast a pall over KPMG's lucrative business as the largest auditor of the U.S. banking sector." In the article, Foley referenced the opinions of Jeffrey Johanns, a former partner at PwC and professor at the University of Texas at Austin, who questioned whether "KPMG should have highlighted [risk management and internal audit] failings as material weaknesses that could affect the financial results." Foley further quoted Professor Johanns as stating that, "[i]f you have significant deficiencies in the risk function, how can the bank assert that it does not have a weakness in its internal controls?"

383.      KPMG's role in auditing SBNY is also subject to an ongoing congressional probe. In May 2023, Senators Richard Blumenthal and Ron Johnson sent a letter to KPMG CEO Paul Knopp asking for "all communications," records "referring or relating to" the firm's audits and

advisory work, and a "complete list of all advisory work" between KPMG and SBNY (as well as Silicon Valley Bank and First Republic Bank). As of the filing of this Complaint, Congress has not revealed additional details regarding its ongoing investigation into KPMG's audits.

## VIII.   KPMG'S MATERIALLY FALSE OR MISLEADING STATEMENTS AND OMISSIONS OF MATERIAL FACT

### 1.   March 1, 2021 – 2020 Form 10-K

384.   On March 1, 2021, SBNY issued its Annual Report for FY-2020 on Form 10-K. In the Annual Report, KPMG audited the Bank's consolidated financial statements and related notes and issued its "Opinion on the Consolidated Financial Statements."

385.   Within its audit that appeared in the Bank's Annual Report, KPMG stated:

> In our opinion, the consolidated financial statements present fairly, in all material respects, the financial position of the Company as of December 31, 2020 and 2019, and the results of its operations and its cash flows for each of the years in the three-year period ended December 31, 2020, in conformity with U.S. generally accepted accounting principles.

386.   The statement set forth in ¶385 was materially false or misleading when made, omitted material facts necessary to render the statement not misleading, or lacked a reasonable basis in fact, because SBNY's financial statements were not issued in conformity with GAAP because SBNY's financial statements did not disclose the Bank's concentration in large, uninsured deposits, which presented a "severe impact" that was "at least reasonably possible" to materialize "in the near term" due to the potential volatility of these deposits and based upon the fact that, as Regulators communicated to Defendants and KPMG, the Bank "did not sufficiently establish policies and controls to address this key risk." *See* Section IV.F.2.

387.   KPMG further stated in its audit opinion that appeared in the Annual Report:

> We also have audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States) (PCAOB), the Company's internal control over financial reporting as of December 31, 2020, based on criteria established in Internal Control – Integrated Framework (2013) issued by the Committee of Sponsoring Organizations of the Treadway Commission, and our

report dated March 1, 2021 expressed an unqualified opinion on the effectiveness of the Company's internal control over financial reporting.

388.    The statement set forth in ¶387 was materially false or misleading when made, omitted material facts necessary to render the statement not misleading, or lacked a reasonable basis in fact, because KPMG was required but failed to consider SBNY's fundamental control and risk management deficiencies, which were each known to KPMG. *See* Sections IV.F, VII.C. If KPMG had appropriately considered the Bank's deficiencies consistent with PCAOB Standards, KPMG would have, for instance, revealed there was an amplified risk of fraud in the Bank's financial statements and operations, and would not have issued an "unqualified opinion."

### 2.    March 1, 2022 – 2021 Form 10-K

389.    On March 1, 2022, SBNY issued its Annual Report for FY-2021 on Form 10-K. In the Annual Report, KPMG issued its "Opinion on the Consolidated Financial Statements."

390.    Within its audit that appeared in the Bank's Annual Report, KPMG stated:

In our opinion, the consolidated financial statements present fairly, in all material respects, the financial position of the Company as of December 31, 2021 and 2020, and the results of its operations and its cash flows for each of the years in the three-year period ended December 31, 2021, in conformity with U.S. generally accepted accounting principles.

391.    The statement set forth in ¶390 was materially false or misleading when made, omitted material facts necessary to render the statement not misleading, or lacked a reasonable basis in fact, because SBNY's financial statements were not issued in conformity with GAAP because SBNY's financial statements did not disclose the Bank's concentration in large, uninsured deposits, which presented a "severe impact" that was "at least reasonably possible" to materialize "in the near term" due to the potential volatility of these deposits and based upon the fact that, as Regulators communicated to SBNY and KPMG, the Bank "did not sufficiently establish policies and controls to address this key risk." *See* Section IV.F.2.

392.    KPMG further stated in its audit opinion that appeared in the Annual Report:

We also have audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States) (PCAOB), the Company's internal control over financial reporting as of December 31, 2021, based on criteria established in Internal Control – Integrated Framework (2013) issued by the Committee of Sponsoring Organizations of the Treadway Commission, and our report dated March 1, 2022 expressed an unqualified opinion on the effectiveness of the Company's internal control over financial reporting.

393.    The statement set forth in ¶392 was materially false or misleading when made, omitted material facts necessary to render the statement not misleading, or lacked a reasonable basis in fact, because KPMG was required but failed to consider SBNY's fundamental control and risk management deficiencies, which were each known to KPMG. *See* Sections IV.F, VII.C. If KPMG had appropriately considered the Bank's deficiencies consistent with PCAOB Standards, KPMG would have, for instance, revealed there was an amplified risk of fraud in the Bank's financial statements and operations, and would not have issued an "unqualified opinion."

### 3.      March 1, 2023 – 2022 Form 10-K

394.    On March 1, 2023, SBNY issued its Annual Report for FY-2022 on Form 10-K. In the Annual Report, KPMG issued its "Opinion on the Consolidated Financial Statements."

395.    Within its audit that appeared in the Bank's Annual Report, KPMG stated:

In our opinion, the consolidated financial statements present fairly, in all material respects, the financial position of the Company as of December 31, 2022 and 2021, and the results of its operations and its cash flows for each of the years in the three-year period ended December 31, 2022, in conformity with U.S. generally accepted accounting principles.

396.    The statement set forth in ¶395 was materially false or misleading when made, omitted material facts necessary to render the statement not misleading, or lacked a reasonable basis in fact, because SBNY's financial statements were not issued in conformity with GAAP because SBNY's financial statements did not disclose the Bank's concentration in large, uninsured deposits, which presented a "severe impact" that was "at least reasonably possible" to materialize "in the near term" due to the potential volatility of these deposits and based upon the fact that, as

125

Regulators communicated to SBNY and KPMG, the Bank "did not sufficiently establish policies and controls to address this key risk." *See* Section IV.F.2.

397.    KPMG further stated in its audit opinion that appeared in the Annual Report:

We also have audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States) (PCAOB), the Company's internal control over financial reporting as of December 31, 2022, based on criteria established in Internal Control – Integrated Framework (2013) issued by the Committee of Sponsoring Organizations of the Treadway Commission, and our report dated March 1, 2023 expressed an unqualified opinion on the effectiveness of the Company's internal control over financial reporting.

398.    The statement set forth in ¶397 was materially false or misleading when made, omitted material facts necessary to render the statement not misleading, or lacked a reasonable basis in fact, because KPMG was required but failed to consider SBNY's fundamental control and risk management deficiencies, which were each known to KPMG. *See* Sections IV.F, VII.C. If KPMG had appropriately considered the Bank's deficiencies consistent with PCAOB Standards, KPMG would have, for instance, revealed there was an amplified risk of fraud in the Bank's financial statements and operations, and would not have issued an "unqualified opinion."

## IX.    ADDITIONAL ALLEGATIONS OF DEFENDANTS' SCIENTER

399.    Defendants acted with scienter in that they knew or, recklessly disregarded, that the public statements set forth in Section V *supra* were materially false or misleading when made, and knowingly or recklessly participated or acquiesced in the issuance or dissemination of such statements as primary violators of the federal securities laws. In conjunction with and in addition to the facts set forth above, including in Sections IV.F, IV.L *supra*, Defendants' scienter is evidenced by the following facts, among others.

A.   **Defendants Had Actual Knowledge that SBNY Lacked Critical Liquidity and Risk Management Controls and Could Not Identify, Analyze or Address the Bank's Liquidity Problems and Risks**

400.   Defendants' knowledge of the many internal problems and risk management failures and deficiencies is readily established through the findings of Regulators, which were communicated in meetings, letters, and reports directly to Defendants, whom were each serving as senior managers of the Bank and/or as members of its Board of Directors, leading up to and throughout the Class Period. These findings reflect the then-existing facts on the ground at SBNY, all of which were known to the Defendants.

401.   Defendants' receipt of the Regulators' letters and reports identifying the Bank's deficiencies as MRBA and SRs further strengthens the scienter inference. As set forth in ¶81, MRBAs "*represent significant issues that necessitate immediate board attention*" and SRs "are material issues that require remediation by senior management but do not rise to the level of MRBAs." Regulator guidelines specifically stated that "[r]emediation of all MRBAs *is critical to the overall risk management and internal control processes of a bank.*" As described above, Defendants were under a continuing obligation to remediate highly significant and material MRBA and SRs related to liquidity risk management for the majority of the Class Period. Defendants were issued the MRBA and related-SRs by no later than July 6, 2020, when Regulators told Defendants that SBNY's deficiencies in "liquidity contingency planning" were a new "critical finding." Following the issuance of the MRBA and SRs, Defendants received at least annual Regulator reviews to determine whether Defendants had remediated the risk management deficiencies. As detailed above, Defendants never fully corrected the MRBA or 11 of the 18 SRs.

402.   As is established by the Reports of the FDIC, NYDFS, and GAO, Defendants also received in real-time the Regulators' findings of then-existing problems and deficiencies. Prior to the Class Period, from the 2019 examination cycle, Regulators told Defendants, among other

things, that there were "significant weaknesses in the Bank's liquidity contingency planning, including that the risk exposure presented by the concentration of uninsured deposits was not sufficiently identified, measured, [or] monitored." During the 2020 examination cycle, Regulators told Defendants, among other things, that the Bank's "funds management practices and liquidity contingency planning required improvement" and that "management needed to identify, document, and review stress scenarios that were relevant to the Bank and presented a range of liquidity and funding challenges to be approved by the Board." During the 2021 examination cycle, Regulators told Defendants, among other things, that SBNY's "management and the Board needed to implement corrective actions to remediate the funds management weaknesses in order to adequately control liquidity risk and limit potential adverse impacts on the financial condition of the Bank." Additionally, during the 2021 examination cycle, Regulators found that "[m]anagement [had] not identif[ied] an appropriate liquidity buffer, did not demonstrate the ability to adequately measure and control the impact of deposit volatility during stress events, and did not properly assess the likelihood of and survival requirements for a variety of idiosyncratic and macroeconomic stress events."

403.    Even more, that Defendants continued to falsely tout the Bank's risk management processes and conceal the truth—even after Regulators identified these deficiencies, which Defendants had failed to address over multiple years—adds to the scienter inference. Indeed, that Defendants had never implemented appropriate risk management and liquidity management systems was borne out during the weekend of March 10, 2023, as Defendants were woefully unprepared to manage the Bank's liquidity and, further demonstrating fraudulent intent, provided inaccurate and untrue information to Regulators. *See* Section IV.J.

404.    That Defendants knew about these severe deficiencies in processes needed to manage liquidity risks at the same time they were repeatedly and publicly emphasizing that they had assessed and were managing these risks, further strengthens the inference of scienter.

**B.    Defendants Were Specifically Responsible for the Bank's Risk and Liquidity Management Functions**

405.    Defendants' knowledge of the Bank's failing risk management systems is also evident from their responsibilities to oversee the Bank's risk management and liquidity management framework.

406.    Defendants DePaolo and Shay served as members of the Board of Directors throughout the Class Period. Defendant Howell was appointed to the Board in 2022. Moreover, Defendants DePaolo, Howell and Shay each served as members of the Risk Committee of the Board of Directors. Defendants DePaolo and Shay were members of the Risk Committee throughout the Class Period, and Defendant Howell joined the Risk Committee in 2022. The Risk Committee "assist[ed]" in the Board's oversight of "the risks inherent in the Bank and the control processes with respect to such risks; the assessment and review [of risks]; and the risk management activities of the Bank." In carrying out its responsibilities, the Risk Committee "develop[ed] and articulat[ed] the risk and risk appetite within the Bank, the enhancement of means of identifying, qualifying, quantifying, measuring and monitoring [KRIs] or dashboards for each major risk sector." The Risk Committee also was responsible for "educat[ing] management and employees about their responsibilities to manage risks and the review of key management, systems, processes and decisions so as to build risk assessment data into critical business systems."

407.    Moreover, as was stated in the Bank's SEC filings issued throughout the Class Period:

> Our liquidity management is guided by policies developed and monitored by our asset/liability management committee and approved by our Board of Directors. The asset/liability management committee consists of, among others, our Chairman,

129

President and Chief Executive Officer, Vice Chairman, Chief Operating Officer, Chief Financial Officer and, Chief Investment Officer and Treasurer. These policies take into account the marketability of assets, the source and stability of deposits, our wholesale borrowing capacity and the amount of our loan commitments.

408.    Based upon the Bank's representation, Defendants DePaolo, Shay, Howell, Susca, and Wyremski each served on the Bank's asset/liability management committee and thus were responsible for developing and monitoring policies related to the Bank's liquidity management. The Bank's committee structure also included an Enterprise Risk Management Committee. According to FE-1, throughout his tenure, Defendant Howell attended Enterprise Risk Management Committee meetings. FE-1 specifically recalled that during Enterprise Risk Management Committee meetings, MRBAs were presented and discussed, and that Howell had expressed concern and frustration with the outstanding MRBAs.

409.    That these Defendants were specifically charged with overseeing and managing the Bank's risk and liquidity management functions, but repeatedly misstated the Bank's ability to manage key risks facing the Bank, further supports the strong inference of scienter.

**C.    Defendants Repeatedly Spoke About the Issues at the Center of the Fraud**

410.    As set forth in Sections IV.H–I, V, throughout the Class Period, Defendants repeatedly spoke about the Bank's risk limits and overall risk management practices, the nature and size of the Bank's deposits, SBNY's deposit base, the Bank's liquidity, and SBNY's relationship with Regulators, among other critical and material topics. The consistent questioning on these issues by analysts throughout the Class Period demonstrate that Defendants had knowledge of and access to information about those topics, or, at the very least, that they were deliberately reckless in failing to investigate the issues before responding to investor questions on the topics.

411.    For example, Defendants DePaolo and Howell repeatedly misled investors about the Bank's commitment to setting and sticking to its digital asset concentration limits in response

130

to direct analyst questions. For example, on December 8, 2021, analyst Ryan Matthew Nash of Goldman Sachs asked DePaolo, in part, "And are there any concentration limits or other risks that you guys are considering related to them?" Defendant DePaolo responded: "We're spending a lot of time on risk and compliance, and we have concentration limits on our clients . . . I can't divulge those, but we have limits." Similarly, with respect to the Bank's tools to assess the stability of deposits, Defendant Howell touted on March 5, 2021 that "what we found thus far is that deposits are quite stable" in response to a specific analyst question about "thoughts on the valuation of the deposits and sensitivity to changes in value of bitcoin and the ecosystem." Defendants were also specifically asked by analysts throughout the Class Period about the Bank's liquidity. Defendant Howell specifically responded to one such question on October 18, 2022 that "we haven't had any issues to liquidity at all." Moreover, Defendants issued multiple false or misleading statements in response to analyst questions about the Bank's relationship with Regulators and ability to meet regulatory requirements, as seen through, for example, statements issued by Defendant Howell on October 19, 2021 and Defendant DePaolo on November 10, 2021.

412.    Investors are entitled to rely on statements made by public company officials, who should be informed as to the topics on which they speak. These repeated statements on matters directly concerning the fraud alleged herein strongly and plausibly suggest each Defendant had access to negative material undisclosed information and thus strengthen the scienter inference.

### D.    SBNY's Liquidity and Risk Management Controls Were Critical to the Bank

413.    Defendants knew sound risk management practices were essential to the bank's operations, as they acknowledged repeatedly throughout the Class Period. Risk management is essential for banks as banks face a wide range of risks, such as credit risk, market risk, operational risk, and reputational risk. Effective risk management, as the Bank acknowledged in SEC filings and in reports to investors, is crucial for banks to identify, assess, and mitigate these risks. The

importance of risk management to the Bank is evident by regulatory scrutiny surrounding risk management (*see* Section IV.F); the committees the Bank set in place to manage risks, which included the Bank's senior most personnel (*see* Section IX.B); and Defendants many statements emphasizing SBNY's dedication to employing "sound" risk management practices and ensured investors that the Bank was "spending a lot of time" on the development of a "robust" risk management framework (*see* Section IX.C).

414.    That Defendants' false and misleading statements concerned a fundamental aspect of its business further strengthens the scienter inference.

### E.    Defendants DePaolo and Howell Issued Specific Denials About SBNY's Weakening Liquidity

415.    As set forth in Section V, as the negative consequences of Signature's decision to cater to digital asset depositors led to substantial deposit outflows in 2022 and 2023, Defendants DePaolo and Howell specifically denied having any issues with available liquidity to assuage investor concern. During Signature's Q3 2022 Earnings Call, when asked how Signature was managing its cash balances (¶313), DePaolo stated: "***[w]e haven't had any issues to liquidity at all***." ¶318. Similarly, on January 17, 2023, DePaolo stated that the Bank had "overcame" the then-present "arduous rate environment" and "challenges in the digital asset space . . . with little difficulty, given ***our robust liquidity position***." ¶333. On March 9, 2023, in Signature's Updated Financial Figures Press Release, Defendant Howell likewise told investors that Signature "intentionally maintain[s] a high level of capital, ***strong liquidity profile***, and solid earnings" and is "committed to our depositors' safety, first and foremost."

416.    From these specific denials by Defendants DePaolo and Howell, there is a strong and plausible inference that each of them either knew of negative material, undisclosed information that contradicted their statements, or failed to investigate the necessary facts before issuing these denials.

**F.** **Defendants Controlled the Contents of SBNY's Public Statements and Had Unfettered Access to Information Contrary to Their Statements**

417.    Defendants' control over the entire Bank and access to non-public information also support a strong inference of scienter. As SBNY's top executives during the Class Period, Defendants controlled the Company's day-to-day operations and were informed of and unquestionably intimately involved with SBNY's relevant business practices and risk management.

418.    These Defendants' high-level positions, and their involvement with SBNY's core operation, allowed them to control the contents of the material misstatements alleged in Section V. Each Defendant controlled the contents of the oral statements they made during various earnings calls and investor conferences during the Class Period. In addition, because of their high-level positions, each Defendant was provided with, or had access to, copies of the press releases, FDIC filings, and presentations alleged herein to be false and misleading prior to, or shortly after, their issuance, and had the ability and opportunity to prevent their issuance or cause them to be corrected.

419.    Moreover, because of their high-level positions and access to material non-public information concerning the Bank, including all Regulator findings and periodic reports and communications, Defendants knew, or were deliberately reckless in not knowing, that the adverse facts alleged herein had not been disclosed to, and were being concealed from, the public, and that the positive representations that were being made to investors were materially false, misleading, and incomplete, and/or lacked any reasonable basis. Defendants were responsible for the accuracy of SBNYs corporate statements, and each is therefore responsible and liable for the false and misleading representations contained therein or material information omitted therefrom.

### G. Defendants Monitored Signature's Liquidity Risks on a Regular Basis

420.    Throughout the Class Period, Defendants claimed that they specifically and closely monitored SBNY's liquidity risks on a regular basis. Defendant DePaolo specifically stated on October 18, 2022 that "*we've been monitoring [liquidity] as we should on a minute-by-minute basis* and we feel comfortable that we'll be at about that [sic] we want at any point in time." Beyond public statements confirming minute-by-monitoring of the Bank's liquidity risk, Defendants were required to confer with Regulators regarding the Bank's available liquidity during the annual examination cycle. Within these reviews, Regulators met with the Bank's Board and senior management each year to present its finding on the topic and further issued separate liquidity risk management supervisory letters to the Bank each year of the Class Period. Within the report issued as part of the 2019 examination cycle, Regulators specifically noted that the Bank's "Board and management adequately monitored the daily liquidity position of the Bank." Further, according to FE-3 (*see* ¶120), Defendant DePaolo received a weekly review of the Bank's deposits that exceeded $250 million in an effort to manage the Bank's liquidity.

421.    That Defendants monitored the Bank's liquidity position regularly throughout the Class Period supports the strong inference that Defendants knew, or were deliberately reckless in not knowing, of the false and misleading nature of their statements about the Bank's management of risks related to liquidity, as set forth above.

### H. Defendants Had Motive and Opportunity to Mislead Investors

#### 1. By Driving Deposit Growth from 2020 to 2022, Defendants DePaolo, Shay, and Howell Increased Their Compensation by Millions of Dollars

422.    Leading up to and throughout the Class Period, Defendants DePaolo, Shay, and Howell had motive to chase untrammeled deposit growth in order to cash in on their lucrative incentive-based compensation package and Long-Term Incentive ("LTI") plan.

423.    More specifically, as discussed in Section IV.G above, SBNY's NEOs operated under both short-term and long-term incentive-based compensation plans that rewarded Signature's senior management for achieving substantial deposit growth. *See* Section IV.G. Under Signature's yearly incentive-based compensation plan from 2020 to 2022, a percentage of each NEO's compensation package was determined by Signature's ability to hit "[a]ctual [d]eposit [g]rowth" goals. ¶122. Similarly, half of Signature's lucrative LTI plan for the three-year period from 2020 to 2022 vested based solely on whether Signature could hit deposit growth goals during that time. ¶122.

424.    This dual short-term and long-term incentive package provided DePaolo, Shay, and Howell significant potential additional compensation beyond their comparatively smaller base pay. ¶123. Due to Signature's success in bringing in substantial deposits during the Class Period, *see* Section IV.D, above, Defendants DePaolo, Shay, and Howell received almost the entirety of this dual compensation package: DePaolo earned nearly $4 million in PSUs, over $2 million in restricted stock, and over $975,000 in cash payouts; Shay earned over $2.5 million in PSUs, nearly $1.3 million in restricted stock, and approximately $600,000 in cash payouts; and Howell earned over $1.6 million in PSUs, nearly $850,000 in restricted stock, and approximately $420,000 in cash payouts.

425.    Given the foregoing, Defendants DePaolo, Shay, and Howell were incentivized to drive deposit growth at SBNY during the Class Period in order to trigger these lucrative short-term and long-term compensation packages.

**2.      Defendants DePaolo, Shay, Susca, and Howell Engaged in a Series of Suspicious Stock Transactions During the Class Period, Netting Them Millions in Proceeds**

426.    Leading up to and throughout the Class Period, Defendants DePaolo, Shay, Susca, and Howell made a series of large and suspicious stock transactions at times when SBNY's

common stock price was artificially inflated due to the fraudulent conduct alleged herein. These stock sales netted Defendants DePaolo, Shay, Susca, and Howell millions in gross proceeds during the Class Period, as alleged fully below.

427.   ***DePaolo.*** As of March 3, 2020, just prior to the start of the Class Period, Defendant DePaolo owned 249,417 shares of SBNY common stock. By February 28, 2023, however, DePaolo's common stock holdings had declined by ***22%*** to 194,376 shares. This is because, during the Class Period, DePaolo sold over 78,000 shares of SBNY common stock at artificially inflated prices, for gross proceeds of ***$19,492,453.93***, through the following transactions:

| Transaction | Date | Shares | Price | Proceeds |
|---|---|---|---|---|
| Common Stock Disposed | 3/23/2021 | 15,239 | $219.941 | $3,351,665.66 |
| Common Stock Disposed | 4/6/2021 | 14,555 | $226.766 | $3,300,579.13 |
| Common Stock Disposed (Unsolicited) | 4/23/2021 | 30,000 | $242.4013 | $7,272,039.00 |
| Common Stock Disposed | 3/23/2022 | 18,285 | $304.5212 | $5,568,170.14 |

428.   The gross proceeds DePaolo received from these opportunistic sales of SBNY common stock vastly exceeded the $671,000 DePaolo spent to purchase SBNY securities during the Class Period. Further, as compared to DePaolo's stock purchases and sales in 2020 (the "Control Period"), DePaolo's substantial sales in 2021 were uncharacteristically large. In 2020, DePaolo sold 26,789 shares for gross proceeds of $2,744,990.73. In 2021, however, these numbers more than doubled, with DePaolo selling 59,794 shares for gross proceeds of $13,924,283.80.

429.   Defendant DePaolo engaged in suspicious stock transactions at times when the Bank's common stock price was artificially inflated due to the fraudulent misconduct alleged herein. *First*, DePaolo's stock sales on March 23, 2021 and March 23, 2022 were executed just one day after he received performance-based stock awards that, as discussed above, were largely contingent upon the Bank achieving its deposit growth initiatives (¶122).

430.     *Second*, Defendant DePaolo's sales of 59,794 shares, accounting for nearly 23% of his holdings, during March and April 2021 were made shortly after the Company filed its March 1, 2021, Form 10-K, where Defendants made material misrepresentations to investors regarding the Bank's risk management practices, internal controls, liquidity, and stress testing. *See* Sections V.2-3. Similarly, Defendant DePaolo's sale of 30,000 shares on April 23, 2021, came just two days after the Company's first quarter 2021 Earnings Call, where Defendants DePaolo and Howell made false and misleading statements to investors about the Bank's low risk profile and the stickiness of its digital asset depositor base. *See* Section V.4. Likewise, Defendant DePaolo's March 23, 2022, sale of 18,285 shares for gross proceeds of $5.5 million was made shortly after SBNY filed its March 1, 2022, Form 10-K, where DePaolo, Shay, and Wyremski made material misrepresentations to investors regarding SBNY's risk management practices, internal controls, regulatory compliance, available liquidity, and stress testing processes. *See* Sections V.13-14.

431.     *Howell*. As of March 3, 2020, just prior to the start of the Class Period, Defendant Howell owned 103,534 shares of SBNY's common stock. By February 28, 2023, however, Howell's holdings had decreased ***67%*** to just 34,467 shares. This is because, during the Class Period, Howell sold over 115,000 shares of SBNY common stock at artificially inflated prices, for gross proceeds of ***$19,354,687.12***, through the following transactions:

| Transaction | Date | Shares | Price | Proceeds |
|---|---|---|---|---|
| Common Stock Disposed | 3/23/2021 | 10,238 | $219.941 | $2,251,755.96 |
| Common Stock Disposed | 4/6/2021 | 10,012 | $226.766 | $2,270,381.19 |
| Common Stock Disposed (Unsolicited) | 4/23/2021 | 43,000 | $242.4982 | $10,427,422.60 |
| Common Stock Disposed | 3/23/2022 | 11,810 | $304.5212 | $3,596,395.37 |
| Preferred Stock Disposed (Unsolicited) | 8/9/2022 | 40,000 | $20.2183 | $808,732.00 |

432.     The gross proceeds Howell received from these opportunistic sales of SBNY common stock vastly exceeded the $1,959,170 Howell spent to purchase SBNY securities during

the Class Period. Further, as compared to Howell's stock sales in the Control Period, Howell's substantial sales in 2021 were uncharacteristically large. In 2020, Howell sold 13,500 shares for gross proceeds of $1,187,401.16. In 2021, however, these numbers more than quadrupled, with Howell selling 63,250 shares for gross proceeds of $14,949,559.80.

433.     Defendant Howell engaged in suspicious stock transactions at times when SBNY's common stock price was artificially inflated due to the fraudulent misconduct alleged herein. *First*, like DePaolo, Howell's stock sales on March 23, 2021, and March 23, 2022, were executed just one day after he received performance-based stock awards that, as discussed above, were largely contingent upon the Bank achieving its deposit growth initiatives (¶122).

434.     *Second*, Defendant Howell's sales of 63,250 shares, accounting for nearly 48% of his holdings, during March and April 2021 were made shortly after the Company filed its March 1, 2021, Form 10-K, where Defendants DePaolo, Shay, and Susca made material misrepresentations to investors regarding the Bank's risk management practices, internal controls, liquidity, and stress testing. *See* Sections V.2-3. Similarly, Defendant Howell's sale of 43,000 shares on April 23, 2021, came just two days after the Company's first quarter 2021 Earnings Call, where Defendants DePaolo and Howell made false and misleading statements to investors about the Bank's low risk profile and the stickiness of its digital asset depositor base. *See* Section V.4. Likewise, Defendant Howell's March 23, 2022, sale of 11,810 shares was made shortly after SBNY filed its March 1, 2022, Form 10-K, where DePaolo, Shay, and Wyremski made material misrepresentations to investors regarding the Bank's risk management practices, internal controls, regulatory compliance, available liquidity, and stress testing processes. *See* Sections V.13-14.

435.     *Shay*.  During the Class Period, Shay sold over 24,000 shares of SBNY common stock at artificially inflated prices, for gross proceeds of ***$5,431,120.82***, through the following transactions:

| Transaction | Date | Shares | Price | Proceeds |
|---|---|---|---|---|
| Common Stock Disposed | 3/23/2021 | 13,539 | $219.941 | $2,977,781.20 |
| Common Stock Disposed | 4/6/2021 | 10,818 | $226.766 | $2,453,154.59 |
| Common Stock Disposed (Unsolicited) | 7/21/2022 | 1.008 | $183.56 | $185.03 |

436.    The gross proceeds Shay received from these opportunistic sales of SBNY common stock significantly exceeded the $833,895 Shay spent to purchase SBNY securities during the Class Period. Further, as compared to Shay's stock sales in the Control Period, Shay's substantial sales in 2021 were uncharacteristically large. In 2020, Shay did not sell a single share of SBNY stock. In 2021, however, Shay sold 24,357 shares for gross proceeds of $5,430,935.79.

437.    Defendant Shay engaged in suspicious stock transactions at times when SBNY's common stock price was artificially inflated due to the fraudulent misconduct alleged herein. *First*, like DePaolo and Howell, Defendant Shay's March 23, 2021 sale of 13,539 shares of common stock was executed just one day after he received performance-based stock awards that, as discussed above, were largely contingent upon the Bank achieving its deposit growth initiatives (¶122).

438.    *Second*, Defendant Shay's sales of 24,357 shares during March and April 2021 were made shortly after the Company filed its March 1, 2021, Form 10-K, where Defendants DePaolo, Shay, and Susca made material misrepresentations to investors regarding the Bank's risk management practices, internal controls, liquidity, and stress testing. *See* Section V.2.

439.    *Susca*. As of March 24, 2020, just prior to the start of the Class Period, Defendant Susca owned 45,579.556 shares of SBNY's common stock. By February 15, 2023, however, Susca's holdings had decreased ***28.91%*** to just 32,403 shares. This is because, during the Class Period, Susca sold over 25,000 shares of SBNY common stock at artificially inflated prices, for gross proceeds of ***$6,469,461.76***, through the following transactions:

| Transaction | Date | Shares | Price | Proceeds |
|---|---|---|---|---|
| Common Stock Disposed | 3/23/2021 | 5,751 | $219.941 | $1,264,880.69 |
| Common Stock Disposed | 4/6/2021 | 5,835 | $226.766 | $1,323,179.61 |
| Common Stock Disposed (Unsolicited) | 4/23/2021 | 7,000 | $241.8298 | $1,692,808.60 |
| Common Stock Disposed | 3/23/2022 | 7,187 | $304.5212 | $2,188,592.86 |

440.    The gross proceeds Susca received from these opportunistic sales of SBNY common stock significantly exceeded the $513,895 Susca spent to purchase SBNY securities during the Class Period. Further, as compared to Susca's stock sales in the Control Period, Susca's substantial sales in 2021 were uncharacteristically large. In 2020, Susca sold 5,239 shares for gross proceeds of $401,150.23. In 2021, however, these numbers more than tripled, with Susca selling 18,586 shares for gross proceeds of $4,280,868.90.

441.    Defendant Susca engaged in suspicious stock transactions at times when SBNY's common stock price was artificially inflated due to the fraudulent misconduct alleged herein. *First*, like other SBNY executives, Susca's stock sales on March 23, 2021, and March 23, 2022, were executed just one day after he received performance-based stock awards that, as discussed above, were largely contingent upon the Bank achieving its deposit growth initiatives (¶122).

442.    *Second*, Defendant Susca's sales of 18,586 shares, accounting for approximately 39% of his holdings, during March and April 2021 were made shortly after the Company filed its March 1, 2021, Form 10-K, where Defendants DePaolo, Shay, and Susca made material misrepresentations to investors regarding the Bank's risk management practices, internal controls, liquidity, and stress testing. *See* Section V.2. Similarly, Defendant Susca's sale of 7,000 shares on April 23, 2021, came just two days after the Company's Q1 2021 Earnings Call, where Defendants DePaolo and Howell made false and misleading statements to investors about the Bank's low risk profile and the stickiness of its digital asset depositor base. *See* Sections V.2-3.    Likewise, Defendant Susca's March 23, 2022, sale of 7,187 shares was made shortly after SBNY filed its

March 1, 2022, Form 10-K, where DePaolo, Shay, and Wyremski made material misrepresentations to investors regarding the Bank's risk management practices, internal controls, regulatory compliance, available liquidity, and stress testing processes. *See* Section V.13.

## X.   ADDITIONAL ALLEGATIONS OF KPMG'S SCIENTER

### A.   KPMG Had Actual Knowledge of SBNY's Deposit Concentrations and Failing Risk Management Systems

443.   Section 36(h) of the Federal Deposit Insurance Act (12 U.S.C. § 1831m(h)) required SBNY to provide KPMG with copies of the institution's "report of condition," "report of examination," or "any supervisory memorandum of understanding" issued by the Bank's regulators. Through the information contained within these reports, as is reflected in detailed summaries throughout the various Regulator reports issued after the Bank's collapse, KPMG knew or was reckless to disregard the material risks facing SBNY and the Bank's many related deficiencies, including its many risk management failures as fully described in Sections IV.F, IX.A, and VII.C above. KPMG similarly knew or was reckless to disregard that Defendants, along with SBNY's Board and other senior leaders, pursued rapid, unrestrained growth without developing and maintaining adequate risk management practices and controls appropriate for the size, complexity and risk profile of the institution, did not prioritize good corporate governance practices, and failed to adequately respond to, address, or remediate the FDIC's many MRBAs and SRs during the Class Period.

444.   KPMG learned all of these and other adverse facts in real-time. By way of example only, KPMG learned during the 2019 examination cycle that the Bank's liquidity risk management framework was completely deficient since, by this time, Regulators had issued the Bank an MRBA and 18 related-SRs stemming from the Bank's "liquidity contingency planning," which the Regulators called "a critical finding." KPMG further understood that the Bank had "significant weaknesses in the Bank's liquidity contingency planning, including that the risk exposure

presented by the concentration of uninsured deposits was not sufficiently identified, measured, [or] monitored." KPMG also knew that the Bank's risk management practices were not "commensurate with the institution's complexity, risk profile, and scope of operations due to the weaknesses with liquidity contingency planning, LST, and internal controls."

445.    KPMG further learned during the 2020 examination cycle that the Company's risk management function had remained deficient. KPMG further understood by this point that SBNY's "funds management practices and liquidity contingency planning required improvement" and that "management needed to identify, document, and review stress scenarios that were relevant to the Bank and presented a range of liquidity and funding challenges to be approved by the Board." During this examination cycle, the Regulators continued to raise concerns with SBNY's uninsured deposit concentration, and specifically flagged that "196 clients with balances exceeded $50 million as of year-end 2020, account[ed] for $35 billion, or 55 percent of total deposits."

446.    During the 2021 examination cycle, KPMG further learned that SBNY's "management and the Board needed to implement corrective actions to remediate the funds management weaknesses in order to adequately control liquidity risk and limit potential adverse impacts on the financial condition of the Bank." KPMG understood that, at this point, "[m]anagement [had] not identif[ied] an appropriate liquidity buffer, did not demonstrate the ability to adequately measure and control the impact of deposit volatility during stress events, and did not properly assess the likelihood of and survival requirements for a variety of idiosyncratic and macroeconomic stress events." During this examination cycle, the Regulators reiterated concerns that "management's assumptions [regarding the stability of deposits] was not well documented and not been substantiated." The Regulators flagged their concern that "60 clients held deposit account balances in excess of $250 million, representing about 40 percent of total

deposits" and that "other large depositor concentration included four single depositors, each comprising greater than 2 percent of total assets, totaling 14 percent of total assets."

447. KPMG was informed in real-time through Regulator findings of the significant risk of SBNY's concentration in large, uninsured deposits, a risk that was amplified through SBNY's years long failure to develop specific processes to manage this risk, and, more generally of SBNY's crumbling internal control and risk management framework. That KPMG issued false or misleading audit opinions while fully aware of all of these adverse facts further strengthens the inference of scienter.

**B.      KPMG's Conflicts of Interest with Key SBNY Personnel Are Further Indicia of Scienter**

448. SEC guidance specifically provides that "[p]ublic companies have a responsibility to ensure that the auditors of their financial statements are independent, as do the auditors themselves." Auditor independence requirements are further set forth under the PCAOB, including PCAOB Auditing Standard 2010, which requires auditors to "determine compliance with independence and ethics requirements" at the beginning of each audit.

449. Significant questions exist regarding KPMG's independence with respect to its audits of SBNY. For example, Keisha Hutchinson joined SBNY on June 1, 2021, as the Bank's Senior Vice President and Chief Risk Officer. Hutchinson was hired directly from KPMG, where she worked as an audit partner from 2015 to 2021, specifically assigned to KPMG's SBNY audit work. Hutchinson signed off on KPMG's clean audit of SBNY in March of 2021, just a month before the Bank announced her hiring. Indeed, in the aftermath of SBNY's collapse, *The Wall Street Journal* reported that Ms. Hutchinson's "rapid transition from a senior KPMG auditor to a senior executive at a KPMG client adds to the list of questions facing the accounting firm over its audits of Signature." As Chief Risk Officer at SBNY, Hutchinson was instrumental to the governance and control framework as she was "responsible for overseeing Signature's enterprise

risk management, compliance and information security programs." As stated in the Bank's 2021 Social Impact Report: "the Board's primary means for overseeing and evaluating risk is through open lines of communication with senior management and Signature Bank's Chief Risk Officer [Hutchinson]."

450.    There existed many additional ties between SBNY and KPMG that undermined KPMG's independence. Defendants DePaolo and Wyremski both previously worked at KPMG. DePaolo worked for KPMG as a senior audit manager from 1981 to 1988, and Wyremski worked for KPMG as a bank auditor for eight years from 2004 to 2012, including overseeing audits for large and mid-sized banking enterprises. Further, two independent members of SBNY's Board of Directors, Judith Huntington and Michael Pappagallo, previously had long tenures working for KPMG. Huntington worked for KPMG as an audit senior manager for fifteen years (from 1989 to 2004), and Pappagallo worked at KPMG for nine years (from 1981 to 1990). Both Huntington and Pappagallo sat on the examining committee that oversaw the work of KPMG as Signature's auditor.

451.    Thus, there is a strong and plausible inference that KPMG's independence over its audits of SBNY was likely undermined through its deepening and longstanding conflicts of interest with key SBNY personnel, which further supports the already strong inference of KPMG's scienter.

## XI.    LOSS CAUSATION

452.    Defendants' false and misleading statements, material omissions, and deceptive course of conduct had their intended effect, directly and proximately causing SBNY common stock to trade at artificially inflated prices during the Class Period, closing as high as $365.71 per share on January 7, 2022. Relying on the integrity of the market price for SBNY common stock and public information related to SBNY, Lead Plaintiff and other Class members purchased or

otherwise acquired SBNY common stock at prices that incorporated and reflected Defendants' misrepresentations and omissions of material fact alleged herein. As a result of their purchases of SBNY common stock during the Class Period at artificially inflated prices, and the removal of that inflation upon the disclosures set forth below, Lead Plaintiff and the Class suffered economic losses (i.e., damages) under the federal securities laws.

453.   Absent Defendants' misrepresentations and omissions of material fact, Lead Plaintiff and other Class members would not have purchased or otherwise acquired their SBNY common stock at the artificially inflated prices at which it traded during the Class Period. It was foreseeable to Defendants that misrepresenting and concealing material facts from the public would artificially inflate the price of SBNY common stock and/or maintain artificial inflation in SBNY's stock price. The economic losses (i.e., damages suffered by Lead Plaintiff and other members of the Class) were a direct, proximate, and foreseeable result of Defendants' materially false and misleading statements and omissions of material fact, which artificially inflated the price of the Company's common stock and/or maintained artificial inflation in SBNY's stock price, and the subsequent significant decline in the value of the Company's common stock when the relevant truth was revealed and/or the risks previously concealed by Defendants' material misrepresentations and omissions materialized.

454.   Lead Plaintiff and other Class members suffered actual economic loss and were damaged when the material facts and/or the foreseeable risks concealed or obscured by Defendants' misrepresentations and omissions were revealed and/or materialized through the disclosure of new information concerning SBNY on May 16, 2022, July 19, 2022, December 6, 2022, and March 13, 2023. As alleged in this Section, the disclosure of the relevant truth and/or materialization of the risks concealed by Defendants' fraud directly and proximately caused foreseeable declines in the price of SBNY common stock on these dates by removing the artificial

inflation in the price of SBNY common stock that resulted from Defendants' fraud. The timing and magnitude of the declines in the price of SBNY common stock, as detailed herein, negate any inference that the losses suffered by Lead Plaintiff and the Class was caused by changed market conditions or other macroeconomic factors unrelated to Defendants' fraudulent conduct.

### A.    May 16, 2022 – Mid-Quarter Update

455.    Investors began to learn the relevant truth concealed by Defendants' misrepresentations and omissions on May 16, 2022. On that day, SBNY issued a *Mid-Quarter Update*, revealing that, in response to volatility in the digital asset markets, SBNY's "[d]eposit balances" had fallen by "approximately $1.39 billion" as of May 13, 2022.

456.    On this news, the price of SBNY common stock fell by *7.1%*, closing on Friday May 13, 2022, at $201.20 per share and closing on May 16, 2022, at $186.93 per share.

457.    This disclosure called into question Defendants earlier representations concerning their methods for assessing the stability of digital asset deposits.

458.    SBNY's stock price, however, remained artificially inflated because Defendants continued to conceal the Bank's liquidity risk from its concentrated exposure to the digital asset markets. Instead, Defendants continued to misrepresent and conceal the full relevant truth by falsely assuring investors that deposit "[b]alances ha[d] not been meaningfully affected by current events in the digital asset trading space" and that the Bank "remain[ed] well-positioned for deployment of excess cash, and reiterate[d] guidance for interest-earning asset growth in the $4–7 billion range for the 2022 second quarter." Yet, Defendants had no reasonable basis to make these assurances. As noted herein, Defendants had concentrated the Bank into large, uninsured and volatile digital asset deposits without implementing appropriate risk management strategies such as reliable methods to analyze the stability of the Bank's deposits or to identify and mitigate risks related to the Bank's liquidity in times of stress.

459.     Analysts and market commentators expressed concern and surprise at the Bank's disclosure of declining deposits, and attributed the stock price declines that day to perceived volatility in the Bank's deposit base and questions regarding the Bank's ability to deploy cash into profit generating activities. For example, JPMorgan stated: "While loan growth and earning asset growth are on track with its previous guidance, deposit balances declining quarter-to-date was below our expectations for 2Q22." Stephens wrote that it was "disappointed in [the] deposit run-off (and unsure where it occurred)." Wedbush wrote that the disclosure "confirms that deposit growth is under pressure." Piper Sandler wrote a few days later, on May 20, 2022, that "on Monday [SBNY] indicated that deposits were down approximately $1.39 billion quarter-to-date. This follows the prior 4 quarters when deposits grew by an average of about $8.8 billion per quarter."

**B.      July 19, 2022 – Earnings Report and Earnings Call**

460.     On July 19, 2022, investors further learned of the material risks concealed and distorted by Defendants' misrepresentations and omissions. When the Bank reported its full 2022 second quarter results on that date, it revealed, in relevant part, that "total deposits in the second quarter declined $5.04 billion" and that "[t]he decline was primarily driven by client balances of the New York Banking Teams, which decreased $2.4 billion and the Digital Asset Banking Team, which declined $2.4 billion." On the earnings call held the same day, Defendant Howell also revealed that "clearly, there are people leaving th[e] [digital asset] space and therefore deposits leaving."

461.     On this news, the price of SBNY common stock fell by *4.5%*, from a closing price of $196.12 on July 18, 2022 to close at $187.28 on July 19, 2022.

462.     SBNY's stock price, however, remained artificially inflated because Defendants continued to misrepresent and conceal the full relevant truth. Once more, Defendants had no reasonable basis on which to make positive statements concerning how distress in the digital asset

147

market would impact the Bank's deposit base and liquidity position. As noted throughout, at this time, they had concentrated the Bank into large, uninsured and volatile digital asset deposits without implementing appropriate risk management strategies such as reliable methods to analyze the stability of the Bank's deposits or to identify and mitigate risks related to the Bank's liquidity in times of stress. Rather than disclose the full truth, Defendant Howell reassured investors that "we saw a 65% decline in the price of Bitcoin and that -- we were hardly down, not even 10% in deposits in that space. We're pretty pleased with the fact that we only saw a less than 10% outflow in our deposit base there." DePaolo again falsely reassured investors that Defendants were "feel[ing] really good" in response to an analyst question about overall deposit trends.

463.    Analysts and market commentators expressed surprise and dismay at Signature's newest disclosure. Many analysts attributed the weakness in the stock to negative deposit trends. On July 19, 2022, Jefferies wrote that the drop in deposits "will increase investor angst about funding future loan growth with [the] excess cash position now exhausted." UBS also responded to the news that: "Deposit dynamics are the biggest debate for SBNY and we believe these results could stoke concerns about overall B/S growth moving forward. As of the mid-quarter update, crypto deposits were flat but ended the quarter down $2.4bn. . . . Given the ~$25bn+ in total digital asset deposits, it is a critical component to overall trends."

464.    Analysts and commentators also attributed the stock drop to concerns regarding the Bank's liquidity position. On July 19, 2022, Piper Sandler wrote, reacting to the Bank's quarterly results: "Liquidity declined meaningfully. Total cash and cash equivalents fell by 44% or $11.7 billion to $14.6 billion or about 13% of assets from 22% in the most recent quarter." Similarly, on July 27, 2022 the *Financial Times*' article entitled, *Signature Bank Bet Big on Crypto – And Must Reckon with the Crash*, stated that there existed "concerns raised in private by investors relate[d] to liquidity: as Signature banks eight of the 12 largest crypto brokers, for instance, an implosion

of the industry in a credit crunch could see their deposits rapidly evaporate." The *Financial Times* also reported that "Signature has also faced speculation that its rapid growth and embrace of a controversial industry may have attracted the attention of regulators." In the comments to this article, Patrick Jenkins of the *Financial Times* wrote, based on the facts disclosed by the Bank regarding deposit run-off: "There is a chunk about asset exposure (eg fund lending). But the main concern seems to be funding and liquidity relating to the stability of the deposit base…. That can kill a bank just as much as a credit crisis."

465. Defendants further sought to assuage investors in the days after the July 19 disclosure. As reported by the *Financial Times* on July 27, 2022, DePaolo falsely assured investors that the Bank could withstand the death of Bitcoin and its ilk: "Every month we model with an assumption that every single last crypto deposit is withdrawn." DePaolo further stated: "The first thing we think about when we wake up in the morning and the last thing when my head hits the pillow at night is to make sure that we have plentiful liquidity and safe assets."

### C.   December 6, 2022 – Goldman Sachs Investor Conference

466. Weeks later, investors continued to learn the truth about the risks concealed and distorted by Defendants' prior misrepresentations. On December 6, 2022, during an investor conference hosted by Goldman Sachs in New York, Howell shocked investors by announcing that the Bank would be "shrink[ing] its deposits tied to cryptocurrencies by $8 billion to $10 billion." Howell further revealed to the market, for the first time, that Signature was limiting deposits of digital asset clients that held more than 2% of total deposits, stating: "We're going to put in at least -- no [one] client can have more than 2% in deposits. We're going to, over time, look to lower that as well." Howell also hinted at Defendants' risk management failings, stating that Defendants would be analyzing the Bank's digital asset deposits "in a much more thoughtful manner moving forward."

467.    On this news, the price of SBNY common stock fell approximately *7%*, opening December 6, 2022 at $125.70 per share and closing December 7, 2022 at $116.99 per share. SBNY's stock dropped 11.2% during the week after the announcement was made.

468.    SBNY's stock price, however, remained artificially inflated because Defendants concealed the full relevant truth. While this disclosure revealed that Defendants had banked especially risky digital asset deposits that exceeded 2% of the Bank's total deposits and that the Bank was over-concentrated in digital assets and was facing risks related thereto, Defendants did not reveal that they still had not implemented appropriate risk management strategies such as methods to analyze the stability of the Bank's deposits or to identify and mitigate risks related to the Bank's liquidity in times of stress. Further, rather than disclose the full truth, Howell instead falsely assured investors that, "between [its] cash and borrowing capacity," SBNY could "easily take care of any deposits leaving, any and all deposits if they were to leave the ecosystem, the crypto ecosystem for us. So it's a nonevent."

### D.    March 12, 2023 – SBNY Is Shuttered

469.    The relevant truth concealed by Defendants' false and misleading statements and omissions was fully revealed to the market on March 12, 2023 when it was announced that SBNY did not have the liquidity to cover its obligations. On Sunday, March 12, 2023, the public learned that NYDFS had taken possession of the Bank at approximately 5:30 p.m. and the Bank was forced into receivership. The FDIC issued a press release on the same day entitled, *FDIC Establishes Signature Bridge Bank, N.A., As Successor to Signature Bank, New York, NY*, stating that, although depositors would be made whole, "[s]hareholders . . . will not be protected." Contrary to SBNY management's recent assurances that the Bank had a "strong liquidity position" and additional borrowing capacity "of approximately $29.01 billion," these press releases made it unequivocally

clear to investors that SBNY did not have enough available liquidity to cover its obligations to depositors.

470.    On the news, the Bank's stock price collapsed at open on Monday, March 13, 2023, causing Nasdaq to halt trading in the stock at a last sale price of $70.00 "until Signature Bank ha[d] fully satisfied Nasdaq's request for additional information." When trading resumed on March 28, 2023, the stock was trading under a dollar, and closed at $0.13. This amounted to a ***99.81%*** drop.

471.    Following the Bank's collapse, analysts quickly started dropping research coverage of the Bank. In a March 13, 2023, Report, Janney dropped its coverage of SBNY and indicated that the Bank's failure stemmed from Regulators' determining that "the Bank was . . . conducting business in an unsafe manner given expeditious changes in its financial condition." Stephens published a report on the same day outlining lessons learned from the collapse of Silvergate, SVB, and SBNY, and specifically pointed to SBNY's low percentage of deposits worth less than $250,000 (just 6%) and high percentage of uninsured deposits (90%) as causes of the failure.

## XII.    A PRESUMPTION OF RELIANCE APPLIES

472.    At all relevant times, the market for SBNY's common stock was efficient for the following reasons, among others: (i) SBNY's common stock met the requirements for listing, and was listed and actively traded on the Nasdaq, a highly efficient and automated market; (ii) as a regulated issuer, SBNY filed periodic reports with the FDIC and SEC; (iii) SBNY regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and (iv) SBNY was followed by numerous securities analysts employed by major brokerage firms who wrote reports which were

distributed to those brokerage firms' sales force and certain customers, and were publicly available and/or entered the public market place.

473.    As a result of the foregoing, the market for SBNY common stock reasonably and promptly digested current information regarding SBNY from all publicly available sources and reflected such information in the price of SBNY common stock. Purchasers and acquirers of SBNY common stock during the Class Period suffered similar injury through their purchases and acquisitions of SBNY common stock at artificially inflated prices, and a presumption of reliance applies.

474.    Further, at all relevant times, Lead Plaintiff and other Class members relied on Defendants to timely disclose material information as required by law. Lead Plaintiff and other Class members would not have purchased or otherwise acquired SBNY common stock at artificially inflated prices if Defendants had timely disclosed all material information as required by law.

475.    Thus, to the extent that Defendants concealed or improperly failed to disclose material facts concerning the Company and its business, Lead Plaintiff and other Class members are entitled to a presumption of reliance in accordance with *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 153 (1972).

## XIII.   THE STATUTORY SAFE HARBOR AND BESPEAKS CAUTION DOCTRINE DO NOT APPLY

476.    The Private Securities Litigation Reform Act's statutory safe harbor and/or the "bespeaks caution doctrine" applicable to forward-looking statements under certain circumstances do not apply to any of the materially false or misleading statements alleged herein. Most, if not all, of the statements complained of herein were not forward-looking statements. Rather, they were either: (i) historical statements or statements of purportedly current facts and conditions at the time the statements were made; (ii) mixed statements of present and/or historical facts and future intent;

and/or (iii) omitted to state material current or historical facts necessary to make the statements not misleading.

477.     To the extent that any of the materially false and misleading statements alleged herein can be construed as forward-looking, those statements were not accompanied by meaningful cautionary language identifying important facts that could cause actual results to differ materially from those in the statements. Given the then-existing facts contradicting Defendants' statements, any generalized risk disclosures made by Defendants were not sufficient to insulate Defendants from liability for their materially false and misleading statements.

478.     To the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, or portion thereof, Defendants are liable for those false forward-looking statements because at the time each of those statements was made, Defendants knew the statements were false and/or misleading, did not actually believe the statements, had no reasonable basis for the statements, and/or were aware of undisclosed facts tending to seriously undermine the statements' accuracy.

## XIV.   CLASS ACTION ALLEGATIONS

479.     Lead Plaintiff brings this action on its own behalf and as a class action, pursuant to Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure, on behalf of a Class consisting of all persons and entities who, during the Class Period, purchased or otherwise acquired SBNY common stock and were damaged thereby. Excluded from the Class are: (i) Defendants; (ii) former executive officers of SBNY or any of SBNY's subsidiaries or affiliates, former members of SBNY's Board of Directors, and members of the immediate families of each of the foregoing (as defined in 17 C.F.R. § 229.404, Instructions (1)(a)(iii) and (1)(b)(ii)); (iii) any of the foregoing individuals' and entities' legal representatives, heirs, successors, or assigns; and (iv) any entity in which any Defendant has a controlling interest.

480. The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to Lead Plaintiff at this time and can only be ascertained through appropriate discovery, Lead Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Throughout the Class Period, SBNY's common stock was actively traded on the Nasdaq (an open and efficient market) under the symbol "SBNY." As of February 28, 2023, SBNY had approximately 62.9 million shares of common stock outstanding. Record owners and the other Class members may be identified from records maintained by SBNY and/or its transfer agents and may be notified of the pendency of this action by mail, using a form of notice similar to that customarily used in securities class actions.

481. Lead Plaintiff's claims are typical of the claims of the other Class members, as all Class members were similarly affected by Defendants' wrongful conduct in violation of federal laws that is complained of herein.

482. Lead Plaintiff will fairly and adequately protect the interests of the other Class members and has retained counsel competent and experienced in prosecuting class actions and securities litigation.

483. Common questions of law and fact exist as to all Class members and predominate over any questions solely affecting individual Class members. Among the questions of law and fact common to the Class are: (i) whether Defendants violated the federal securities laws by their acts and omissions as alleged herein; (ii) whether Defendants' statements to the investing public during the Class Period contained material misrepresentations and/or omitted to disclose material facts; (iii) whether and to what extent the market price of SBNY's common stock was artificially inflated during the Class Period due to the material misrepresentations and omissions alleged herein; (iv) whether SBNY and the Executive Defendants acted with the requisite level of scienter; (v) whether the Executive Defendants were controlling persons of the Company; and (vi) whether

members of the Class have sustained damages as a result of the conduct complained of herein and, if so, the proper measure of damages.

484.     A class action is also superior to other available methods for the fair and efficient adjudication of this controversy. Because the damages suffered by each individual member of the Class may be relatively small, the expense and burden of individual litigation make it impracticable for Class members to seek redress for the wrongful conduct alleged herein. Lead Plaintiff knows of no difficulty that will be encountered in the management of this litigation that would preclude its maintenance as a class action.

## XV.    CAUSES OF ACTION

### COUNT I

**Violation of Section 10(b) of the Exchange Act
and SEC Rule 10b-5 Promulgated Thereunder Against Defendants
DePaolo, Howell, Santora, Seibert, Shay, Susca, and Wyremski**

485.     Lead Plaintiff incorporates ¶¶1-484 by reference. This Count is brought against these Defendants pursuant to Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5, on behalf of Lead Plaintiff and all other members of the Class.

486.     During the Class Period, these Defendants violated §10(b) of the Exchange Act and SEC Rule 10b-5(b) by disseminating or approving the false statements specified above, which they knew or recklessly disregarded were misleading in that the statements contained misrepresentations and/or failed to disclose material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading.

487.     Lead Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid for or otherwise acquired SBNY common stock at inflated prices. Lead Plaintiff and the Class would not have purchased or otherwise acquired SBNY common stock

at such prices, or at all, had they been aware that the market prices for SBNY common stock had been artificially inflated by Defendants' fraudulent course of conduct.

488.    As a direct and proximate result of these Defendants' wrongful conduct, Lead Plaintiff and the Class suffered damages in connection with their respective purchases or acquisitions of SBNY common stock during the Class Period.

489.    This claim is brought within the applicable statute of limitations.

## COUNT II

### Violation of Section 10(b) of the Exchange Act
### and SEC Rule 10b-5 Promulgated Thereunder Against Defendants
### DePaolo, Howell, Santora, Seibert, Shay, Susca, and Wyremski

490.    Lead Plaintiff incorporates ¶¶1-489 by reference. This Count is brought against these Defendants pursuant to Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5, on behalf of Lead Plaintiff and all other members of the Class.

491.    During the Class Period, these Defendants violated Section 10(b) of the Exchange Act and SEC Rules 10b-5(a) and (c) in that they employed devices, schemes, and artifices to defraud and carried out a plan, scheme, and course of conduct which operated as a fraud and deceit upon those who purchased or otherwise acquired the Bank's common stock during the Class Period.

492.    Lead Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid for or otherwise acquired SBNY common stock at inflated prices. Lead Plaintiff and the Class would not have purchased or otherwise acquired SBNY common stock at such prices, or at all, had they been aware that the market prices for SBNY common stock had been artificially inflated by Defendants' fraudulent course of conduct.

493.    As a direct and proximate result of these Defendants' wrongful conduct, Lead Plaintiff and the Class suffered damages in connection with their respective purchases or acquisitions of SBNY common stock during the Class Period.

494.    This claim is brought within the applicable statute of limitations.

### COUNT III

**Violation of Section 10(b) of the Exchange Act**
**and SEC Rule 10b-5 Promulgated Thereunder Against Defendant KPMG**

495.    Lead Plaintiff incorporates ¶¶1-494 by reference. This Count is brought against Defendant KPMG pursuant to Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5, on behalf of Lead Plaintiff and all other members of the Class.

496.    During the Class Period, KPMG violated §10(b) of the Exchange Act and SEC Rule 10b-5(b) by disseminating the false statements specified above, which it knew or recklessly disregarded were misleading in that the statements contained misrepresentations and/or failed to disclose material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading.

497.    Lead Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid for or otherwise acquired SBNY common stock at inflated prices. Lead Plaintiff and the Class would not have purchased or otherwise acquired SBNY common stock at such prices, or at all, had they been aware that the market prices for SBNY common stock had been artificially inflated by KPMG's fraudulent course of conduct.

498.    As a direct and proximate result of KPMG's wrongful conduct, Lead Plaintiff and the Class suffered damages in connection with their respective purchases or acquisitions of SBNY common stock during the Class Period.

499.    This claim is brought within the applicable statute of limitations.

## XVI.   PRAYER FOR RELIEF

WHEREFORE, Lead Plaintiff, on behalf of itself and the Class, prays for relief and judgment, as follows:

a.      determining that this action is a proper class action pursuant to Rule 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure on behalf of the Class as defined herein, and a certification of Lead Plaintiff as class representative pursuant to Rule 23 of the Federal Rules of Civil Procedure and appointment of Lead Plaintiff's counsel as Lead Counsel;

b.      awarding compensatory damages in favor of Lead Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of the wrongdoing of all Defendants, in an amount to be proven at trial, including pre-judgment and post-judgment interest thereon;

c.      awarding Lead Plaintiff and other members of the Class their costs and expenses in this litigation, including reasonable attorneys' fees and experts' fees and other costs and disbursements; and

d.      awarding Lead Plaintiff and the other Class members such other relief as this Court may deem just and proper.

## XVII.  JURY TRIAL DEMANDED

Lead Plaintiff demands a trial by jury.

Dated:   December 1, 2023

Respectfully submitted,

**KESSLER TOPAZ
  MELTZER & CHECK, LLP**

By: */s/ Sharan Nirmul*
    Sharan Nirmul
    Richard A. Russo, Jr.
    Joshua A. Materese

158

Nathaniel C. Simon (pro hac vice
forthcoming)
280 King of Prussia Road
Radnor, PA 19087
Telephone: (610) 667-7706
Facsimile: (610) 667-7056
snirmul@ktmc.com
rrusso@ktmc.com
jmaterese@ktmc.com
nsimon@ktmc.com

Max Johnson (pro hac vice forthcoming)
One Sansome Street
Suite 1850
San Francisco, CA 94104
Telephone: (415) 400-3000
Facsimile: (415) 400-3001
mjohnson@ktmc.com

**BERNSTEIN LITOWITZ BERGER
& GROSSMANN LLP**

By: */s/ John Rizio-Hamilton*
John Rizio-Hamilton
Jeremy Robinson
John J. Esmay
Jonathan G. D'Errico
1251 Avenue of the Americas
New York, NY 10020
Telephone: (212) 554-1400
Facsimile: (212) 554-1444
johnr@blbglaw.com
jeremy@blbglaw.com
john.esmay@blbglaw.com
Jonathan.derrico@blbglaw.com

*Co-Counsel for Lead Plaintiff Sjunde AP-
Fonden*