**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SJUNDE AP-FONDEN, Individually and on behalf of all others similarly situated, | Civil Action |
| Plaintiff, | No. 1:23-cv-01921-FB-JRC |
| v. | |
| JOSEPH DEPAOLO, ERIC HOWELL, FRANK SANTORA, JOSEPH SEIBERT, SCOTT SHAY, VITO SUSCA, STEPHEN WYREMSKI, and KPMG LLP, | **LEAD PLAINTIFF'S OPPOSITION TO THE FDIC'S MOTION TO DISMISS THE COMPLAINT** |
| Defendants. | |

**TABLE OF CONTENTS**

**Page**

PRELIMINARY STATEMENT.................................................................................................. 1

FACTUAL BACKGROUND ................................................................................................... 3

    A.    Lead Plaintiff Asserts Securities Fraud Claims against KPMG and Former Officers and Directors of SBNY...................................................................... 3

    B.    Lead Plaintiff Files Claims with the FDIC on Behalf of Itself and the Class......... 4

ARGUMENT ......................................................................................................................... 4

I.    LEAD PLAINTIFF HAS STANDING TO ASSERT DIRECT SECURITIES FRAUD CLAIMS AND THE FDIC DOES NOT OWN THOSE CLAIMS...................... 4

    A.    The Succession Clause Applies Only to Derivative Claims Brought on Behalf of a Failed Bank—Not Direct Claims as Lead Plaintiff Asserts Here .................................................................................................................. 4

        1.    The Succession Clause's Text Does Not Support the FDIC's Reading ................................................................................................ 5

        2.    No Court Has Held that the Succession Clause Applies to Direct Claims for Securities Fraud ............................................................ 7

        3.    The FDIC's Position Raises Constitutional Problems ................................ 8

    B.    The FDIC's Overreaching View of the Succession Clause Cannot Withstand Scrutiny................................................................................................ 9

        1.    FIRREA's Purpose and History Refute the FDIC's Interpretation ............ 9

        2.    FIRREA's Statutory Structure Refutes the FDIC's Interpretation .......... 10

        3.    The FDIC's Reliance on *Zucker* Is Misplaced......................................... 10

        4.    The FDIC's Argument Concerning D&O Insurance Fails ...................... 12

II.    THE FDIC'S ADMINISTRATIVE EXHAUSTION ARGUMENTS FAIL ................... 14

    A.    FIRREA's Exhaustion Requirements are Inapplicable ...................................... 14

        1.    The Claims Do Not Allege "[A]cts or [O]missions of [SBNY]" Within the Meaning of Section 1821(d)(13)(d) ...................................... 14

2.    The FDIC's Refusal to Administratively Determine Class Claims Gives this Court Jurisdiction Over Them Under Second Circuit Law ......................................................................................... 17

B.    Even if FIRREA Did Require Exhaustion, Lead Plaintiff Properly Exhausted on Behalf of Itself and the Putative Class ........................................... 20

1.    The FDIC Has Disallowed or Failed to Timely Determine the Claims, Giving this Court Jurisdiction...................................................... 20

2.    Lead Plaintiff's Exhaustion for the Class Is Permissible Under FIRREA and the PSLRA ........................................................................ 21

C.    The FDIC's Motion to Dismiss Raises Fact Questions that Require Discovery ........................................................................................................ 23

III.    THIS COURT HAS JURISDICTION OVER THE ACTION, OR ALTERNATIVELY SHOULD TRANSFER THE ACTION TO THE SOUTHERN DISTRICT OF NEW YORK .................................................................... 25

CONCLUSION................................................................................................................. 25

# **TABLE OF AUTHORITIES**

**Page(s)**

C ASES

*Aaron v. Illinois Nat'l Ins. Co.*,
2023 WL 7389034 (E.D. La. Nov. 8, 2023) ......................................................7, 11

*Aber-Shukofsky v. JPMorgan Chase & Co.*,
755 F. Supp. 2d 441 (E.D.N.Y. 2010) .................................................................17

*ADL, LLC v. Tirakian*,
2010 WL 3925131 (E.D.N.Y. Aug. 26, 2010) ................................................14, 24

*Am. Nat'l Ins. Co. v. FDIC*,
642 F.3d 1137 (D.C. Cir. 2011) .....................................................15, 16, 17, 18

*America West Bank Members v. Utah*,
2023 WL 4108352 (D. Utah June 21, 2023) ........................................................12

*ANA Int'l, Inc. v. Way*,
393 F.3d 886 (9th Cir. 2004) ..............................................................................16

*Avery v. FDIC*,
113 F. Supp. 3d 116 (D.D.C. 2015) ....................................................................20

*Bank of New York v. First Millennium, Inc.*,
607 F.3d 905 (2d Cir. 2010) ..........................................................14, 17, 18, 19, 25

*Bateman Eichler, Hill Richards, Inc. v. Berner*,
472 U.S. 299 (1985) ...............................................................................................9

*In re Beach First Nat'l Bancshares, Inc.*,
702 F.3d 772 (4th Cir. 2012) .....................................................................7, 11, 13

*Bloom v. FDIC*,
738 F.3d 58 (2d Cir. 2013) ..................................................................................21

*Caires v. FDIC*,
2017 WL 1393735 (S.D.N.Y. 2017) ....................................................................20

*Carlyle Towers Condo. Ass'n, Inc. v. FDIC*,
170 F.3d 301 (2d Cir. 1999) ..........................................................................20, 24

*Cassese v. Wash. Mut., Inc.*,
711 F. Supp. 2d 261 (E.D.N.Y. 2010) .................................................................21

*Cassese v. Washington Mut., Inc.*,
743 F. Supp. 2d 148 (E.D.N.Y. 2010) ...........................................................15, 16

iii

*Chenesky v. New York Life Ins. Co.*,
  2011 WL 1795305 (S.D.N.Y. 2011).................................................................23

*Eberhard v. Marcu*,
  530 F.3d 122 (2d Cir. 2008)...........................................................................6

*Esther Sadowsky Testamentary Tr. v. Syron*,
  2009 WL 10697000 (S.D.N.Y. Jan. 28, 2009) ...........................................7, 8

*In re Facebook, Inc., IPO Sec. & Derivative Litig.*,
  2013 WL 4399215 (S.D.N.Y. Aug. 13, 2013)............................................7, 22

*Farnik v. FDIC*,
  707 F.3d 717 (7th Cir. 2013) .........................................................................17

*FDIC v. Jenkins*,
  888 F.2d 1537 (11th Cir. 1989) .....................................................................13

*Fed. Hous. Fin. Agency v. JPMorgan Chase & Co.*,
  902 F. Supp. 2d 476 (S.D.N.Y. 2012).......................................................14, 17

*Flynn v. DIRECTV, LLC*,
  2016 WL 4467885 (D. Conn. Aug. 23, 2016) ...............................................23

*Gomez v. United States*,
  490 U.S. 858 (1989).........................................................................................8

*Harris v. TD Ameritrade Inc.*,
  338 F. Supp. 3d 170 (S.D.N.Y. 2018)............................................................24

*Henneberry v. Sumitomo Corp. of Am.*,
  415 F. Supp. 2d 423 (S.D.N.Y. 2006)............................................................10

*Howard v. Haddad*,
  916 F.2d 167 (4th Cir. 1990) ..........................................................5, 6, 12, 13

*Hudson United Bank v. Chase Manhattan Bank of Connecticut, N.A.*,
  43 F.3d 843 (3d Cir. 1994).............................................................................19

*Kamen v. Kemper Fin. Servs., Inc.*,
  500 U.S. 90 (1991)...........................................................................................5

*Levin v. Miller*,
  763 F.3d 667 (7th Cir. 2014) ...................................................................5, 6, 8

*Lubin v. Skow*,
  382 Fed. App'x 866 (11th Cir. 2010) ..............................................................7

*Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. City Sav., F.S.B.*,
    28 F.3d 376 (3d Cir. 1994) ...........................................................................13

*In re NYSE Specialists Sec. Litig.*,
    240 F.R.D. 128 (S.D.N.Y. 2007) ...................................................................22

*Off. & Pro. Emps. Int'l Union, Loc. 2 v. F.D.I.C.*,
    962 F.2d 63 (D.C. Cir. 1992) ...................................................................21, 23

*Ortiz v. Comm'r of Soc. Sec.*,
    659 F. Supp. 3d 301 (E.D.N.Y. 2023) .............................................................5

*Pareto v. FDIC*,
    139 F.3d 696 (9th Cir. 1998) ...........................................................................7

*Patel v. Patel*,
    2010 WL 11549879 (N.D. Ga. Dec. 29, 2010) ...............................................5

*Rajamin v. Deutsche Bank Nat'l Tr. Co.*,
    757 F.3d 79 (2d Cir. 2014) ...............................................................................6

*Rampersaud v. Chase Home Fin.*,
    2011 WL 6217559 (E.D.N.Y. Dec. 14, 2011) ...............................................24

*In re Recoton Corp.*,
    307 B.R. 751 (Bankr. S.D.N.Y. 2004) ...........................................................22

*Reitan v. China Mobile Games & Ent. Grp., Ltd.*,
    68 F. Supp. 3d 390 (S.D.N.Y. 2014) ..............................................................22

*Rinestone v. Enter. Bank & Tr.*,
    2012 WL 1681986 (D. Ariz. May 14, 2012) ..................................................18

*Sharpe v. FDIC*,
    126 F.3d 1147 (9th Cir. 1997) .......................................................................19

*In re Ski Train Fire*,
    257 F. Supp. 2d 648 (S.D.N.Y. 2003) ............................................................25

*In re Smith Barney Transfer Agent Litig.*,
    765 F. Supp. 2d 391 (S.D.N.Y. 2011) ........................................................6, 13

*In re Sunrise Sec. Litig.*,
    916 F.2d 874 (3d Cir. 1990) .............................................................................7

*In re Synergy Pharms. Inc. Sec. Litig.*,
    2020 WL 5763830 (E.D.N.Y. Sept. 28, 2020) ..............................................22

*Verdi v. FDIC*,
   2023 WL 6388225 (C.D. Cal. Sept. 28, 2023) ......................................................17

*Zucker v. Rodriguez*,
   919 F.3d 649 (1st Cir. 2019) ...........................................................10, 11, 12, 13

**STATUTES AND RULES**

12 U.S.C. § 1821:

   (d)(2)(A)(i) ..............................................................................................2, 5

   (d)(3) ...........................................................................................................15

   (d)(3)(C) ......................................................................................................24

   (d)(5)(A)(i) ............................................................................................15, 19

   (d)(5)(A)(ii) .............................................................................................4, 21

   (d)(6) ...........................................................................................................15

   (d)(6)(A) ...............................................................................................19, 21

   (d)(11)(A) .............................................................................................10, 15

   (d)(13)(D) ....................................................................................................14

   (d)(13)(D)(ii) ....................................................................................14, 16, 17

28 U.S.C. § 1404(a) .......................................................................................25

28 U.S.C. § 1406(a) .......................................................................................25

Fed. R. Civ. P.:

   Rule 23(d)(1)(D) ..........................................................................................23

**OTHER AUTHORITIES**

135 Cong. Rec. H4985 (daily ed. Aug. 3, 1989) ..............................................9

135 Cong. Rec. S3993-01 (April 17, 1989) .....................................................9

Private Securities Litigation Reform Act of 1995 ................................... passim

Financial Institutions Reform, Recovery and Enforcement Act of 1989, S. 774,
   101st Cong. § 214(o) (1989) ............................................................................9

## PRELIMINARY STATEMENT[1]

The Federal Deposit Insurance Corporation (the "FDIC") claims that, as the receiver of Signature Bank ("SBNY"), it owns private investors' direct class action claims for securities fraud against SBNY's officers, directors, and outside auditor.  This claim is demonstrably wrong, and the Court should reject the FDIC's attempt to usurp investors' ability to recover for the damages that they suffered.  While the FDIC may have succeeded to any *derivative* claims that could be brought by or on behalf of SBNY, the law is clear that it cannot (and did not) take over the claims at issue here.  This case involves *direct* securities fraud claims brought by *investors* to recover damages that the *investors* suffered due to declines in the value of assets *owned by investors*, *i.e.*, their SBNY stock, which were caused by the misrepresentations of the Individual Defendants and KPMG.  Neither SBNY nor the FDIC is a defendant in this action, and Lead Plaintiff asserts no claim derivatively on behalf of SBNY or the FDIC.  No court has ever held that the FDIC owns investors' direct claims for securities fraud against the former executives or auditor of a bank in receivership.

As explained below, the FDIC's arguments rely on sweeping misinterpretations of the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 ("FIRREA") that contravene its text, structure, purpose, and history.  Congress did not intend FIRREA to thwart securities fraud suits and, to the contrary, crafted FIRREA to ensure private investors could continue to pursue them against failed banks' officers, directors, and auditors—precisely what is happening here.  The FDIC's unfounded reading of FIRREA is also contrary to the mandates of the Private Securities Litigation Reform Act of 1995 ("PSLRA"), pursuant to which this Court

---

[1] Capitalized terms have the meaning given in the Corrected Consolidated Complaint, Dkt. 70 (the "Complaint"); cites to "¶_" refer to paragraphs of the Complaint; "Mot." refers to the FDIC's Memorandum of Law; and, unless otherwise noted, all emphasis is added, and internal punctuation and citations are omitted.

appointed Sjunde AP-Fonden ("AP-7") as Lead Plaintiff to bring claims on behalf of former investors in SBNY.  To that end, Lead Plaintiff filed the Complaint asserting direct claims against the Individual Defendants and KPMG on behalf of defrauded investors who purchased artificially inflated SBNY stock during the Class Period (January 21, 2021 to March 12, 2023, inclusive).

The FDIC's three main arguments fail for the following reasons.  **_First_**, the investor claims here do not belong to the FDIC under FIRREA Section 1821(d)(2)(A)(i) (the "Succession Clause") because that provision only applies to *derivative* claims asserted *on a failed bank's behalf*, not to the *direct investor* claims asserted here.  The FDIC's claim that the Succession Clause gives it ownership of direct investor claims has been rejected by every court to hear it—indeed, the FDIC relies entirely on inapposite, outlier authority that did *not involve securities fraud claims, let alone class action claims under the PSLRA*.  A near-uniform body of case law and FIRREA's history make clear that Congress did not intend the FDIC to gain ownership of securities fraud claims possessed by investors individually defrauded by directors, officers, and agents of the failed bank.

**_Second_**, FIRREA's administrative exhaustion requirements provide no basis for dismissal. Critically, FIRREA only requires exhaustion prior to bringing claims against *a failed bank*, not the failed bank's former officers, directors, and auditor—which are the *only* claims at issue here.  The FDIC's own claim notification form all but concedes this, stating: "[i]f you do not have a claim *against the Failed Institution*, please disregard this notice."  Declaration of Donald G. Grieser Decl. ("Grieser Decl.") Ex. C.  Because Lead Plaintiff brings no claim against SBNY, the FDIC's exhaustion argument fails right out of the gate.

In any event, although it was not required to exhaust, Lead Plaintiff—out of an abundance of caution at a preliminary stage—*did* file administrative claims on behalf of itself and the Class. The FDIC rejected both, refusing to accept the class claim and disallowing the individual claim.

Thus, even under the FDIC's erroneous reading of FIRREA, Lead Plaintiff has sufficiently exhausted administrative remedies and this Court has jurisdiction over the claims at issue here. Relatedly, as to the class claim, Second Circuit law recognizes that FIRREA does not require exhaustion of claims that *the FDIC refuses to even recognize*.  In fact, FIRREA does not prohibit classwide exhaustion and, consistent with FIRREA and the PSLRA, the Court should deem Lead Plaintiff's exhaustion for the Class effective.  As to the individual claims, even if FIRREA required every individual Class member to file their own administrative claim (it does not), the FDIC's motion fails because it prematurely raises fact questions requiring discovery, including regarding which Class members *did* file claims the FDIC disallowed, which cannot be resolved at the pleading stage.

**Third**, because FIRREA's exhaustion requirements are inapplicable, its venue provisions do not require this suit to be transferred to the Southern District of New York or the District of Columbia.  However, if the Court finds that the venue provisions are applicable, transfer to the Southern District of New York, not dismissal, is the proper and just result.

## FACTUAL BACKGROUND

### A.    Lead Plaintiff Asserts Securities Fraud Claims Against KPMG and Former Officers and Directors of SBNY.

On August 10, 2023, the Court consolidated two previously-filed securities class actions and appointed AP-7 as Lead Plaintiff pursuant to the PSLRA to lead this consolidated case on behalf of a putative Class of former investors in SBNY.  Dkt. 51.  On December 1, 2023, Lead Plaintiff filed the Complaint, alleging direct securities fraud claims against the Individual Defendants and KPMG based on their misstatements regarding SBNY's risk profile and deficient risk management that contributed to its collapse on March 12, 2023—"the third largest bank failure in United States history."  ¶ 40.  Lead Plaintiff alleges that, "through repeated misleading

statements . . . to investors during the Class Period, Defendants dismissed concerns that SBNY's growth strategy was increasing its risks and created the illusion of prudent risk management and responsible growth." ¶ 8; *see also* ¶¶ 73-109. Lead Plaintiff further alleges that "KPMG's audit opinions of SBNY were materially false or misleading" and KPMG "misled investors about whether [SBNY]'s financial statements complied with GAAP and the sufficiency of SBNY's internal control over financial reporting." ¶ 361. The Complaint does not name SBNY as a defendant or assert any claim derivatively on its behalf.

Lead Plaintiff alleges only *direct* harm to shareholders who "paid for or otherwise acquired SBNY common stock at inflated prices," ¶ 487, and as a result "suffered economic losses (i.e., damages) under the federal securities laws." ¶ 452.

### B. Lead Plaintiff Files Claims with the FDIC on Behalf of Itself and the Class.

On March 12, 2023, the FDIC took receivership of SBNY. On July 17, 2023, out of an abundance of caution, Lead Plaintiff filed Proofs of Claims with the FDIC on behalf of itself and the Class. *See* Declaration of John Rizio-Hamilton ("JRH Decl.") Exs. A & B. On August 28, 2023, the FDIC issued a "Notice of Unaccepted Claim" purportedly declining Lead Plaintiff's Proof of Claim on behalf of the Class because "the Receiver does not accept class claims for review." Grieser Decl. Ex. E. Further, the 180-day period to allow or disallow the Class's Proof of Claim expired on January 16, 2024. *See* 12 U.S.C. § 1821(d)(5)(A)(ii). On January 12, 2024, the FDIC disallowed Lead Plaintiff's individual Proof of Claim. JRH Decl. Ex. C.

### ARGUMENT

### I. LEAD PLAINTIFF HAS STANDING TO ASSERT DIRECT SECURITIES FRAUD CLAIMS AND THE FDIC DOES NOT OWN THOSE CLAIMS.

### A. The Succession Clause Applies Only to Derivative Claims Brought on Behalf of a Failed Bank—Not Direct Claims as Lead Plaintiff Asserts Here.

The FDIC argues that Lead Plaintiff lacks standing to assert its claims because the FDIC

owns the claims as SBNY's receiver.  Mot. at 19-25.  The FDIC is wrong.  As set forth below, (i) the FDIC's position finds no support in the text of the Succession Clause, (ii) courts routinely hold that the FDIC owns only derivative claims, not direct claims, and (iii) the FDIC's position raises constitutional problems that undermine its validity.

### 1.     The Succession Clause's Text Does Not Support the FDIC's Reading.

As a threshold matter, the FDIC's assertion that it owns investors' direct claims is not supported by the plain language of the statute.[2]  The Succession Clause does *not* mention direct claims at all.  *See* 12 U.S.C. § 1821(d)(2)(A)(i).  It also does not state that the FDIC succeeds to *all* claims a failed bank's shareholder may assert, but rather only those asserting the shareholder's "rights, titles, powers, and privileges . . . *with respect to [the failed bank] and the assets of the [failed bank]*."  12 U.S.C. § 1821(d)(2)(A)(i).  Because the statute "transfers to the FDIC *only* stockholders' claims 'with respect to . . . the assets of the institution,'" its scope is limited to "those that investors would pursue *derivatively* on behalf of the failed bank."  *Levin v. Miller*, 763 F.3d 667, 672 (7th Cir. 2014).  This language alone should end any dispute because Lead Plaintiff asserts only direct claims for securities fraud.  *See Howard v. Haddad*, 916 F.2d 167, 170 (4th Cir. 1990) (securities fraud claims are direct claims that do not belong to the FDIC); *Patel v. Patel*, 2010 WL 11549879, at *2 (N.D. Ga. Dec. 29, 2010) (same).

Even putting aside the plain language of the Succession Clause, interpreting it to exclude direct securities fraud claims makes complete sense because these claims do not allege harms to "the assets of the *[failed bank]*" under its text.  Derivative suits "enforce a *corporate* cause of action."  *Kamen v. Kemper Fin. Servs., Inc.*, 500 U.S. 90, 95 (1991).  But direct claims do *not* belong to the institution in which investors hold stock—they assert an "individual injury [to

---

[2] "In contested issues of statutory interpretation, the Court begins with the language of the statute itself, examining its 'plain meaning.'"  *Ortiz v. Comm'r of Soc. Sec.*, 659 F. Supp. 3d 301, 306 (E.D.N.Y. 2023).

investors] distinct from the injury to the corporation," and thus do *not* belong to the institution in which investors hold stock. *In re Smith Barney Transfer Agent Litig.*, 765 F. Supp. 2d 391, 398 (S.D.N.Y. 2011). Here, Lead Plaintiff does not seek recovery for injuries to SBNY or its assets— it alleges that a class of private investors purchased stock at artificially high prices due to Defendants' fraud—and suffered damage due to the precipitous decline in the price of the personally-held stock when the truth was revealed. ¶¶ 452, 481. The damages they suffered are measured not by a reduction in value of "the assets of [SBNY]," but by "the difference between what [each investor] paid and what the stock was [actually] worth on the day [that investor] paid it." *See Howard*, 916 F.2d at 169-70.

Relatedly, under settled law, shares owned by investors are not assets of the bank, but rather are the asset of the investor. *See Eberhard v. Marcu*, 530 F.3d 122, 136 n.14 (2d Cir. 2008) ("[S]hares of stock are . . . *personal* property of the shareholder."). Thus, under the plain text of the Succession Clause, Lead Plaintiff's direct claims are not transferred to the FDIC.

Because the Succession Clause did not transfer Lead Plaintiff's claims to the FDIC, the FDIC's reliance on cases dismissing claims for lack of prudential standing is misplaced. Mot. at 17-19. These cases actually *reinforce that the FDIC* lacks standing to bring direct claims because the FDIC "cannot rest [its] claim . . . on the legal rights . . . of third parties," (*Rajamin v. Deutsche Bank Nat'l Tr. Co.*, 757 F.3d 79, 86 (2d Cir. 2014)), just as SBNY could not bring direct claims for its shareholders' losses (*Smith Barney*, 765 F. Supp. 2d at 398). Indeed, if the FDIC is correct that it owns all investors' claims (it does not), then it follows that no class members have standing to pursue these securities fraud claims under the PSLRA. Given the FDIC could not bring the securities fraud class action claims here, the Succession Clause cannot be interpreted to transfer them. *Levin*, 763 F.3d at 672 ("[FIRREA] is not designed to vaporize claims that otherwise exist

after a business failure. Yet if [the claim] is dismissed . . . no one will be able to pursue it. It would not be sensible to read [the Succession Clause] that way.").

> **2.      No Court Has Held that the Succession Clause Applies to Direct Claims for Securities Fraud.**

No court has ever held that the Succession Clause divests a PSLRA-appointed lead plaintiff of authority to bring direct securities fraud class claims.  Except for inapposite outlier authority (discussed *infra* at Section I.B.3) that did not involve securities fraud claims, courts unanimously hold that the Succession Clause vests the FDIC with ownership of only *derivative* claims.

As these authorities explain, because the Succession Clause only "grants the FDIC ownership over all shareholder *derivative* claims against the Bank's officers, . . . if [a plaintiff] can establish a *direct* harm . . . FIRREA would *not* be a bar to standing."  *See, e.g.*, *Lubin v. Skow*, 382 Fed. App'x 866, 870-71 (11th Cir. 2010) (per curiam); *see also In re Beach First Nat'l Bancshares, Inc.*, 702 F.3d 772, 780 (4th Cir. 2012) (reversing dismissal of a shareholder's *direct* claim based on the Succession Clause because it "is . . . *not a derivative claim*"); *In re Sunrise Sec. Litig.*, 916 F.2d 874, 889 (3d Cir. 1990) ("To the extent that depositors assert individual, *nonderivative fraud claims* against the officers, directors, auditors, or attorneys of [a failed bank], they may proceed on equal footing with FDIC.").  Indeed, "[m]ost courts . . . have held that the [FIRREA] transfers the *derivative* claims of a bank's shareholders to the FDIC, but *not the direct* claims."  *Aaron v. Illinois Nat'l Ins. Co.*, 2023 WL 7389034, at *3 (E.D. La. Nov. 8, 2023).

The FDIC's cherrypicked vague quote that "Congress has transferred everything it could to FDIC . . ." does not support the FDIC's argument here.  Mot. at 20 (citing *Pareto v. FDIC*, 139 F.3d 696 (9th Cir. 1998); *Esther Sadowsky Testamentary Tr. v. Syron*, 2009 WL 10697000, at *2-3 (S.D.N.Y. Jan. 28, 2009)).  Both cases confirm the distinction between derivative claims (which are transferred to the FDIC) and direct claims (which are not).  *See Pareto*, 139 F.3d at 699-700

7

(applying the Succession Clause because the "claims were for injury to [the bank] itself"); *Syron*, 2009 WL 10697000 at *1 (applying the Succession Clause because "[t]his is a derivative action.").

The FDIC asks this Court to cast aside the near-universal case law against it because, the FDIC claims, these cases purportedly "fail to analyze the text, structure, history and purpose of FIRREA." Mot. at 23 n.7. The FDIC is wrong. For example, *Levin* closely analyzed the text of the Succession Clause and concluded that, by including the phrase "with respect to . . . the assets of the institution," Congress limited the Succession Clause to derivative claims. *See* 763 F.3d at 672. To the extent *Levin* and other authorities did not further analyze FIRREA's structure, history, and purpose, it is likely because "[n]o federal court has read the statute" to include direct claims, and, in those cases, the FDIC itself actually shared "[the court's] reading of the statute." *Id*.

### 3.    The FDIC's Position Raises Constitutional Problems.

The Court should also reject the FDIC's interpretation of the Succession Clause because it raises constitutional problems under the Takings Clause of the Fifth Amendment, which prohibits the federal government from seizing private property for public use without just compensation. *See Levin*, 763 F.3d at 672 (rejecting an interpretation of the Succession Clause that "would pose the question [of] whether [plaintiff] and similarly situated stockholders would be entitled to compensation for a taking"); *see also Gomez v. United States*, 490 U.S. 858, 864 (1989) (directing courts to avoid statutory interpretations that engender constitutional issues). The FDIC's position that FIRREA deprives investors of direct claims, particularly those against Defendants *not* under FDIC receivership, raises serious questions as to whether (a) the Succession Clause amounts to an unlawful seizure under the Fifth Amendment, (b) plaintiffs received "just compensation" for their direct claims, and (c) FIRREA authorized the FDIC to use any proceeds flowing from plaintiffs' direct claims to pay private creditors, rather than for public use. The Seventh Circuit rejected the FDIC's interpretation of the Succession Clause to avoid engendering these issues. *See Levin*, 763

8

F.3d at 672.  The same result is appropriate here.

**B.     The FDIC's Overreaching View of the Succession Clause Cannot Withstand Scrutiny.**

**1.     FIRREA's Purpose and History Refute the FDIC's Interpretation.**

The FDIC incorrectly argues that FIRREA's purpose and history support its view of the Succession Clause.  These interpretative tools further underscore that Congress did *not* intend to give the FDIC ownership of any direct securities fraud claims, especially against the failed institution's former directors and officers or its auditor.  To the contrary, in enacting FIRREA, Congress recognized that private plaintiffs bringing *securities fraud* lawsuits would play a critical role in achieving FIRREA's goal of preventing a "widespread pattern of fraud and illegal conduct." *See* 135 Cong. Rec. S3993-01, S3994 (April 17, 1989).  In fact, Congress expressly rejected a proposal to give the FDIC priority over competing claims asserted by shareholders of the failed bank in suits against officers and directors.  *See* S. 774, 101st Cong. § 214(o) (1989).  In "overwhelmingly" rejecting this amendment, FIRREA's drafters determined that giving the FDIC such a priority "would represent fundamentally bad policy."  135 Cong. Rec. H4985, at 18339 (daily ed. Aug. 3, 1989) (explaining that giving the FDIC priority would frustrate the purpose of FIRREA because "*private plaintiffs would simply no longer bring fraud suits against bank officers and others guilty of wrongdoing*").

Put simply, Congress' express rejection of a proposal to give the FDIC *priority* over private plaintiffs to pursue direct claims demonstrates that it did not intend for FIRREA to go even further by *stripping* private plaintiffs of their direct claims *and transferring them* to the FDIC—which is exactly the absurd result sought by the FDIC here.[3]  In sum, the FDIC's contrary argument cannot

---

[3] *See also Bateman Eichler, Hill Richards, Inc. v. Berner*, 472 U.S. 299, 310 (1985) ("[P]rivate actions provide 'a most effective weapon in the enforcement' of the securities laws and are 'a necessary supplement to [SEC] action.'").

be squared with the reality of FIRREA's legislative history.

### 2. FIRREA's Statutory Structure Refutes the FDIC's Interpretation.

The FDIC erroneously argues that FIRREA's priority scheme shows the Succession Clause was intended to transfer ownership of direct claims. Mot. at 24-25 (pointing to Section 1821(d)(11)(A)'s "priority scheme" in the distribution of a failed bank's assets where "stockholders are paid last"). But that priority scheme, by its plain terms, only applies to amounts realized from the FDIC's liquidation of the *failed bank*'s assets. *See* Section 1821(d)(11)(A) (governing distribution of "amounts realized from the liquidation or other resolution *of any insured depository institution* by [the FDIC]"). This has no bearing here since Lead Plaintiff seeks to recover from the Individual Defendants and KPMG, *not* SBNY or its assets.[4]

### 3. The FDIC's Reliance on *Zucker* Is Misplaced.

The FDIC relies heavily on *Zucker v. Rodriguez*, 919 F.3d 649 (1st Cir. 2019)—but that inapposite ruling, which was expressly limited to its unique facts, does not support the FDIC's argument. In *Zucker*, the First Circuit held that the Succession Clause transferred to the FDIC ownership of non-securities fraud claims alleged by the sole shareholder of a failed bank's holding company against the holding company's officers, directors, and insurance company. *Id.* at 650. Unlike here, the claims at issue in *Zucker* were "negligence and breach of fiduciary dut[y]" claims "owed to the Holding Company" that allegedly "caused the Bank's failure and the Holding Company's resultant loss of its investment in the Bank." *Id.* The claim against the bank's insurance company sought coverage under a policy "shared by the Holding Company and the Bank." *Id.* at 657. Under these unique facts, the First Circuit found that the claims fell under the

---

[4] Applying this priority scheme to derivative claims makes perfect sense where "damages are awarded to the corporation rather than directly to the derivative plaintiff." *Henneberry v. Sumitomo Corp. of Am.*, 415 F. Supp. 2d 423, 439 (S.D.N.Y. 2006). But damages recovered for direct claims belong to *individual shareholders*, not the corporation. Here, any recovery will come from the individual defendants, not SBNY as it is not even a defendant.

Succession Clause "with respect to the [Bank] and the assets of the [Bank]." *Id.* Critically, however, the court stated its ruling was "a limited one," that it "applies only to claims like those before it," that it "do[es] not establish any broader principles," and that "future claims . . . will need to be evaluated on their own terms." *Id.* at 656.

Zucker does not support the FDIC's argument here for at least the following reasons. **First**, critically, *Zucker*'s application of the Succession Clause turned legally and factually on the fact that the claims there "*[were] not one[s] alleging fraud or one[s] to enforce the securities laws*." *Id.* at 660. Here, Lead Plaintiff asserts securities fraud claims. As such, *Zucker* is inapplicable.

**Second**, *Zucker* erroneously accepted the FDIC's flawed interpretation that the Succession Clause transfers shareholder direct claims, which this Court should reject as explained above. *See supra* at Section I.A. In particular, *Zucker* found FIRREA's legislative history showing that Congress rejected the proposed priority amendment (discussed *supra* at Section I.B.1) to be irrelevant because that case did not involve securities fraud claims. *Zucker*, 919 F.3d at 660. Here, by contrast, that history is directly on point, which further distinguishes *Zucker* and confirms that Congress did not intend the securities fraud claims here to fall within the Succession Clause.

**Third**, even under *Zucker*'s flawed analysis, the securities fraud claims here do not fall within the Succession Clause because they do not "relate to or concern the assets of the Bank." *Id.* at 656-57. As *Aaron* explains, "[w]hile *Zucker* rejects an express distinction between direct and derivative claims, it does not reject a 'source of the harm' inquiry." 2023 WL 7389034, at *4. "The critical inquiry is whether the harm . . . allege[d] is distinct from the harm suffered by the bank." *Id.*

Here, Lead Plaintiff's securities fraud claims are "distinct from [any] harm *to the bank*" (*Zucker*, 919 F.3d at 653, 656) because they seek to recover (a) on behalf of a specific Class of

individual stock purchasers, not all SBNY shareholders, and (b) they are based on the decline in the value of the shares that ***investors purchased***, not a reduction in value of SBNY's assets. Stock held by an investor is an asset of that investor, not the bank. *See supra* at Section I.A.1. Thus, the damages at issue here are not, as the FDIC claims (Mot. at 22), for "losses inflicted on *the Bank*," but instead damages inflicted on investors due to the decline in the value of their personal assets. Likewise, the misconduct at issue is not that defendants' *mismanagement* caused damage to SBNY but, rather, that officers, directors, and auditor of SBNY made *misrepresentations* causing damages to *investors*. ¶ 8. *See Howard*, 916 F.2d at 170 (rejecting the FDIC's conflation of securities fraud and corporate mismanagement claims). With respect to *securities fraud* claims, "[t]here is no compensable injury to the corporation," and thus the FDIC does not own these claims. *Id.*

**Fourth**, *Zucker* does not support that the Succession Clause applies to Lead Plaintiff's claims against KPMG. Mot. at 22. *Zucker* did not involve any claim against an auditor; and Lead Plaintiff does not allege that KPMG's mismanagement "depressed" SBNY's assets, but rather that KPMG's audit opinions misled investors as to the value of their individual shares. ¶¶ 361; 452.

**Fifth**, the FDIC's reliance on *America West Bank Members v. Utah*, 2023 WL 4108352 (D. Utah June 21, 2023) similarly fails. There, the court merely followed *Zucker*'s erroneous interpretation of the Succession Clause, which fails for all of the reasons discussed above. Moreover, there, the holding company's claims alleged "an injury to the Bank" and sought "recovery of the assets of the Bank," which is not the case here. *Id.* at *7.

### 4. The FDIC's Argument Concerning D&O Insurance Fails.

The FDIC argues that the Succession Clause applies because "Plaintiff's recovery would likely be paid from the same sources as those available to the FDIC-R . . . for claims against directors and officers of [SBNY], such as the proceeds of any applicable D&O insurance policies." Mot. at 20. This argument should be rejected for at least three reasons.

**First**, the FDIC seeks priority over private plaintiffs that Congress explicitly rejected in enacting FIRREA. Courts routinely reject this argument based on FIRREA's legislative history. *See, e.g.*, *Howard*, 916 F.2d at 169-70 (holding that the Succession Clause does not apply to claims merely because they "seek to recover from the same assets that the [FDIC] might look to"); *FDIC v. Jenkins*, 888 F.2d 1537, 1546 (11th Cir. 1989) (same). Although the FDIC has never stated that it intends to pursue derivative claims against the Individual Defendants or KPMG relating to these facts, it remains free to do so. *See Smith Barney*, 765 F. Supp. 2d at 399 ("[D]irect and derivative actions based on the same underlying conduct" can proceed simultaneously). But "pursuing the same source of assets does not transform [the direct] action to a derivative one" within the Succession Clause. *Howard*, 916 F.2d at 170.

**Second**, neither *Zucker* nor *National Union Fire Insurance Co. of Pittsburgh, Pa. v. City Savings, F.S.B.*, 28 F.3d 376, 384-85 (3d Cir. 1994) supports the FDIC's argument. Unlike *Zucker*, where the insurance policy was "an asset shared by the Holding Company and the Bank" (*Zucker*, 919 F.3d at 657), the FDIC concedes that the alleged D&O proceeds here are *not* an asset of SBNY because they cover *only* the directors and officers, *not* the bank. *See* Mot. at 21 n.6 (conceding that "insurance proceeds are not an 'asset' of the bank"). *National Union Fire Insurance. Co.* is inapt for the same reason—there, unlike here, the bank was "*an insured*" under the relevant policy. 28 F.3d at 384. These authorities confirm that Lead Plaintiff's claims do not "relate to or concern the assets *of the Bank*" under the Succession Clause.

**Third**, there are no D&O insurance policies relied on (or even referenced) in the Complaint (or in the record on this motion). Conversely, in *Zucker*, the plaintiff affirmatively alleged that the policies existed and applied to the claims there. *See* 919 F.3d at 658. Thus, the FDIC's speculative and unsubstantiated evidentiary argument cannot be considered (much less credited) at the motion

13

to dismiss stage. *ADL, LLC v. Tirakian*, 2010 WL 3925131, at *7 (E.D.N.Y. Aug. 26, 2010), *report & recommendation adopted*, 2010 WL 3926135 (E.D.N.Y. Sept. 29, 2010).

In sum, the Court should reject the FDIC's claim that it owns Lead Plaintiff's and the Class's direct securities fraud claims.

## II.     THE FDIC'S ADMINISTRATIVE EXHAUSTION ARGUMENTS FAIL.

### A.     FIRREA's Exhaustion Requirements are Inapplicable.

#### 1.     The Claims Do Not Allege "[A]cts or [O]missions of [SBNY]" Within the Meaning of Section 1821(d)(13)(D).

The FDIC relies on Section 1821(d)(13)(D)(ii) to argue that Lead Plaintiff asserts "claim[s] relating to any act or omission of [SBNY] or the [FDIC] as receiver."  The FDIC is wrong.

The reality is that FIRREA only requires administrative exhaustion of claims against *the institution* in receivership—it does not apply more broadly to claims against employees or agents of the institution, or to parties who were contracted to perform work for the entity.  Here, Lead Plaintiff's claims fall outside the scope of Section 1821(d)(13)(D)(ii) because they are asserted solely against the Individual Defendants and KPMG for their own wrongdoing and not acts or omissions of SBNY within the meaning of Section 1821(d)(13)(D)(ii).  The law is clear that Section 1821(d)(13)(D)(ii) does *not* "bar any lawsuit that is in any way related to an 'act or omission' of a failed bank or the FDIC."  *Fed. Hous. Fin. Agency v. JPMorgan Chase & Co.*, 902 F. Supp. 2d 476, 501 (S.D.N.Y. 2012).  "[Section 1821(d)(13)(D)(ii)] is not an isolated edict, but is part of FIRREA's statutory scheme . . . intended to force plaintiffs with claims *against failed depository institutions* to exhaust administrative remedies before coming to federal court."  *Bank of New York v. First Millennium, Inc.*, 607 F.3d 905, 921 (2d Cir. 2010).

Indeed, the provisions that comprise FIRREA's statutory scheme clearly show that FIRREA's exhaustion requirements are only intended to apply to claims brought against the bank

itself, not individuals and entities related to the bank.  For example, FIRREA requires that the FDIC initiate the claims process by providing notice to potential creditors, directing that the FDIC "promptly publish a notice to the *depository institution's* creditors to present their claims."  12 U.S.C. § 1821(d)(3).  FIRREA does not include any provision or mechanism for notifying creditors of *every employee or agent* of the institution, underscoring that Congress only intended this exhaustion scheme to encompass claims against the bank itself, not all employees or agents.

Further, Section 1821(d)(5)(A)(i), which prescribes the "procedures for determination of claims," refers only to "claim[s] *against a depository institution* for which [the FDIC] is receiver." Similarly, Section 1821(d)(6), which enables claimants to sue in court after the FDIC disallows their claims, refers to "claim[s] *against a depository institution* for which [the FDIC] is receiver." Neither provision mentions claims against persons or entities related to the failed bank that are not themselves in receivership.

Moreover, Section 1821(d)(11)(A), mandating the priority in which the FDIC must distribute "amounts realized from the liquidation or other resolution *of any insured depository institution* by any receiver appointed for such institution," clearly reinforces that "FIRREA's administrative claims process is available only to claims against depository institutions."  *Am. Nat'l Ins. Co. v. FDIC*, 642 F.3d 1137, 1143 (D.C. Cir. 2011) (noting that Section 1821(d)(11)(A) is further evidence that FIRREA only requires exhaustion of claims against the failed bank itself).

Consistent with the above provisions of FIRREA, courts hold that, "[w]hereas FIRREA forces plaintiffs to file claims with the FDIC before suing failed banks in receivership, FIRREA *does not extend this protection to persons related to the failed bank, but not themselves in receivership*."  *Cassese v. Washington Mut., Inc.*, 743 F. Supp. 2d 148, 157 (E.D.N.Y. 2010) ("*Cassese II*").  Thus, even where claims factually relate to the acts or omissions of a failed bank,

Section 1821(d)(13)(D)(ii) does not require exhaustion when they are asserted against a party other than the failed bank "for its own wrongdoing, not against the depository institution for which the FDIC is receiver." *Am. Nat'l Ins. Co.*, 642 F.3d at 1142.

Notably, as a jurisdiction-stripping provision, Section 1821(d)(13)(D)(ii) must be narrowly interpreted and not expanded. *See ANA Int'l, Inc. v. Way*, 393 F.3d 886, 891 (9th Cir. 2004) ("[T]he narrower construction of a jurisdiction-stripping provision is favored over the broader one."). Section 1821(d)(13)(D)(ii) refers only to "act[s] or omission[s] of [the failed bank] or the [FDIC] as receiver" and makes no reference to claims based on the acts or omissions of individual employees or agents of the bank. This provision requires exhaustion of claims against the bank, but not against employees, agents, or others.

Consistent with FIRREA, and contrary to the FDIC's arguments, the FDIC's notices define SBNY as "the Failed Institution," and advise claimants that "[t]he Receiver has discovered that you may have a claim *against the Failed Institution*. If you do *not* have a claim *against the Failed Institution*, please *disregard* this notice." Grieser Decl. Ex. C. Thus, the FDIC's own notice affirmatively states that claims against persons other than the SBNY (like the Individual Defendants and KPMG) are *not* subject to the claims process.

The FDIC's contrary arguments have no merit. Recognizing that Lead Plaintiff's claims do not fit the text of Section 1821(d)(13)(D)(ii), the FDIC argues with no relevant legal support that exhaustion applies because "*the substance* of Plaintiff's claims relate to acts or omissions of [SBNY]." Mot. at 14. In truth, the mere factual relation of Lead Plaintiff's claims to SBNY is insufficient to require exhaustion because "FIRREA does not extend this protection to persons *related to the failed bank, but not themselves in receivership*." *Cassese II*, 743 F. Supp. 2d at 157. Neither the Individual Defendants nor KPMG are failed banks in receivership. Because *they* are

being sued for their *own* wrongdoing, FIRREA does not require exhaustion. *Am. Nat'l Ins. Co.*, 642 F.3d at 1144.

The FDIC's reliance on cases applying FIRREA exhaustion to claims against a successor to the failed bank is misplaced. Mot. at 13. Here, Lead Plaintiff has *not* sued any successor entity; and in two of the four cases, the court found that exhaustion *was not* required because the claims fell outside of the FDIC's administrative claims process. *See Am. Nat'l Ins. Co.*, 642 F.3d at 1144; *Fed. Hous. Fin. Agency*, 902 F. Supp. 2d at 502. *Farnik v. FDIC*, 707 F.3d 717 (7th Cir. 2013) is inapposite. There, the plaintiff brought the same claims against the successor bank *and the failed bank*, and "ma[de] no effort to differentiate the actions of the two banks." *Id.* at 722. *Aber-Shukofsky v. JPMorgan Chase & Co.*, 755 F. Supp. 2d 441, 446 (E.D.N.Y. 2010) is similarly inapposite because there, the plaintiffs conceded that their claims against the successor were in fact "claims relating to the acts or omissions of [the failed bank]."

The FDIC's sole authority applying FIRREA exhaustion to claims against individual defendants is the out-of-Circuit decision in *Verdi v. FDIC*, which has no application to Lead Plaintiff's claims. 2023 WL 6388225, at *6 (C.D. Cal. Sept. 28, 2023). Unlike here, the plaintiff in *Verdi* sued both individual defendants *and the bank*, meaning the action clearly asserted "claim[s] relating to any act or omission of [the bank]." *Id.* at *1. And, in any event, the *Verdi* court contravened Second Circuit law by treating Section 1821(d)(13)(D)(ii) as an "isolated edict," rather than "part of FIRREA's statutory scheme." *First Millennium*, 607 F.3d at 921. This Court, bound to consider FIRREA's entire structure (discussed *supra* at 15-16) showing exhaustion is not required to bring the claims asserted here, should not follow *Verdi*.

### 2. The FDIC's Refusal to Administratively Determine Class Claims Gives this Court Jurisdiction Over Them Under Second Circuit Law.

Even setting aside all the foregoing reasons why the FDIC's takeover bid here should fail,

the claims Lead Plaintiff asserts on behalf of the putative Class are also exempt from FIRREA's exhaustion requirements because the FDIC refuses to review such claims in its administrative process.  Lead Plaintiff did not seek to "bypass" the FDIC's claims process as the FDIC suggests.  Mot. at 15.  Rather, Lead Plaintiff *filed* a claim on behalf of the putative Class that the FDIC *refused to accept* because these claims are not subject to its administrative processes.  The FDIC's refusal to determine class claims administratively gives this Court jurisdiction to decide them.

In *First Millennium*, the Second Circuit held that FIRREA's exhaustion requirements did not apply in an interpleader action brought by the trustee of a failed bank against the FDIC.  607 F.3d at 920.  There, as here, the FDIC argued that FIRREA barred the action because the claimant failed to properly file an administrative claim prior to bringing suit.  *Id.*  The Second Circuit rejected the FDIC's argument, holding that because interpleader was not resolvable under the FDIC's administrative process, FIRREA did not require exhaustion.  *Id.* at 921; *see also Am. Nat. Ins. Co.*, 642 F.3d at 1142-43 ("[D]emands unresolvable through the [FDIC's] process" do not require exhaustion); *Rinestone v. Enter. Bank & Tr.*, 2012 WL 1681986, at *8 (D. Ariz. May 14, 2012) (denying motion to dismiss where the FDIC failed to show claims were administratively resolvable).

The class action that Lead Plaintiff brings here is not subject to FIRREA's exhaustion requirements based on the FDIC's refusal to administratively review class claims.  Indeed, on August 28, 2023, the FDIC refused to accept the class claim on the basis that "the Receiver does not accept class claims for review."  Grieser Decl. Ex. E. Under *First Millennium*, the FDIC's exclusion of class claims from its administrative process renders them not susceptible to resolution, meaning Lead Plaintiff was not required to exhaust these claims before bringing them in court.  It would make no sense to hold that Lead Plaintiff was required to exhaust a claim that the FDIC

refuses to even *recognize, let alone accept*.

The FDIC argues that *First Millennium* is inapposite because it "involve[d] claims *by* the FDIC . . . not claims against directors, officers and accountants of a failed bank." Mot. at 14 n.4. This fact is irrelevant to the Second Circuit's holding that FIRREA only requires exhaustion of claims that are administratively resolvable. If anything, *First Millennium* applies with *greater* force here, where exhaustion is also not required because neither SBNY nor the FDIC is a defendant.

Relatedly, the FDIC's reading of FIRREA, under which it can deprive courts of jurisdiction over class claims by refusing to administratively accept them, should be rejected as contravening FIRREA's basic structure, showing Congress did not intend the results the FDIC seeks here.[5]

FIRREA authorizes the FDIC to decide a claim in one of two ways: it must either "allow" or "disallow" the claim.  *See* 12 U.S.C. §§ 1821(d)(5)(A)(i); 1821(d)(4)(A); *compare* 1821(d)(5)(B) *with* 1821(d)(5)(D).  FIRREA does not give the FDIC the third option it purports to exercise here, *i.e.*, refusing to even recognize (let alone accept) a claim under its administrative process such that it is constructively denied, while also depriving any court of jurisdiction.  In fact, FIRREA prohibits this result by specifying that if the FDIC fails to allow or disallow the claim within 180 days, the claimant may "file suit on such claim" in court.  12 U.S.C. § 1821(d)(6)(A).

Here, the FDIC failed to act on the class claim within the 180-day statutory period (which expired on January 16, 2024), giving the Court jurisdiction over it under Section 1821(d)(6)(A).  The FDIC's response to Lead Plaintiff's class claim tacitly acknowledges this result.  In a transparent attempt to escape FIRREA's jurisdictional consequences, the FDIC stated, "[p]lease be advised that this does not constitute a disallowance under 12 U.S.C. § 1821(d)(5)(A)(i)."  Grieser

---

[5] Courts reject interpretations of FIRREA that would lead to unfair results for claimants.  *See, e.g.*, *Sharpe v. FDIC*, 126 F.3d 1147, 1156 (9th Cir. 1997) (The FDIC cannot "breach any pre-receivership contract . . . and then escape the consequences by hiding behind . . . FIRREA"); *Hudson United Bank v. Chase Manhattan Bank of Connecticut, N.A.*, 43 F.3d 843, 849 (3d Cir. 1994) ("The purpose [of FIRREA] was not to immunize certain claims from review.").

Decl. Ex. E.  But this self-serving denial does not change the fact that the FDIC failed to timely

allow or disallow the claim; it shows the FDIC's awareness of the consequences under FIRREA.

**B.  Even if FIRREA Did Require Exhaustion, Lead Plaintiff Properly Exhausted on Behalf of Itself and the Putative Class.**

**1.  The FDIC Has Disallowed or Failed to Timely Determine the Claims, Giving this Court Jurisdiction.**

Although Lead Plaintiff was not required to file an administrative claim with the FDIC to

pursue claims in this Court, Lead Plaintiff did so in an abundance of caution.  The FDIC offers no

support for its argument that Lead Plaintiff's filing of the Proofs of Claims operates as a concession

that FIRREA requires exhaustion here, particularly because the Proofs of Claims state that "[t]he

filing of this Proof of Claim shall *not* constitute . . . an admission . . . by [Claimants] that [FDIC's

process] is the proper forum to resolve the aforementioned claims."  JRH Decl. Exs. A & B.  Lead

Plaintiff's filing of the Proofs of Claims renders the FDIC's reliance on cases where the plaintiffs

did not file any claim misplaced.[6]

The FDIC argues that this action must be dismissed because it was commenced before

Lead Plaintiff filed administrative claims with the FDIC.  Mot. at 5.  This hypocritical argument is

baseless.  Underscoring the lack of logic in its arguments, the FDIC would treat all Class members

as one entity for purposes of commencing the action but as distinct for purposes of exhaustion.

Lead Plaintiff did not commence this action or the action with which it was consolidated—they

were commenced by others not appointed as lead plaintiff or affiliated with Lead Plaintiff.[7]

Moreover, even if other litigants' commencement of the action were imputable to Lead Plaintiff,

---

[6] *See Avery v. FDIC*, 113 F. Supp. 3d 116, 119 (D.D.C. 2015) ("Plaintiff has never filed an administrative claim with the FDIC."); *Carlyle Towers Condo. Ass'n, Inc. v. FDIC*, 170 F.3d 301, 302 (2d Cir. 1999) ("[T]he [plaintiff] had not submitted its claim to the FDIC within the allotted 90 days.").

[7] The FDIC's reliance on *Caires v. FDIC*, 2017 WL 1393735 (S.D.N.Y. 2017) is misplaced.  Unlike *Caire*s, where the plaintiff filed an administrative claim *after* filing his complaint (*id.* at *6), Lead Plaintiff filed the Proofs of Claim *before* filing the Complaint here.  *See supra* at 3-4.

the FDIC's argument seeks to elevate form over substance.  The bottom line is that on January 12,

2024, the FDIC disallowed Lead Plaintiff's claim, giving this Court jurisdiction under Section

1821(d)(6)(A).  *See* JRH Decl. Ex. C.  On January 16, 2024, the FDIC's time to allow or disallow

the Class's administrative claim expired, giving this Court jurisdiction under Section

1821(d)(5)(A)(ii).  Thus, these claims *have* been exhausted and are ripe for adjudication.

> **2.    Lead Plaintiff's Exhaustion for the Class Is Permissible Under FIRREA and the PSLRA.**

The FDIC's argument that FIRREA prohibited Lead Plaintiff from exhausting on behalf of

the putative Class misstates the law.  FIRREA contains no provision prohibiting a claimant from

filing for a class or prohibiting the FDIC from accepting these claims.  *See Cassese v. Wash. Mut.,*

*Inc.*, 711 F. Supp. 2d 261, 270 (E.D.N.Y. 2010) ("*Cassese I*").  The Second Circuit has never held

that FIRREA prohibits classwide exhaustion.[8]  Courts hold that FIRREA may permit classwide

exhaustion if the "representative filing with the FDIC [has] authority to act on behalf of the persons

he claims to represent."  *Id.* at 269 (citing *Off. & Pro. Emps. Int'l Union, Loc. 2 v. F.D.I.C.*, 962

F.2d 63, 67 (D.C. Cir. 1992) (permitting classwide exhaustion by a labor union on behalf of all

members)).

In *Cassese I*, a class of borrowers sued Washington Mutual for charging improper mortgage

fees.  *Cassese I*, 711 F. Supp. 2d at 264.  After the FDIC took receivership, the FDIC moved to

decertify the class, arguing that the named plaintiffs' administrative filing of a class claim did not

satisfy FIRREA's exhaustion requirements.  *Id.* There, unlike here, the named plaintiff was *not* a

PSLRA-appointed Lead Plaintiff, vested with the robust authority to act on behalf of the Class.

The FDIC cites no case—and Lead Plaintiff is aware of none—in which a PSLRA-appointed lead

---

[8] The district court's ruling in *Cassese I* was appealed on grounds not involving classwide exhaustion, hence the issue was not presented to the Second Circuit.  *See Bloom v. FDIC*, 738 F.3d 58 (2d Cir. 2013).

plaintiff was prohibited from exhausting on behalf of a putative class.

The Court may appropriately deem Lead Plaintiff's exhaustion on behalf of the Class effective under FIRREA provided there is a source of law giving Lead Plaintiff sufficient authority to do so.  Here, Congress's lead plaintiff mandates in the PSLRA provide the necessary authority.

a.   <strong>The PSLRA Allows Lead Plaintiff to Exhaust for the Class.</strong>

Congress enacted the PSLRA to "empower investors so that they may exercise primary control over private securities litigation." *In re Recoton Corp.*, 307 B.R. 751, 757 (Bankr. S.D.N.Y. 2004).  The PLSRA's lead plaintiff process "serve[s] as the main vehicle for effectuating [the PSLRA's] goals." *Reitan v. China Mobile Games & Ent. Grp., Ltd.*, 68 F. Supp. 3d 390, 395 (S.D.N.Y. 2014).  "[T]he PSLRA vests lead plaintiffs with the authority to exercise control over the litigation as a whole, including . . . to select the claims, the class period, and the theory of the case." *In re Synergy Pharms. Inc. Sec. Litig.*, 2020 WL 5763830, at *3 (E.D.N.Y. Sept. 28, 2020). The lead plaintiff "is charged with acting in the best interest of all class members." *In re Facebook, Inc., IPO Sec. & Derivative Litig.*, 2013 WL 4399215, at *2 (S.D.N.Y. Aug. 13, 2013).

As the PSLRA-appointed class representative, Lead Plaintiff's filing of the class claims with the FDIC was sufficient to satisfy FIRREA's exhaustion requirements.  Although the PSLRA does not contain an express provision governing this situation, "courts have established procedures to address various lead plaintiff issues not specifically addressed in the statute." *In re NYSE Specialists Sec. Litig.*, 240 F.R.D. 128, 133 (S.D.N.Y. 2007).  It follows from the Court's broad discretion to carry out the mandate of the PSLRA that the Court can find that Lead Plaintiff's class claim was effective for purposes of satisfying FIRREA's exhaustion requirements.  This is particularly true given FIRREA's history showing that Congress intended to *preserve* private plaintiffs' right to bring securities fraud suits against the officers and directors of failed banks.

Permitting Lead Plaintiff to exhaust the claims scheme does not "frustrate the purposes of

the FIRREA claim procedure." *Off. & Pro. Emps.*, 962 F.2d at 67.  In fact, the FDIC's preferred reading would undermine FIRREA's purposes, as it cannot be true that "the interests of administrative and judicial economy would be advanced by processing more than 370 discrete claims rather than one overarching complaint." *Id.*  Indeed, there is a stronger case for permitting Lead Plaintiff to exhaust for the Class here than in the *Off. & Pro. Emps* opinion. Whereas "Congress, in deliberations on FIRREA, apparently did not advert to the Act's implications for collective bargaining arrangements" (*id.* at 66-67), Congress explicitly considered FIRREA's impact on securities fraud claims and ensured FIRREA would *not* interfere with them.[9]

The FDIC cannot credibly argue that FIRREA was intended to produce the result it seeks here.  Congress's concerns about preserving claimants' rights are particularly applicable in a case such as this, a private securities suit against officers and directors of a failed bank that Congress explicitly identified as a key tool to prevent the fraud and abuses FIRREA was enacted to address.

### C.      The FDIC's Motion to Dismiss Raises Fact Questions that Require Discovery.

Even if FIRREA required Class members to individually exhaust to have standing (which it did not), the action should not be *dismissed* on this ground.  The FDIC's request for dismissal of the class claim, which is in fact a motion to strike class allegations under Rule 23(d)(1)(D), cannot be granted unless the class "cannot be certified as a matter of law."  *Flynn v. DIRECTV, LLC*, 2016 WL 4467885, at *5 (D. Conn. Aug. 23, 2016) ("If any plausibly discoverable facts could render the class appropriate for certification, then plaintiffs would be entitled to proceed."); *see also Chenesky v. New York Life Ins. Co.*, 2011 WL 1795305, at *1 (S.D.N.Y. 2011) (disfavoring motions to strike because they "preemptively terminate the class aspects of  . . . litigation . . . before plaintiffs are permitted to complete the discovery . . . relevant to class certification").

---

[9] The FDIC's interpretations of FIRREA are not entitled to agency deference.  *See Off. & Pro. Emps.*, 962 F.2d at 65.

The FDIC *does not even attempt* to argue that *every* single putative Class member failed to file a claim with the FDIC.  The FDIC admits that putative Class members *did* file claims (Mot. at 14 n.4) and attested that the FDIC received a "large volume of claims" that were "still being processed."  Grieser Decl. ¶ 11.  The FDIC contends that "few" Class members filed claims, but fails to substantiate this assertion with any supporting facts or evidence.  *See Tirakian*, 2010 WL 3925131 at *7.  Indeed, the FDIC does not specify (a) how many putative Class members filed claims with the FDIC, (b) what criteria were used to identify Class members, or (c) how the FDIC decided these claims.  These facts require discovery, can be challenged on numerous grounds, and cannot be resolved until the class certification stage at earliest.

The FDIC's argument that putative Class members who did not file a claim by the Claims Bar Date "have necessarily failed to exhaust the FIRREA claims process" is patently wrong.  Mot. at 15.  FIRREA requires that, *after* expiration of the claims bar deadline, "[f]or claimants whose names do not appear on the books of a failed financial institution, . . . the FDIC must mail to the newly discovered creditor a notice" within 30 days of discovery and allow them 90 days to file an administrative claim.  *Carlyle Towers*, 170 F.3d at 305 (citing 12 U.S.C. §§ 1821(d)(3)(C)).

The names of SBNY stockholders in the putative Class "do not appear on the books of [SBNY]," because their shares are overwhelmingly held in "street name" through the Depository Trust Company ("DTC") and intermediaries.  *See Harris v. TD Ameritrade Inc.*, 338 F. Supp. 3d 170, 176 n.1 (S.D.N.Y. 2018) (explaining the "common arrangement" of shares held in street name through DTC).  Once these putative Class members are identified through discovery in this litigation, *the FDIC is required to notify them to permit the consideration of their claims* under Section 1821(d)(3)(C)(ii).  *See Rampersaud v. Chase Home Fin.*, 2011 WL 6217559, at *4 (E.D.N.Y. Dec. 14, 2011) (holding that the plaintiff's filing suit triggered the FDIC's duty to

individually notify and provide her 90 days to file an administrative claim).  The FDIC's conduct confirms this requirement, as it has mailed individual notices to every claimant appearing in the action within 30 days of their discovery.  Grieser Decl. ¶¶ 7-8.

Discovery in this action will readily identify purchasers of SBNY's stock during the Class Period, whom the FDIC must notify and give the opportunity to file administrative claims.  Only after this process is complete will the Court be able to rule on the FDIC's argument.

## III.    THIS COURT HAS JURISDICTION OVER THE ACTION, OR ALTERNATIVELY SHOULD TRANSFER THE ACTION TO THE SOUTHERN DISTRICT OF NEW YORK

Because the claims here do not fall within FIRREA's claims provisions, FIRREA's venue limitations do not apply.  *First Millennium*, 607 F.3d at 921.  But if the Court finds these requirements applicable, the Court should transfer the action to the Southern District of New York pursuant to 28 U.S.C. §§ 1404(a), 1406(a), or 1631.  Each of these provisions presents the same inquiry: whether the transferee court has subject matter jurisdiction, and whether a transfer is in the "interest of justice."  *In re Ski Train Fire*, 257 F. Supp. 2d 648, 651 (S.D.N.Y. 2003).

As to the first inquiry, the FDIC concedes the Southern District of New York has subject matter jurisdiction over any exhausted claims.  As to the second inquiry, the FDIC fails to show that transfer would be against the interests of justice.  It argues that the Court should not transfer because Lead Plaintiff lacks standing, but that is incorrect as shown above.  Nor is there any merit to the FDIC's argument that a transfer would be unjust because Lead Plaintiff filed the Complaint after the FDIC argued for a lack of jurisdiction in its letter.  Dkt. 42.  This Court permitted Lead Plaintiff to file the Complaint *with this Court's permission* after the Court was apprised of the FDIC's arguments.  Dkt. 63.

## <u>CONCLUSION</u>

Lead Plaintiff requests that the FDIC's motion to dismiss be denied in its entirety.

Dated:  February 2, 2024

Respectfully submitted,

**BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP**

*/s/ John Rizio-Hamilton*
John Rizio-Hamilton
Jeremy P. Robinson
John J. Esmay
Alexander Noble
Jonathan G. D'Errico
1251 Avenue of the Americas
New York, NY 10020
Telephone: (212) 554-1400
Facsimile: (212) 554-1444
johnr@blbglaw.com
jeremy@blbglaw.com
john.esmay@blbglaw.com
alexander.noble@blbglaw.com
jonathan.derrico@blbglaw.com


Sharan Nirmul
Richard A. Russo, Jr. (admitted *pro hac vice*)
Joshua A. Materese (admitted *pro hac vice*)
Nathaniel C. Simon (admitted *pro hac vice*)
**KESSLER TOPAZ MELTZER & CHECK, LLP**
280 King of Prussia Road
Radnor, PA 19087
Telephone: (610) 667-7706
Facsimile: (610) 667-7056
snirmul@ktmc.com
rrusso@ktmc.com
jmaterese@ktmc.com
nsimon@ktmc.com

*Lead Counsels for Lead Plaintiff Sjunde AP-Fonden and the Class*

26

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 2nd day of February, 2024, I served: (1) Memorandum of Law in Opposition to the FDIC's Motion to Dismiss the Complaint; (2) Declaration of John Rizio-Hamilton in Support of Lead Plaintiff's Opposition, with Exhibits A through C thereto; and (3) Cover Letter, via electronic mail to all counsel of record in the above-captioned litigation.

Alexander Noble