# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF NEW YORK

SJUNDE AP-FONDEN, Individually and on
Behalf of All Others Similarly Situated,

                                    Plaintiff,

            vs.

JOSEPH J. DEPAOLO, ERIC HOWELL,
FRANK SANTORA, JOSEPH SEIBERT,
SCOTT A. SHAY, VITO SUSCA, STEPHEN D.
WYREMSKI, and KPMG, LLP,

                                    Defendants.

No. 1:23-CV-01921-FB-JRC

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS JOSEPH J. DEPAOLO AND ERIC HOWELL'S MOTION TO DISMISS CONSOLIDATED CLASS ACTION COMPLAINT

## TABLE OF CONTENTS

**PAGE**

TABLE OF AUTHORITIES ..................................................................................... iv

INTRODUCTION ...................................................................................................... 1

STATEMENT OF FACTS .......................................................................................... 3

    A.    Signature's Business Model Generated Years of Growth and Profits .................... 3

    B.    Signature's Business Model Attracted Uninsured Deposits ................................... 3

    C.    Signature Disclosed the Risks of Its Expansion into New Business Lines .............. 5

        1.    Signature Warned the Market of Expansion Risks ..................................... 6

        2.    Signature Specifically Warned the Market of Risks Associated with Its Digital Asset Industry Deposits ....................................................... 7

        3.    Signature Disclosed the Extent of Its Deposits from Clients in the Digital Asset Industry and Its Proactive Decision to Reduce Those Deposits ........................................................................................................ 8

        4.    Signature Updated Its Warnings Regarding Digital Asset Sector Deposits ...................................................................................................... 11

    D.    Signature Disclosed Its Capital and Liquidity Positions and Risks ..................... 12

        1.    Signature Disclosed That It Was "Well Capitalized" Under Prescribed Capital Ratios .......................................................................... 12

        2.    Signature Disclosed Its Sources and Amounts of Liquidity ..................... 13

        3.    Signature Warned Investors of Liquidity and Capital Risks .................... 13

    E.    The Bank's Closure in March 2023 Was Caused by an Unprecedented Bank Run Outside the Bank's Control ................................................................. 16

    F.    The Complaint Exaggerates the Regulators' Conduct ........................................ 18

SUMMARY OF COMPLAINT ............................................................................... 20

ARGUMENT ............................................................................................................ 20

I.    PLAINTIFF DOES NOT PLEAD ANY ACTIONABLE MISSTATEMENTS OR OMISSIONS ...................................................................................................... 22

A.      Mismanagement Is Not Actionable Under the Securities Laws ............................22

B.      Many of the Challenged Misstatements Are Non-Actionable Puffery.................24

        1.      Generalized Statements About the Bank's Business, Financial
                Position, and Future Prospects Are Non-Actionable .................................24

        2.      Generalized Statements About the Bank's Risk Management
                Practices Are Non-Actionable ...................................................26

C.      Many of the Challenged Misstatements Are Non-Actionable Opinions ..............29

        1.      Statements Regarding the Bank's Relationship With Regulators
                Are Non-Actionable ...................................................................30

        2.      Statements Regarding Deposit Stability Are Non-Actionable.................31

        3.      Numerous Other Statements Are Also Non-Actionable Opinions ..........32

D.      Forward-Looking Statements Are Non-Actionable................................................33

E.      Plaintiff Fails to Plead Particularized Facts Showing That Numerous
        Alleged Misrepresentations Were False ................................................................34

        1.      Plaintiff Does Not Allege That Statements Regarding the Bank's
                Modeling for Digital Asset Deposit Withdrawals Were False .................35

        2.      Plaintiff Does Not Allege that Statements Regarding the Impact of
                Cryptocurrency Volatility on Deposits Were False When Made .............35

        3.      Plaintiff Fails to Allege that Statements About the Bank's Deposit
                Concentrations Were False ....................................................37

        4.      Plaintiff Fails to Allege that the Remaining Capital Ratio and
                Liquidity Statements Were False ............................................38

F.      Plaintiff Fails to State a Claim Based upon the Representations Regarding
        Internal Control Over Financial Reporting. ..........................................................39

II.     PLAINTIFF FAILS TO ADEQUATELY PLEAD SCIENTER ......................................41

A.      Plaintiff Fails to Allege Motive and Opportunity ................................................42

        1.      Incentive Compensation Does Not Establish Motive ..............................42

        2.      Individual Defendants' Stock Sales Do Not Establish Motive.................43

                (a)     The Individual Defendants' Sales of Stock Acquired
                        Through Performance-Based Awards Were Not Unusual............43

|  |  | (b) | The Remaining Sales Were Not Suspiciously Timed | 44 |
|  |  | (c) | Individual Defendants' Acquisitions and Retention of Shares Negate Any Inference of Scienter | 45 |
|  | B. | Plaintiff Fails to Plead Strong Circumstantial Evidence of Conscious Misbehavior or Recklessness | | 47 |
|  |  | 1. | The Complaint Improperly Relies on Group Pleading | 47 |
|  |  | 2. | The Complaint Relies Heavily on Regulator Reports that Do Not Raise an Inference of Scienter | 48 |
|  |  | 3. | Plaintiff's Confidential Witness Opinions Do Not Establish Scienter | 51 |
|  |  | 4. | KPMG's Audit Opinions Negate a Finding of Scienter | 53 |
|  |  | 5. | The Individual Defendants' Decision to Limit Digital Asset Deposits Contradicts Plaintiff's Allegations of Scienter | 54 |
| III. | PLAINTIFF FAILS TO ADEQUATELY PLEAD LOSS CAUSATION | | | 55 |
|  | A. | The 2022 Stock Price Declines Were Not Causally Related to Any Alleged Misrepresentations | | 55 |
|  | B. | The Closure of The Bank Was Not Foreseeable | | 57 |
| IV. | PLAINTIFF FAILS TO STATE A SCHEME LIABILITY CLAIM. | | | 58 |
|  | A. | The Complaint Fails to Plead Something More than Misstatements | | 58 |
|  | B. | The Complaint Fails to Plead Reliance | | 59 |
| CONCLUSION | | | | 60 |

## **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*In re Aceto Corp. Sec. Litig.*,
2019 WL 3606745 (E.D.N.Y. Aug. 6, 2019).........................................................35

*Acito v. IMCERA Grp., Inc.*,
47 F.3d 47 (2d Cir. 1995)....................................................................................43, 44

*In re Alkermes Public Ltd. Co. Sec. Litig*,
523 F. Supp. 3d 283 (E.D.N.Y. 2021) ................................................................50

*In re Alpharma Inc. Sec. Litig.*,
372 F.3d 137 (3d Cir. 2004)................................................................................55

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*,
493 F.3d 87 (2d Cir. 2007)..................................................................................21

*Ballan v. Wilfred Am. Educ. Corp.*,
720 F. Supp. 241 (E.D.N.Y.1989) .......................................................................24

*Basic Inc. v. Levinson*,
485 U.S. 224 (1988).............................................................................................23

*In re Bear Stearns Cos. Sec., Deriv., & ERISA Litig.*,
763 F. Supp. 2d 423 (S.D.N.Y. 2011).................................................................45, 46

*In re Braskem S.A. Sec. Litig.*,
246 F. Supp. 3d 731 (S.D.N.Y. 2017)..................................................................41

*Building Trades Pension Fund of W. Pa. v. Insperity, Inc.*,
2022 WL 784017 (S.D.N.Y.  Mar. 15, 2022) ......................................................26

*Campo v. Sears Holdings Corp.*,
371 F. App'x 212 (2d Cir. 2010) .........................................................................53

*Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*,
750 F.3d 227 (2d Cir. 2014).................................................................................21

*In re Carter-Wallace, Inc. Sec. Litig.*,
150 F.3d 153 (2d Cir. 1998).................................................................................55

*Cent. States, Se. & Sw. Areas Pension Fund v. Fed. Home Loan Mortg. Corp.*,
543 F. App'x 72 (2d Cir. 2013) ...........................................................................58

*In re Chembio Diagnostics, Inc. Sec. Litig.*,
   586 F. Supp. 3d 199 (E.D.N.Y. 2022) ...................................................43

*Chill v. Gen. Elec. Co.*,
   101 F.3d 263 (2d Cir. 1996).................................................................52

*Citibank, N.A. v. K-H Corp.*,
   968 F.2d 1489 (2d Cir. 1992)...............................................................56

*In re Citigroup Sec. Litig.*,
   2023 WL 2632258 (S.D.N.Y. Mar. 24, 2023) ....................................24, 28, 31, 36

*City of Brockton Ret. Sys. v. Shaw Group Inc.*,
   540 F. Supp. 2d 464 (S.D.N.Y. 2008)..................................................46

*City of Dearborn Heights Act 345 Police & Fire R v. Axonyx, Inc.*,
   374 F. App'x 83 (2d Cir. 2010) ........................................................52, 53

*City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*,
   752 F.3d 173 (2d Cir. 2014)............................................................24, 38

*City of Roseville Employees' Ret. Sys. v. Sterling Fin. Corp.*,
   47 F. Supp. 3d 1205 (E.D. Wash. 2014) ..............................................28

*City of Taylor Gen. Emps. Ret. Sys. v. Magna Int'l Inc.*,
   967 F. Supp. 2d 771 (S.D.N.Y. 2013)..................................................46

*In re Danimer Sci., Inc. Sec. Litig.*,
   2023 WL 6385642 (E.D.N.Y. Sept. 30, 2023) .....................................43

*In re DDAVP Direct Purchaser Antitrust Litig.*,
   585 F.3d 677 (2d Cir. 2009)................................................................48

*Decker v. Massey–Ferguson, Ltd.*,
   681 F.2d 111 (2d Cir. 1982)................................................................48

*In re Deutsche Bank Aktiengesellschaft Sec. Litig.*,
   2017 WL 4049253 (S.D.N.Y. June 28, 2017) .........................................28, 38, 40

*In re DraftKings Inc. Sec. Litig.*,
   650 F. Supp. 3d 120 (S.D.N.Y. 2023)..................................................48

*ECA & Local 134 IBEW Joint Pension Tr. of Chic. v. JP Morgan Chase Co.*,
   553 F.3d 187 (2d Cir. 2009)...................................................... *passim*

*In re Express Scripts Holdings Co. Sec. Litig.*,
   773 F. App'x 9 (2d Cir. 2019) ........................................................30, 31

*Fadem v. Ford Motor Co.*,
    352 F. Supp. 2d 501 (S.D.N.Y.)........................................................................54

*Ford v. Voxx Int'l Corp.*,
    2016 WL 3982466 (E.D.N.Y. July 22, 2016) ..........................................52, 53

*In re Franklin Bank Corp. Sec. Litig*,
    782 F.Supp.2d 364 (S.D. Tex. 2011) ............................................................51

*Ganino v. Citizens Utilities Co.*,
    228 F.3d 154 (2d Cir. 2000)...........................................................................42

*In re Hain Celestial Grp. Inc. Sec. Litig.*,
    2022 WL 18859055 (E.D.N.Y. Nov. 4, 2022) .......................................46, 52

*Hammer v. Frontier Fin. Corp.*,
    2012 WL 13020032 (W.D. Wash. Apr. 20, 2012) ........................................51

*In re Iconix Brand Grp. Inc.*,
    2017 WL 4898228 (S.D.N.Y. Oct. 25, 2017) ...............................................56

*Int'l Audiotext Network, Inc. v. Am. Tel. & Tel. Co.*,
    62 F.3d 69 (2d Cir. 1995).................................................................................2

*Janus Cap. Grp., Inc. v. First Deriv. Traders*,
    564 U.S. 135 (2011)................................................................................36, 37

*Kalnit v. Eichler*,
    264 F.3d 131 (2d Cir. 2001)...........................................................................43

*In re Keyspan Corp. Sec. Litig.*,
    383 F. Supp. 2d 358 (E.D.N.Y. 2003) ...........................................44, 46, 47

*Kuriakose v. Fed. Home Loan Mortg. Corp.*,
    897 F. Supp. 2d 168 (S.D.N.Y. 2012)......................................................51, 58

*Lentell v. Merrill Lynch & Co.*,
    396 F.3d 161 (2d Cir. 2005)....................................................................57, 59

*In re Liberty Tax, Inc. Sec. Litig.*,
    435 F. Supp. 3d 457 (E.D.N.Y. 2020) .....................................................28, 58

*Livingston v. Cablevision Sys. Corp.*,
    966 F. Supp. 2d 208 (E.D.N.Y. 2013) .....................................................44, 45

*Loc. No. 38 Int'l Bhd. of Elec. Workers Pension Fund v. Am. Exp. Co.*,
    724 F. Supp. 2d 447 (S.D.N.Y. 2010).........................................................54

*Malin v. XL Cap. Ltd.*,
   499 F. Supp. 2d 117 (D. Conn. 2007) ...................................................................55

*In re Manulife Fin. Corp. Sec. Litig.*,
   2012 WL 4108104 (S.D.N.Y. Sept. 19, 2012) ......................................................51

*In re Meta Materials Inc. Sec. Litig.*,
   2023 WL 6385563 (E.D.N.Y. Sept. 29, 2023) ......................................................34

*In re Metricom Sec. Litig.*,
   2004 WL 966291 (N.D. Cal. April 29, 2004) ........................................................47

*Mills v. Polar Molecular Corp.*,
   12 F.3d 1170 (2d Cir. 1993) ..................................................................................49

*In re MSC Indus. Direct Co., Inc.*,
   283 F. Supp. 2d 838 (E.D.N.Y. 2003) ...................................................................55

*In re N.Y. Cmty. Bancorp, Inc., Sec. Litig.*,
   448 F. Supp. 2d 466 (E.D.N.Y. 2006) ...................................................................25

*New Falls Corp. v. Soni Holdings, LLC*,
   2020 WL 13850728 (E.D.N.Y. Mar. 31, 2020) ....................................................49

*In re Nextcard, Inc. Sec. Litig.*,
   2005 WL 6342406 (N.D. Cal. Feb. 7, 2005) .........................................................23

*Noto v. 22nd Century Grp., Inc.*,
   35 F.4th 95 (2d Cir. 2022) .....................................................................................37

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
   575 U.S. 175 (2015) ...............................................................................................30

*Orlan v. Spongetech Delivery Sys., Inc., Sec. Litig.*,
   2012 WL 1067975 (E.D.N.Y. Mar. 29, 2012) ......................................................49

*Ortiz v. Canopy Growth Corp.*,
   537 F. Supp. 3d 621 (D.N.J. 2021) ........................................................................56

*In re PEC Sols. Inc. Sec. Litig.*,
   2004 WL 1854202 (E.D. Va. May 25, 2004) ........................................................56

*In re PetroChina Co. Ltd. Sec. Litig.*,
   120 F. Supp. 3d 340 (S.D.N.Y. 2015) ....................................................................41

*In re Philip Morris Int'l Inc. Sec. Litig.*,
   89 F.4th 408 (2d Cir. 2023) .......................................................................29, 32, 34

*Plumber & Steamfitters Local 773 Pension Fund v. Danske Bank A/S,*
    11 F.4th 90 (2d Cir. 2021) ......................................................................27, 28, 29, 61

*Portannese v. Donna Karan Int'l, Inc.,*
    1998 WL 637547 (E.D.N.Y. Aug. 14, 1998).................................................22, 44

*Ressler v. Liz Claiborne, Inc.,*
    75 F. Supp. 2d 43 (E.D.N.Y. 1998) ...........................................................44, 45, 47

*Ret. Bd. of the Policemen's Annuity & Benefit Fund of Chi. v. FXCM Inc.,*
    333 F. Supp. 3d 338 (S.D.N.Y. 2018)................................................................26

*In re Rockwell Med., Inc. Sec. Litig.,*
    2018 WL 1725553 (S.D.N.Y. Mar. 30, 2018) ....................................................55

*Rombach v. Chang,*
    355 F.3d 164 (2d Cir. 2004)................................................................................25

*Ronconi v. Larkin,*
    253 F.3d 423 (9th Cir. 2001) ..............................................................................46

*Roofer's Pension Fund v. Papa,*
    2018 WL 3601229 (D.N.J. July 27, 2018)...........................................................56

*San Leandro Emergency Med. Grp. Profit Sharing Plan v. Philip Morris Cos.,*
    75 F.3d 801 (2d Cir. 1996).................................................................................55

*Santa Fe Indus., Inc. v. Green,*
    430 U.S. 462 (1977).............................................................................................22

*SEC v. Rio Tinto plc.,*
    41 F.4th 47 (2d Cir. 2022) ..................................................................................61

*Singh v. Cigna Corp.,*
    918 F.3d 57 (2d Cir. 2019)........................................................................24, 28, 29

*In re Sketchers USA Sec. Litig.,*
    444 F. Supp.3d 498 (S.D.N.Y. 2020)..................................................................54

*Slayton v. Am. Exp. Co.,*
    604 F.3d 758 (2d Cir. 2010)................................................................................56

*SRM Global Fund Ltd. P'ship v. Countrywide Fin. Corp.,*
    448 F. App'x 116 (2d Cir. 2011) ........................................................................26

*Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc.,*
    552 U.S. 148 (2008)........................................................................................61, 62

*Stratte-McClure v. Morgan Stanley*,
    598 F. App'x 25 (2d Cir. 2015) ..................................................................58

*Teamsters Local 445 Freight Div. Pension Fund v. Dynex Cap. Inc.*,
    531 F.3d 190 (2d Cir. 2008)......................................................................43

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.*,
    551 U.S. 308 (2007)...................................................................................42

*Tongue v. Sanofi*,
    816 F.3d 199 (2d Cir. 2016)................................................29, 30, 32, 33

*In re Turquoise Hill Res. Ltd. Sec. Litig.*,
    625 F. Supp. 3d 164 (S.D.N.Y. 2022)......................................60, 61, 62

*In re UBS AG Sec. Litig.*
    2012 WL 4471265 (S.D.N.Y. Sept. 28, 2012)........................................26

*In re Wachovia Equity Sec. Litig.*,
    753 F. Supp. 2d 326 (S.D.N.Y. 2011)....................................................26

*In re Weight Watchers Int'l Inc. Sec. Litig.*,
    504 F. Supp. 3d 224 (S.D.N.Y. 2020).....................................................35

**Statutes**

Private Securities Litigation Reform Act, 15 U.S.C. § 78u–4................................21, 42

Private Securities Litigation Reform Act, 15 U.S.C. § 78u–5................................33, 34

Securities Exchange Act of 1934 Section 10(b) ..............................................21, 22, 61

N.Y. Banking Law § 36(10) ........................................................................................23

**Other Authorities**

12 C.F.R. § 309.5(g)(8)................................................................................................23

12 C.F.R. § 309.6(a)....................................................................................................23

SEC Rule 10b-5, 17 C.F.R. § 240.10b-5 ..............................................21, 23, 36, 60

Federal Rule of Civil Procedure 9(b)...........................................................................21

N.Y. Comp. Codes R. & Regs. §§ 7.1(a), 7.2(a) ........................................................23

1 *The Law and Regulation of Financial Institutions* § 7.06(1)(i), (4)(d)
    (LexisNexis A.S. Pratt 2023)....................................................................23

# INTRODUCTION

Signature Bank ("Signature" or the "Bank") was a growing, profitable bank that was "well capitalized"—the highest category—under federal banking regulations. The Federal Deposit Insurance Corporation (the "FDIC") regularly examined the Bank's operations and consistently gave it a ranking reserved for banks that are "fundamentally sound," have satisfactory risk management practices, and pose "no material supervisory concerns." The Bank also received unqualified audit opinions with respect to its financial statements.

Unlike many banks, Signature used a single point of contact approach pursuant to which private banking client teams serviced a client base of primarily privately-owned businesses and their high net worth owners. Because of this model, the Bank's deposit base was heavily weighted to large uninsured deposits, *i.e.*, deposits exceeding the FDIC's insurance limit of $250,000 per depositor. Investors were well aware of the Bank's concentration of uninsured deposits because the Bank repeatedly disclosed it. They were also aware of its history of rapid deposit growth, including in the nascent digital asset industry, because the Bank carefully disclosed these facts, along with the associated risks to its business, operations, and financial results, in its public filings. Likewise, the Bank's public filings regularly updated investors on its capital and liquidity positions.

After over two decades of success, which saw Signature rise from a newly created bank to one with more than $100 billion in deposits, and successfully weather adverse events ranging from 9/11 to the 2008 financial crisis to the COVID-19 pandemic, the Bank fell victim to an extraordinary run on deposits sparked by other bank failures; a series of events banking regulators called "unprecedented."[1] As the FDIC later acknowledged, "[t]he speed with which depositors

---

[1] *E.g.*, Ex. A, FDIC, *FDIC's Supervision of Signature Bank*, 40 (Apr. 28, 2023) (the "FDIC Report") (referenced at ¶ 181). References to ¶ __ are citations to the Corrected Consolidated

withdrew funds ... was unexpected and surprised the regulators and the banking industry." *Id.* Indeed, prior to the run on Signature, "no one had modeled for this catastrophic of an event."[2]

The vast majority of the items the Complaint claims were hidden from investors were, in fact, disclosed—repeatedly, with granular detail and plenty of cautionary statements. The Complaint ignores those disclosures. The Complaint also ignores all the positive conclusions the regulators reached at the time of Signature's supervision. It instead cherry-picks out of context various snippets from regulatory reports identifying areas where there was room for improvement, and claims fraud based upon those comments, thus demonstrating one of the reasons why the banking regulations ***prohibit*** banks such as Signature from disclosing such information. Selective disclosure of banking supervisory communications—called Confidential Supervisory Information precisely because they are ***confidential***, and are part of the normal cadence of oversight and communication in the banking industry—are apt to be taken out of context and misconstrued, just as Plaintiff does here.

The rest of the Complaint critiques the skills of Signature's management team, repeatedly urging that the Bank supposedly should have been managed better. But mismanagement is not securities fraud, and there is no duty to disclose supposed managerial flaws. Finally, the Complaint's challenge to various statements that were non-actionable opinions, and to non-actionable puffery that touted with generalities the Bank's strengths, strategies, and operations,

---

Complaint (ECF 70) (the "Complaint"). The Complaint cites various Signature public filings, earnings call and conference transcripts, news articles, analyst reports, and regulatory and governmental reports issued in the wake of the Bank's closure. *See, e.g.*, Complaint at 1; *id.* ¶¶ 63, 65, 83, 117, 126, 134, 145. The Court may consider these documents and the other public filings cited here in deciding this motion. *See Int'l Audiotext Network, Inc. v. Am. Tel. & Tel. Co.*, 62 F.3d 69, 71-72 (2d Cir. 1995).

[2] Ex. B, Office of Inspector Gen., *Material Loss Review of Signature Bank of New York*, 36 (Oct. 2023) (the "OIG Report").

fail to state a claim.  Similarly, Plaintiff fails to allege a strong inference of scienter or that the alleged misrepresentations caused the purported losses.  Despite its 159-page girth, the Complaint states no viable claims and should be dismissed.

## STATEMENT OF FACTS

### A.    Signature's Business Model Generated Years of Growth and Profits

Signature was founded in 2001.  ¶ 31.[3]  It featured a "single point of contact model wherein clients were fully serviced by veteran private client service teams," an innovation that Signature touted as "the hallmark of our franchise."  ¶ 42.

For more than two decades, Signature's business model paid off.  It attracted the deposits of privately-owned businesses and their owners in a diverse range of industries, ranging from real estate developers to law firms.  Ex. C, 2020 Form 10-K at 10, 88, 94; ¶¶ 41-43.  And over time, as its client base grew, the Bank's revenues and deposits followed suit.  ¶ 44.  Signature also increased its profits over the years, including during the putative Class Period.  *See* Ex. D, 2022 Form 10-K at F-6 (profits growing from $528 million to $1.33 billion from 2020 to 2022).

### B.    Signature's Business Model Attracted Uninsured Deposits

Signature's relationship-driven banking model attracted deposits "well in excess of FDIC deposit insurance limits."  Ex. E, 2020 Proxy Statement at 8.  Contrary to Plaintiff's allegations that investors were left in the dark regarding uninsured deposits, the Bank repeatedly disclosed the associated risks, as well as the amounts of its deposits that were uninsured.

The Bank repeatedly warned investors that: (1) its "depositor base is more heavily weighted to larger uninsured deposits," (2) "deposit outflows" could occur for a number of reasons,

---

[3] Unless otherwise noted, all emphasis is added and all internal citations and quotations are omitted.  References to "Ex. __" are citations to the Declaration of Peter L. Simmons dated February 13, 2024.

including during "extremely volatile and unstable market conditions," and (3) outflows could "materially and adversely affect our business."  As the Bank's 2020 Form 10-K cautioned:

> **The loss of our deposit clients or substantial reduction of our deposit balances could force us to fund our business with more expensive and less stable funding sources.**
> . . .
> ***Given our business model, our depositor base is more heavily weighted to larger uninsured deposits than many other banks.... Deposit outflows can occur for a number of reasons,*** including because clients may seek investments with higher yields, ***clients with uninsured deposits may seek greater financial security during prolonged periods of extremely volatile and unstable market conditions*** or clients may simply prefer to do business with our competitors, or for other reasons.... ***The occurrence of any of these events could materially and adversely affect our business, results of operations or financial condition.***

Ex. C, 2020 Form 10-K at 53-54.  Signature reiterated these warnings to investors every year and incorporated them in its quarterly Form 10-Q filings.  Ex. F, 2021 Form 10-K at 54; Ex. D, 2022 Form 10-K at 53; *see also e.g.*, Ex. G, 2021 Q1 Form 10-Q at 79.

Beyond warning the market about the risks associated with its uninsured deposits, the Bank repeatedly quantified them.  In every single quarter, Signature informed the market of the precise dollar amount and percentage of its uninsured deposits:

| Quarter | Deposits (billions) | Uninsured Deposits (billions) | Percentage of Uninsured Deposits[4] (%) |
|---------|---------------------|-------------------------------|-----------------------------------------|
| 2020 Q4 | 63.32 | 55.7216 | 88 |
| 2021 Q1 | 73.97 | 66.0552 | 89.3 |
| 2021 Q2 | 85.56 | 77.6029 | 90.7 |
| 2021 Q3 | 95.56 | 87.4374 | 91.5 |
| 2021 Q4 | 106.13 | 97.6396 | 92 |
| 2022 Q1 | 109.16 | 100.646 | 92.2 |
| 2022 Q2 | 104.12 | 95.1657 | 91.4 |
| 2022 Q3 | 102.78 | 93.5298 | 91 |

---

[4] *See* Ex. C, 2020 Form 10-K at 53; Ex. G, 2021 Q1 Form 10-Q at 70; Ex. H, 2021 Q2 Form 10-Q at 78; Ex. I, 2021 Q3 Form 10-Q at 77; Ex. F, 2021 Form 10-K at 54; Ex. J, 2022 Q1 Form 10-Q at 65; Ex. K, 2022 Q2 Form 10-Q at 71; Ex. L, 2022 Q3 Form 10-Q at 75; Ex. D, 2022 Form 10-K at 55.

| *2022 Q4* | 88.59 | 79.4652 | 89.7 |

While Plaintiff generally complains about the amount of the Bank's uninsured deposits, ¶¶ 4, 64, it does not dispute the accuracy of any of the numbers set forth above, and expressly concedes that the Bank "did disclose its overall concentration of uninsured deposits." *Id.*

Unable to contend that the Bank failed to disclose its uninsured deposits or their risks, Plaintiff alleges that the market was unaware of Signature's concentrations in "large depositors." ¶ 67. But the very numbers above made that strikingly apparent—a significant number of uninsured (*i.e.*, large) deposits necessarily means that the total deposits are concentrated in fewer, larger depositors. The Bank also disclosed that its client base was "more heavily weighted to larger uninsured deposits." Moreover, Signature executives regularly commented on "large depositors," and analysts asked specifically about large depositors. *See, e.g.*, Ex. M, 2020 Q4 Earnings Call at 18, 23 (discussing institutional cryptocurrency clients and large deposits from class actions); Ex. N, 2021 Q1 Earnings Call Tr. at 9 (discussing deposits from stablecoin reserves, digital miners, and digital asset exchanges, including reserve deposits from the Circle digital exchange); Ex. O, 2022 Q1 Earnings Call at 3-4 (eight of the twelve major digital asset exchanges use Signature as their primary bank); Ex. P, 2022 Q2 Earnings Call Tr. at 3, 7, 8 (discussing a West Coast client and a digital client who reduced deposits by $450 million and $1.5 billion respectively); Ex. Q, 2022 Q3 Earnings Call Tr. at 15, 17 (discussing digital asset exchanges as Signature's "biggest deposits" and large depositors with "over $100 million" in the mortgage business).

## C.    Signature Disclosed the Risks of Its Expansion into New Business Lines

From its founding in 2001, Signature serially developed new business to serve an ever more diverse set of industries. In 2018, the bank formed a "Digital Asset Banking Group." ¶ 55. A

year later, Signature launched Signet, a blockchain-based digital payments platform.    ¶ 58. Together, the Digital Asset Banking Group and Signet were designed to attract deposits from clients in the digital asset industry, including exchanges, custodians, digital miners, institutional traders, and other participants in the cryptocurrency industry.  *See, e.g.*, Ex. C, 2020 Form 10-K at 7; ¶¶ 55, 58.   In 2018, Signature also launched a Fund Banking division, which focused on providing banking services to the private equity industry.  ¶ 60.  In 2019, Signature launched a Venture Banking Group focused on venture capital.  ¶ 59.

1.    <u>Signature Warned the Market of Expansion Risks</u>

In connection with its expansion into these new areas, Signature prominently warned the market that, for various reasons: "**[w]e may be unable to successfully implement our growth strategy**" and "**[w]e may be unable to successfully integrate new business lines into our existing operations**."  Ex. C, 2020 Form 10-K at 48 (emphasis in original).  The Bank underscored that its ability to expand successfully would depend, among other things, on "factors beyond our control, such as national and regional economic conditions," and that the "[f]ailure to manage our growth effectively could have a material adverse effect" on the Bank.  *Id.*  Signature repeated these warnings in 2022 and 2023.  *See* Ex. F, 2021 Form 10-K at 48; Ex. D, 2022 Form 10-K at 46.

Signature also warned investors about the risks associated with the launch of its Fund Banking and Venture Banking business lines, as well as Signet, writing:

> **[W]e may not be as successful in managing new business lines as we have been for business lines with which we have more experience.**  We will be required to employ and maintain qualified personnel, and as our business expands into new and existing markets, we may be required to install additional operational and control systems.  **Any failure to successfully manage this integration may adversely affect our future financial condition and results of operations.**

Ex. C, 2020 Form 10-K at 49.

2.    Signature Specifically Warned the Market of Risks Associated with Its
Digital Asset Industry Deposits

Given that the digital asset industry was new, Signature made sure to warn the market

repeatedly about the risks that serving the industry entailed.  As an initial matter, the Bank made

clear that *it did not hold cryptocurrency assets*.  Ex. D, 2022 Form 10-K at 8; Ex. P, 2022 Q2

Earnings Call Tr. at 3.  Instead, its digital asset business *was limited to facilitating digital asset*

*transactions and taking U.S. dollar deposits from clients operating in the digital asset industry*.

That is critical because Signature was not directly subject to volatility in the value of digital assets

or the risks of holding digital assets; rather, its clients were—no different than Bank clients subject

to interest rate volatility, stock market fluctuations, or changes in the value of real estate assets.

The Bank warned the market of the various risks associated with deposits from digital asset

clients, prominently disclosing in its 2021 Form 10-K that "*[o]ur expansion into the marketplace*

*for digital asset transactions and deposits presents certain operational, financial, and regulatory*

*compliance risks*," including*:*

- "*The digital asset industry is somewhat nascent and the use of digital assets in financial transactions is an emerging practice*."

- "At present, digital assets and digital asset service providers and markets are not subject to extensive regulation....  As supervisory scrutiny and regulation of digital assets increases, *we may face greater exposure to operational, financial and regulatory risk and our strategic plans [and] activities in this area may be limited or delayed, which could adversely affect our business, financial condition and results of operations*."

Ex. F, 2021 Form 10-K at 49.

Market participants were well aware of the risks associated with Signature's digital asset

industry depositors—including the risk that a downturn in the digital asset market could cause

deposits to be withdrawn.  As the Complaint admits, in early 2021, the "stability of digital asset

deposits was a frequent topic of analyst reports."  ¶ 126.  In February 2021, UBS acknowledged

7

the risks of these deposits, writing: "the question increasingly is how much of these [digital asset] inflows are 'sticky.'" *Id*.  UBS explained that "[t]o the extent there are major drawdowns in crypto asset prices in the future, there is risk [Signature] could see outflows as a result." *Id*.

### 3.    Signature Disclosed the Extent of Its Deposits from Clients in the Digital Asset Industry and Its Proactive Decision to Reduce Those Deposits

At all relevant times, the Bank disclosed the extent of its deposits from clients in the digital asset industry—including the significant decrease in those deposits following a period of volatility in 2022.  The Bank also disclosed in late 2022 that it had decided to proactively reduce its deposits from digital asset clients to further diversify deposits, reduce deposit costs, and avoid the misperception that it was a "crypto bank."  Ex. S, December 6, 2022 Goldman Sachs Conference Tr. at 2, 4-5.  As with the Bank's disclosures of uninsured deposits, Plaintiff nowhere alleges that the Bank's disclosures of the amount of its deposits from digital asset clients was inaccurate.

As Plaintiff acknowledges, the Bank disclosed the increase in its deposits from digital asset clients during 2020 and 2021.  At year-end 2019, such deposits comprised $1.7 billion of Signature's $44 billion deposit balance.  ¶ 69.  By the end of 2020, such deposits had grown to $9 billion of the Bank's $63.3 billion of total deposits.  *Id.*; Ex. C, 2020 Form 10-K at F-6.  And, by year end 2021, these deposits had increased to $28.7 billion of the Bank's $106 billion in total deposits.  *Id.*; Ex. F, 2021 Form 10-K at F-6.[5]

In the second quarter of 2022, a phenomenon commonly referred to as the "crypto winter" occurred, sending values of cryptocurrencies such as Bitcoin decreasing from their 2021 highs and causing "investors to question the purported stability" of digital assets.  ¶¶ 14, 138.  As a provider

---

[5] The Bank also disclosed quarterly fluctuations of these deposits.  *See, e.g.*, Ex. N, 2021 Q1 Earnings Call Tr. at 3 (growth of $4.4 billion); Ex. T, 2021 Q2 Earnings Tr. at 4 (growth of $6.3 billion); Ex. U, 2021 Q3 Earning Tr. at 3 (growth of $5.1 billion); Ex. V, 2021 Q4 Earnings Tr. at 3 (growth of $5.7 billion).

of banking services to companies affected by the "crypto winter," Signature did not emerge unaffected. On May 16, 2022, the Bank disclosed that its "[d]eposit balances [we]re lower by approximately $1.39 billion quarter-to-date." ¶ 139; Ex. W, May 16, 2022 Mid-Quarter Update. As Plaintiff admits, the decrease in deposits caused market commentators to highlight the risks faced by Signature. For example, a Piper Sandler analyst wrote in May 2022: "Given the developments in the cryptospace, we would logically expect [Signature] to see some pressure on deposit flows in coming quarters. ***How much remains a tough question to answer since we are in unchartered water***." ¶ 141; *see also id.* (CNBC: investors were concerned because "swings in crypto prices can be reflected in crypto-related deposit[s]"; Janney: "we expect lower deposit balances to lead to reduced excess liquidity").

The downturn in digital assets continued for months. ¶ 148. On July 19, 2022, Signature reported that, in the second quarter of 2022, its total deposits had declined by $5.04 billion, with deposits from digital asset clients representing $2.4 billion of the decline. ¶ 143. Signature's COO, Eric Howell, stated that "clearly, there are people leaving the digital assets space and therefore deposits leaving." *Id.* He further warned that the "[d]igital winter hasn't quite gone away yet" and that it would continue to be a "headwind." Ex. P, 2022 Q2 Earnings Call Tr. at 3.

As Plaintiff admits, the July 19 disclosures caused analysts once again to highlight the risks faced by Signature. For instance, the *Financial Times* specifically noted concerns "relate[d] to liquidity," explaining that "the main concern seems to be funding and liquidity relating to the stability of the deposit base…. ***That can kill a bank just as much as a credit crisis***." ¶ 145; *see also id.* (Jefferies analyst noting the drop in deposits and "investor angst").

As the "crypto winter" continued, Signature kept the market informed of the fluctuations in its digital asset client deposits. On September 2, 2022, Signature issued a Mid-Quarter Update,

disclosing quarterly digital asset-related deposit outflows through that date of $4.27 billion and attributing the outflows to the "recent 'crypto winter.'" ¶ 149.  At the end of the quarter, Signature disclosed digital asset industry deposit outflows of $3 billion. ¶ 151.  During an earnings call, Howell warned the market that, while Signature hoped the "digital winter" had bottomed out, "it's still very choppy, and that's hard to predict."  Ex. Q, 2022 Q3 Earnings Call Tr. at 3, 20.

In November 2022, the collapse of the cryptocurrency exchange FTX fueled a shift in the Bank's digital asset strategy.  ¶¶ 153-54.  FTX was publicly known as a Signature client, and Signature published a press release four days after FTX's bankruptcy filing to inform the market of its current exposure to FTX.  ¶ 154.  As Plaintiff admits, Signature's involvement with FTX caused "[m]arket concerns regarding [Signature's] digital asset exposure [to] bubble[] over." ¶ 153.  Indeed, analysts at both Compass Point and Stephens highlighted Signature's risks, with Stephens specifically noting the risks of "increased deposit run-off as well as lower cash and securities levels." *Id.*

Less than a month later, on December 6, 2022, Signature representatives participated in a Goldman Sachs investor conference.  ¶ 160.  During the conference, Howell announced that Signature would be intentionally shrinking digital asset-related deposits by $8 billion to $10 billion, with a goal of lowering the Bank's deposits from digital asset clients to under 15% of total deposits. ¶ 161; Ex. S, December 6, 2022 Goldman Sachs Conference Tr. at 2.  He also stated that Signature would limit clients to deposits that were no more than 2% of Signature's total deposits, and would "over time, look to lower that as well."  *Id.*  This reduction in deposits from digital asset clients was "expensive" for Signature, as the Bank had to cover the exited deposits with cash, securities, and borrowings.  Ex. S, December 6, 2022 Goldman Sachs Conference Tr. at 2-3.  But

as Signature President and CEO Joseph DePaolo stated, "we don't want to be beholden to any [one] industry or any [one] individual client." *Id.* at 2.

Signature disclosed the further reduction of its deposits from digital asset clients in connection with its fourth quarter 2022 earnings release. The Bank reported that total deposits decreased by $14.2 billion, with $7.4 billion in digital asset client deposit outflows. ¶ 166; Ex. SSS, 2022 Q4 Earnings Call Tr. at 3. DePaolo stated on the January 17 earnings call that Signature expected to reduce deposits from digital asset clients by a further $3-5 billion by the end of 2023 and attributed the decline in deposits to the Bank's previously announced strategy change. *Id.*

    4.    <u>Signature Updated Its Warnings Regarding Digital Asset Sector Deposits</u>

By March 1, 2023, Signature had reduced its 2023 deposits from digital asset clients by an additional $1.51 billion, while deposits from other depositors increased by $682 million. Ex. CC, March 2, 2023 Mid-Quarter Update at 2. In light of the volatility that the digital asset industry had recently experienced, the Bank updated its risk warnings in light of recent developments:

> The Bank's relationships with [digital asset] market participants, and its digital asset banking operations generally, are subject to ***risks related to the use of digital assets, including, but not limited to, volatility in the value of digital assets, a loss of confidence in the participants of the digital asset ecosystem and negative publicity surrounding digital assets.*** The bankruptcy or other operational failure of the Bank's digital asset customers or other market participants could affect the ability of our digital asset customers to maintain their deposits with us and ***could lead to a decline in volume of the Bank's digital asset deposits.*** For example, in November 2022, FTX, the third largest digital asset exchange by volume at the time, filed for bankruptcy. Although the Bank's relationship with FTX was only limited to USD denominated deposits, ***the market fallout from the FTX bankruptcy has led to extreme digital asset price volatility and negative publicity surrounding digital assets and undermined confidence in the digital asset markets, all of which have resulted in declines in the Bank's digital asset deposits.… [F]urther volatility in the digital asset markets may adversely affect our deposits and, in turn, our business, earnings, net interest margin, efficiency ratio, liquidity, capital levels/ratios, the ability to grow our loan portfolio, financial condition and results of operations.***

Ex. D, 2022 Form 10-K at 47-48. The Bank specifically warned that volatility in the digital asset

industry could lead to deposits being withdrawn, which could "materially and adversely affect our business, results of operations or financial condition." *Id.* at 53.

### D.    Signature Disclosed Its Capital and Liquidity Positions and Risks

Plaintiff alleges that Defendants did not adequately disclose the Bank's capital and liquidity risks. *See, e.g.*, ¶¶ 11-12. However, Signature regularly disclosed the details of its capital and liquidity positions while also warning investors about the risks to its business in these areas.

### 1.    Signature Disclosed That It Was "Well Capitalized" Under Prescribed Capital Ratios

In its public filings, Signature summarized the regulatory risk-based capital rules applicable to the Bank. *See, e.g.*, Ex. C, 2020 Form 10-K at 24-25, 105-107; Ex. F, 2021 Form 10-K at 23-24, 105-07; Ex. D, 2022 Form 10-K at 24-25, 103-06. In accordance with those requirements, Signature calculated various prescribed capital amounts and ratios and disclosed those numbers to the market quarterly.[6] At all relevant times, the Bank's capital ratios exceeded the requirements for a "well capitalized" bank—the highest category under federal banking regulations[7]:

| | Total Based Ratio | Risk Capital | Tier 1 Risk-Based Capital Ratio | Common Equity Tier 1 Based Capital Ratio | Leverage Ratio |
|---|---|---|---|---|---|
| *"Well-capitalized"* | 10.0% | | 8.0% | 6.5% | 5.0% |
| *2020 Form 10-K* | 13.54% | | 11.20% | 9.87% | 8.55% |
| *2021 Form 10-K* | 11.76% | | 10.51% | 9.60% | 7.27% |
| *2022 Form 10-K* | 12.32% | | 11.20% | 10.41% | 8.79% |

---

[6] Ex. G, 2021 Q1 Form 10-Q at 74; Ex. H, 2021 Q2 Form 10-Q at 83; Ex. I, 2021 Q3 Form 10-Q at 82; Ex. F, 2021 Form 10-K at 106; Ex. J, 2022 Q1 Form 10-Q at 69; Ex. K, 2022 Q2 Form 10-Q at 75; Ex. L, 2022 Q3 Form 10-Q at 79; Ex. D, 2022 Form 10-K at 105.

[7] Ex. C, 2020 Form 10-K at 106; Ex. F, 2021 Form 10-K at 106; Ex. D, 2022 Form 10-K at 105.

Plaintiff does not allege that any of these capital disclosures were inaccurate.

### 2.    Signature Disclosed Its Sources and Amounts of Liquidity

Signature also provided investors with extensive information concerning the Bank's liquidity.  Its quarterly and annual public reports disclosed: (1) the Bank's deposit growth and balances; (2) the Bank's loan growth and balances and the composition of its loan portfolio; (3) the Bank's cash balances; (4) the value of the Bank's securities portfolio, including breakdowns by security types, maturities, and investment ratings; and (5) estimates of the Bank's borrowing capacity (which was secured by portions of the Bank's securities and loan portfolios).  *See, e.g.*, Ex. G, 2021 Q1 Form 10-Q at 3, 11, 17-22, 63, 70, 76.  In addition, the Bank's earnings presentations provided more liquidity details, including loan-to-deposit trends, borrowings-to-assets trends, and the roll-off of borrowings.  *See, e.g.*, Ex. DD, April 19, 2022 Form 8-K, Earnings Presentation at 17.  Accordingly, investors had detailed information to track the Bank's liquidity.  For example, the Bank's 2021 Form 10-K reported total deposits of $106.13 billion, cash and cash equivalents of $29.62 billion, and estimated additional borrowing capacity of $3.99 billion.  Ex. F, 2021 Form 10-K at 69, 102, 108, F-26.  At year-end 2022, the Bank reported total deposits of $88.59 billion, cash and cash equivalents of $5.95 billion, and estimated additional borrowing capacity of $25.28 billion.  Ex. D, 2022 Form 10-K at 16, 101-02, F-5.[8]  Again, Plaintiff does not challenge the accuracy of any liquidity number disclosed by the Bank.

### 3.    Signature Warned Investors of Liquidity and Capital Risks

Signature regularly warned investors about liquidity risks and the stress testing of its capital.  Each quarter, it disclosed that its "primary source of liquidity has been core deposit

---

[8] The Bank also held securities available for sale of approximately $18.59 billion at year-end 2022, up from $17.15 billion at year-end 2021.  Ex. D, 2022 Form 10-K at F-5.  A portion of the Bank's securities portfolio was used as collateral for borrowing capacity.

growth." *See, e.g.*, Ex. G, 2021 Q1 Form 10-Q at 75; Ex. F, 2021 Form 10-K at 108.  It also warned that "[i]f a significant portion of our deposits were withdrawn we may need to rely more heavily on more expensive borrowings and other sources of funding to fund our business and meet withdrawal demands" and any such "events could materially and adversely affect our business, results of operations or financial condition."  Ex. C, 2020 Form 10-K at 54; Ex. F, 2021 Form 10-K at 54; Ex. D, 2022 Form 10-K at 53.  Moreover, as conditions in the digital asset markets deteriorated, the Bank cautioned that "further volatility in the digital asset markets may adversely affect our deposits and, in turn, our business ... liquidity, capital levels/ratios ... financial condition and results of operations."  Ex. D, 2022 Form 10-K at 47.

Signature also warned investors that it might not be able to supplement deposit flows with alternative sources of liquidity.  In a risk factor entitled "***We may not be able to raise the additional funding needed for our operations***," the Bank cautioned that "we cannot assure you that, if needed or desired, we would be able to obtain additional capital or financing on commercially reasonable terms or at all.  Our failure to obtain sufficient capital or financing could have a material adverse effect on our growth, on our ability to compete effectively and on our financial condition and results of operations."  Ex. C, 2020 Form 10-K at 54; Ex. F, 2021 Form 10-K at 55; Ex. D, 2022 Form 10-K at 53.

In a separate risk disclosure, the Bank explained that "***[w]e rely on the Federal Home Loan Bank of New York for secondary and contingent liquidity sources***" and warned that "if we were unable to borrow from the FHLB, we would need to find alternative sources of liquidity, which may not be available."  Ex. C, 2020 Form 10-K at 52; Ex. F, 2021 Form 10-K at 52; Ex. D, 2022 Form 10-K at 50.  The Bank further explained that credit availability from the FHLB and the Federal Reserve Bank of New York ("FRB"), another potential liquidity source, would be "based

14

on our financial condition, our asset size and the amount of collateral we hold at each institution." *See, e.g.*, Ex. K, 2022 Q2 Form 10-Q at 76; Ex. D, 2022 Form 10-K at 103.

While Plaintiff alleges that Defendants did not disclose that the Bank's Fund Banking lines of credit might be ineligible to be pledged as collateral, ¶¶ 73-76, 336-37, Plaintiff fails to point to any statement by any Defendant (or the Bank) saying these lines of credit *would* be eligible.  To the contrary, the Bank repeatedly disclosed that the FHLB and FRB held "securities" and "commercial real estate loans" that could be pledged toward future borrowing.  *See, e.g.*, Ex. F, 2021 Form 10-K at 103, Ex. K, 2022 Q2 Form 10-Q at 72, 76.

With respect to stress testing its capital, the Bank informed investors that, due to a change in law, it was "no longer ... subject to the stress testing requirements established by the Dodd-Frank Act until it accumulates $250 billion of total consolidated assets."  *See* Ex. C, 2020 Form 10-K at 21; *see also* Ex. F, 2021 Form 10-K at 107; Ex. D, 2022 Form 10-K at 106.  Instead, the Bank disclosed that it would "perform capital stress testing on a situational and idiosyncratic basis, such as during our annual capital planning and budgeting processes," while also cautioning that "we expect that the FDIC's supervisory expectations of the Bank will continue to evolve in the interest of ensuring consistent regulatory treatment among banking organizations of similar size and complexity."  Ex. F, 2021 Form 10-K at 22; *see also* Ex. C, 2020 Form 10-K at 21; Ex. D, 2022 Form 10-K at 23.

Signature also highlighted that "[r]eputational risk, or the risk to our earnings and capital from negative public opinion, is inherent in our business."  Ex. C, 2020 Form 10-K at 55; Ex. F, 2021 Form 10-K at 55.  It explained that "[n]egative public opinion can result from the actual or perceived manner in which we conduct our business activities," and warned that "[n]egative public opinion can adversely affect our ability to keep and attract clients."  *Id.*; *see also* Ex. D, 2022 Form

10-K at 54.  Signature further reiterated its long-standing warning that the "**soundness of other financial institutions could adversely affect us**." *Id.* (emphasis in original); *see also* Ex. C, 2020 Form 10-K at 55; Ex. F, 2021 Form 10-K at 56.  As discussed below, these warnings were prescient, as Signature's stunning demise was triggered by the collapse of two banks serving the cryptocurrency market and misperceptions that Signature was similarly situated to those banks.

### E.    The Bank's Closure in March 2023 Was Caused by an Unprecedented Bank Run Outside the Bank's Control

On March 2, 2023, "crypto-friendly Silvergate Bank … made a set of comments that raised concern about its ability to continue as a going concern."  ¶ 169.  Less than a week later, on March 8, 2023, Silvergate Bank announced that it was winding down operations.  Ex. B, OIG Report at 8.  Additionally, California regulators closed another crypto-friendly bank, Silicon Valley Bank, two days later on March 10, 2023.  *Id.*  After the failure of these two banks, "investors speculated that [Signature] could be the next institution to collapse."  *Id.*  As an official of the New York Department of Financial Services ("DFS") explained, "there was a belief in the market that [Signature] was similar to these other banks given assumptions that [Signature] was a 'crypto bank' *even though the Bank's business model differed* from Silvergate Bank and [Silicon Valley Bank]."  *Id.*  Indeed, as a report later issued by DFS recognized, Signature "had vastly different clienteles" than Silicon Valley Bank and only 18% of the Bank's deposits in March 2023 originated from digital asset businesses.  Ex. EE, DFS, *Internal Review of the Supervision and Closure of Signature Bank*, 32 & n. 12 (Apr. 28, 2023) (the "DFS Report").

Nevertheless, on the same day that Silicon Valley Bank failed—Friday, March 10, 2023—Signature clients withdrew $18.6 billion worth of deposits, a staggering *20% of the Bank's total deposits*.  Ex. B, OIG Report at 9.  Over the following weekend, the value of expected withdrawals for Monday, March 13, 2023 grew to $7.9 billion.  *Id.*  Given the regulators' belief that the Bank

would be unable to raise billions of dollars of cash on an emergency basis over a weekend, DFS closed the Bank and appointed the FDIC as receiver on Sunday, March 12, 2023.  ¶ 190.

Rather than setting forth a fair recitation of these facts, the Complaint cherry-picks statements from various governmental post-mortems to allege that the regulators concluded that liquidity issues alone caused the Bank's closure.  ¶¶ 22-23.  The regulators made clear, however, that the Bank's closure was caused by an unprecedented bank run, exacerbated by a misperception of Signature as a "crypto bank."  As the FDIC stated: "The weekend of March 10, 2023, was **unprecedented**.  The speed with which depositors withdrew funds from [Signature] and [Silicon Valley Bank] was unexpected and surprised the regulators and the banking industry."  Ex, A, FDIC Report at 40.  The FDIC described the "primary cause" of the Bank closure as "illiquidity precipitated by contagion effects in the wake of the announced self-liquidation of Silvergate Bank ... and the failure of Silicon Valley Bank ... after both experienced deposit runs."  *Id.* at 7.  DFS similarly concluded that "[t]he immediate cause of the Bank's failure was a propulsive run on deposits instigated by the consecutive announcements" of Silvergate Bank's and Silicon Valley Bank's closures, which was propelled by "the rapid spread of information and rumors on social media."  Ex. EE, DFS Report at 5.  These rumors were instigated in part by a short seller who, on March 9, claimed that 25 percent of Signature's deposits were related to the cryptocurrency industry.  Ex. A, FDIC Report at 15.  DFS explained that market "panic caused a run on Signature that ***was faster than any other bank run in history***, save the run that had just taken place at [Silicon Valley Bank]."  *Id*. at 5.  In fact, DFS doubted whether Signature's closure could have been avoided even if Signature had more liquidity.  *Id.* at 41 ("It is unclear whether, if it had opened on March 13 in a better liquidity position, Signature could have survived a digital-age deposit run.").

The run on the Bank was so unexpected that it caused the FDIC and DFS to reconsider their existing liquidity guidance.  Ex. B, OIG Report at 36-37.  Prior FDIC guidance was based on "traditional banking experience," which did not account for the evolution of technology, social media, and depositors' ability to quickly transfer money out of banks.  *Id.* at 35, 37.  As FDIC officials recognized, "previously, no one had modeled for this catastrophic of an event."  *Id.* at 36.  Similarly, DFS found that "[t]he rapid collapse of Signature underscores the need to revisit the assumptions used to model and manage liquidity risk.  In particular, both the types of Signature's depositors that ran and the speed at which they initiated withdrawals far outpaced assumptions many institutions use to model and assess liquidity risk."  Ex. EE, DFS Report at 44.

## F.    The Complaint Exaggerates the Regulators' Conduct

Signature was subject to joint supervision by the FDIC and DFS.  ¶ 78; Ex. B, OIG Report at 2.  In its Complaint, Plaintiff tries to paint a picture of Bank executives ignoring regulatory warnings and making statements contrary to those warnings.  But the documents upon which Plaintiff relies tell a different story.

Significantly, Plaintiff omits from its Complaint that, until the day before the Bank was shut down, the FDIC consistently gave Signature an overall score of "2"—the second *highest* ranking out of 5—under the "CAMELS" (**C**apital adequacy, **A**sset quality, **M**anagement capabilities, **E**arnings sufficiency, **L**iquidity position, and **S**ensitivity to market risk) ranking system.  Banks with this composite ranking are "fundamentally sound" with "no material supervisory concerns."  Ex. A, FDIC Report at 3, 22; Ex. B, OIG Report at 18.  As the FDIC's Risk Management Manual of Examination Policies ("FDIC Manual") explains:

> Financial institutions in this group are ***fundamentally sound***.  For a financial institution to receive this rating, generally no component rating should be more severe than 3.  ***Only moderate weaknesses are present*** and are well within the board of directors' and management's capabilities and willingness to correct.  These financial institutions are ***stable and are capable of withstanding business***

> *fluctuations*.  These financial institutions are in substantial compliance with laws and regulations.  ***Overall risk management practices are satisfactory relative to the institution's size, complexity, and risk profile***.  There are **no material supervisory concerns** and, as a result, the supervisory response is informal and limited.

Ex. FF, FDIC Manual § 1.1-23; *see also* Ex. B, OIG Report at 18.

Even when the FDIC downgraded the Bank's ranking for a single component of the CAMELS rankings—a downgrade of the liquidity component rating from a "2" to a "3" in 2019—the FDIC continued to give the Bank an overall rating of "2" until March 11, 2023, the day before the Bank closed.  In fact, during the putative Class Period and prior to March 11, 2023, the Bank *never* received a composite score below a 2.  Ex. B, OIG Report at 17; Ex. FF, FDIC Manual § 1.1-27.  In addition, as the Office of Inspector General ("OIG") concluded in October 2023, the "FDIC appropriately found that [Signature] was well capitalized throughout each examination cycle based upon defined capital measures."  Ex. B, OIG Report at 38.

Even regarding the issue of liquidity, the regulators concluded that the Bank was making significant improvements.  In portions of the cited regulatory reports that Plaintiff omits from its Complaint, the FDIC, OIG, and DFS noted:

- During the 2020 examination cycle, the regulators found that "management began addressing the deficiencies identified in the 2019 Liquidity targeted review," Ex. A, FDIC Report at 50; "[m]anagement was working to identify appropriate stress testing scenarios, developing documentation, frequencies and metrics to implement the new liquidity model'; and "[c]oncerns over liquidity risk management were partially offset by a substantial increase in on-balance sheet liquidity."  Ex. EE, DFS Report at 22.

- After the 2021 liquidity target review, the regulators acknowledged that the Bank "increased efforts to improve liquidity contingency planning and engaged a third-party provider to conduct a deposit study" and "made progress in remediating the MRBA [Matters Requiring Board Attention] on liquidity" by implementing a new liquidity model for addressing contingency financial planning, which was a "significant improvement" over the previous model.  *Id.* at 25-26.

- At year-end 2021, the regulators concluded that the Bank's "liquidity risk profile improved significantly given a large increase in on-balance sheet liquidity" and that the "liquidity posture looked better than in prior years." Ex. B, OIG Report at 32.

- For 2021, the regulators maintained the "2" component rating for management practices because the Bank was "raising capital, holding new deposit growth in cash, improving the Bank's liquidity position, and addressing other recommendations." *Id.* at 20.

- The regulators' draft 2022 liquidity target review commended the Bank for "successfully manag[ing]" liquidity events in July and September 2022 by "slowing loan originations and revising loan and investment growth down." *Id.* at 7. In the wake of the FTX bankruptcy, Signature began providing the regulators periodic liquidity updates in November 2022 and daily liquidity reports in January 2023, which led the regulators to observe that "the Board and management adequately monitored the daily liquidity position of the Bank." Ex. EE, DFS Report at 17.

## SUMMARY OF COMPLAINT

Plaintiff purports to bring the Complaint on behalf of a putative class of all persons or entities that acquired Signature common stock between January 21, 2021 and March 12, 2023. The Complaint asserts causes of action for violations of Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") and United States Securities and Exchange Commission ("SEC") Rule 10b-5 against several former officers and directors of Signature—Joseph J. DePaolo, Eric Howell, Frank Santora, Joseph Seibert, Scott A. Shay, Vito Susca, and Stephen D. Wyremski (collectively, the "Individual Defendants")—as well as the Bank's auditor, KPMG LLP ("KPMG", together with the Individual Defendants, the "Defendants"). The Complaint alleges that the Individual Defendants made misstatements that concealed deficiencies in the Bank's risk profile and liquidity position, which supposedly caused the Bank's closure on March 12, 2023.

## ARGUMENT

To state a claim under Section 10(b) and Rule 10b-5, a plaintiff must show: "'(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the

misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation.'" *Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*, 750 F.3d 227, 232 (2d Cir. 2014).  Under Federal Rule of Civil Procedure 9(b), a securities fraud complaint must "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 99 (2d Cir. 2007).  Additionally, under the heightened pleadings standards of the Private Securities Litigation Reform Act ("PSLRA"), the plaintiff must "specify each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading," 15 § U.S.C. 78u–4(b)(1), and "state with particularity facts giving rise to a strong inference" that each defendant acted with scienter, *i.e.*, an intent to deceive,  15 U.S.C. § 78u–4(b) (2)(A).

The Complaint falls well short of pleading particularized facts of fraud as to any Individual Defendant.  Instead, in the wake of an "unprecedented" run on the Bank, Ex. A, FDIC Report at 40, Plaintiff now attempts to second-guess the Bank's business strategy and the Individual Defendants' management of the Bank.  But the Supreme Court long ago held that alleged corporate mismanagement is not actionable under Section 10(b).  And Plaintiff's attempt to repackage purported corporate mismanagement as securities fraud fails as a matter of law for four reasons. *First*, Plaintiff fails to allege any actionable misstatements or omissions.  *Second*, Plaintiff fails to plead particularized facts supporting a strong inference of scienter as to any Individual Defendant. *Third*, Plaintiff does not establish loss causation.  *Finally*, Plaintiff fails to allege scheme liability.[9]

---

[9] Additionally, as detailed in the FDIC's Memorandum of Law in Support of its Motion to Dismiss, the FDIC-R, and not Plaintiff, has standing to maintain this action.

I.    **PLAINTIFF DOES NOT PLEAD ANY ACTIONABLE MISSTATEMENTS OR OMISSIONS**

A.    **Mismanagement Is Not Actionable Under the Securities Laws**

Over forty years ago, the Supreme Court held that Section 10(b)'s prohibition on misrepresentations and omissions does not extend to "instances of corporate mismanagement." *Santa Fe Indus., Inc. v. Green*, 430 U.S. 462, 476-77 (1977). Accordingly, "courts repeatedly have found that allegations constituting nothing more than assertions of general mismanagement, or nondisclosures of mismanagement, cannot support claims under § 10(b) of the Exchange Act…." *Portannese v. Donna Karan Int'l, Inc*., 1998 WL 637547, at *9 (E.D.N.Y. Aug. 14, 1998).

The thrust of the Complaint is that the Individual Defendants allegedly "ignored" "critical problems and deficiencies in the Bank's risk profile and liquidity management risks controls" while "expand[ing] the Bank's liquidity risks by taking on billions of dollars in uninsured and volatile deposits from the cryptocurrency industry." ¶ 2. In support of this theory, the Complaint relies heavily on the FDIC Report and DFS Report, which are critical of the Bank's risk management practices, liquidity risk, levels of uninsured and concentrated deposits, and strategic pursuit of digital asset depositors. *See, e.g.*, ¶¶ 71, 82-87, 92-95, 100-118, 127-128, 157-158, 198-206, 222, 236, 251, 266, 270, 276.[10] But even if these reports' criticisms were true (and they are not) they would still only make out a theory of mismanagement and not of securities fraud.

Moreover, Plaintiff's claim that the Individual Defendants "concealed" alleged deficiencies that bank regulators identified, ¶¶ 22, 79, 125, fail as a matter of law. "Silence, absent

---

[10] In the heavily regulated banking industry, banks are regularly reviewed by and engaged in an ongoing dialogue with their regulators regarding their practices and controls. *See* 1 *The Law and Regulation of Financial Institutions* § 7.06(1)(i), (4)(d) (LexisNexis A.S. Pratt 2023) (describing detailed examination practices of banking agency regulators). It is commonplace for bank regulators to identify areas of improvement for the institutions that they regulate.

a duty to disclose, is not misleading under Rule 10b-5." *Basic Inc. v. Levinson*, 485 U.S. 224, 239 n.17 (1988). Here, the Individual Defendants had no duty to disclose regulatory comments, and in fact were ***prohibited*** from doing so by federal and state regulations. *See* 12 C.F.R. §§ 309.5(g)(8), 309.6(a); 3 N.Y. Comp. Codes R. & Regs. §§ 7.1(a), 7.2(a); N.Y. Banking Law § 36(10); *see also In re Nextcard, Inc. Sec. Litig.*, 2005 WL 6342406, at *11 (N.D. Cal. Feb. 7, 2005) (dismissing claim based on failure to disclose substance of bank examination report because defendants "were prohibited by law from disclosing the contents of the [report]"); Consent Order ¶¶ 17-24, 28, 36-37, *In the Matter of Indus. & Com. Bank of China Ltd.* (DFS Jan. 17, 2024)[11] (penalizing DFS-regulated institution for disclosing confidential supervisory information).

Nor can Plaintiff survive dismissal by trying to turn managerial criticisms into a theory of nondisclosure. As the Second Circuit has cautioned, "disclosure is not a rite of confession, and companies do not have a duty to disclose uncharged, unadjudicated wrongdoing." *City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173, 184 (2d Cir. 2014) (cleaned up). Accordingly, a company's management is not required to "to direct conclusory accusations at itself or to characterize its behavior in a pejorative manner." *Ballan v. Wilfred Am. Educ. Corp.*, 720 F. Supp. 241, 249 (E.D.N.Y. 1989).

The Second Circuit rejects "attempt[s] to recast corporate mismanagement as securities fraud." *Singh v. Cigna Corp.*, 918 F.3d 57, 59-60, 64 (2d Cir. 2019). Yet, that is precisely what Plaintiff attempts to do here. For this reason, it is no surprise that Plaintiff fails to identify any actionable material misrepresentation. As discussed below, the alleged misstatements are non-actionable because they are (1) puffery; (2) statements of opinion; (3) forward-looking statements; or (4) not false when viewed in the context they were made.

---

[11] https://www.dfs.ny.gov/system/files/documents/2024/01/ea_co_icbc_20240117.pdf.

**B.        Many of the Challenged Misstatements Are Non-Actionable Puffery**

To be actionable, an alleged misstatement must be material.  *See ECA & Local 134 IBEW Joint Pension Tr. of Chic. v. JP Morgan Chase Co.*, 553 F.3d 187, 197 (2d Cir. 2009).  "Certain categories of statements are immaterial as a matter of law, such as puffery…."  *In re Citigroup Sec. Litig.*, 2023 WL 2632258, at *11 (S.D.N.Y. Mar. 24, 2023).  "Puffery encompasses statements that are too general to cause a reasonable investor to rely upon them."  *Id*.  For example, "generalizations regarding integrity, fiscal discipline, and risk management ... amount to no more than inactionable puffery."  *In re N.Y. Cmty. Bancorp, Inc., Sec. Litig.*, 448 F. Supp. 2d 466, 478-79 (E.D.N.Y. 2006).  "Expressions of puffery and corporate optimism do not give rise to securities violations."  *Rombach v. Chang*, 355 F.3d 164, 174 (2d Cir. 2004).  As discussed below, the Complaint challenges numerous statements that are not actionable because they are puffery.

1.        Generalized Statements About the Bank's Business, Financial Position, and Future Prospects Are Non-Actionable

Plaintiff alleges that numerous generalized statements regarding the Bank's business, financial position, and future prospects were false and misleading, including (1) Signature's "strong risk-based capital ratios reflect the relatively low risk profile of the Bank's balance sheet" (¶¶ 205, 225, 246, 256, 275, 288, 297, 334); (2) "we … keep a decent amount of liquidity" (¶ 228); (3) "Signature Bank continues to fire on all cylinders" and "we remain prudent in the deployment of new funds" (¶ 244); (4) "now that Signature Bank has diversified across many different businesses and has not relied on any single one area, we feel we are better positioned than ever before" (¶ 300); (5) "Our strong capital, solid earnings and overall diversification, continues to provide a source of strength for our depositor clients" (¶ 323); (6) "The arduous rate environment, along with challenges in the digital asset space, led to deposit declines, which we overcame with little difficulty, given our robust liquidity position" (¶ 333); (7) Signature "reiterated its strong,

well-diversified financial position and limited digital-asset related deposit balances" and its "strong liquidity position" (¶ 346); and (8) "Since we opened our doors, we have been a 'deposit-first' institution and have always been committed to our depositors' safety, first and foremost. As shown by our current metrics, we intentionally maintain a high level of capital, strong liquidity profile and solid earnings." (¶ 347).

These statements are classic puffery. *See, e.g., SRM Global Fund Ltd. P'ship v. Countrywide Fin. Corp.*, 448 F. App'x 116, 117-18 (2d Cir. 2011) (summary order) (statements that company "developed a comprehensive Liquidity Management Plan … to moderate liquidity risk," "had adequate liquidity to meet our obligations," "stabilized its liquidity," and "strengthened its capital position" were not actionable); *Building Trades Pension Fund of W. Pa. v. Insperity, Inc.*, 2022 WL 784017, at *12 (S.D.N.Y Mar. 15, 2022) (statement that company was "well-positioned to continue our strong financial performance" was puffery); *Ret. Bd. of the Policemen's Annuity & Benefit Fund of Chi. v. FXCM Inc.*, 333 F. Supp. 3d 338, 349 (S.D.N.Y. 2018) (statements that brokerage firm "maintained a substantial pool of liquidity," and "maintained excess regulatory capital" were puffery), *aff'd*, 767 F. App'x 139 (2d Cir. 2019); *In re UBS AG Sec. Litig.* 2012 WL 4471265, at *14 (S.D.N.Y. Sept. 28, 2012) (statements regarding "diversification of risks" and "avoidance of undue concentrations" were puffery), *aff'd* 752 F.3d 173 (2d Cir. 2014); *In re Wachovia Equity Sec. Litig.*, 753 F. Supp. 2d 326, 376 (S.D.N.Y. 2011) (statements regarding bank's "prudent" lending practices, "conservative" underwriting, and "strong" credit risk management were puffery). For this reason, Plaintiff's claims as to these alleged misrepresentations must be dismissed.

2.    Generalized Statements About the Bank's Risk Management Practices Are Non-Actionable

Plaintiff also challenges various statements regarding the Bank's risk management practices, including: (1) "Risk management is an important element of our business…. We have put internal controls in place that help to mitigate the risks that affect our business.  In addition, we have policies and procedures that further help mitigate risk and regulatory requirements that mandate that we evaluate, test and opine on the effectiveness of internal controls….  [W]e believe that our risk management processes will help keep our risks to a manageable level."  (¶¶ 208, 237, 252, 262, 278, 290, 311, 320, 339); (2) Signature "developed a process to comply with the stress testing requirements" (¶¶ 210, 237, 252, 262, 280, 290, 311, 320, 341); (3) Signature would "continue to monitor and stress test its capital in a manner consistent with the safety and soundness expectations of the federal banking agencies and in accordance with applicable internal processes." (¶¶ 210, 237, 252, 262, 280, 290, 311, 320, 341); and (4) "Signature Bank is a well-diversified institution that employs appropriate risk management strategies that help us navigate the current challenging digital asset landscape" (¶ 323).

Court have consistently dismissed claims challenging similar statements as puffery.  For example, in *ECA*, the Second Circuit held that a bank's statements that its "risk management processes" were "highly disciplined" and that it "set the standard for the best practices in risk management techniques" were not actionable.  *ECA*, 553 F.3d at 194, 205-06.  The court explained that the statements were "too general to cause a reasonable investor to rely upon them" because they "were merely generalizations regarding [the bank's] business practices," and "did not … amount to a guarantee that its choices would prevent failures in its risk management practices." *Id.* at 206.  Noting that "almost every … bank makes these statements," the court "decline[d] to broaden the scope of securities laws" to sweep up such "routine representations."  *Id.*

Similarly, in *Danske Bank*, the Second Circuit affirmed the dismissal of securities fraud claims challenging statements regarding a bank's compliance with anti-money laundering laws. *Plumber & Steamfitters Local 773 Pension Fund v. Danske Bank A/S*, 11 F.4th 90, 96, 98, 103-04 (2d Cir. 2021). Following an internal investigation finding that the bank's AML procedures were "manifestly insufficient and inadequate[,]" the plaintiffs alleged that the bank's statements that it "condemns . . . money laundering," "takes the steps necessary to comply with internationally recognized standards, including Know Your Customer procedures," and has procedures for "customer due diligence, reporting … and communications" were false and misleading. *Id.* at 95-98, 103. Relying on *ECA*, the court rejected the plaintiffs' claims on puffery grounds. *Id.* at 104. It reasoned that while the bank had "averred that it took steps to comply with AML protocols and vaguely recited some AML buzzwords, it claimed no particular acts of compliance." *Id.*

Likewise, in *Singh*, the Second Circuit held that an insurance company's statement that it had "established policies and procedures to comply with applicable [regulatory] requirements" was not actionable. 918 F.3d at 60, 63-64. The plaintiff alleged that that statement was materially false and misleading because the insurance company had received more than 75 regulatory notices for a variety of compliance infractions and a regulatory audit concluded that the company "had a longstanding history of non-compliance…." *Id.* at 61. But the court held that the company's "simple and generic assertions about having 'policies and procedures'" did not "amount[] to actionable assurances of actual compliance," and were also framed by warnings regarding the complex regulatory environment. *Id.* at 63-64. Accordingly, no reasonable investor would view the statements as material. *Id.* at 64; *see also Citigroup*, 2023 WL 2632258, at *14-15 (concluding that bank's statements that its risk governance framework was "developed in alignment with the expectations" of regulators was non-actionable puffery); *In re Liberty Tax, Inc. Sec. Litig.*, 435 F.

Supp. 3d 457, 467 (E.D.N.Y. 2020) (finding statements regarding "modifications and improvements" to "internal controls are puffery"), *aff'd*, 828 F. App'x 747 (2d Cir. 2020); *In re Deutsche Bank Aktiengesellschaft Sec. Litig.*, 2017 WL 4049253, at *6 & n.4 (S.D.N.Y. June 28, 2017) (bank's statements that "[w]e comply with all laws and regulations" were puffery), *aff'd sub nom. Sfiraiala v. Deutsche Bank Aktiengesellschaft*, 729 F. App'x 55 (2d Cir. 2018); *City of Roseville Employees' Ret. Sys. v. Sterling Fin. Corp.*, 47 F. Supp. 3d 1205, 1216, 1220 (E.D. Wash. 2014) (statement that "[o]ur commitment is to continue maintaining a safe, sound and secure banking practice for the benefit of customers, shareholders and employees" was puffery), *aff'd*, 691 F. App'x 393 (9th Cir. 2017).

Here, the challenged statements regarding the Bank's risk management practices—that it employed "appropriate risk management strategies," "put internal controls in place that helped to mitigate risk, had a "process" to conduct stress testing, and would "monitor and stress test its capital in a manner consistent with the safety and soundness expectations of the federal banking agencies"—are no different than the non-actionable statements in the cases above.  They are the type of vague, general statements made by virtually all financial institutions, *see ECA*, 553 F.3d at 206, and are devoid of details regarding particular acts of compliance, *Danske*, 11 F.4th at 103-04.  Moreover, as in *Singh*, 918 F.3d at 63-64, these general statements were framed by extensive disclosures outlining the complex, evolving regulatory environment the Bank faced.  For example, the Bank informed investors that it was no longer subject to Dodd-Frank's stress testing requirements, would perform stress testing "on a situational and idiosyncratic basis," and anticipated "that the FDIC's supervisory expectations of the Bank [would] continue to evolve." *See supra* at Statement of Facts.D.3.  In addition, the Bank specifically warned that "[n]o system of internal control or policies and procedures will ever totally eliminate risk."  *See, e.g.*, Ex. F,

2021 Form 10-K at 12.  For all these reasons, Plaintiff's claims based on the risk management statements fail as a matter of law.

### C.    Many of the Challenged Misstatements Are Non-Actionable Opinions

Because opinions are "inherently subjective" statements, *In re Philip Morris Int'l Inc. Sec. Litig.*, 89 F.4th 408, 418 (2d Cir. 2023), "a statement of opinion is not misleading just because external facts show the opinion to be incorrect," *Tongue v. Sanofi*, 816 F.3d 199, 212 (2d Cir. 2016); *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 194 (2015) ("[A]n investor cannot state a claim by alleging only that an opinion was wrong…."). Instead, an opinion is actionable only if (1) the speaker does not honestly hold the opinion; (2) the opinion includes an embedded statement of fact that is false; or (3) the opinion omits material facts necessary to make the opinion not misleading to a reasonable person reading the statement fairly and in context.  *Sanofi*, 816 F.3d at 209-10.

Pleading that an opinion is false "is no small task for an investor."  *Omnicare*, 575 U.S. at 194.  As the Supreme Court has explained, "[r]easonable investors understand that opinions sometimes rest on a weighing of competing facts; indeed, the presence of such facts is one reason why an issuer may frame a statement as an opinion, thus conveying uncertainty."  *Id.* at 189-90. Similarly, reasonable investors "do[] not expect that *every* fact known to an issuer supports its opinion statement."  *Id*.  Thus, an opinion "is not necessarily misleading when an issuer knows, but fails to disclose, some fact cutting the other way."  *Id*.  The securities laws do "not allow investors to second-guess inherently subjective and uncertain assessments."  *Id.* at 186.  As discussed below, many of the Complaint's challenged statements are non-actionable opinions.

1.    <u>Statements Regarding the Bank's Relationship With Regulators Are Non-Actionable</u>

Plaintiff alleges that statements about Signature's relationship with its regulators are false and misleading.  For example, the Complaint points to statements made at a March 2021 tech forum that "[t]hey've been very good to us" (¶ 216); that "we've developed a stronger partner [sic] with them" (¶ 218); and that "[t]hey're comfortable with us" (*id.*).  Likewise, the Complaint emphasizes statements at a November 2021 financial conference that "[w]e have 2 regulators that are supportive, led by the New York Department Financial Services…. The FDIC has been asking a lot of questions and it's been supportive of us as well." ¶ 265.

Plaintiff's attacks on these statements fail as a matter of law because they are both puffery and non-actionable opinions.  *See, e.g.*, *In re Express Scripts Holdings Co. Sec. Litig.*, 773 F. App'x 9, 13 (2d Cir. 2019) (summary order) (statements that company's relationship with largest customer was "great" and "very, very solid" were "expressions of puffery and optimism," as well as non-actionable opinions); *Citigroup*, 2023 WL 2632258, at *18 (statement that bank was "rebuilding [its] relationship with regulators" was "clearly subjective," and was not false or misleading simply because regulator later brought an action against the bank).  The Complaint contains no allegations that the individuals stating these opinions did not genuinely believe them. The Bank had an overall CAMELS rating of "2" at the time these statements were made, meaning that the regulators had "no material supervisory concerns."  *See supra* at Statement of Facts.F. Moreover, DFS issued a press release specifically supporting Signet.  Ex. QQQ, Press Release, DFS, *DFS Continues to Lead Responsible Innovation in New York's Fintech Industry with New Virtual Currency Approval for Commercial Banking Transactions* (Dec. 4, 2018).  As such, the opinions were well grounded.

2.    Statements Regarding Deposit Stability Are Non-Actionable

Plaintiff further alleges that statements regarding the stability of the Bank's deposits were materially misleading.  For example, the Complaint alleges that Howell made a misstatement at a March 2021 conference when, commenting on digital asset deposits, he said "what we found thus far is that the deposits are quite stable."  ¶ 221.  The Complaint also challenges a statement by DePaolo during an April 2021 earnings call that "we feel that they are fairly sticky deposits."  ¶ 228.  These statements, which were made before the "crypto winter," are non-actionable opinions.

Whether deposits are "sticky" or "stable" turns on "inherently subjective assessments." *Philip Morris*, 89 F.4th at 419.  But the Complaint pleads no facts, as it must, that suggest that Howell or DePaolo did not genuinely hold this opinion, that the opinion included an embedded statement of fact that is false, or that the opinion omitted material facts necessary to make it not misleading to a reasonable person when read fairly and in context.  *Sanofi*, 816 F.3d at 209-10.

At most, Plaintiff asserts that these statements were false and misleading because the Bank had not done sufficient modeling to support these assertions.  ¶¶ 222-223.  However, Howell himself warned that "we're obviously in the early stages" and that "we've got more work to do in modeling through it, seeing more history and more data." ¶ 221.  DePaolo likewise warned that it was "early on."  ¶ 228.  Moreover, the Complaint itself acknowledges that analysts at the time understood that the stickiness of these deposits was an open question and that "[t]o the extent there are major drawdowns in crypto asset prices in the future, there is risk [Signature] could see outflows as a result." ¶ 126.

There was also a good basis for these opinion statements.  Howell explained that Bitcoin had "fallen quite a bit over the last 2 weeks" but that the Bank's "deposits in this space went up." ¶ 221.  Plaintiff alleges no facts suggesting the Bank's deposits did not, in fact, increase during this time period.

31

### 3.    Numerous Other Statements Are Also Non-Actionable Opinions

Many of the other statements in the Complaint also fail because they are non-actionable opinions.  For example, the representation that "[r]isk management is an important element of our business" and "*we believe* that our risk management processes will help keep our risks to a manageable level" bear the hallmarks of a classic statement of opinion—it is expressly articulated as a belief.  ¶¶ 208, 210, 212, 237, 252, 262, 278, 280, 282, 290, 311, 320, 339, 341.  The Complaint further attempts to package opinions regarding other aspects of the Bank's business and performance as supposed misstatements of fact, including the following:

- "strong risk-based capital ratios reflect the relatively low risk profile of the Bank's balance sheet."  ¶ 205; *see also* ¶¶ 225, 246, 256, 275, 288, 297, 315, 318, 333-334.

- "Signature Bank continues to fire on all cylinders as we stay true to our core principles of providing relationship-based, client-centric service and sleep-at-night safety.  While our deposit growth has been truly extraordinary, we remain prudent in the deployment of new funds."  ¶ 244.

- "I don't think we're doing anything that would render us to be systemically important.  Our banking model is pretty straightforward and simple.  So I highly doubt that the regulators would go there."  ¶¶ 258-260.

- "[N]ow that Signature Bank has diversified across many different businesses and has not relied on any single one area, we feel we are better positioned than ever before."  ¶ 300.

- "Right now we've been monitoring it as we should on a minute-by-minute basis, and we feel comfortable that we'll be at that what we want at any point in time.  We haven't had any issues to liquidity at all."  ¶ 318.

- "Signature Bank is a well-diversified institution that employs appropriate risk management strategies that help us navigate the current challenging digital asset landscape.  Our strong capital, solid earnings, and overall diversification, continues to provide a source of strength for our depositor clients."  ¶ 323.

Critically, with respect to all of these statements, the Complaint does not allege that the maker of each statement believed it to be false when made.  Moreover, the fact that the regulators raised concerns in these areas is not enough to render the opinions actionable.  Indeed, as noted

above, an opinion "is not necessarily misleading when an issuer knows, but fails to disclose, some fact cutting the other way." *Sanofi*, 816 F.3d at 210.

### D. Forward-Looking Statements Are Non-Actionable

The PSLRA contains a safe harbor for forward-looking statements. 15 U.S.C. § 78u–5I. Such statements are protected if (1) they are identified and accompanied by meaningful cautionary language; (2) they are immaterial; or (3) plaintiff fails to prove the statement was made with actual knowledge of falsity. *Id.*; *see also In re Meta Materials Inc. Sec. Litig.*, 2023 WL 6385563, at *12 (E.D.N.Y. Sept. 29, 2023). Forward-looking statements include "plans and objectives of management for future operations" and "future economic performance." 15 U.S.C. § 78u–5(i)(1)(B)-(C).

Here, many of the statements Plaintiff challenges are statements "whose truth cannot be ascertained until some time after the time they are made," and thus, "are forward-looking statements." *Philip Morris*, 89 F.4th at 428. *See, e.g.*, ¶¶ 210, 237, 252, 262, 280, 290, 311, 320, 341 (Signature will "***continue to*** monitor and stress test its capital in a manner consistent with the safety and soundness expectations of the federal banking agencies and in accordance with applicable internal processes."); ¶ 318 (On the cash balances, "right now, we've been monitoring it as we should on a minute-by-minute basis, and we feel comfortable that ***we'll be at the amount*** that we want at ***any point in time***."); ¶ 330 ("[W]e have between cash and borrowing capacity, we can easily take care of any deposits leaving, any and all deposits if they ***were to leave*** the ecosystem, the crypto ecosystem for us. So it's a nonevent. We ***would cover it*** without having to sell any securities."). Each of these statements contains language that Signature identified as forward-looking in its public filings. *See, e.g.*, Ex. C, 2020 Form 10-K at 3; Ex. F, 2021 Form 10-K at 3; Ex. TTT, October 18, 2022 Form 8-K at 12; Ex. D, 2022 Form 10-K at 3.

Signature accompanied these forward-looking statements with meaningful cautionary warnings. With respect to the statements above related to the Bank's future liquidity, the Bank specifically warned that if deposits were withdrawn, it would need to rely upon more expensive borrowings; that volatility in the digital asset markets may adversely affect deposits and, in turn, liquidity; that it may not be able to raise additional funding needed for its operations; and that the failure to obtain sufficient capital or financing could affect its future operations. *See supra* at Statement of Facts.D.3. With regard to the potential loss of deposits and future stress testing, the Bank warned that deposits could be withdrawn for several reasons: its deposit base was more heavily weighted toward larger uninsured deposits which may seek greater financial security during unstable market conditions; it was not subject to Dodd-Frank's stress testing requirements and performed stress testing on a situational and idiosyncratic basis; and the loss of deposits could materially and adversely affect the Bank. *See supra* at Statement of Facts.D.3.

Because these warnings were meaningful and specifically related to the forward-looking statements, the safe harbor applies. *See In re Aceto Corp. Sec. Litig.*, 2019 WL 3606745, at *5-6 (E.D.N.Y. Aug. 6, 2019) (finding cautionary statements about China's political and economic policies, failure to maintain effective internal controls, and adverse market conditions, among others, to be "meaningful"); *In re Weight Watchers Int'l Inc. Sec. Litig.*, 504 F. Supp. 3d 224, 255 (S.D.N.Y. 2020) (cautionary statements warning of the "*exact* risk of which Plaintiffs complain" were meaningful for purposes of the PSLRA safe harbor).

### E.    Plaintiff Fails to Plead Particularized Facts Showing That Numerous Alleged Misrepresentations Were False

Numerous statements challenged by Plaintiff are not actionable because Plaintiff fails to plead facts showing that they were false or misleading. To the contrary, Plaintiff improperly disputes accurate statements of historical fact, takes statements out of context, or improperly

claims that statements were false because the Individual Defendants failed to disclose their purported mismanagement.  As discussed below, none of the challenged statements is actionable.

        1.      <u>Plaintiff Does Not Allege That Statements Regarding the Bank's Modeling for Digital Asset Deposit Withdrawals Were False</u>

Plaintiff alleges that DePaolo falsely claimed in July 2022 that, "[e]very month we model with an assumption that every last crypto deposit is withdrawn," ¶ 309, and that Howell falsely stated in December 2022 that "between cash and borrowing capacity, we can easily take care of any [digital asset] deposits leaving."  ¶ 330; *see also* ¶ 228.  Plaintiff does not, however, plead facts showing that these statements were false.  Plaintiff does not, for instance, plead that the Bank did not perform the modeling exercise that DePaolo described.  Nor does Plaintiff plead that the value of the Bank's digital asset deposits exceeded its cash and borrowing capacity.  Nor could it, as the Bank's financial statements demonstrate that the Bank could cover the withdrawal of digital assets with cash and its borrowing capacity.  *See*, *e.g.*, Ex. K, 2022 Q2 Form 10-Q at 3, 76 (disclosing approximately $14.5 billion in cash and $32.57 in additional borrowing capacity); Ex. UUU, July 19, 2022 Form 8-K, Earnings Presentation at 26 (digital asset deposits represented 26% of the Bank's $104 billion in total deposits, or approximately $27 billion).

        2.      <u>Plaintiff Does Not Allege that Statements Regarding the Impact of Cryptocurrency Volatility on Deposits Were False When Made</u>

Plaintiff alleges that Howell made a misstatement when he said, in June 2021, that the Bank had seen "zero correlation between the price of Bitcoin and our deposit flows."  ¶ 242; *see also* ¶ 250 (similar statement in July 2021); ¶ 286 (March 2022).  Plaintiff pleads no facts showing that these statements were false.  Plaintiff does not compare the price of Bitcoin to the Bank's deposits and demonstrate a correlation between them at the time.  *Citigroup*, 2023 WL 2632258, at *12 ("[A] statement must be contemporaneously false….")

Plaintiff also alleges that Howell made a misstatement in May 2022 when the Bank stated that "[b]alances ha[ve] not been meaningfully affected by current events in the digital assets trading space." ¶¶ 294-295.[12]  Once again, Plaintiff fails to allege facts showing that this vague and subjective statement was false.  Most significantly, Plaintiff does not allege that the Bank's disclosed levels of digital asset deposits were false or that recent digital asset events did, in fact, cause a meaningful decrease in those deposits.

Plaintiff also alleges that DePaolo made a misstatement during a July 2022 earnings call— *after* the impact of the digital winter had begun to be felt—when he said that the Bank "holds no cryptocurrencies." ¶ 302.  Specifically, Plaintiff alleges that the statement misleadingly suggested that the Bank's deposits were not "susceptible to risks related to digital asset volatility…." ¶ 303.  However, the statement says no such thing.  Rather, it simply disclosed—truthfully, as the regulators acknowledged—that the Bank held no cryptocurrencies.  Moreover, when read in context, DePaolo's statement made clear that digital asset volatility could impact the Bank.  Indeed, just a few sentences earlier, DePaolo referred to the "significant decline in the value of cryptocurrencies" and disclosed that the Bank's digital asset deposits had fallen by $2.4 billion that quarter.  ¶ 302; *see also* ¶ 305 (failing to plead facts showing falsity of Howell's statement

---

[12] The allegations in these paragraphs cite a May 16, 2022 press release that Plaintiff purports to attribute to Howell because the release "specifically referenced Defendant Howell's appearance at a forthcoming investor conference…." ¶ 293.  "For purposes of Rule 10b–5, the maker of a statement is the person or entity with ultimate authority over the statement, including its content and whether and how to communicate it." *Janus Cap. Grp., Inc. v. First Deriv. Traders*, 564 U.S. 135, 142-43 (2011).  The allegation that Howell was merely mentioned—but not quoted—in this press release does not suffice to attribute any alleged statements in that release to him. *See Noto v. 22nd Century Grp., Inc.*, 35 F.4th 95, 103-04 (2d Cir. 2022) (plaintiffs did not adequately plead attribution where they merely alleged that articles repeated certain statements in press releases reviewed by defendant but not that defendant wrote or had "ultimate authority" over articles).

36

during the same call that the Bank experienced less than a 10% decrease in digital asset deposits and that Bitcoin fell by 65%).

3.    <u>Plaintiff Fails to Allege that Statements About the Bank's Deposit Concentrations Were False</u>

Plaintiff alleges that statements regarding the Bank's concentration policies were false and misleading.  For instance, it alleges that certain Individual Defendants falsely claimed that the Bank had "internal limitations on concentrations" and "turned away deposits."  ¶ 231; *see also* ¶¶ 267, 269, 273, 327.  But these statements are not actionable for two reasons:  First, the statements were not sufficiently definite.  *City of Pontiac Policemen's & Firemen's Ret. Sys.*, 752 F.3d at 185-86 (bank's statements that it "avoided 'asset concentrations' as a 'key pillar' of its risk management" were "too open ended and subjective" to be actionable where bank did not disclose specific limits).  Second, Plaintiff does not allege that the Bank lacked a concentration policy or never turned away deposits.  To the contrary, it admits that the Bank had a concentration policy.  ¶ 71.  While Plaintiff alleges that the Bank did not perform sufficient stress testing to support an increase in the concentration limit, any such failure amounts to non-actionable mismanagement.  As the Southern District of New York has explained: "many of Plaintiffs' identified statements state that certain internal control policies are in place, but Plaintiffs do not plead that the controls did not exist, but merely that they were ineffective.  Mere allegations of corporate mismanagement are [n]ot actionable." *Deutsche Bank*, 2017 WL 4049253, at *7 (cleaned up).

Similarly, Plaintiff alleges that DePaolo made a misstatement in December 2022 when he stated that "we don't want to be beholden to any [one] industry or any [one] individual client."  ¶ 327.  This allegation likewise fails for two reasons.  First, Plaintiff pleads no facts showing that this statement did not accurately reflect the Bank's goals.  Second, the context of the statement and subsequent events demonstrate that the statement was not false.  This statement was made in

37

connection with the Bank's decision to limit digital asset deposits, and, as Plaintiff admits, the Bank did, in fact, reduce such deposits by over $7 billion in the fourth quarter of 2022. ¶ 166.

For similar reasons, the Court should reject Plaintiff's allegation that a January 23, 2023 Signature press release was false. ¶ 336. That press release stated that "[i]n the fourth quarter of 2022, the Bank announced a plan to purposely decrease deposits in the digital asset banking space … [and that] these deposits are declining as the Bank is intentionally managing them, to a lower level." Ex. PPP, Press Release, Signature Bank, Signature Bank Responds to Inaccuracies in Wall Street Journal Article (Jan. 23, 2023) ("January 23, 2023 Press Release"). Once again, the statement is an accurate description of historical fact. To the extent Plaintiff alleges that the press release misleadingly stated that the Bank had replaced the deposits with borrowings from the FHLB, Plaintiff fails to allege that the Bank had not increased its borrowings. Nor could it. *Compare* Ex. L, 2022 Q3 Form 10-Q at 80 (FHLB borrowings of $1.45 billion as September 30, 2022) *with* Ex. D, 2022 Form 10-K at 102 (FHLB borrowings of approximately $11.3 billion). Moreover, the FHLB itself is quoted in the Signature press release, noting that it is "proud to serve as a liquidity partner for each of our more than 300 members, including Signature Bank, with which we have a longstanding relationship…." Ex. PPP, January 23, 2023 Press Release.

4.    Plaintiff Fails to Allege that the Remaining Capital Ratio and Liquidity Statements Were False

Plaintiff alleges that Howell made a misstatement when he stated during an April 2021 earnings call that "we've put on little to no risk." ¶ 235. However, Plaintiff takes the statement out of context. During the earnings call, Howell was asked about specific capital ratios—the CET1 (Common Equity Tier 1 capital ratio) and the TCE (Total Common Equity capital ratio). Howell's response dealt with those ratios (and a third ratio – the Tier 1) —*not* other risks of the Bank:

> [W]e're primarily focused on the regulatory ratios and the risk-based ratios versus the straight TCE ratio, given the nature of our growth, right?  We've grown cash, we've grown securities, and we've grown well-secured fund banking loans.  So, we've really put on little to no risk, so we're not focused on the TCE for sure, but it's more the CET1, the Tier 1, and total-risk based capital ratios. That's our focus.

Ex. N, Q1 2021 Earnings Call Tr. at 11-12.  Each of those ratios was disclosed at year end 2020 and as of March 31, 2021.  *See* Ex. C, 2020 Form 10-K at 106; Ex. VVV, 2021 1Q Form 8-K at 14.  As discussed above, each of the ratios exceeded the regulatory requirements for the Bank to be considered "well capitalized."

Finally, Plaintiff alleges that particular Individual Defendants made misrepresentations when the Bank stated that its liquidity management policies "take into account the marketability of assets, the source and stability of deposits, our wholesale borrowing capacity and the amount of our loan commitments."  ¶¶ 238, 253, 291, 312, 321.  Once again, Plaintiff does not allege that these statements did not accurately convey the items the Bank considered under its liquidity management policies.  Instead, it alleges that the statement is misleading because, in managing its liquidity policy, the Bank failed to adequately establish the stability of deposits or adequate stress testing and had increased its uninsured and digital asset deposits.  ¶ 239.  As above, these statements fail to plead falsity.  Rather, by acknowledging that the Bank had a liquidity management policy which purportedly could have been run better, Plaintiff alleges, at most, non-actionable mismanagement.  *Deutsche Bank*, 2017 WL 4049253, at *7.

### F.    Plaintiff Fails to State a Claim Based upon the Representations Regarding Internal Control Over Financial Reporting.

As a last-ditch effort to state an actionable misrepresentation, Plaintiff alleges that certain Individual Defendants made a material misrepresentation regarding the Bank's internal controls over financial reporting (the "ICFR Representation").  ¶ 350.  That representation provides that the Bank's "system of internal control is a process designed to provide reasonable assurance

regarding the reliability of financial reporting and the preparation" of the Bank's financial statements in accordance with Generally Accepted Accounting Principles ("GAAP").   ¶ 350. Plaintiff alleges that this statement was false because the Bank's financial statements fraudulently failed to disclose the Bank's concentration of large depositors. ¶ 356.  Plaintiff's theory fails.

Initially, the Bank repeatedly disclosed in its public filings that its "depositor base is more heavily weighted to larger uninsured deposits" (Ex. C, 2020 Form 10-K at 53-54), quantified the dollar amounts and percentage of overall deposits that were uninsured, and also referred during earnings calls to clients with large deposits.  *See supra* Statement of Facts.B.

Moreover, Plaintiff does not allege that the ICFR Representation itself was false.  Even if GAAP required the additional disclosure of large depositor concentrations—and it does not—the representation would not be false because it merely provided that the Bank's internal control over financial reporting was designed to provide "reasonable assurance" that the financial statements complied with GAAP.  Plaintiff pleads no facts showing that the internal control system failed to do so.  *In re PetroChina Co. Ltd. Sec. Litig.*, 120 F. Supp. 3d 340, 359-60 (S.D.N.Y. 2015) (dismissing claim where plaintiff did not allege facts showing that the company's "internal controls in relation to *financial reporting* were insufficient" or "how or why [the company's] internal controls were inadequate"); *see also In re Braskem S.A. Sec. Litig.,* 246 F. Supp. 3d 731, 758 (S.D.N.Y. 2017) (finding alleged misstatements about internal controls not actionable where plaintiffs did "not concretely allege that any of [company's] financial reports were in any way inaccurate.").  Moreover, the Bank expressly warned "[a]ll internal control systems, no matter how well designed, have inherent limitations" and, thus, "internal control over financial reporting may not prevent or detect misstatements on a timely basis."  *See, e.g.*, Ex. F, 2021 Form 10-K at 111.

Lastly, Plaintiff's theory under GAAP is wrong. The Complaint relies upon ASC 275 to argue that the Bank was required to disclose in its audited financial statements the Bank's "concentration in a small number of large depositors." ¶ 67; *see also* ¶ 366. However, that provision expressly *exempts* from disclosure "concentrations of financial instruments." *See* Ex. RRR, ASC-275-10-50-19, https://asc.fasb.org/1943274/2147482861/275-10-50-19. "Financial instruments" are defined as "Cash," which includes "demand deposits with banks or other financial institutions." ASC Master Glossary, https://asc.fasb.org/MasterGlossary, "Financial Instrument" (defining "Financial Instrument" as "Cash"); ASC Master Glossary, https://asc.fasb.org/MasterGlossary, "Cash" (defining "cash" to include "demand deposits with banks or other financial institutions"). *Id.* Therefore, the Individual Defendants were not required to disclose the Bank's concentration of large deposits under GAAP.

## II.    PLAINTIFF FAILS TO ADEQUATELY PLEAD SCIENTER

The PSLRA requires a plaintiff to "state with particularity facts giving rise to a strong inference" that each defendant acted with scienter. *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 321 (2007) (citing 15 U.S.C. § 78u–4(b)(2)). "[I]n determining whether the pleaded facts give rise to a 'strong' inference of scienter, the court must take into account plausible opposing inferences." *Tellabs*, 551 U.S. at 323. Thus, although courts "normally draw reasonable inferences in the non-movant's favor on a motion to dismiss," the PSLRA "establishes a more stringent rule" and requires an inference of scienter that is "cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Teamsters Local 445 Freight Div. Pension Fund v. Dynex Cap. Inc.*, 531 F.3d 190, 194 (2d Cir. 2008).

A "plaintiff may satisfy this requirement by alleging facts (1) "show[ing] that [the] defendants had both motive and opportunity to commit the [fraud]" or (2) "constitute[ing] strong

circumstantial evidence of conscious misbehavior or recklessness." *Ganino v. Citizens Utilities Co.*, 228 F.3d 154, 168-69 (2d Cir. 2000). Here, Plaintiff does neither.

### A.    Plaintiff Fails to Allege Motive and Opportunity

#### 1.    Incentive Compensation Does Not Establish Motive

To plead motive, "plaintiffs must assert a concrete and personal benefit to the individual defendants resulting from the fraud." *Kalnit v. Eichler*, 264 F.3d 131, 139 (2d Cir. 2001). "Motives common to most corporate officers, including the desire for the corporation to appear profitable, to keep stock prices high to increase officer compensation, or even to enhance their own prestige do not suffice for scienter." *In re Chembio Diagnostics, Inc. Sec. Litig.*, 586 F. Supp. 3d 199, 218-19 (E.D.N.Y. 2022). "If scienter could be pleaded solely on the basis that defendants were motivated because an inflated stock price or improved corporate performance would increase their compensation, virtually every company in the United States that experiences a downturn in stock price could be forced to defend securities fraud actions." *ECA*, 553 F.3d at 201 (cleaned up).

Here, Plaintiff alleges that DePaolo, Shay, and Howell were motivated to drive deposit growth at Signature because they were eligible for incentive-based pay based on the Bank's performance. ¶¶ 422-425. But as the Second Circuit has made clear, "incentive compensation can hardly be the basis on which an allegation of fraud is predicated." *Acito v. IMCERA Grp., Inc.*, 47 F.3d 47, 54 (2d Cir. 1995). Accordingly, the Court should reject Plaintiff's attempt to plead scienter based upon incentive compensation. *See also In re Danimer Sci., Inc. Sec. Litig.*, 2023 WL 6385642, at *12 (E.D.N.Y. Sept. 30, 2023) (allegations that an executive has a motive to increase the company's share price beyond the exercise price of stock options insufficient); *Donna Karan*, 1998 WL 637547, at *19 (allegations that defendant sought to secure bonuses contingent upon profits were insufficient).

2.    Individual Defendants' Stock Sales Do Not Establish Motive

Plaintiff next tries to plead scienter based upon certain Individual Defendants' stock sales. To plead a strong inference of scienter based on such sales, a plaintiff must plead facts showing "that [a defendant's] stock sales were unusual." *Acito*, 47 F.3d at 54. "Factors considered in determining whether insider trading activity is unusual include the amount of profit from the sales, the portion of stockholdings sold, the change in volume of insider sales, and the number of insiders selling." *In re Keyspan Corp. Sec. Litig.*, 383 F. Supp. 2d 358, 382 (E.D.N.Y. 2003). Courts also consider whether the sales are "dramatically out of line with prior trading practices," *Livingston v. Cablevision Sys. Corp.*, 966 F. Supp. 2d 208, 221 (E.D.N.Y. 2013), and whether the timing of the sales is "calculated to maximize personal benefit from inside information," *Ressler v. Liz Claiborne, Inc.*, 75 F. Supp. 2d 43, 58, 60 (E.D.N.Y. 1998), *aff'd sub nom. Fishbaum v. Liz Claiborne, Inc.*, 1999 WL 568023 (2d Cir. 1999). Plaintiff fails to satisfy any of these standards.

(a)    The Individual Defendants' Sales of Stock Acquired Through Performance-Based Awards Were Not Unusual

Plaintiff alleges that seven stock sales are "suspicious" because they were executed shortly after certain of the Individual Defendants received performance-based stock awards. ¶¶ 429, 433, 437, 441.[13] But the timing weighs against an inference of scienter because selling stock (*e.g.*, to diversify one's portfolio) upon receipt of a stock award is routine. Four other sales corresponded with the acquisition of shares through annual vesting.[14] But selling shares upon vesting, for example to pay taxes (including on the income generated from the vested shares) is not unusual.

---

[13] Exs. LL, MM, DePaolo Form 4 dated 3/24/21, DePaolo Form 4 dated 3/24/22; Exs. NN, OO, Howell Form 4 dated 3/24/21, Howell Form 4 dated 3/24/22; Ex. PP, Shay Form 4 dated 3/24/21; Exs. QQ, RR, Susca Form 4 dated 3/24/22.

[14] Ex. SS, DePaolo Form 4 dated 4/8/21; Ex. TT, Howell Form 4 dated 4/8/21; Ex. UU, Shay Form 4 dated 4/8/21; Ex. VV, Susca Form 4 dated 4/8/21.

*See Ressler*, 75 F. Supp. 2d at 58-60 ("[T]he flurry of transactional activity by these defendants within a limited time period suggests not that there was fraud, but that the sales were precipitated by some other factor such as an impending tax increase.").

Moreover, these sales were not "dramatically out of line with prior trading practices." *Livingston*, 966 F. Supp. 2d at 221. The Complaint compares putative Class Period stock sales only to 2020 stock sales. ¶¶ 428, 432, 436, 440. By looking only at 2020—during the height of the COVID pandemic and the economic uncertainty that it caused—Plaintiff creates a highly misleading impression. Indeed, looking back just one more year to 2019 reveals that DePaolo, Howell, Susca, and Shay also sold vested stock awards in March 2019.[15] These earlier sales demonstrate that the sale of shares received through performance-based awards was typical for these Individual Defendants, and therefore do not support an inference of scienter.

(b)    The Remaining Sales Were Not Suspiciously Timed

The Complaint also points to DePaolo, Howell, and Susca's April 2021 stock sales as suggestive of motive because they were made "shortly after" the Bank filed its 2020 Form 10-K in March 2021. ¶¶ 430, 434, 442.[16] However, it is normal for insiders to sell shortly after an earnings release to help ensure that they have no information different than the market at large. *In re Bear Stearns Cos. Sec., Deriv., & ERISA Litig.*, 763 F. Supp. 2d 423, 500 (S.D.N.Y. 2011) ("[T]rading after the release of financial information has been held to be appropriate and

---

[15] Exs. WW, XX, YY, DePaolo Form 4 dated 3/26/19, DePaolo Form 4 dated 3/25/20, Depaolo Amended Form 4 dated 12/30/20; Exs. ZZ, AAA, BBB, Howell Form 4 dated 3/26/19, Howell Form 4 dated 3/25/20, Howell Amended Form 4 dated 12/29/20; Exs. CCC, DDD, EEE Susca Form 4 dated 3/26/19, Susca Form 4 dated 3/25/20, Susca Amended Form 4 dated 12/29/20; Ex. FFF, Shay Form 4 dated 3/26/19.

[16] Howell, DePaolo, and Susca each made sales on April 23, 2021. *See* Ex. GGG, DePaolo Form 4 dated 4/26/21; Ex. HHH, Howell Form 4 dated 4/26/21; Ex. III, Susca Form 4 dated 4/26/21.

commonplace"); *City of Brockton Ret. Sys. v. Shaw Group Inc.*, 540 F. Supp. 2d 464, 475-76 (S.D.N.Y. 2008) (no inference of motive from stock sale after issuance of financial statements).

Furthermore, these April 2021 sales occurred at a price of $242. However, ten months later, the stock price was $340. The fact that these Individual Defendants sold well before a run-up in the stock price undermines a finding of scienter. *See Ronconi v. Larkin*, 253 F.3d 423, 435-37 (9th Cir. 2001) (timing of sale not suspicious where stock price continued to rise after insider sales). Moreover, the first alleged corrective disclosure did not occur until more than a year after the April 2021 sales—on May 16, 2022. ¶ 455. Once again, this timing cuts against a finding of scienter. *See In re Hain Celestial Grp. Inc. Sec. Litig.*, 2022 WL 18859055, at *25 (E.D.N.Y. Nov. 4, 2022) (finding no inference of scienter where last stock sales occurred more than eight months before first alleged corrective disclosure).

None of the Individual Defendants sold stock "at the end of the putative class period, when insiders would have rushed to cash out." *City of Taylor Gen. Emps. Ret. Sys. v. Magna Int'l Inc.*, 967 F. Supp. 2d 771, 800 (S.D.N.Y. 2013). Plaintiff offers no explanation as to why, if the Individual Defendants had fraudulent intent, they refrained from selling at this time. *Ressler*, 75 F. Supp. 2d at 60 ("Such timing does not suggest that the defendants meant to realize profits immediately prior to an expected and dramatic fall in the stock's price" where sale of stocks occurred more than six months before negative disclosure).

        (c)    Individual Defendants' Acquisitions and Retention of Shares Negate Any Inference of Scienter

The Complaint also conspicuously omits that certain of the Individual Defendants ***acquired*** stock during the putative Class Period, including several purchases that occurred immediately before the collapse of the Bank. For example, Howell made two large volume purchases of preferred stock in the days immediately preceding the Bank's collapse. On March 8, 2023, Howell

acquired 38,600 shares of preferred stock, and the next day, March 9, he purchased an additional 17,400 shares.[17]  Similarly, on March 10, 2023, Shay purchased 5,000 shares of common stock.[18]  These ill-timed purchases severely undercut the plausibility of any inference of scienter.  *See Keyspan Corp.*, 383 F. Supp. 2d at 383.  Indeed, it defies logic that senior executives and directors who supposedly knew that the Bank's stock price was artificially inflated would spend huge sums of their own money to purchase additional stock days before the purported risk materialized and the stock became worthless.  *See, e.g.*, *In re Metricom Sec. Litig.*, 2004 WL 966291, at *35 (N.D. Cal. April 29, 2004) (scienter theory "makes no sense as applied to Vulcan, because Vulcan increased its exposure to [the company] … which negates, rather than raises, an inference of scienter"), *aff'd*, 182 F. App'x 714 (9th Cir. 2006).[19]

Similarly, DePaolo, Shay, and Susca retained far more Signature common shares than they sold during the putative Class Period.  Specifically, Shay held 514,288 shares of Signature common stock when the Bank was closed, compared to sales of only 25,365 shares during the Class Period.  *See* Ex. OOO, Signature 2023 Proxy Statement at 15; ¶ 435.  DePaolo held 194,376 shares of Signature common stock when the Bank was closed, well over double the amount of shares he sold during the Class Period.  *See* Ex. OOO, Signature 2023 Proxy Statement at 7; ¶ 427.  Finally, Susca held 32,403 shares when the Bank was closed, over 7,000 more shares than he sold during the Class Period.  ¶ 439.  The significant retention of shares by these Individual Defendants undermines an inference of scienter, as does the fact that they lost an enormous sum

---

[17] Ex. KKK, Howell Form 4 dated 3/10/23.

[18] Ex. LLL, Shay Form 4 dated 3/10/23.

[19] Additionally, DePaolo and Susca acquired stock through service-based awards in February 2023.  *See* Ex. MMM, DePaolo Form 4 dated 2/16/23, Ex. NNN, Susca Form 4 dated 2/16/23.  These acquisitions preceded the Bank's collapse by less than a month, but were not followed by any sales, weighing against an inference of scienter.

when the Bank was closed.[20]  *See In re DraftKings Inc. Sec. Litig.*, 650 F. Supp. 3d 120, 175 (S.D.N.Y. 2023) (finding that "selling defendants all retained more shares than they sold" which "weigh[s] against inferring scienter").

**B.    Plaintiff Fails to Plead Strong Circumstantial Evidence of Conscious Misbehavior or Recklessness**

Beyond failing to plead motive and opportunity, Plaintiff fails to plead particularized facts of conscious misbehavior or recklessness.  For a statement to be reckless, it must "represent[] an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it."  *ECA*, 553 F.3d at 202-03.  Reckless conduct "must, in fact, approximate an actual intent to aid in the fraud being perpetrated…."  *Decker v. Massey–Ferguson, Ltd.*, 681 F.2d 111, 120–21 (2d Cir. 1982).

1.    The Complaint Improperly Relies on Group Pleading

As an initial matter, Plaintiff fails to plead scienter based upon conscious misbehavior because it improperly relies upon group pleading.  "In a case involving multiple defendants, plaintiffs must plead circumstances providing a factual basis for scienter for each defendant; guilt by association is impermissible."  *In re DDAVP Direct Purchaser Antitrust Litig.*, 585 F.3d 677, 695 (2d Cir. 2009).  Thus, a plaintiff fails to state a claim where the "complaint vaguely attributes the alleged fraudulent statements to 'defendants,'" absent allegations that each defendant "*personally* knew of, or participated in, the fraud."  *Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1175 (2d Cir. 1993); *New Falls Corp. v. Soni Holdings, LLC*, 2020 WL 13850728, at *5 (E.D.N.Y. Mar. 31, 2020) ("All other allegations … describe the Defendants' collectively, and … constitutes impermissible group pleading.").

---

[20] The final closing price for Signature common stock shares was $70.00 on March 10, 2023. *See* https://www.nasdaq.com/market-activity/stocks/sbny/historical.

Here, the Complaint lumps Individual Defendants together and alleges generalized descriptions of their collective state of mind. *See, e.g.*, ¶¶ 98, 107, 419. As such, it fails to allege scienter through conscious misbehavior. *See Orlan v. Spongetech Delivery Sys., Inc., Sec. Litig.*, 2012 WL 1067975, at *10-11 (E.D.N.Y. Mar. 29, 2012) (dismissing claim because allegations failed to attribute statements to defendant and scienter allegations were not pled with specificity).

        2.    <u>The Complaint Relies Heavily on Regulator Reports that Do Not Raise an Inference of Scienter</u>

Plaintiff also fails to plead particularized facts showing that the Individual Defendants had "knowledge of the many internal problems and risk management failures and deficiencies" based on "the findings of Regulators," but "continued to falsely tout the Bank's risk management processes and conceal the truth…." ¶¶ 400, 403. To the contrary, the facts Plaintiff plead and the reports it incorporates into the Complaint refute a finding of scienter.

The Complaint relies almost exclusively on the FDIC, DFS, and OIG Reports to allege that the Individual Defendants knew of internal problems with the Bank's risk management and liquidity. However, as those reports make plain, the FDIC rated Signature as a "fundamentally sound" bank throughout the Class Period. *See* Ex. B, OIG Report at 17-18; Ex. FF, FDIC Manual §§ 1.1-23, 1.1-27. It was not until March 11, 2023, one day before the Bank was shut down and two days *after* the Individual Defendants' final public statement about the Bank, that the Individual Defendants were informed of the FDIC decision to downgrade Signature. ¶ 191. Given the FDIC's consistent positive rating of the Bank throughout the class period, Plaintiff fails to allege scienter based upon purported regulatory concerns.

In *In re Alkermes Public Ltd. Co. Sec. Litig.*, 523 F. Supp. 3d 283 (E.D.N.Y. 2021), *aff'd sub nom. Midwest Operating Engineers Pension Trust Fund v. Alkermes Public Co.*, 2021 WL 5782079 (2d Cir. Dec. 7, 2021), for instance, the FDA raised various concerns regarding a

pharmaceutical company's clinical trial methodologies for a new drug, *id*. at 287-91.  After the FDA failed to approve the drug, investors sued, claiming that the defendants knew of significant problems based on the FDA's stated concerns.  *Id.* at 285-86, 291.  The court dismissed the complaint, explaining:

> Ultimately, none of the interactions between the FDA and [the company] support a strong inference of scienter.  Despite expressing concerns regarding [the company's] trial methodology, the FDA nonetheless permitted the drug to proceed through various stages of approval prior to its ultimate denial of the application ….  Put differently, the "FDA's negative feedback was muted by a series of encouraging regulatory decisions" which allowed the drug to proceed through the approval process prior to the ultimate disapproval.  *In re Sanofi*, 87 F. Supp. 3d at 545.

*Id.* at 295.

Here, as in *Alkermes*, the regulatory concerns were "muted" by the FDIC's overall positive ratings.  The Bank was always rated as a "2," meaning that "[o]verall risk management practices are satisfactory" and that there were "no material supervisory concerns and, as a result, the supervisory response is informal and limited."  As such, Plaintiff cannot rely upon the regulators' "informal and limited" guidance to establish scienter.  Indeed, even where encouraging regulatory ratings are lacking, courts hold that regulatory concerns do not support a finding of scienter.  *See Kuriakose v. Fed. Home Loan Mortg. Corp.*, 897 F. Supp. 2d 168, 181 (S.D.N.Y. 2012) (FHFA Memorandum finding "pervasive and ongoing problems and deficiencies" at Freddie Mac prior to placing the company in a conservatorship did not support an inference of scienter), *aff'd*, 543 F. App'x 72 (2d Cir. 2013); *In re Manulife Fin. Corp. Sec. Litig.*, 2012 WL 4108104, at *2, *7 (S.D.N.Y. Sept. 19, 2012) (supervisory letter from Canadian financial regulator did not raise inference of scienter when regulator requested company "shore up its capital" to maintain capital adequacy); *Hammer v. Frontier Fin. Corp.*, 2012 WL 13020032, at *3 (W.D. Wash. Apr. 20, 2012) (rejecting strong inference of scienter based on OIG report discussing bank's failure to implement

recommendations and explaining that is "an unjustifiable leap from saying that a practice needs strengthening or a fuller explanation to concluding that the practice is highly unreasonable"); *In re Franklin Bank Corp. Sec. Litig*, 782 F.Supp.2d 364, 386, 388, 390-92 (S.D. Tex. 2011) (alleged failure to implement recommendations from FDIC examinations regarding liquidity risk limits and contingency planning did not give rise to strong inference of scienter against bank chairman), *aff'd sub nom. Harold Roucher Tr. U/A DTD 9/21/72*, 464 F. App'x 334 (5th Cir. 2012).

In fact, as discussed above, certain regulatory findings undermine a finding of scienter because they demonstrate that the Bank's management was taking steps to respond to the regulators' concerns. *See, e.g.*, Ex. A, FDIC Report at 50 ("[M]anagement began addressing the deficiencies identified in the 2019 Liquidity targeted review"); Ex. EE, DFS Report at 22 ("Management was working to identify appropriate stress testing scenarios, developing documentation, frequencies and metrics to implement the new liquidity model"); *id.* at 25-26 (the Bank "increased efforts to improve liquidity contingency planning and engaged a third-party provider to conduct a deposit study" and "made progress in remediating the [Matters Requiring Board Attention] on liquidity"); Ex. B, OIG Report at 32 (at year-end 2021, the "liquidity posture looked better than in prior years."); *id.* at 7 (Bank "successfully manag[ed]" liquidity events in July and September 2022 by "slowing loan originations and revising loan and investment growth down.").

In light of the Bank's overall ratings and what the FDIC actually said about the Bank in real time, Plaintiff has alleged nothing more than purported mismanagement, *i.e.*, that management should have done more. These allegations fail to establish an intent to defraud. *See Chill v. Gen. Elec. Co.*, 101 F.3d 263, 269-70 (2d Cir. 1996) (plaintiffs' allegations that defendant ignored "red flags" and "obvious signs" that financial reports were inaccurate were insufficient to plead

recklessness); *Hain Celestial Grp.*, 2022 WL 18859055, at *30 ("Rather than pleading an inference of scienter ... any inadequacy in ... internal controls were, at the most, a result of inactionable corporate mismanagement.").

### 3.    Plaintiff's Confidential Witness Opinions Do Not Establish Scienter

Plaintiff seeks to rely on confidential witnesses, former Signature employees ("FE"s), to support its scienter claims. "As a general matter, the mere opinions of confidential witnesses ... are not actionable in securities fraud cases." *Ford v. Voxx Int'l Corp.*, 2016 WL 3982466, at *6 (E.D.N.Y. July 22, 2016) (concluding that confidential witness's "statements and opinions" were "too vague to form the basis of a fraud claim"). Indeed, courts have found that the "opinions of confidential witnesses" do not support allegations of scienter where the plaintiffs "fail to offer any factual underpinnings for those opinions." *City of Dearborn Heights Act 345 Police & Fire R v. Axonyx, Inc.*, 374 F. App'x 83, 85 (2d Cir. 2010) (summary order). Here, the FE statements amount to mere opinions about the Bank's practices that do not demonstrate conscious misbehavior or recklessness.

The Complaint alleges that FE-1, a "departmental leader in the Risk Management department," believed that there were purported inadequacies in the Bank's "funds management and liquidity models" and internal controls. ¶ 97. But FE-1's opinions that Signature's liquidity risk management practices were "loose" or "weak," *id.*, are insufficient to support an inference of scienter. *Ford*, 2016 WL 3982466, at *6. FE-1 also fails to describe any Individual Defendant's access to material information at odds with what they said publicly. *Campo v. Sears Holdings Corp.*, 371 F. App'x 212, 217 (2d Cir. 2010) (summary order). In any event, FE-1's impression that Howell "expressed concern and frustration" with MRBAs, ¶ 408, weighs *against* an inference of recklessness because it shows that Bank management was concerned with and addressing risk management issues.

The statements from FE-2, an alleged former member of Signature's digital banking team, and FE-3, an alleged former manager in Signature's audit department, fare no better. ¶¶ 119-120. FE-2 simply stated that digital assets were more volatile than other types of deposits and that the volatility of these assets was discussed with Howell. ¶ 119. But FE-2's opinions that volatility was "significantly more" for digital deposits and that swings occurred "fairly regularly" are too vague to support an inference of scienter. *Ford*, 2016 WL 3982466, at *7 (finding former employee's vague claims about bank losing market share insufficient to support fraud claim). FE-3 stated that he "worked on an audit of the Bank's liquidity risk management processes" and "concluded that [the Bank's] liquidity risk management function was inadequate." ¶ 120. The "adequacy" of the Bank's controls, however, is also an opinion and hardly establishes that anyone with a different view must have been lying. *Axonyx, Inc.*, 374 F. App'x at 85 (confidential witness opinions without "factual underpinnings" are not actionable). Moreover, the fact that DePaolo allegedly received information regarding the Bank's deposits "in an effort to manage the Bank's liquidity" cuts against an inference of scienter.

Finally, FE-4, allegedly a former Managing Group Director, stated that the Individual Defendants were not taking adequate steps to vet new depositors but provided no basis for his opinion that they "did not care where those deposits came from." ¶ 150. Nor are any facts pled to establish what personal knowledge he had to support that opinion, which independently makes his accusation insufficient. *Loc. No. 38 Int'l Bhd. of Elec. Workers Pension Fund v. Am. Exp. Co.*, 724 F. Supp. 2d 447, 460 (S.D.N.Y. 2010) ("[A]necdotes and conclusory statements of belief cannot form the basis for a finding of reckless disregard"), *aff'd* 430 F. App'x 63 (2d Cir. 2011).[21]

---

[21] Plaintiff's other scienter theories likewise fail. Plaintiff does not adequately allege scienter through its allegations that the Individual Defendants were responsible for liquidity and risk management or that the Individual Defendants had "control over the entire Bank." ¶¶ 405-09, 417-

4.    KPMG's Audit Opinions Negate a Finding of Scienter

Plaintiff's allegations with respect to Signature's financial statements likewise fall short of establishing a strong inference of scienter.  As an initial matter, Plaintiff has failed to allege a material misrepresentation with respect to the Bank's financial statements.  Plaintiff does not identify a single figure in those financial statements that was wrong.  Nor does it allege that "there has been any restatement of any financial statement"; "that any auditor . . . has qualified or withdrawn its opinion"; or "any other indicator that the results reported by Defendants were inaccurate at the time reported, or that Defendants had knowledge of any inaccurac[ies]."  *Malin v. XL Cap. Ltd.*, 499 F. Supp. 2d 117, 148 (D. Conn. 2007), *aff'd*, 312 F. App'x 400 (2d Cir. 2009).  Instead, Plaintiff alleges that the Bank should have disclosed its concentration of large depositors.  But, as discussed above, GAAP does not require such a disclosure.  As such, Plaintiff cannot establish scienter.  *San Leandro Emergency Med. Grp. Profit Sharing Plan v. Philip Morris Cos.*, 75 F.3d 801, 813 (2d Cir. 1996) (there can be no scienter where there is no false statement).

Moreover, even if GAAP did require the Bank to disclose its concentration of large depositors, Plaintiff does not allege that any Individual Defendant was aware of such a requirement.  Nor does Plaintiff allege that any documents, confidential witnesses, auditors, or

---

21; *see In re Sketchers USA Sec. Litig.*, 444 F. Supp.3d 498, 528 (S.D.N.Y. 2020) ("[H]igh-level positions are insufficient to plead scienter"); *Fadem v. Ford Motor Co.*, 352 F. Supp. 2d 501, 522 (S.D.N.Y.), *aff'd*, 157 F. App'x 398 (2d Cir. 2005) (evidence that defendants knew of and approved Ford's palladium purchases were "not enough to establish scienter" because plaintiffs "fail[ed] to show that simultaneous to the palladium purchases, defendants knew, or should have known, about impending technological breakthroughs" that would reduce palladium needs).

Likewise, Plaintiff does not adequately plead scienter by alleging that the Individual Defendants spoke publicly regarding the Bank's liquidity and risk management.  ¶¶ 410-412, 415-416.  Indeed, such allegations amount to accusations "founded on nothing more than a defendant's corporate position," and "it is practically hornbook law" that such accusations "are entitled to no weight." *In re Rockwell Med., Inc. Sec. Litig.*, 2018 WL 1725553, at *14 (S.D.N.Y. Mar. 30, 2018); *In re MSC Indus. Direct Co., Inc.*, 283 F. Supp. 2d 838, 848-49 (E.D.N.Y. 2003) ("[G]eneral knowledge of [corporation's] sales and inventory does not show conscious misbehavior or recklessness").

regulators put any Individual Defendant on notice of any purported requirement. This is fatal to a finding of scienter. *See ECA*, 553 F.3d at 202-203 (no scienter where defendants were unaware of alleged accounting violation); *In re Carter-Wallace, Inc. Sec. Litig.*, 150 F.3d 153, 157 (2d Cir. 1998) (scienter not inferred where a defendant has "no sound reason to doubt" the accuracy of financial statements); *In re Alpharma Inc. Sec. Litig.*, 372 F.3d 137, 150 (3d Cir. 2004) (dismissing claim where plaintiffs failed to allege defendants were involved with GAAP violation).

Finally, the fact that the financial statements were audited, "in itself, weighs heavily against scienter." *Ortiz v. Canopy Growth Corp.*, 537 F. Supp. 3d 621, 678 (D.N.J. 2021); *see also In re PEC Sols. Inc. Sec. Litig.*, 2004 WL 1854202, at *12 (E.D. Va. May 25, 2004), *aff'd*, 418 F.3d 379 (4th Cir. 2005) (dismissing fraudulent accounting claim where "Defendants' financial statements were reviewed by independent auditors" who issued clean audit opinion); *Roofer's Pension Fund v. Papa*, 2018 WL 3601229, at *20 (D.N.J. July 27, 2018) ("[T]he approval of an independent auditor is strongly probative of a lack of scienter"); *In re Iconix Brand Grp. Inc.*, 2017 WL 4898228, at *19 (S.D.N.Y. Oct. 25, 2017) (that auditor did not "note any improprieties in Iconix's financial accounting—over three consecutive audit years—is significant").

5.   The Individual Defendants' Decision to Limit Digital Asset Deposits Contradicts Plaintiff's Allegations of Scienter

Plaintiffs' scienter theory fails for one last reason: the Bank voluntarily took steps to reduce its deposits and limit potential future losses. On December 6, 2022, Howell announced that Signature would "shrink its deposits tied to cryptocurrencies." ¶ 466. Signature subsequently reduced its digital asset deposits by $1.51 billion by March 1, 2023. Ex. CC, March 2, 2023 Mid-Quarter Update at 2. The Bank's decision to limit deposits from the digital assets industry demonstrates that the Individual Defendants were undertaking a "prudent course of action that weakens rather than strengthens an inference of scienter." *Slayton v. Am. Exp. Co.*, 604 F.3d 758,

777 (2d Cir. 2010).  Indeed, if the Individual Defendants were trying to fool the market, the Bank never would have issued its numerous robust warnings or voluntarily chosen to reduce its deposits.

## III.    PLAINTIFF FAILS TO ADEQUATELY PLEAD LOSS CAUSATION

Plaintiff also fails to allege loss causation.  "[T]o establish loss causation, a plaintiff must prove that the damage suffered was a foreseeable consequence of the misrepresentation." *Citibank, N.A. v. K-H Corp.*, 968 F.2d 1489, 1495 (2d Cir. 1992).  In other words, the Second Circuit "require[s] both that the loss be foreseeable *and* that the loss be caused by the materialization of the concealed risk." *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 173 (2d Cir. 2005).  "[T]o establish loss causation, a plaintiff must allege … that the *subject* of the fraudulent statement or omission was the cause of the actual loss suffered, *i.e.*, that the misstatement or omission concealed something from the market that, when disclosed, negatively affected the value of the security." *Id.*

Here, Plaintiff alleges that the materialization of the risks purportedly concealed by the Individual Defendants occurred in May, July, and December 2022 and then, ultimately, when the Bank closed in March 2023.  However, Plaintiff's own allegations and the regulatory reports upon which it relies refute the notion that the stock price declines at those times were caused by the materialization of an undisclosed risk or that the closure of the Bank was foreseeable.

### A.    The 2022 Stock Price Declines Were Not Causally Related to Any Alleged Misrepresentations

Plaintiff alleges that the declines in Signature's stock price in May and June 2022 were caused by decreases in the Bank's deposits, including deposits from digital asset industry clients. *See, e.g.*, ¶¶ 455-456, 460-461.  Its theory of loss causation for these stock price declines fails for two reasons.

First, the decreases in deposits said nothing about the Bank's purported inadequate risk management systems or weak internal controls. Courts emphasize that "loss causation is not adequately pled simply by allegations of a drop in stock price following an announcement of bad news *if the news did not disclose the fraud*." *In re Liberty Tax, Inc.*, 435 F. Supp. at 471. Rather, a complaint must allege that the purported "news" revealed some then-undisclosed *fact* with regard to the specific misrepresentations alleged in the complaint." *Id.* at 470-71. Here, the stock price declines coincided with disclosed decreases in deposits, including deposits from digital asset clients. These disclosures say nothing about the Bank's controls or risk management. As such, Plaintiff fails to plead that the stock price declines were caused by the alleged fraud.

Second, the Bank had disclosed the risk of a decline in deposits for years. It disclosed that deposits could fall for numerous reasons and that a decline in deposits could materially and adversely affect its business. It also disclosed that it had begun taking deposits from players in the "nascent" digital assets industry and the risks associated with that industry. *See supra* at Statement of Facts.C.2.

What is more, the Bank regularly disclosed its total deposits, uninsured deposits, and deposits from digital asset industry clients. Thus, investors were fully aware of the risks that deposits, including digital asset deposits, could be withdrawn. *See* ¶ 126 (in early 2021 the "stability of digital asset deposits was a frequent topic of analysts' reports"). Accordingly, Plaintiff has "not set forth allegations that would lead to the conclusion that any of these statements were corrective, given that [Signature] made extensive disclosures" with respect to the potential decline in deposits. *Kuriakose*, 897 F. Supp. 2d at 178; *see also Stratte-McClure v. Morgan Stanley*, 598 F. App'x 25, 29 (2d Cir. 2015) (summary order) (plaintiffs failed to plead that the defendant's "drop in stock price was not caused by the intervening market deterioration throughout the

financial services industry" due to "the continued decline in the subprime market"); *Cent. States, Se. & Sw. Areas Pension Fund v. Fed. Home Loan Mortg. Corp.*, 543 F. App'x 72, 74 (2d Cir. 2013) (summary order) (affirming the dismissal where "the plaintiff's stock purchases and losses coincided with a marketwide phenomenon—the housing bubble burst").

Plaintiff's allegations regarding the stock price decline in December 2022 fare no better. Plaintiff alleges that the Bank's stock price declined after the Bank announced that it was shrinking its digital asset deposits by $8-10 billion and limiting deposits of individual digital asset clients to 2% of total deposits. Once again, the disclosure said nothing about the Bank's purported deficient systems or risk management. Rather, it merely announced a change in business plans. Moreover, to the extent the stock price fell because the market was disappointed that the Bank was de-emphasizing digital asset deposits, the disclosure plainly had nothing to do with the alleged fraud.

### B.    The Closure of The Bank Was Not Foreseeable

Plaintiff likewise does not allege that the March 2023 closure of the Bank and the accompanying decline in its stock price were foreseeable. Rather, according to the very reports upon which Plaintiff relies, unforeseeable market forces—unforeseen bank closures and an unprecedented run on Signature's deposits—caused the Bank to be closed. *Lentell*, 396 F.3d at 172-73 (noting that "the damages suffered by plaintiff must be a foreseeable consequence of any misrepresentation or material omission").

As described above, the closure of the bank was precipitated by the unexpected closure of Silvergate Bank and Silicon Valley Bank. Even though Signature's "business model differed from [these banks]," Ex. B, OIG Report at 8, Signature clients withdrew 20% of the Bank's total deposits in a single day based upon the misimpression that Signature was a "crypto bank," with billions of dollars' worth of deposits expected to be withdrawn the following business day. *Id.* at 9. As the FDIC stated: "The weekend of March 10, 2023, was unprecedented. The speed with which

depositors withdrew funds from [Signature] and [Silicon Valley Bank] was unexpected and surprised the regulators and the banking industry." Ex. A, FDIC Report at 40.  Indeed, the FDIC noted that the Banks' failure was caused by "illiquidity precipitated by contagion effects" of the failures of Silvergate Bank and Silicon Valley Bank.  *Id.* at 7.  DFS explained that the "propulsive run on deposits" was propelled by "the rapid spread of information and rumors on social media." Ex. EE, DFS Report at 5.  In fact, DFS doubted whether Signature's closure could have been avoided even if Signature had more liquidity.  *Id.* at 41.

Moreover, the run on the Bank was so unexpected that it caused the FDIC and DFS to reconsider their existing liquidity guidance.  Ex. B, OIG Report at 36-37.  As FDIC officials themselves recognized, "previously, no one had modeled for this catastrophic of an event."  *Id.* at 36.  If this unprecedented bank run, fueled by investors' misunderstanding of Signature's business model and social media panic, was not unforeseeable, then nothing is.

## IV.    PLAINTIFF FAILS TO STATE A SCHEME LIABILITY CLAIM.

In Count II, Plaintiff purports to state a claim for so-called "scheme liability" under Rules 10b-5(a) and 10b-5(c).  "To state a claim for scheme liability, a plaintiff must present facts showing (1) that the defendant committed a deceptive or manipulative act, (2) in furtherance of the alleged scheme to defraud, (3) with scienter, and (4) reliance."  *In re Turquoise Hill Res. Ltd. Sec. Litig.*, 625 F. Supp. 3d 164, 247 (S.D.N.Y. 2022).  Plaintiff fails to state such a claim.

### A.    The Complaint Fails to Plead Something More than Misstatements

Plaintiff's scheme liability claim fails because Plaintiff does not allege that any Individual Defendant committed a deceptive or manipulative act beyond allegedly making misstatements and omissions.  In *SEC v. Rio Tinto plc.*, the Second Circuit held that "misstatements and omissions— without more" cannot form the basis for scheme liability.  41 F.4th 47, 49 (2d Cir. 2022).  Rather, a scheme liability claim "requires something *beyond* misstatements and omissions, such as

dissemination." *Id.*  Put differently, "[w]here the only fraudulent conduct that is alleged is the making of a false statement to the investing public, a defendant in a private civil action is either liable as a maker under Rule 10b-5(b) or is not liable to investors at all." *In re Turquoise Hill*, 625 F. Supp. 3d at 248-49.  Here, Plaintiff fails to allege that any Individual Defendant "performed an inherently deceptive act that was distinct from an alleged misstatement." *Id.* at 253.  Under *Rio Tinto*, Count II should therefore be dismissed.  *See Danske*, 11 F.4th at 105 (affirming dismissal of scheme liability claim for failure to comply with heightened pleading requirements where complaint did not "articulate with precision the contours of an alleged scheme to defraud investors, or which specific acts were conducted in furtherance of it").

### B.    The Complaint Fails to Plead Reliance

To the extent Plaintiff might point to management's alleged efforts to mislead regulators in the days before DFS placed Signature into receivership, the claim would likewise fail. *Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc.*, 552 U.S. 148, 160 (2008); *In re Turquoise Hill*, 625 F. Supp. 3d at 253.  As "[t]he Supreme Court held in *Stoneridge*, '[r]eliance by the plaintiff upon the defendant's deceptive acts is an essential element of the § 10(b) private cause of action,' including one premised on scheme liability, as it ensures that 'for liability to arise, the "requisite causal connection between a defendant's misrepresentation and a plaintiff's injury" exists.'" *In re Turquoise Hill*, 625 F. Supp. 3d at 253 (quoting *Stoneridge*, 552 U.S. at 159).

Here, Plaintiff alleges that Bank representatives made "false statements *to Regulators*" during the days immediately preceding the Bank's seizure.  ¶¶ 182, 185.  However, Plaintiff does not plead that any "member of the investing public had knowledge, either actual or presumed, of [the alleged] deceptive acts during the relevant times." *Stoneridge*, 552 U.S. at 159.  In fact, since these alleged statements were made over the course of a weekend when equity markets were

closed, reliance on these statements would have been impossible.  ¶ 176; *see In re Turquoise Hill*, 625 F. Supp. 3d at 254.

## CONCLUSION

For the foregoing reasons, the Complaint should be dismissed.


Dated:    New York, New York
          February 13, 2024

                                    FRIED, FRANK, HARRIS, SHRIVER
                                      & JACOBSON LLP


                                    By:  _____/s/ *Peter L. Simmons*_____
                                             Peter L. Simmons
                                             Harrison D. Polans

                                    One New York Plaza
                                    New York, New York 10004
                                    (212) 859-8000
                                    peter.simmons@friedfrank.com
                                    harrison.polans@friedfrank.com

                                    *Attorneys for Defendant Eric Howell*


                                    DECHERT LLP

                                    Michael Doluisio
                                    Stuart T. Steinberg
                                    Cira Centre
                                    29 Arch Street
                                    Philadelphia, PA 19104
                                    (215) 994-4000
                                    michael.doluisio@dechert.com
                                    stuart.steinberg@dechert.com

R. Ryan Dykhouse
25 Cannon St.
London EC4M 5UB
UK
+44 (0) 20 7184 7000
ryan.dykhouse@dechert.com

*Attorneys for Defendant Joseph DePaolo*

61861496