**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SJUNDE AP-FONDEN, Individually and on behalf of all others similarly situated, | Civil Case No. 1:23-cv-01921-FB-JRC |
|     Plaintiff, | |
| vs. | |
| JOSEPH J. DEPAOLO, et al., | |
|     Defendants. | |

**LEAD PLAINTIFF'S OMNIBUS MEMORANDUM OF LAW
IN OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS
THE CONSOLIDATED COMPLAINT**

## TABLE OF CONTENTS

**Page**

GLOSSARY ................................................................................................................. xvi

PRELIMINARY STATEMENT ...................................................................................... 1

SUMMARY OF RELEVANT FACTS ............................................................................ 7

    A.    Defendants Turned SBNY Into a High-Risk Crypto "Deposit Machine" .............. 7

    B.    Defendants Were Repeatedly Told by Regulators that SBNY Lacked Critical Liquidity and Risk Management Controls, but Misled the Public............. 8

    C.    FEs Confirm the Bank's Shocking, Undisclosed Internal Problems. ................... 11

    D.    Defendants Made Misstatements Regarding Liquidity and Other Risks.............. 11

    E.    KPMG Misleadingly Issued Unqualified Audit Opinions.................................... 13

    F.    As the Truth Begins to Emerge, Defendants Continue to Mislead Investors........................................................................................................ 14

    G.    The Full Truth Is Revealed with SBNY's Precipitous Collapse.......................... 15

ARGUMENT ............................................................................................................... 17

I.    THE COMPLAINT ADEQUATELY ALLEGES A 10B-5(B) CLAIM AGAINST THE INDIVIDUAL DEFENDANTS. ................................................................. 17

    A.    The Complaint Adequately Alleges that the Individual Defendants Made Materially False and/or Misleading Misstatements. ............................................ 17

        1.    Misstatements Concerning Concentration Caps/Limits and Well-Diversified Assets (Misstatements 9, 17-19, 23, 29, 31 and 33). ............. 18

        2.    Misstatements Concerning SBNY's Purported Adequate Liquidity and Low Risk Profile (Misstatements 1, 13, 22, 28, 32, 34, 36 and 37). ....................................................................................................... 20

        3.    Misstatements Concerning Deposit Stability and Lack of Correlation to Crypto Prices (Misstatements 7, 8, 12, 14, 20, 21, 24-26, 30 and 35). ..................................................................................... 24

        4.    Misstatements Concerning Modeling and Analysis (Misstatements 2, 3, 10, 11 and 27). ................................................................................. 29

5.      Misstatements Concerning Financial Reporting, Internal Controls and GAAP Compliance (Misstatements 4 and 38). ................................. 34

6.      Misstatements Concerning Regulatory Oversight (Misstatements 5, 6, 15 and 16). ................................................................................... 37

B.      The Individual Defendants' Remaining Challenges to the Misstatements Fail. ............................................................................................................. 38

1.      The Alleged Misstatements Are not "Fraud by Hindsight."..................... 38

2.      The Alleged Misstatements Are not Immaterial Puffery. ......................... 39

3.      The Alleged Misstatements Are not Non-Actionable Opinions. .............. 43

4.      Defendants' Forward-Looking/Cautionary Language Arguments Fail. ............................................................................................................. 46

5.      Defendants' Remaining Arguments that their Statements Are Inactionable Fail. ....................................................................................... 51

        a.      Defendants' "Maker" and "Group Pleading" Arguments Fail. ................................................................................................. 51

        b.      Defendants' Arguments About Regulatory Confidentiality Are a Red Herring. ........................................................................ 53

C.      The Complaint Alleges a Strong Inference of the Individual Defendants' Scienter. ....................................................................................................... 54

1.      The Complaint Alleges All Individual Defendants' Scienter Based on Conscious Misbehavior or, at a Minimum, Recklessness.................... 55

        a.      Regulators' Findings and Reports Support Scienter. ................... 55

        b.      Defendants Repeatedly Misled the Regulators as to the Bank's Available Liquidity During the Weekend Leading up to SBNY's Collapse. ............................................................... 60

        c.      FE Accounts Confirm the Bank's Lack of Adequate Liquidity and Risk Controls and Defendants' Awareness of these Facts. .................................................................................. 62

        d.      Defendants' Repeatedly Spoke About Issues at the Center of the Alleged Fraud. ................................................................... 64

        e.      Defendants Were Personally Responsible for Designing and Implementing the Bank's Liquidity and Risk Management. ............................................................................... 65

f.      Defendants Regularly Monitored and Issued Specific Denials about SBNY's Weakening Liquidity............................. 66

g.      The Core Operations Doctrine Supports Scienter......................... 67

h.      GAAP Violations Contribute to a Strong Inference of Scienter. ...................................................................... 68

i.      Defendants' Purported Steps to "Limit" Crypto-Related Deposits Do Not Negate Scienter. ................................................. 69

j.      Individual Defendants' Remaining Arguments Fail. ................... 70

2.      The Complaint Also Alleges Certain Individual Defendants' Scienter Based on Motive and Opportunity.............................................. 73

a.      The LTI compensation plan incentivized DePaolo, Shay, and Howell to conceal the allegedly omitted facts in pursuit of unrestrained deposit growth........................................................ 73

b.      DePaolo, Howell, Shay and Susca's suspicious and unusual stock sales support scienter. ........................................................ 74

II.    THE COMPLAINT ADEQUATELY ALLEGES A 10B-5(B) CLAIM AGAINST KPMG. ................................................................................................................ 79

A.    The Complaint Adequately Alleges that KPMG Made Materially False or Misleading Statements. .......................................................................... 79

1.    KPMG Falsely Certified SBNY's Financial Statements as GAAP Compliant (Misstatements 39, 41, 43)..................................................... 79

2.    KPMG's Opinions on SBNY's Internal Controls Were False or Misleading (Misstatements 40, 42, 44)................................................... 82

B.    The Complaint Alleges a Strong Inference of KPMG's Scienter......................... 86

III.   THE COMPLAINT ADEQUATELY ALLEGES A SCHEME LIABILITY CLAIM................................................................................................................... 90

IV.   THE COMPLAINT ADEQUATELY ALLEGES LOSS CAUSATION......................... 91

CONCLUSION.......................................................................................................................... 95

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

CASES

*In re Able Labs. Sec. Litig.*,
    2008 U.S. Dist. LEXIS 23538 (D.N.J. Mar. 24, 2008)............................................56

*Abramson v. Newlink Genetics Corp.*,
    965 F.3d 165 (2d Cir. 2020)....................................................................43, 46

*In re Aceto Corp. Sec. Litig.*,
    2019 WL 3606745 (E.D.N.Y. Aug. 6, 2019)........................................................51

*Acito v. IMCERA Grp., Inc.*,
    47 F.3d 47 (2d Cir. 1995)............................................................................74

*In re Advanced Battery Techs., Inc.*,
    781 F.3d 638 (2d Cir. 2015)........................................................................88

*In re Alibaba Grp. Holding Ltd. Sec. Litig.*,
    2023 WL 2601472 (S.D.N.Y. Mar. 22, 2023) ........................................................45

*In re Alkermes Public Co. Sec. Litig.*,
    523 F. Supp. 3d 283 (E.D.N.Y. 2021) ..............................................................58

*In re Alstom SA Sec. Litig.*,
    454 F. Supp. 2d 187 (S.D.N.Y. 2006)..............................................................71

*In re Am. Bus. Fin. Servs., Inc. Noteholders Litig.*,
    2008 WL 3405580 (E.D. Pa. Aug. 11, 2008) ........................................................88

*In re Ambac Fin. Grp., Inc. Sec. Litig.*,
    693 F. Supp. 2d 241 (S.D.N.Y. 2010)..............................................40, 41, 57, 72

*Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*,
    568 U.S. 455 (2013)................................................................................93

*Amorosa v. AOL Time Warner Inc.*,
    409 F. App'x 412 (2d Cir. 2011) ..................................................................95

*In Re AOL Time Warner Sec. & "ERISA" Litig.*,
    381 F. Supp. 2d 192 (S.D.N.Y. 2004)..............................................................87

*Arkansas Teacher Ret. Sys. v. Bankrate, Inc.*,
    18 F.Supp.3d 482 (S.D.N.Y. 2014) ................................................................40

*In re Avon Sec. Litig.*,
2019 WL 6115349 (S.D.N.Y. Nov. 18, 2019)...................................................42, 65

*In Re Bank of Am. AIG Disclosure Sec. Litig.*,
980 F. Supp. 2d 564 (S.D.N.Y. 2013).........................................................89

*In re Barclays PLC Sec. Litig.*,
2024 U.S. Dist. LEXIS 31366 (S.D.N.Y. Feb. 23, 2024)................................60, 71

*In re Bear Stearns Companies, Inc. Sec., Deriv., & ERISA Litig.*,
763 F. Supp. 2d 423 (S.D.N.Y. 2011)..................................................... *passim*

*In re BHP Billiton Ltd. Sec. Litig.*,
276 F. Supp. 3d 65 (S.D.N.Y. 2017)......................................................5, 40, 41, 42

*Bishins v. CleanSpark, Inc.*,
2023 WL 112558 (S.D.N.Y. Jan. 5, 2023) ...............................................94

*Bldg. Trades Pension Fund of W. Pa. v. Insperity, Inc.*,
2022 WL 784017 (S.D.N.Y Mar. 15, 2022) .............................................43

*In re Braskem S.A. Sec. Litig.*,
246 F. Supp. 3d 731 (S.D.N.Y. 2017)......................................................36

*Bricklayers & Masons Local Union No. 5 Ohio Pension Fund v. Transocean Ltd.*,
866 F.Supp.2d 223 (S.D.N.Y. 2012)......................................................39, 42

*Brown v. E.F. Hutton Grp., Inc.*,
991 F.2d 1020 (2d Cir. 1993)................................................................83

*Campo v. Sears Holdings Corp.*,
371 F. App'x 212 (2d Cir. 2010) ...........................................................63

*In re CarLotz, Inc. SEC Litig.*,
2024 U.S. Dist. LEXIS 61722 (S.D.N.Y. Mar. 29, 2024) ...........................57, 60, 66

*In re Carter-Wallace, Inc. Sec. Litig.*,
150 F.3d 153 (2d Cir. 1998)................................................................69

*Cent. States, Se. & Sw. Areas Pension Fund v. Fed. Home Loan Mortg. Corp.*,
543 F. App'x 72 (2d Cir. 2013) ...........................................................95

*Chapman v. Mueller Water Prods., Inc.*,
466 F. Supp. 3d 382 (S.D.N.Y. 2020)...................................................77

*In re Chembio Diagnostics, Inc. Sec. Litig.*,
586 F. Supp. 3d 199 (E.D.N.Y. 2022) ...................................................74

*Christine Asia Co. v. Yun Ma*,
    718 F. App'x 20 (2d Cir. 2017) ..................................................................55

*In re CitiGroup Inc. Bond Litig.*,
    723 F. Supp. 2d 568 (S.D.N.Y. 2010) ........................................................81

*In re Citigroup Inc. Sec. Litig.*,
    753 F. Supp. 2d 206 (S.D.N.Y. 2010) ........................................................66

*In re Citigroup Sec. Litig.*,
    2023 WL 2632258 (S.D.N.Y. Mar. 24, 2023) .................................43, 44

*City of Brockton Ret. Sys. v. Shaw Group Inc.*,
    540 F. Supp. 2d 464 (S.D.N.Y. 2008) ........................................................76

*City of Dearborn Heights Act 345 Police & Fire R v. Axonyx, Inc.*,
    374 F. App'x 83 (2d Cir. 2010) ..................................................................63

*City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*,
    752 F.3d 173 (2d Cir. 2014).......................................................................19

*City of Pontiac Gen. Emps.' Ret. Sys. v. Lockheed Martin Corp.*,
    875 F. Supp. 2d 359 (S.D.N.Y. 2012) ........................................................52

*City of Roseville Emps.' Ret. Sys. v. EnergySolutions, Inc.*,
    814 F. Supp. 2d 395 (S.D.N.Y. 2011) ........................................................52

*In re Complete Mgmt. Sec. Litig.*,
    153 F. Supp. 2d 314 (S.D.N.Y. 2001) ........................................................66

*Das v. Rio Tinto PLC*,
    332 F. Supp. 3d 786 (S.D.N.Y. 2018) ........................................................68

*In re Dentsply Sirona, Inc. Sec. Litig.*,
    665 F. Supp. 3d 255 (E.D.N.Y. 2023) ........................................................41

*In re Deutsche Bank AG Sec. Litig.*,
    2016 WL 4083429 (S.D.N.Y. July 25, 2016) ............................................80

*In re Deutsche Bank Aktiengesellschaft Sec. Litig.*,
    2017 WL 4049253 (S.D.N.Y. June 28, 2017) .........................20, 34, 43

*In re Diamond Foods, Inc., Sec. Litig.*,
    2012 WL 6000923 (N.D. Cal. Nov. 30, 2012) ..........................................37

*Dobina v. Weatherford Int'l Ltd.*,
    909 F. Supp. 2d 228 (S.D.N.Y. 2012)...............................................69, 89

*Doe v. New York Univ.*,
    2021 WL 1226384 (S.D.N.Y. Mar. 31, 2021) ........................................................21

*In re Donna Karan Int'l Sec. Litig.*,
    1998 WL 637547 (E.D.N.Y. Aug. 14, 1998) ........................................................74

*In re DraftKings Inc. Sec. Litig.*,
    650 F. Supp. 3d 120 (S.D.N.Y. 2023) ..................................................................79

*Dura Pharm., Inc. v. Broudo*,
    544 U.S. 336 (2005) ..............................................................................................91

*In re E.S. Bankest, L.C.*,
    2010 WL 1417732 (S.D. Fla. Apr. 6, 2010) ........................................................89

*In re Eletrobras Sec. Litig.*,
    245 F.Supp.3d 450 (S.D.N.Y. 2017)........................................................36, 41, 91

*Emergent Capital Inv. Mgmt., LLC. v. Stonepath Grp., Inc.*,
    343 F.3d 189 (2d Cir. 2003)..................................................................................91

*Emps.' Ret. Sys. of Gov't of the Virgin Islands v. Blanford*,
    794 F.3d 297 (2d Cir. 2015)......................................................................62, 76, 77

*In re EVCI Colls. Holding Corp. Sec. Litig.*,
    469 F.Supp.2d 88 (S.D.N.Y.2006) .......................................................................76

*In re Express Scripts Holdings Co. Sec. Litig.*,
    773 F. App'x 9 (2d Cir. 2019) ..............................................................................44

*In re Facebook, Inc. IPO Sec. & Deriv. Litig.*,
    986 F. Supp. 2d 487 (S.D.N.Y. 2013)............................................................17, 49

*In re Fannie Mae 2008 Sec. Litig.*,
    2011 WL 13267340 (S.D.N.Y. Apr. 11, 2011)....................................................78

*In Re Fannie Mae 2008 Sec. Litig.*,
    891 F. Supp. 2d 458 (S.D.N.Y. 2012)..................................................................82

*Ferber v. Travelers Corp.*,
    785 F. Supp. 1101 (D. Conn. 1991)......................................................................74

*Fin. Guar. Ins. Co. v. Putnam Advisory Co., LLC*,
    783 F.3d 395 (2d Cir. 2015)..................................................................................94

*In re Franklin Bank Corp. Sec. Litig.*,
    782 F.Supp.2d 364 (S.D. Tex. 2011) ...................................................................58

*Freudenberg v. E\*Trade Fin. Corp.*,
  712 F. Supp. 2d 171 (S.D.N.Y 2010).....................................................39, 55, 73, 92

*Fryman v. Atlas Fin. Holdings, Inc.*,
  2022 U.S. Dist. LEXIS 70597 (N.D. Ill. Apr. 18, 2022) .............................................55, 59, 64

*Ganino v. Citizens Utilities Co.*,
  228 F.3d 154 (2d. Cir. 2000)...............................................................................93

*In re GeoPharma, Inc. Sec. Litig.*,
  399 F. Supp. 2d 432 (S.D.N.Y. 2005)....................................................................72

*Gissin v. Endres*,
  739 F. Supp. 2d 488 (S.D.N.Y. 2010)....................................................................35

*Global Network Commc'ns, Inc. v. City of New York*,
  458 F.3d 150 (2d Cir. 2006)................................................................................38

*Gordon v. Vanda Pharms. Inc.*,
  2021 WL 911755 (E.D.N.Y. Mar. 10, 2021) ..........................................................17

*Green v. Deutsche Bank AG*,
  2019 WL 4805804 (S.D.N.Y. Sept. 30, 2019)..........................................................85

*Gregory v. ProNAi Therapeutics Inc.*,
  297 F. Supp. 3d 372 (S.D.N.Y. 2018)....................................................................51

*Gross v. GFI Grp., Inc.*,
  162 F. Supp. 3d 263 (S.D.N.Y. 2016)......................................................... *passim*

*In re Guilford Mills, Inc. Sec. Litig.*,
  1999 WL 33248953 (S.D.N.Y. July 21, 1999) .........................................................79

*Habelt v. iRhythm Techs., Inc.*,
  83 F.4th 1162 (9th Cir. 2023) ..............................................................................54

*In re Hain Celestial Grp. Inc. Sec. Litig.*,
  2022 WL 18859055 (E.D.N.Y. Nov. 4, 2022)..................................................60, 78

*Hammer v. Frontier Fin. Corp.*,
  2012 WL 13020032 (W.D. Wash. Apr. 20, 2012)....................................................58

*Hawaii Structural Ironworkers Pension Tr. Fund v. AMC Ent. Holdings, Inc.*,
  422 F. Supp. 3d 821 (S.D.N.Y. 2019)......................................................... *passim*

*Hedick v. The Kraft Heinz Company*,
  2021 WL 3566602 (N.D. Ill. Aug. 11, 2021) ..........................................................64

*In Re IMAX Sec. Litig.*,
    587 F. Supp. 2d 471 (S.D.N.Y. 2008)......................................................................87

*In ECA, Loc. 134 IBEW Joint Pension Tr. of Chic. v. JP Morgan Chase Co.*,
    553 F.3d 187 (2d Cir. 2009)....................................................................42, 69, 74

*Iowa Pub. Emp.'s Ret. Sys. v. Deloitte & Touche LLP*,
    919 F. Supp. 2d 321 (S.D.N.Y. 2013)......................................................................88

*Janus Capital Grp., Inc. v. First Deriv. Traders, Inc.*,
    564 U.S. 135 (2011).........................................................................................51, 52

*In re JPMorgan Chase & Co. Sec. Litig.*,
    2014 U.S. Dist. LEXIS 44050 (S.D.N.Y. Mar. 31, 2014) ......................................25

*Kalnit v. Eichler*,
    264 F.3d 131 (2d Cir. 2001)....................................................................................74

*Karimi v. Deutsche Bank Aktiengesellschaft*,
    607 F. Supp. 3d 381 (S.D.N.Y. 2022)...................................................6, 19, 54, 55

*In re Keyspan Corp. Sec. Litig.*,
    383 F. Supp. 2d 358 (E.D.N.Y. 2003) ....................................................................78

*Kuriakose v. Fed. Home Loan Mortg. Corp.*,
    897 F. Supp. 2d 168 (S.D.N.Y. 2012).................................................................58, 94

*In re Lehman Bros. Sec. & ERISA Litig.*,
    799 F. Supp. 2d 258 (S.D.N.Y. 2011).....................................................................19

*Lentell v. Merrill Lynch & Co.*,
    396 F.3d 161 (2d Cir. 2005).....................................................................................95

*In re Liberty Tax, Inc. Sec. Litig.*,
    435 F. Supp. 3d 457 (E.D.N.Y. 2020) .....................................................................43

*Local No. 38 Int'l Brotherhood of Elec.Workers Pension Fund v. American Express Co.*,
    724 F. Supp. 2d 447 (S.D.N.Y. 2010)......................................................................62

*Lonegan v. Hasty*,
    436 F. Supp. 2d 419 (E.D.N.Y. 2006) .....................................................................89

*In re Longtop Fin. Techs. Ltd. Sec. Litig.*,
    2012 WL 2512280 (S.D.N.Y. June 29, 2012) ........................................................48

*Lorenzo v. SEC*,
    139 S. Ct. 1094 (2019)........................................................................................90, 91

*Makor Issues & Rights Ltd. v. Tellabs, Inc.*,
    437 F.3d 588 (7th Cir. 2006) ............................................................41

*Manavazian v. ATEC Grp., Inc.*,
    160 F. Supp. 2d 468 (E.D.N.Y. 2001) .........................................17, 73

*In re Manulife Fin. Corp. Sec. Litig.*,
    2012 WL 4108104 (S.D.N.Y. Sept. 19, 2012)...................................58

*In re MBIA, Inc., Sec. Litig.*,
    700 F. Supp. 2d 566 (S.D.N.Y. 2010)................................................93

*In re Merck & Co., Inc. Sec., Deriv., & ERISA Litig.*,
    2011 WL 3444199 (D.N.J. Aug. 8, 2011) ..........................................52

*In re Merrill Lynch & Co. Rsch. Reports Sec. Litig.*,
    568 F. Supp. 2d 349 (S.D.N.Y. 2008)................................................95

*In re Metricom Sec. Litig.*,
    2004 WL 966291 (N.D. Cal. Apr. 29, 2004) ......................................78

*Meyer v. JinkoSolar Holdings Co.*,
    761 F.3d 245 (2d Cir. 2014)..................................................... *passim*

*In re Mindbody Sec. Litig.*,
    489 F. Supp. 3d 188 (S.D.N.Y. 2020)................................................27

*In re Moody's Corp. Sec. Litig.*,
    599 F. Supp. 2d 493 (S.D.N.Y. 2009)................................................42

*In re MSC Indus. Direct Co., Inc.*,
    283 F. Supp. 2d 838 (E.D.N.Y. 2003)................................................65

*New England Carpenters Guaranteed Annuity & Pension Funds v. DeCarlo*,
    80 F.4th 158 (2d Cir. 2023) ..............................................................45

*New Jersey v. Sprint Corp.*,
    314 F. Supp. 2d 1119 (D. Kan. 2004)................................................89

*New Orleans Emp.'s. Ret. Sys. v. Celestica, Inc.*,
    455 F. App'x 10 (2d Cir. 2011) ........................................................64

*In re Nextcard Sec. Litig.*,
    2005 WL 6342406 (N.D. Cal. Feb. 7, 2005) ......................................53

*Novak v. Kasaks*,
    216 F.3d 300 (2d Cir. 2000)................................................40, 55, 74

*Ok. Firefighters Pension & Ret. Sys. v. Lexmark Int'l, Inc.*,
　367 F. Supp.3d 16 (S.D.N.Y. 2019)..........................................................68

*Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*,
　575 U.S. 175 (2015).......................................................................43, 44, 45, 46

*In re Omnicom Grp., Inc. Sec. Litig.*,
　597 F.3d 501 (2d Cir. 2010)...................................................................94

*Ong v. Chipotle Mexican Grill, Inc.*,
　2017 WL 933108 (S.D.N.Y. Mar. 8, 2017) ..............................................35

*Operating Local 649 Annuity Trust Fund v. Smith Barney Fund Mgmt., LLC*,
　595 F.3d 86 (2d Cir. 2010)..................................................................26, 27

*In re Oxford Health Plans, Inc. Sec. Litig.*,
　187 F.R.D. 133 (S.D.N.Y.1999) ........................................................75, 78, 79

*P. Stolz Family P'ship L.P. v. Daum*,
　355 F.3d 92 (2d Cir. 2004)...................................................................48

*Panther Partners Inc. v. Jianpu Tech. Inc.*,
　2020 WL 5757628 (S.D.N.Y. Sept. 27, 2020)..........................................49

*In re Petrobras Sec. Litig.*,
　116 F. Supp. 3d 368 (S.D.N.Y. 2015).....................................................41

*In re Pfizer Inc. Sec. Litig.*,
　2012 WL 983548 (S.D.N.Y. Mar. 22, 2012) ...........................................52

*In re Pfizer, Inc. Sec. Litig.*,
　538 F. Supp. 2d 621 (S.D.N.Y. 2008).....................................................72

*In re Philip Morris Int'l Inc. Sec. Litig.*,
　89 F.4th 408 (2d Cir. 2023) .............................................................45, 46

*Pirnik v. Fiat Chrysler Automobiles, N.V.*,
　2016 WL 5818590 (S.D.N.Y. Oct. 5, 2016)............................................67

*Plumber & Steamfitters Local 773 Pension Fund v. Danske Bank A/S*,
　11 F.4th 90 (2d Cir. 2021) ...............................................................42, 91

*In re Qiwi plc Sec. Litig.*,
　2023 WL 7283619 (E.D.N.Y. Nov. 3, 2023)............................................85

*Ressler v. Liz Claiborne, Inc.*,
　75 F. Supp. 2d 43 (E.D.N.Y. 1998) .......................................................76

*Ret. Bd. of the Policemen's Annuity & Benefit Fund of Chi. v. FXCM Inc.*,
   333 F. Supp. 3d 338 (S.D.N.Y. 2018) .....................................................................43

*In re Rockwell Med., Inc. Sec. Litig.*,
   2018 WL 1725553 (S.D.N.Y. Mar. 30, 2018) ........................................................65

*Rombach v. Chang*,
   355 F.3d 164 (2d Cir. 2004) ....................................................................................31

*Ronconi v. Larkin*,
   253 F.3d 423 (9th Cir. 2001) ...................................................................................77

*Roth v. Jennings*,
   489 F.3d 499 (2d Cir. 2007)....................................................................................24

*In re Royal Ahold N.V. Sec. & ERISA Litig.*,
   351 F. Supp. 2d 334 (D. Md. 2004) ........................................................................90

*In re Salix Pharm, Ltd.*,
   2016 WL 1629341 (S.D.N.Y. Apr. 22, 2016)..........................................................55

*In re Sanofi Sec. Litig.*,
   87 F. Supp. 3d 510 (S.D.N.Y. 2015)........................................................................46

*Schiro v. Cemex, S.A.B. de C.V.*,
   396 F. Supp. 3d 283 (S.D.N.Y. 2019)......................................................................36

*In re Scholastic Corp. Sec. Litig.*,
   252 F.3d 63 (2d Cir. 2001)......................................................................................72

*SEC v. Caserta*,
   75 F.Supp.2d 79 (E.D.N.Y.1999) ...........................................................................85

*SEC v. GenAudio Inc.*,
   32 F.4th 902 (10th Cir. 2022) .................................................................................60

*SEC v. Rio Tinto plc.*,
   41 F.4th 47 (2d Cir. 2022) ......................................................................................90

*SEC v. Ripple Labs, Inc.*,
   2022 WL 762966 (S.D.N.Y. Mar. 11, 2022) ..........................................................58

*SEC v. Sequential Brands Grp., Inc.*,
   2021 WL 4482215 (S.D.N.Y. Sept. 30, 2021)........................................................91

*SEC v. Sugarman*,
   2020 WL 5819848 (S.D.N.Y. Sept. 30, 2020).........................................................91

*SEPTA v. Orrstown Fin. Servs., Inc.*,
   2022 WL 3572474 (M.D. Pa. Aug. 18, 2022) .......................................................89

*Set Capital LLC v. Credit Suisse Grp. AG*,
   996 F.3d 64 (2d Cir. 2021)...................................................................................55

*Sharette v. Credit Suisse Int'l*,
   127 F. Supp. 3d 60 (S.D.N.Y. 2015)....................................................................17

*In re Signet Jewelers Ltd. Sec. Litig.*,
   2018 WL 6167889 (S.D.N.Y. Nov. 26, 2018)........................................................67

*In re Signet Jewelers Ltd. Sec. Litig.*,
   389 F. Supp. 3d 221 (S.D.N.Y. 2019)...................................................................40

*In re Silver Wheaton Corp. Sec. Litig.*,
   2019 WL 1512269 (C.D. Cal. Mar. 25, 2019) .......................................................83

*Singh v. Cigna Corp.*,
   918 F.3d 57 (2d Cir. 2019)...................................................................................43

*In re SLM Corp. Sec. Litig.*,
   740 F. Supp. 2d 542 (S.D.N.Y. 2010)...................................................................48

*SRM Global Fund Ltd. P'ship v. Countrywide Fin. Corp.*,
   448 F. App'x 116 (2d Cir. 2011) ..........................................................................43

*Stevelman v. Alias Rsch. Inc.*,
   174 F.3d 79 (2d Cir. 1999)............................................................................74, 78

*In re Stillwater Cap. Partners Inc. Litig.*,
   853 F.Supp.2d 441 (S.D.N.Y. 2012)....................................................................52

*Stratte-McClure v. Morgan Stanley*,
   598 F. App'x 25 (2d Cir. 2015) ............................................................................95

*Strougo v. Barclays PLC*,
   105 F. Supp. 3d 330 (S.D.N.Y. 2015)...................................................................71

*In re SunEdison, Inc. Sec. Litig.*,
   300 F. Supp. 3d (S.D.N.Y. 2018) .........................................................................36

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
   551 U.S. 308 (2007)......................................................................................54, 86

*In re Toyota Motor Corp. Sec. Litig.*,
   2011 WL 2675395 (C.D. Cal. July 7, 2011)..........................................................59

*In re Turquoise Hill Resources Ltd. Sec. Litig.*,
   625 F. Supp. 3d 164 (S.D.N.Y. 2022)........................................................91

*U.S. Bank Nat. Ass'n v. PHL Variable Ins. Co.*,
   2013 WL 791462 (S.D.N.Y. Mar. 5, 2013) ...........................................40

*In re UBS AG Sec. Litig.*
   2012 WL 4471265 (S.D.N.Y. Sept. 28, 2012).......................................43

*Universal Health Servs., Inc. v. United States*,
   579 U.S. 176 (2016)..................................................................................18

*In re Vale Sec. Litig.*,
   2020 WL 2610979 (E.D.N.Y. May 20, 2020) ......................................20

*In re Van der Moolen Holding N.V. Sec. Litig.*,
   405 F. Supp. 2d 388 (S.D.N.Y. 2005).....................................................55

*In re Vivendi Universal, S.A. Sec. Litig.*,
   381 F. Supp. 2d 158 (S.D.N.Y. 2003).........................................29, 33, 94

*In re Vivendi Universal, S.A. Sec. Litig.*,
   634 F. Supp. 2d 352 (S.D.N.Y. 2009).....................................................93

*In re Vivendi Universal, S.A. Sec. Litig.*,
   765 F. Supp. 2d 512 (S.D.N.Y. 2011).....................................................48

*In re Vivendi, S.A. Sec. Litig.*,
   838 F.3d 223 (2d Cir. 2016).....................................................18, 47, 92, 93

*In re Wachovia Equity Sec. Litig.*,
   753 F. Supp. 2d 326 (S.D.N.Y. 2011).....................................................43

*In re Washington Mut., Inc. Sec., Deriv. & ERISA Litig.*,
   694 F. Supp. 2d 1192 (W.D. Wash. 2009).................................... *passim*

*Washington State Inv. Bd. v. Odebrecht S.A.*,
   461 F. Supp. 3d 46 (S.D.N.Y. 2020).......................................................41

*In re Weight Watchers Int'l Inc. Sec. Litig.*,
   504 F. Supp. 3d 224 (S.D.N.Y. 2020).....................................................50

*In re Wells Fargo & Co. Sec. Litig.*,
   2021 WL 4482102 (S.D.N.Y. Sept. 30, 2021)............................. *passim*

*In re Wilmington Tr. Sec. Litig.*,
   29 F. Supp. 3d 432 (D. Del. 2014)..........................................................88

**STATUTES AND RULES**

Securities Exchange Act of 1934:

§ 10(b), 15 U.S.C. §78j(b) ................................................................17, 93

Fed. R. Civ. P.:

Rule 12 ................................................................................................76, 89

Rule 12(b)(6) .............................................................................................91

Rule 15(a) ..................................................................................................96

Securities and Exchange Commission Rule 10b-5,

17 C.F.R. § 240.14a-9(b) ..........................................................................90

**OTHER AUTHORITIES**

Paul Munter, *The Importance of a Comprehensive Risk Assessment by Auditors and Management,* U.S. Securities and Exchange Commission (Aug. 25, 2023) ...................85

## GLOSSARY

| Term | Description |
| --- | --- |
| "Action" | The above-captioned action |
| "AP7" or "Plaintiff" | Lead Plaintiff Sjunde AP-Fonden |
| "Board" | SBNY's Board of Directors |
| "CAO" | Chief Administrative Officer |
| "CEO" | Chief Executive Officer |
| "CFO" | Chief Financial Officer |
| "COO" | Chief Operating Officer |
| "Class Period" | January 21, 2021 and March 12, 2023, inclusive |
| "Complaint" or "Compl." | Corrected Consolidated Complaint (ECF No. 70) |
| "DePaolo" | Defendant Joseph J. DePaolo |
| "Defendants" | Defendants DePaolo, Howell, Santora, Seibert, Shay, Susca, Wyremski and KPMG |
| "DFS" | New York State Department of Financial Services |
| "DFS Report" | New York Department of Financial Services Internal Review of the Supervision and Closure of Signature Bank, April 28, 2023 |
| "DX __" | Exhibits to the Simmons Decl. |
| "FDIC" | Federal Deposit Insurance Corporation |
| "FDIC Report" | FDIC's Supervision of Signature Bank, April 28, 2023 |
| "FE" or "FEs" | Former employees of SBNY referenced as confidential witnesses in Complaint |
| "FRB" | Federal Reserve Bank of New York |
| "GAAP" | Generally Accepted Accounting Principles |
| "GAO" | U.S. Government Accountability Office |
| "GAO Report" | U.S. Government Accountability Office Report, Preliminary Review of Agency Actions Related to March 2023 Bank Failures |
| "Howell" | Defendant Eric Howell (Senior Executive Vice President—Corporate & Business Development until June 31, 2021 and COO thereafter until March 12, 2023) |
| "Individual Defendants" | Defendants DePaolo, Howell, Santora, Seibert, Shay, Susca, Wyremski |
| "JRH Decl." | Declaration of John Rizio-Hamilton filed herewith |
| "KPMG" | Defendant KPMG LLP |
| "KPMG Br." | Memorandum of Law in Support of KPMG LLP's Motion to Dismiss, dated February 13, 2024 |

| Term | Description |
|---|---|
| "Lead Br." | Memorandum of Law in Support of Defendants Joseph J. DePaolo and Eric Howell's Motion to Dismiss Consolidated Class Action Complaint, dated February 13, 2024 |
| "LTI" or "LTI Plan" | Long Term Incentive Plan for individual compensation |
| "Misstatements" | False and/or misleading statements alleged in the Complaint and set forth in PX 1 |
| "Motions" | Defendants' motions to dismiss served on February 13, 2024 |
| "MRBAs" | Matters Requiring Board Attention issued by the Regulators |
| "NYRO" | New York Regional Office of the FDIC |
| "OIG Report" | Office of Inspector General's Material Loss Review of Signature Bank of New York |
| "PCAOB" | Public Company Accounting Oversight Board |
| "PX __" | Exhibit to the JRH Decl. |
| "Regulators" | FDIC and DFS |
| "ROE" | Reports on Examination issued by the Regulators |
| "Santora" | Defendant Frank Santora (SBNY's Chief Payments Officer) |
| "Santora Br." | Memorandum of Law in Support of Defendant Frank Santora's Motion to Dismiss the Complaint, dated February 13, 2024 |
| "SBNY," "Signature," or the "Bank" | Signature Bank |
| "SEC" | Securities and Exchange Commission |
| "Seibert" | Defendant Joseph Seibert (Managing Group Director, Senior Vice President of Digital Asset) |
| "Seibert Br." | Memorandum of Law in Support of Defendant Joseph Seibert's Motion to Dismiss the Consolidated Complaint, dated February 13, 2024 |
| "Shay" | Defendant Scott A. Shay |
| "Shay Br." | Memorandum of Law in Support of Defendant Scott A. Shay's Motion to Dismiss the Corrected Consolidated Complaint, dated February 13, 2024 |
| "Simmons Decl." | Declaration of Peter L. Simmons dated February 13, 2024 filed by Defendants |
| "SR" | Supervisory Recommendations issued by the Regulators |
| "Supervisory Letters" | Correspondence from Regulators communicating findings from target reviews |
| "Susca" | Defendant Vito Susca (CFO until June 30, 2021 and CAO thereafter until March 12, 2023) |

| Term | Description |
|------|-------------|
| "Susca Br." | Memorandum of Law in Support of Defendant Vito Susca's Motion to Dismiss, dated February 13, 2024 |
| "Wyremski" | Defendant Stephen D. Wyremski (Controller until June 30, 2021 and CFO thereafter until March 12, 2023) |
| "Wyremski Br." | Memorandum of Law in Support of Defendant Stephen D. Wyremski's Supplemental Motion to Dismiss the Consolidated Class Action Complaint, dated February 13, 2024 |

## PRELIMINARY STATEMENT[1]

This securities class action arises from misleading statements that senior SBNY officials and the Bank's auditor made to investors prior to the Bank's collapse in March 2023—which was then the third largest bank failure in U.S. history. Prior to and during the Class Period, Signature grew rapidly as it transformed from a staid, traditional bank that catered to regional businesses into the go-to financial institution for the cryptocurrency industry. Chasing these deposits became SBNY's primary growth strategy. Given this sector's volatility, SBNY's expansion into this area required the Bank to maintain robust risk controls and liquidity management practices to guard against the possibility of rapid deposit withdrawals and liquidity problems in the event of a crypto downturn. To convince investors that the Bank was safe and sound as it undertook this expansion, Defendants repeatedly assured investors that the Bank's deposits were stable and subject to careful deposit concentration limits, the Bank had adequate liquidity and risk management controls in place, and Defendants had excellent relationships with bank Regulators (collectively, the "Misstatements").[2] For example, Defendant Howell (COO) boasted about the Bank's purportedly "quite stable" deposits (Misstatement 7) and Defendant Wyremski (CFO) touted its "robust liquidity position" in the face of "challenges in the digital asset space" (Misstatement 34). Likewise, Defendant DePaolo (CEO) stated "[w]e haven't had *any* issues [with] liquidity at all" (Misstatement 28) and touted the Bank's "internal limitations on concentrations" (Misstatement 9) as important safeguards. Through the Misstatements, Defendants conveyed that SBNY would remain secure even during periods of market turbulence.

---

[1] Capitalized terms have the meanings given in the above Glossary and the Complaint; cites to "¶__" refer to paragraphs of the Complaint. Unless otherwise noted, all emphasis is added, internal punctuation, quotations and citations are omitted, citations to "PX __" refer to the exhibit attached to the Declaration of John Rizio-Hamilton ("JRH Decl.") filed herewith, and citations to "DX __," refer to the exhibits to the Declaration of Peter L. Simmons ("Simmons Decl.") served by Defendants on February 13, 2024.

[2] Plaintiff has identified each false and/or misleading statement, *i.e.*, "Misstatement" in the chart submitted as PX 1.

As the Bank's uninsured deposit base doubled, its stock price soared from $160 to $360 during the Class Period. Defendants took full advantage of the run-up in the stock price. DePaolo, Howell, Shay and Susca each sold tens of thousands of shares of SBNY stock and collectively reaped proceeds of nearly $51 million. ¶¶427, 431 435, 439.

Unfortunately for investors, the impression that Defendants created of a secure bank that was well-equipped to withstand crypto-market turbulence was not true. For years prior to and throughout the Class Period, as Defendants collected ever-increasing crypto deposits, Regulators had privately informed Defendants that, contrary to the picture of stability they portrayed publicly, SBNY actually suffered from myriad severe liquidity and risk control problems. For instance, Regulators privately informed Defendants that the Bank faced "critical exposure . . . from the potential volatility associated with the high level of uninsured deposits" (¶87) and had "inadequate liquidity contingency planning, liquidity stress testing, and internal controls" in place (¶92). As Regulators warned, the Bank's dangerous "combination of rapid deposit growth, increasing funding concentrations, and unknown deposit stability had contributed to an increasing liquidity risk profile" (¶106) which the Bank severely and pervasively failed to manage. ¶¶83, 92, 106, 115. And as Defendants touted the purported security of the "concentration limits" they imposed, Regulators criticized Defendants for moving the goal posts behind the scenes: when SBNY reached its internal 10% concentration limit for crypto industry deposits, rather than abide by the limit, Defendants simply increased the concentration limit to a staggering 35%—even though, as the FDIC later confirmed, "there was no evidence of appropriate analysis or stress testing being completed to support the limit increase." ¶¶10, 71, 111, 128, 232, 270.

Regulators issued these conclusions to Defendants during the 2019 examination cycle, again in 2020, and again in 2021. ¶¶81, 88, 92, 105. Each time, the Regulators met with senior

management to explain the problems, and issued formal written reports and deficiency findings in the form of MRBAs and SRs directly to the Bank's management and Board. ¶¶90, 113, 116. On July 28, 2022, after these deficiencies were outstanding for two full annual examination cycles, the Regulators warned Defendants of the Bank's "urgent need for robust risk management practices" which the Bank had failed to implement (¶106), and would continue to lack up to the point of its collapse. ¶118. Nevertheless, Defendants never heeded these findings. As Regulators found: "since the 2019 examination cycle, SBNY's management and board were aware that the bank's fund management practices needed improvement" but "SBNY never adequately addressed the liquidity risk management concerns." ¶200. As a result of Defendants' refusal to remedy these severe deficiencies, the Bank had become a sitting duck if a liquidity stress event were to occur.

In March 2023, that liquidity stress event occurred, and it was anything but the "non-event" Defendants continually assured investors that the Bank "could easily handle" (Misstatement 32). When SBNY's liquidity and risk controls were put to the test, the ugly truth was revealed—the Bank did not have anything resembling the liquidity, concentration limits or risk controls that Defendants had touted to investors. On March 10, 2023, when the Bank's inability to manage a single day of deposit withdrawals left a multi-billion dollar cash deficit that placed it at risk of defaulting, the FRB loaned SBNY $5.6 billion. ¶171. Yet when the Regulators asked the Bank to share its liquidity plan to survive the coming Monday, it could not provide one. Instead, Defendants tried to *mislead* the Regulators with liquidity projections that Regulators determined were "inaccurate," "unreliable," and "not credible." ¶176. On Sunday, March 12, 2023, the Regulators placed the Bank in receivership. ¶172. The Bank's stock price plummeted from $70 to just $0.13 per share as the Bank was placed in receivership—wiping out its investors entirely.

While Defendants attempt to escape blame by casting themselves as victims of

"unforeseeable market forces" (Lead Br. at 57), the facts show otherwise. Tellingly, the Regulators—who had closely studied the Bank's liquidity and risk management systems, and directly communicated with the Bank's management and Board for years—placed the blame for the Bank's collapse squarely at the feet of Defendants. They concluded that the liquidity weaknesses "were the root cause of the bank's failure" (¶192), the weaknesses were known to SBNY's management and Board "since the 2019 examination cycle," and, "[d]espite repeated criticisms from FDIC supervisors, SBNY never adequately addressed the liquidity risk management concerns." ¶200. Nevertheless, Defendants insist that none of them should have to even face discovery into the alleged fraud. Defendants contend that they did not utter a single misleading statement, and if they did, it was not done intentionally or recklessly. Defendants are wrong.

**First**, Defendants incorrectly argue that none of the 44 alleged Misstatements are actionable, claiming many were not false, were mere puffery, opinion, forward-looking, or covered by SBNY's risk disclosures. But Defendants mischaracterize the statements at issue, ignore key facts, and misstate the law. Under Second Circuit law, "once a company speaks on an issue or topic," "there is a duty to tell the whole truth" in a "complete and accurate manner"—which Defendants failed to do. *Meyer v. JinkoSolar Holdings Co.*, 761 F.3d 245, 250 (2d Cir. 2014). For example, Defendants' public assurances that they set "internal limitations on concentrations" (Misstatement 9) to limit risk and "cap[ped] our deposits by client" (Misstatement 17) were materially misleading statements of fact. In truth, Defendants intentionally disregarded the limits they claimed to be enforcing, arbitrarily raising concentration limits when, as the Regulators found, "there was no evidence of appropriate analysis or stress testing being completed to support the limit increase." ¶111. Similarly, Defendants' public assurances that SBNY utilized "different

modeling tools" showing the Bank's deposits were "quite stable" (Misstatement 7) and that Defendants "haven't had any issues [with] liquidity at all" (Misstatement 28) were materially misleading. At the time these statements were made, Regulators had told Defendants that SBNY lacked basic "liquidity stress testing" to substantiate their statements about deposit stability. ¶103.

Likewise, Defendants' assurances that, even with its meteoric growth, the Bank "really put on little to no risk" (Misstatement 10) and maintained a "relatively low risk profile" (Misstatement 1) were misleading. These statements concealed from the market what Defendants privately knew, as Regulators found: SBNY's "combination of rapid deposit growth, increasing funding concentrations, and unknown deposit stability had contributed to an increasing liquidity risk profile, which highlighted the urgent need for robust risk management practices" that the Bank failed to implement. ¶106.

Defendants' arguments that certain Misstatements are immaterial puffery fare no better. Under settled law, statements are material "when the statements are made repeatedly . . . to reassure the investing public about matters particularly important to the company and investors." *In re BHP Billiton Ltd. Sec. Litig.*, 276 F. Supp. 3d 65, 79 (S.D.N.Y. 2017). Numerous facts here demonstrate the materiality of the Misstatements, including because: (i) they concerned the Bank's liquidity and risk management deficiencies that, as the Regulators confirmed, were the "root cause" of the Bank's demise; and (ii) Defendants repeatedly issued the Misstatements in response to analysts raising investor concerns. *See In re Wells Fargo & Co. Sec. Litig.*, 2021 WL 4482102, at *19 (S.D.N.Y. Sept. 30, 2021) (statement that bank was "making great progress" not puffery where it was "not consistent with the feedback the Bank had received from the Regulators").

**<u>Second</u>**, Defendants wrongly argue that the Complaint fails to plead scienter. It pleads a litany of facts establishing that each Defendant had knowledge of and access to facts that

contradicted their public representations. These facts include Regulators' findings and outright warnings to Defendants about the Bank's severe concentration risk, woefully deficient risk and liquidity management practices, failure to adhere to concentration limits, and complete lack of testing to support its assumptions about deposit stability. Such "[r]elevant warnings from . . . regulators are widely recognized to be evidence of scienter." *Karimi v. Deutsche Bank Aktiengesellschaft*, 607 F. Supp. 3d 381, 397-98 (S.D.N.Y. 2022). These facts alone suffice to plead scienter, but there is more: (i) multiple FEs reported facts confirming Defendants' direct knowledge; (ii) Defendants repeatedly spoke about issues at the center of the fraud, including by issuing specific denials of SBNY's weakening liquidity as the risks they concealed were materializing; and (iii) Defendants were specifically responsible for the Bank's risk and liquidity management functions, which were core operations of the Bank. KPMG's scienter arguments also fail—they do not rebut that KPMG had notice of myriad significant, pervasive red flags that alerted them to the falsity of their GAAP certifications and "unqualified" audit opinions.

Further, while motive is not required, the Complaint's motive allegations add to the inference of scienter here. Accepted as true (as they must be), they show that Defendants: (i) were incentivized to pursue unrestrained deposit growth regardless of the risks to shareholders by a compensation plan tied to deposit growth; and (ii) engaged in suspiciously timed stock sales.

**Third**, Defendants' assertion that the Complaint fails to establish loss causation is meritless. The "burden to plead loss causation is not a heavy one." *Gross v. GFI Grp., Inc.,* 162 F. Supp. 3d 263, 269 (S.D.N.Y. 2016). The Complaint easily meets this low burden by detailing both the corrective information disclosed to the market and the concomitant stock price declines caused by the revelation of the truth. For example, after SBNY was forced into receivership on March 12, 2023, SBNY's stock price declined by 99.81%. Nothing more is required. *See infra* §IV.

The Motions should be denied in their entirety.

## SUMMARY OF RELEVANT FACTS

**A.    Defendants Turned SBNY Into a High-Risk Crypto "Deposit Machine"**

After nearly two decades of staid, steady growth, in 2018 SBNY embarked on an aggressive plan to grow its deposits by courting the digital asset (or cryptocurrency) industry, which prior to SBNY's courtship, had been largely spurned by established banks. ¶3. To do so, SBNY hired Defendant Seibert away from a small New York bank to head its newly formed Digital Asset Banking Group. ¶55. Over the next three years, SBNY's total assets skyrocketed from $43 billion to $118.4 billion (¶¶46, 73), fueled by monumental growth in the Bank's deposits that were largely uninsured and heavily concentrated in the digital asset industry (¶¶64-65). From just 2020 to 2021, uninsured deposits nearly doubled from $55.9 billion to $97.6 billion (92% of total deposits at the time). ¶66. Digital asset-related deposits increased from zero in 2018 to $28.7 billion (27% of total deposits) by year end 2021. ¶69. During this time, Defendants' compensation plan was tied to deposit growth, and the digital asset market provided a path to achieve that growth—which made SBNY "a deposit machine." ¶¶5, 61.

Over this period, SBNY's deposits became increasingly concentrated in fewer clients. By December 31, 2019, SBNY had 128 clients accounting for 40% of total deposits. ¶87. By year end 2021, just 60 clients accounted for 40% of SBNY's total deposits, and just four depositors, three of which were digital asset deposits, comprised 14% of the Bank's total assets. ¶67. Defendants did not disclose these concentrations.

SBNY's explosive growth exposed the Bank to heightened liquidity risks—*i.e.*, that depositors would flee the Bank in times of stress, thus leaving the Bank without sufficient liquidity. ¶5. Defendants deepened these risks by increasingly providing "Capital Call" loans, which could not be pledged as collateral if capital was needed. ¶¶73-76. SBNY's portfolio of Capital Call loans

grew and by the second quarter of 2022 was 25% of its total assets. *Id*.

**B.    Defendants Were Repeatedly Told by Regulators that SBNY Lacked Critical Liquidity and Risk Management Controls, but Misled the Public.**

Throughout the Class Period, SBNY underwent comprehensive, continuous examinations by its Regulators, who closely assessed the Bank's liquidity and risk management systems. ¶78. Regulators repeatedly found and told SBNY's senior management and Board that the Bank did not have adequate liquidity and risk management controls. ¶79. As the Bank more than doubled its deposits during the Class Period, Regulators found repeatedly that Defendants failed to address the many problems and deficiencies the Regulators had identified, which directly led to the Bank's collapse. ¶79. After each review, Regulators presented their findings to SBNY's Board and senior management, held exit meetings, and issued comprehensive ROEs and Supervisory Letters outlining the deficiencies. ¶¶17, 78–79, 90, 113, 158.

**The 2019 Examination Cycle:** By June 16, 2020, just six months before the Class Period, Regulators presented to SBNY's senior management "significant weaknesses in the Bank's liquidity contingency planning, including that the risk exposure presented by the concentration of uninsured deposits was not sufficiently identified, measured, and monitored." ¶87. The Regulators specifically warned Defendants that the Bank was exposed to a critical volatility risk given that "128 clients with deposit account balances exceeding $50 million" represented 40% of deposits. *Id*. The Regulators found that the Bank's assumption that it could quickly sell a material portion of its loans during a liquidity crisis "was not supported with any empirical analysis" and thus management had failed to implement adequate plans to withstand liquidity stress events. ¶¶84-85. The FDIC "downgraded SBNY's Liquidity component rating," indicating the Bank needed "improvement" in its "liquidity levels and fund management practices." ¶82.

In a July 6, 2020 supervisory letter, the Regulators deemed these deficiencies "critical" and

issued two MRBAs and eighteen SRs requiring the Bank to implement adequate liquidity controls. ¶¶88-89. Then these findings were repeated to SBNY's management and Board, including DePaolo and Shay, in a September 23, 2020 exit meeting with Regulators, an October 2, 2020 letter to SBNY's Board, and a subsequent Board meeting on October 21, 2020. ¶90.

**The 2020 Examination Cycle**: The Regulators noted that risks from the high concentration of uninsured depositors had become more severe yet nearly all of the critical deficiencies they had identified had gone unaddressed. In Supervisory Letters provided to SBNY management on October 19, 2020 and January 19, 2021 (just before the Class Period), Regulators emphasized that SBNY's funding became increasingly more concentrated, with only "196 clients . . . accounting for $35 billion, or 55 percent of total deposits." ¶95. The Regulators also concluded that the Banks' "[l]iquidity stress testing did not enable identification, measurement, monitoring, or control of funding risk; thus, management could not establish an appropriately-sized liquidity buffer." ¶94. In contrast, Defendants publicly claimed that SBNY had implemented adequate stress testing that was "consistent with the safety and soundness expectations of the federal banking agencies." ¶210. The subsequent 2020 ROE further demonstrated that Defendants' statements were false, finding that SBNY had not addressed the MRBAs and SRs related to liquidity planning, noting "inadequate liquidity contingency planning, liquidity stress testing, and internal controls continued to impede management's ability to identify and establish appropriate mitigating plans against the potential volatility" of its depositor base. ¶¶92-94. Due to the lack of controls, Regulators concluded that they could not assess the sufficiency of SBNY's liquidity. ¶92.

**The 2021 Examination Cycle:** SBNY's pervasive problems worsened. Regulators issued five Supervisory Letters to management, noting that risky deposit concentrations had again increased, with a mere 60 clients holding a whopping 40% of the Bank's total deposits. ¶106. Even

worse, four depositors, three in the digital asset industry, accounted for over 16% of total deposits. ¶¶106, 110. While DePaolo claimed that SBNY had "internal limitations on concentrations" (¶126), the Regulators determined that they arbitrarily blew past those limits, despite having "no evidence of appropriate analysis or stress testing being completed to support the limit increase." ¶¶111, 128. The Regulators also found that existing control deficiencies were still unaddressed (¶¶105, 111-12), and highlighted the "urgent need for robust risk management practices" given the increased concentration of uninsured deposits. ¶¶106-07.

These findings were communicated to Defendants via a June 7, 2022 meeting between the Regulators, senior management and the Board, a July 28, 2022 Supervisory Letter, and the December 13, 2022 ROE. ¶116. Also, on November 15, 2022, the same day Defendants claimed that deposits were "stable" (¶323) and three days before DePaolo said "we haven't had any liquidity issues at all" (¶318), the Regulators held an exit meeting with management on the deficiencies identified in the 2021 cycle (¶324), including the Bank's outstanding liquidity-related MRBA from 2019.

**The 2022 Examination Cycle**: In the final cycle before the Bank's collapse, the Regulators found during a 2022 liquidity target review that the same concerns identified during the 2019 cycle still existed. ¶¶117-18. The Regulators presented these findings to SBNY's management in a May 19, 2022 meeting and January 23, 2023 Supervisory Letter (¶17), yet Defendants continued to misleadingly tout SBNY's "robust liquidity position" (¶333). In truth, the Regulators were preparing to issue additional MRBAs and SRs based on the Bank's inadequate liquidity and risk controls and were considering bringing an enforcement action to address the longstanding deficiencies. ¶¶114, 118. Just before the collapse, on March 11, 2023, the Regulators downgraded SBNY's liquidity and management ratings to the lowest possible score. ¶191. As the FDIC stated,

"[s]ince the 2019 examination cycle, SBNY's management and board were aware that the bank's fund management practices needed improvement" but "SBNY never adequately addressed the liquidity risk management concerns." ¶200.

### C.    FEs Confirm the Bank's Shocking, Undisclosed Internal Problems.

Multiple FEs from senior roles in the Bank's risk management, digital asset, and audit groups confirmed the risk and liquidity deficiencies at the Bank based on their direct, first-hand knowledge from working at SBNY. ¶¶97, 119, 120, 150. For example, FE-1 recounted that the Bank's modeling framework could not differentiate between crypto deposits and other deposits, nor back-test liquidity projections against actual results; and the Bank increased risk limits relating to deposits and concentrations without documented analysis. ¶97. FE-2 reported that the volatility of digital asset related deposits was significantly more than other types of deposits, they regularly saw billion-dollar swings for large digital asset clients, and that this high volatility was discussed with Defendant Howell. ¶119. FE-3 reported that DePaolo and other senior officers received weekly reviews of deposits, which increased to daily as issues arose. During the 2022 audit, FE-3 was concerned over the concentration of uninsured deposits and the Bank's liquidity risk; and that the Bank's liquidity risk management processes were inadequate, ineffective, not supported by an adequate modeling structure, and like "looking in a rearview mirror." FE-4 confirmed that SBNY's executives "just wanted the deposits, and it didn't matter where they were coming from"—even if it meant skirting compliance and regulatory obligations. ¶150. FE-4 recounted that DePaolo and another senior SBNY official overrode FE-4's concerns about a client that opened 30 accounts with different names because the client promised $70 million in deposits. *Id.*

### D.    Defendants Made Misstatements Regarding Liquidity and Other Risks.

Defendants repeatedly made false and misleading statements to investors during the Class Period that created the illusion of prudent risk management and responsible growth, and dismissed

concerns that SBNY's growth strategy was increasing its risks. ¶8. The Misstatements alleged in the Complaint fall into the following six categories:

(1)     *Concentration Caps/Limits and Well-Diversified Assets.* For example, DePaolo claimed that "we cap our deposits by client, because of concentrations, but our deposit balances could be $10 billion more if we wanted them to be" (Misstatement 17). In truth, Defendants were intentionally disregarding these "rules around the size of deposits" they claimed to be enforcing (Misstatement 18), and arbitrarily raising concentration limits when, as Regulators found, "there was no evidence of appropriate analysis or stress testing . . . to support the limit increase." ¶111. This category comprises Misstatements 9, 17, 18, 19, 23, 29, 31 and 33.

(2)     *Adequate Liquidity and Low Risk Profile*. For example, Defendants falsely claimed "we haven't had any issues to liquidity at all" (Misstatement 28). In truth, as Regulators found, the Bank's "combination of rapid deposit growth, increasing funding concentrations, and unknown deposit stability had contributed to an *increasing* liquidity risk profile," which SBNY pervasively failed to manage. ¶106. This category comprises Misstatements 1, 13, 22, 28, 32, 34, 36 and 37.

(3)     *Deposit Stability and Lack of Correlation to Crypto Prices*. For example, Howell's false assurances that Defendants had analyzed stability using "a couple of different modeling tools" and *concluded* that the Bank's deposits were "quite stable" and not "tied to the value of Bitcoin [cryptocurrency]" (Misstatement 7). In truth, the Bank did not have any deposit study, model, or validated assumptions to support these assertions. ¶127. As Regulators found, Defendants' "assumptions were not well documented and had not been substantiated" and "never fully developed liquidity stress testing deposit assumptions or a deposit runoff framework to substantiate this assumption." *Id*. This category comprises Misstatements 7, 8, 12, 14, 20, 21, 24, 25, 26, 30 and 35.

(4)     *Modeling and Analysis*. For example, DePaolo's false reassurance that "Every month we model with an assumption that every single last crypto deposit is withdrawn" (Misstatement 27). In truth, as Regulators found, SBNY's "risk exposure presented by the concentration of uninsured deposits," driven by digital asset deposits, "was not sufficiently identified, measured, and monitored." ¶236. This category comprises Misstatements 2, 3, 10, 11 and 27.

(5)     *Financial Reporting, Internal Controls and GAAP Compliance*. For example, Defendants' representations that SBNY had reporting processes "designed to provide reasonable assurance regarding the reliability of financial reporting" (Misstatement 4). In truth, as Regulators found, the Bank lacked adequate "internal controls relating to liquidity risk management, including the internal audit of the liquidity function" (¶89), which "impede[d] management's ability to identify and establish appropriate mitigating plans" (¶92). This category comprises Misstatements 4, 38, 39, 40, 41, 42, 43, and 44.

(6)     ***Regulatory Oversight***. For example, DePaolo's false assurance that
Regulators have "been very good to us" (Misstatement 5). In truth, Regulators had
issued numerous MRBA and SRs finding serious deficiencies in SBNY's risk
practices, downgraded its liquidity rating, warned Defendants of their asset
overconcentration and other risks, and admonished SBNY for not seriously heeding
these warnings. ¶82. This category comprises Misstatements 5, 6, 15, and 16.

### E.     KPMG Misleadingly Issued Unqualified Audit Opinions.

KPMG, as SBNY's auditor (¶357), received copies of the supervisory documents (*e.g.*,

ROEs and Supervisory Letters) issued to SBNY. *See* KPMG Br. at 4. But KPMG repeatedly

disregarded these red flag warnings and repeatedly gave SBNY clean bills of health, failing to

ensure that SBNY's financial statements complied with GAAP. Though required by GAAP,

SBNY did not disclose its significant concentration risks. These concentration risks—such as

overconcentration of the Bank's deposits in few, large customers (¶¶67, 95, 109-10) without

appropriate risk management and mitigation systems (*see supra* Facts §B)—presented the risk of

a near-term severe impact.

Because KPMG knew of these material deficiencies, it knew of (or recklessly disregarded)

the lack of disclosure in SBNY's financial statements. But KPMG still issued unqualified opinions

in its audit reports for SBNY's fiscal years 2020, 2021, and 2022. These opinions stated that "the

consolidated financial statements present fairly, in all material respects, the financial position of

the Company . . . in conformity with U.S. generally accepted accounting principles"

(Misstatements 39, 41, 43). Thus, KPMG misrepresented the financial health of SBNY to

investors. ¶¶386, 391, 396.

KPMG also issued "unqualified opinions on the effectiveness" of SBNY's internal control

over financial reporting (ICFR) and stated that KPMG reached this conclusion consistent with

PCAOB Auditing Standards (Misstatements 40, 42, 44). KPMG made these Misstatements about

the effectiveness of SBNY's ICFR and by falsely representing its audits were consistent with

13

PCAOB standards. ¶¶363-73. In reality, KPMG lacked any reasonable basis given the factors it needed to consider during the scope of its audits and the widespread, material deficiencies in SBNY's internal controls (discussed in §III below).

Tellingly, many of SBNY senior managers and Board members had worked for KPMG, including Keisha Hutchinson, a KPMG audit partner, who signed off on its clean audit of SBNY for fiscal year 2020. ¶449. Mere months later, SBNY hired Hutchinson as Senior VP and Chief Risk Officer. *Id.* DePaolo, Wyremski, and Board members Judith Huntington and Michael Pappagallo also served long tenures at KMPG. ¶450. These close relationships between KPMG and SBNY cast serious doubt on KPMG's independence and objectivity. ¶448. Congress is currently investigating KPMG's role in auditing SBNY. ¶383.

**F.    As the Truth Begins to Emerge, Defendants Continue to Mislead Investors.**

On May 16, 2022, despite repeated assurances about the Bank's deposit stability and its supposed lack of correlation to crypto prices, SBNY issued a "Mid Quarter Update" following the collapse of TerraUSD (a stablecoin, i.e., a digital asset pegged to traditional currency), disclosing that "[d]eposit balances are lower by approximately $1.39 billion quarter-to-date." ¶¶138-39. On this news, the price of SBNY common stock fell by 7.1%. ¶140. Still, Howell falsely downplayed the Bank's exposure to the crypto market, claiming "[b]alances ha[d] not been meaningfully affected by current events in the digital asset trading space." ¶142.

On July 19, 2022, SBNY announced its Q2 2022 results and revealed that total deposits had declined by $5.04 billion. ¶143. The news caused the price of SBNY common stock to fall by 4.5%. ¶144-45. In response, DePaolo again falsely reassured investors that the Bank was well diversified, faced minimal risks, and had properly modeled the worst-case scenario, claiming "every month we model with an assumption that every single last crypto deposit is withdrawn." ¶¶146-47. In truth, the Bank lacked "appropriate and sufficient funds management policies or an

14

adequate contingency funding plan" (¶147) and "never fully developed liquidity stress testing deposit assumptions" to support DePaolo's claims (¶127).

In November 2022, the crypto market suffered a series of shocks, including the collapse and bankruptcy of FTX, a crypto exchange and hedge fund. ¶¶153-54. Still, DePaolo assured SBNY investors that they had nothing to worry about, falsely claiming the Bank "employs appropriate risk management strategies." ¶155. But then, on December 6, 2022, Defendants stunned investors by announcing that the Bank would be "shrink[ing] its deposits tied to cryptocurrencies by $8 billion to $10 billion" and indicated for the first time that the Bank held individual deposits from digital asset clients that amounted to more than 2% of SBNY's total deposits. ¶¶160-61. On this news, the price of SBNY common stock fell approximately 7%. ¶162. Yet Defendants continued to mislead investors regarding SBNY's mounting risks related to its digital asset exposure by stating that SBNY was "not just a crypto bank" and its decrease in digital assets was a "nonevent." ¶163.

### G.    The Full Truth Is Revealed with SBNY's Precipitous Collapse

On March 9, 2023, after further turmoil hit the banking sector, SBNY management reassured investors that the Bank was not at risk. ¶¶21, 170. In a press release, DePaolo and Howell "reiterated [the Bank's] strong, well-diversified financial position and limited digital-asset related deposit balances" and highlighted its "strong liquidity position." ¶170.

On Friday, March 10, SBNY had over 1,600 withdrawal requests totaling approximately $18.6 billion, more than 20% of SBNY's total deposits. ¶¶22, 171. Despite Defendants' repeated claims throughout the Class Period that the Bank was prepared for a stress event, SBNY was at risk of default and the FRB had to step in to provide $5.6 billion loan to cover a $3.9 billion cash shortfall. ¶171. Defendants did not have adequate assets to secure the loan and were forced to pledge $6.5 billion in assets already pledged to another institution. ¶171.

Over the weekend of March 11 and 12, Regulators sought to work with management to keep the Bank afloat. However, it soon became clear that Defendants lacked adequate liquidity and risk management controls and did not have a contingency liquidity plan in place, as they had claimed. On Saturday March 11, SBNY could not meet the Regulators' deadline to provide basic information about the Bank's liquidity management systems, and SBNY delayed providing a "comprehensive liquidity plan," which it should already have had in place, by 20 hours. ¶174. Defendants belatedly produced four different liquidity projections that "repeatedly shifted" and even warned Regulators not to rely on the projections. ¶186. The Regulators immediately dismissed Defendants' liquidity projections as unreliable and filled with inaccuracies and errors, demonstrating SBNY's "lack of an established process for pledging collateral." ¶¶187-89.

Nearly all of the other information Defendants provided to Regulators was inconsistent, incomplete, and false, and further demonstrated that SBNY's supposed liquidity and risk controls were a mirage. For instance, Defendants attempted to provide Capital Call loans as collateral even though they knew Regulators could not accept them. ¶178. SBNY's executives also claimed that SBNY had over $5 billion in unpledged assets, but when pressed for details, they lowered their estimate by more than 80% to less than $1 billion. ¶179. Defendants further claimed that estimated additional withdrawals were "minimal" and "uneventful," but Regulators quickly deemed these estimates "unrealistic," as another $20 billion in withdrawals were in fact expected. ¶¶180-82. Defendants also lied about the magnitude of incoming deposits, telling the Regulators they expected an influx of $5 billion by Monday that DFS knew was not forthcoming. ¶¶183-85. By Sunday evening, Regulators concluded that "it was clear there was no reasonable possibility that the Bank could continue operating in a safe and sound manner on Monday, March 13," and took possession of SBNY and appointed the FDIC as receiver. ¶176.

In response to the Regulators' takeover of Signature, and the revelation of the Bank's liquidity failures, the Bank's stock price collapsed on March 13, 2023, and Nasdaq halted trading at $70.00. ¶25. Trading resumed on March 28, 2023 and the stock price closed at $0.13. This amounted to a 99.81% drop and erased billions of dollars in shareholder value. ¶25.

## ARGUMENT

To state a Section 10(b) claim, a plaintiff must allege: "(1) a material misrepresentation or omission; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Gordon v. Vanda Pharms. Inc.*, 2021 WL 911755, at *2 (E.D.N.Y. Mar. 10, 2021) (Block, J.). The complaint "need not plead dates, times, and places with absolute precision, so long as [it] gives fair and reasonable notice to defendants of the claim and the grounds upon which it is based." *Manavazian v. ATEC Grp.*, *Inc.*, 160 F. Supp. 2d 468, 477 (E.D.N.Y. 2001) (Block, J.).

**I.   THE COMPLAINT ADEQUATELY ALLEGES A 10B-5(B) CLAIM AGAINST THE INDIVIDUAL DEFENDANTS.**

    **A.   The Complaint Adequately Alleges that the Individual Defendants Made Materially False and/or Misleading Misstatements.**

To allege falsity, a plaintiff need only plead facts "sufficient to support a reasonable belief as to the misleading nature of the statement or omission." *Sharette v. Credit Suisse Int'l*, 127 F. Supp. 3d 60, 89 (S.D.N.Y. 2015). Under Second Circuit law, "once a company speaks on an issue or topic," "there is a duty to tell the whole truth" in a "complete and accurate manner." *Meyer*, 761 F.3d at 250.

Moreover, "so-called half-truths—literally true statements that create a materially misleading impression—will support claims for securities fraud." *In re Facebook, Inc. IPO Sec. & Deriv. Litig.*, 986 F. Supp. 2d 487, 515 (S.D.N.Y. 2013); *see also In re Vivendi, S.A. Sec. Litig.*,

838 F.3d 223, 240 (2d Cir. 2016) (explaining the "rule against half-truths"); *Universal Health Servs., Inc. v. United States*, 579 U.S. 176, 188 & n.3 (2016). The Complaint identifies the Misstatements and details why each was materially false, misleading, or incomplete.

### 1. Misstatements Concerning Concentration Caps/Limits and Well-Diversified Assets (Misstatements 9, 17-19, 23, 29, 31 and 33).

Defendants repeatedly misled investors about SBNY's asset diversification and falsely claimed that the Bank adhered to internal concentration limits. For example, Defendants claimed that SBNY "set internal limitations on concentrations" (Misstatement 9), "cap[ped] our deposits by client, because of concentrations" (Misstatement 17), and enforced "rules around the size of deposits [and] concentration of deposits by issuer" (Misstatement 18). In reality, Defendants intentionally disregarded these limits, and blew past them in pursuit of untrammeled deposit growth. ¶132. For example, when SBNY reached its internal 10% concentration limit for digital assets deposits, Defendants arbitrarily increased the limit to a staggering *35%*—even though, as the FDIC later confirmed, "there was no evidence of appropriate analysis or stress testing being completed to support the limit increase." ¶¶10, 71, 111, 128, 232, 270. These same facts rendered misleading Defendants' statements that SBNY was "a well-diversified institution" (Misstatement 29) with a supposedly "diversified funding base" (Misstatement 33) that mitigated its overconcentration risks. ¶301.

To start, Defendants do not challenge that Misstatements 23 ("not relied on any single one area"), 29 ("well-diversified" with "appropriate risk management") and 33 ("diversified funding base") are adequately pled as misleading. Nor can they. Defendants' assurances were contradicted by Regulators' warnings about the risks of the Bank's "rapid growth and expansion into digital asset markets" and "its concentration of deposits in the digital assets marketplace." ¶¶117, 324, 330.

18

Defendants claim Misstatements 9, 17, 18, 19 and 31 were not false because: (i) there is no allegation that "the Bank lacked a concentration policy"; and (ii) the Complaint alleges mere mismanagement rather than actionable fraud. Lead Br. at 37. Both arguments miss the point. It was misleading for them to tout SBNY's purported concentration limits to investors when, in reality, they blew past them without any analysis—a patent failure to tell "the whole truth" in a "complete and accurate manner." *Meyer*, 761 F.3d at 250.

Defendants also argue that the "concentration limit" statements "were not sufficiently definite" and did not give "specific limits." Lead Br. at 37. Regardless of whether Defendants disclosed the specific percentage caps, in all events, they misled investors by touting these limits to assure investors of the safety of the Bank—and then arbitrarily increasing the limit to get more deposits. *See In re Lehman Bros. Sec. & ERISA Litig.*, 799 F. Supp. 2d 258, 284 (S.D.N.Y. 2011) (finding actionable allegations that defendant was not adhering to and disregarding risk limits). Plus, DePaolo made clear Defendants *were* referring to percentage-based limits, stating: "we have *concentration limits* on our clients . . . I can't give you *the percentages*. I can't divulge those, but *we have limits*" (Misstatement 19). As the Regulators found, contrary to these statements, Defendants disregarded their limits without basis. ¶¶10, 71, 128. *City of Pontiac Policemen's & Firemen's Retirement System v. UBS AG*, 752 F.3d 173, 186 (2d Cir. 2014) is inapposite, as, there, the plaintiff did not allege defendants were disregarding their internal limits, as alleged here.

Lastly, Defendants argue that the Complaint alleges mismanagement not misrepresentations. This is wrong. Here, "because Plaintiff alleges that Defendants intentionally [or recklessly] misled the public, rather than simply made bad business decisions, [p]laintiff has pled more than mere mismanagement." *In re Vale Sec. Litig.*, 2020 WL 2610979, at *9 (E.D.N.Y. May 20, 2020); *Karimi*, 607 F. Supp. 3d at 396 ("[F]ederal securities laws prohibit

19

misrepresentation of material facts, even when those material facts relate to corporate mismanagement."). *In re Deutsche Bank Aktiengesellschaft Sec. Litig.*, 2017 WL 4049253 (S.D.N.Y. June 28, 2017), is inapposite. There, misstatements concerning a company's risk control processes were inactionable because the plaintiff alleged no "facts showing that the processes ***were not followed***." *Id.* at *7. Here, Plaintiff alleges that Defendants arbitrarily disregarded SBNY's concentration limits. ¶¶10, 71, 111, 128, 232, 270.

### 2. Misstatements Concerning SBNY's Purported Adequate Liquidity and Low Risk Profile (Misstatements 1, 13, 22, 28, 32, 34, 36 and 37).

Defendants misled investors about the Bank's supposedly strong liquidity position and low risk profile. For example, Defendants touted the "low risk profile of the Bank's balance sheet" (Misstatement 1) and "robust liquidity position" (Misstatement 34), claimed they "haven't had any issues to liquidity at all" (Misstatement 28), and asserted they "can easily take care of any deposits leaving" because "we've got adequate capacity to cover all crypto deposits we leave in the bank" (Misstatement 32).

These statements were misleading because Regulators repeatedly informed Defendants that the Bank's "combination of rapid deposit growth, increasing funding concentrations, and unknown deposit stability had contributed to an ***increasing*** liquidity risk profile," which the Bank severely and pervasively failed to manage. ¶106. SBNY failed to (i) "identify an appropriate liquidity buffer"; (ii) "adequately measure and control the impact of deposit volatility during stress events"; or (iii) properly assessed the likelihood of and survival requirements for . . . stress events." ¶107. Thus, contrary to Defendants' statements, the Bank lacked adequate liquidity risk management and did not have a low risk profile. ¶108; *see Meyer*, 761 F.3d at 251 (statements describing specific risk processes are misleading "if in fact the [processes] were then failing to prevent substantial violations of the . . . regulations").

Defendants do not challenge that the Complaint adequately alleges the majority of these Misstatements were materially misleading, including Misstatements 22, 28, 34, 36, and 37. For the handful of Misstatements that Defendants challenge, their arguments are meritless.

**First**, Defendants argue that Misstatement 1 ("low risk profile") was not false in light of Regulators giving the Bank an overall "Composite" score of a "2" for most of the Class Period, which Defendants contend establishes the Bank "appropriately" controlled the Bank's risks for all purposes. Susca Br. at 7. Defendants are wrong. To start, the Complaint does not allege Misstatement 1 misrepresented the Bank's Composite score, but rather that it failed to disclose numerous facts showing the Bank did not in fact have a "low risk profile." ¶206. These facts include: (i) the numerous liquidity-specific deficiencies the Regulators found in SBNY's risk management framework (¶107); (ii) the Bank's overconcentration risks, including due to overreliance on single, large depositors (¶87); and (iii) defendants' lack of the collateral necessary to secure short-term borrowing in a liquidity crunch (¶206).

Moreover, the Bank's Composite rating is not a talisman that immunizes Defendants from liability as a matter of law. The Bank's overall rating was based on six components, **_one_** of which was based on the liquidity component that is central here. DX A at 3 (explaining the Regulators Composite ratings system based on "CAMELS" score). And, in any event, Regulators downgraded the liquidity component of SBNY's Composite score to a "3" in 2019, showing that Regulators did have concerns in this critical area throughout the Class Period. ¶82. SBNY's liquidity downgrade from a "2" to a "3" was significant—it reflected that SBNY no longer had "satisfactory liquidity levels and funds management practices." *See* DX FF §§1.1-23, 1.1-27. Defendants cannot disregard well-pled facts in the Complaint, which must be accepted as true at this stage. *Doe v. New York Univ.*, 2021 WL 1226384, at *9 (S.D.N.Y. Mar. 31, 2021).

**Second**, Defendants argue that Shay's Misstatement 13 ("we remain prudent in the deployment of new funds") was not false or misleading. Shay Br. at 14. Defendants are incorrect. The facts show that Defendants were not "prudent in the deployment of new funds," and, to the contrary, were deploying funds in ways that raised the Bank's liquidity risks, such as Fund Banking capital call loans that by the second quarter of 2021, had grown to $15.9 billion, or approximately *15%* of the Bank's total assets. ¶245. Still, Defendants argue that the Complaint "fails to specify why the growth of the Bank's Fund Banking division or whether these assets were pledgeable as collateral" renders this misstatement misleading. Shay Br. at 14. But Defendants' increasing reliance on these loans presented known, concrete liquidity risks (¶76) and these risks eventually materialized when these loans provided *billions of dollars less* in liquidity than Defendants represented (¶¶178-79).

Next, Defendants ignore the Complaint's allegations and the context of Shay's statement, arguing "the Bank never represented that its Fund Banking capital call loans were pledgeable as collateral with the Federal Reserve." Shay Br. at 15. But, as pled, it was misleading for Shay to reassure investors that the Bank "remain[ed] prudent in the deployment of new funds" without disclosing that these funds were in fact increasingly being deployed into loans that compounded the Bank's liquidity risks. ¶¶6, 178-179, 245. Shay argues that these undisclosed facts pertaining to the Bank's capital call loans cannot render Misstatement 13 misleading because, in a *completely separate* SEC filing, the Bank listed potential sources of collateral for its Federal Reserve borrowings and they did not specifically list the loans in question. Shay Br. at 15. This argument is baseless. Shay never referred to this separate 10-K filing to limit or amend his statement. And even if he had, this 10-K Form states that the Bank's Federal Reserve borrowings "are *typically* collateralized by mortgage-backed and collateralized mortgage obligation securities, along with

commercial real estate loans" (DX D at 102). This list of what the Bank "typically" offered as collateral does **not** purport to exclude capital call loans as Shay suggests, and thus fails to show that investors would have understood his alleged misstatement to exclude them. At most, Defendants' argument raises untimely fact issues about how the market understood the statement.

**Third**, Defendants argue that Howell's Misstatement 32, claiming "we can easily take care of any deposits leaving," "we've got adequate capacity to cover all crypto deposits we leave in the bank," and that an "exit of the digital space" would be "a nonevent," is not adequately alleged to be false. Lead Br. at 33. Defendants are wrong.

To start, these statements are contradicted by the facts alleged in the Complaint. Indeed, as soon as the Bank encountered meaningful withdrawal stress, ***it collapsed in stunning disarray***. After withdrawals on March 10, 2022, the Bank "repeatedly provided unreliable information" to Regulators, "its final liquidity projections were not credible," and "[t]he Regulators assessed that Signature would not have enough liquidity to satisfy known and expected withdrawals on Monday, much less be able to satisfy any additional unknown withdrawals that could reasonably be anticipated in light of market conditions." *See, e.g.*, ¶190.

Even setting aside that decisive point, Howell's assertion cannot be accepted as correct as a matter of law. According to SBNY's SEC filings, in December 2022, SBNY had $17.8 billion in digital asset-related deposits (DX A at 6), approximately $5.9 billion in cash (DX D at 121), and $25.30 billion in borrowing capacity (*id.* at 103). This borrowing capacity, however, was merely an "estimate" from SBNY. The Court cannot (and should not) credit this figure for its truth, particularly because the figure self-evidently included SBNY's "FHLB line and our FRB line, and the amount of securities and loans available for pledging" (DX D at 212), which the Complaint alleges was itself overinflated and misstated to the Regulators.

23

Moreover, even if this portion of the statement were literally true, the Misstatement was materially misleading because the Bank did not have a "comprehensive contingency funding plan" or "validated stress testing model with institution-specific underlying assumptions" that the Regulators found were required to adequately support SBNY's liquidity position. ¶331.

In addition, Howell's argument asks the Court to take judicial notice of SEC filings not cited or referenced in the Complaint for the truth of their contents. This is improper. *Roth v. Jennings*, 489 F.3d 499, 509 (2d Cir. 2007) (Judicial notice may be taken "only to determine what the documents stated, and not to prove the truth of their contents"). And even if the Court considered these documents for their truth, they do not support Howell's argument because these SEC filings contain financial information that the Company represented as of June 2022 (DX K at 3; DX UUU at 26), whereas Howell's Misstatement 32 was made on ***December 6, 2022***. ¶330. These cited figures say nothing about the Bank's status in December 2022.

### 3. Misstatements Concerning Deposit Stability and Lack of Correlation to Crypto Prices (Misstatements 7, 8, 12, 14, 20, 21, 24-26, 30 and 35).

Defendants Seibert, Howell and DePaolo misled investors concerning SBNY's deposit stability and its supposed lack of correlation to price volatility in the digital asset industry. For example, these Defendants represented that SBNY used "different modeling tools" that showed SBNY's deposits were "quite stable" and "a pretty stable base for us" (Misstatement 7). In truth, the Bank did not have any deposit study, model, or validated assumptions to support their assertions about the stability or stickiness of deposits. ¶127. Defendants knew this—Regulators found, long before Defendants' false assurances about SBNY's deposit stability (¶¶80-82, 87-89), that Defendants' "assumptions [about the stability of SBNY's deposits] were not well documented and had not been substantiated" and "never fully developed liquidity stress testing deposit assumptions or a deposit runoff framework to substantiate this assumption." ¶127.

Equally misleading were Defendants' assurances that SBNY had "seen absolutely *zero* correlation between the price of Bitcoin and our deposit flows" (Misstatement 12) and that "the price of Bitcoin *doesn't have anything to do with our growth* one way or the other" (Misstatement 20). In reality, but undisclosed to investors, Defendants did not have the requisite models to test the correlation between the price of digital asset prices and the Bank's deposit flows, or the tools to detect and mitigate volatility of its digital asset deposits. ¶223. *See, e.g.*, *In re Bear Stearns Companies, Inc. Sec., Deriv., & ERISA Litig.*, 763 F. Supp. 2d 423, 457 (S.D.N.Y. 2011) ("Because of the deficiencies in its VaR models, the Company's representation in its 2006 Form 10–K that it had an aggregate VaR of just $28.8 million, which was far lower than its peers, was materially false and misleading."); *In re JPMorgan Chase & Co. Sec. Litig.*, 2014 U.S. Dist. LEXIS 44050, at *22 (S.D.N.Y. Mar. 31, 2014) (statements actionable where they "provided a materially misleading picture of the risks facing [the defendant company]" by failing to disclose changes in the company's "model for measuring risk").

Defendants' arguments fail. **First**, they argue the Complaint does not allege that Misstatement 7 and 8 were misleading. Lead Br. at 31. This ignores the allegations in the Complaint. As pled, when Howell claimed in Misstatement 7 that SBNY had "different modeling tools" showing SBNY's deposits were "quite stable" and DePaolo repeatedly touted the Bank's deposits as "fairly sticky" in Misstatement 8, these claims were misleading because the Bank did not have the models or studies to support these assertions, as the Regulators informed them. ¶221.

**Second**, Defendants argue their Misstatements denying any correlation between crypto prices and SBNY's deposit flows (Misstatements 12, 14, 20 and 21) were not *literally* false because the Complaint does not "compare the prices of Bitcoin to the Bank's deposits and demonstrate a correlation between them at the time." Lead Br. at 35; *see also* Seibert Br. at 12. But "[t]he veracity

of a statement or omission is measured not by its literal truth, but by its ability to accurately inform rather than mislead." *Operating Local 649 Annuity Trust Fund v. Smith Barney Fund Mgmt., LLC*, 595 F.3d 86, 92 (2d Cir. 2010). Here, these Misstatements gave investors the false impression that SBNY had the requisite tools to assess and mitigate the impact of cryptocurrency volatility on the Bank's deposits, when in reality SBNY lacked such tools—as the Regulators had repeatedly warned Defendants. ¶¶222-23, 239. And "once [a defendant] speaks on an issue or topic," as Seibert did here, "there is a duty to tell the whole truth." *Meyer*, 761 F.3d at 250-51. Seibert did not disclose these facts, rendering his statement actionable.

Howell and Seibert also attack the falsity of their statements that SBNY was "just garnering a larger and larger piece of deposits coming from an ever-growing ecosystem" (Misstatement 12) and "just adding more clients, more prospects that we deem a fit for our ecosystem" (Misstatement 20). Their arguments ignore that these inflows had dangerously deepened the Bank's concentration of digital assets and uninsured deposits—including within an increasingly small group of single depositors undisclosed to investors—and severely heightened liquidity risk, all unbeknownst to investors at the time. ¶¶239, 287.

**Third**, Defendants challenge the falsity of DePaolo's Misstatement 24, claiming the Bank "hold[s] no cryptocurrencies," and Howell's Misstatement 25, downplaying the Bank's reliance on crypto-related deposits. Lead Br. at 36. Defendants' arguments that these statements were literally true ignore that these Misstatements gave investors the false impression that the Bank "was not susceptible to risks related to the digital asset volatility," while failing to disclose that the Bank's overconcentration in digital asset deposits carried severe risks, which the Bank lacked the liquidity and risk controls to adequately manage. ¶303; *see also Operating Local 649 Annuity Trust Fund*, 595 F.3d at 92 ("The veracity of a statement or omission is measured not by its literal truth,

26

but by its ability to accurately inform rather than mislead"); *In re Mindbody Sec. Litig.*, 489 F. Supp. 3d 188, 208 (S.D.N.Y. 2020) ("Some statements, although literally accurate, can . . . through their context and manner of presentation . . . mislead investors.").

Instead, DePaolo argues his Misstatement 24 was not misleading because he disclosed that digital asset volatility could impact the Bank. Lead Br. at 36. DePaolo merely prefaced his Misstatement 24 by stating, "despite the significant decline in the value of cryptocurrencies and the latest digital winter, this quarter, our deposits were only down $2.4 billion." ¶302. DePaolo's assertions, even if literally true, were materially misleading "through their context and manner of presentation." *Mindbody*, 489 F. Supp. 3d at 208. They were made in a time and setting designed to falsely alleviate investor concerns about whether SBNY was susceptible to risks related to the digital asset volatility in light of the adverse events that had just taken place in the crypto market. ¶¶14-16. Thus, the point of this statement was not to disclose that there was a severe risk, but rather to falsely assure investors that any risk and impact were minimal. ¶303.

Likewise, Howell's Misstatement 25 falsely reassured investors that SBNY was adequately protected against upheaval in the crypto industry. When analysts asked Howell to "connect what's happening in [the crypto] business to what's happening in [SBNY's] business," he reassured investors that, despite "a 65% decline in the price of Bitcoin . . . we were hardly down, not even 10% in deposits in that space." ¶305. Howell claims his figures were literally accurate (Lead Br. at 36-37), but ignores that SBNY's overreliance on crypto deposits "put it in a precarious position" and "[m]anagement was not sufficiently prepared to ameliorate the risks [it] posed." ¶301.

**Fourth**, Defendants argue that Misstatement 35 was not false because it accurately described "historical fact[s]." Lead Br. at 38. But this ignores the statement's context. In Misstatement 35, DePaolo and Howell sought to refute media reports that SBNY was "rushing to

27

stem a flood of customer withdrawals," by assuring investors the outflows were an "intentional[]" decision to "manag[e] them to a lower level" and the Bank was "replacing these deposits primarily with advances from the Federal Home Loan Bank of New York (FHLBNY) in the short-term." ¶336. Whether or not these "historical fact[s]" were accurate, Defendants misled investors that the Bank's deposit stability and liquidity risks were adequately managed, including by securing liquidity from the FHLB. In reality, (i) "significant deficiencies" existed in SBNY's liquidity risk management practices (¶335), (ii) their susceptibility to digital asset volatility had grown more precarious than ever (¶204), (iii) these risks were not contained and poised to spread across the Bank's assets (¶337), and (iv) SBNY lacked the collateral, documentation and processes necessary to secure any further short-term borrowing from FHLB (*id.*).

Defendants argue the portion of their Misstatement concerning FHLB borrowings was true because SBNY's SEC filings show the Bank had in fact increased its borrowings. Lead Br. at 38. But this is irrelevant. Defendants gave investors the false impression that the Bank could turn to the FHLB to secure short-term borrowings to solidify its liquidity position. ¶337. In truth, the Bank lacked the readily pledgeable collateral required for such borrowings, including because the Bank's *$18 billion* in capital call loans had already been rejected as ineligible for that purpose and the Bank lacked sufficient documentation for its *$5 billion* in commercial real estate loans to be readily pledgeable. ¶¶379. It is also of no import that a separate portion of the press release quotes the FHLB as stating it was "proud to serve as a liquidity partner to each of our more than 300 members, including Signature Bank." Lead Br. at 38. FHLB's anodyne quote does not in any way rebut that Defendants' statements were misleading as pled in the Complaint. Indeed, by deploying FHLB's quote in this way, Defendants amplified the false impression that FHLB would continue providing liquidity to offset its deposit outflows—which Defendants knew it would not. *In re*

*Vivendi Universal, S.A. Sec. Litig.*, 381 F. Supp. 2d 158, 180-81 (S.D.N.Y. 2003) (failure to disclose "growing liquidity crisis" was actionable).

**Lastly**, as noted above, Defendants do not (and cannot) contend that the Complaint fails to adequately allege the falsity of Misstatements 26 and 30. DePaolo asserted that "the Bank's deposits in the digital asset arena remained stable" (Misstatement 30) and, when asked about volatility, that "t[h]ere's always choppiness[,] but we feel really good because we not only have EB-5 [visa investment funds], we believe we have the best team for EB-5" (Misstatement 26). These statements misleadingly assured investors that: (i) SBNY had the models and tools to analyze and protect the stability of its deposits against digital asset volatility (which it did not), and (ii) the risks of its overreliance on digital asset-related deposits were contained, when it reality the Regulators warned they were severe and poised to spread across the Bank (¶¶301, 324).

### 4. Misstatements Concerning Modeling and Analysis (Misstatements 2, 3, 10, 11 and 27).

As alleged in the Complaint, Defendants misled investors by representing that SBNY had models and protocols in place to analyze and mitigate the risks presented by the Bank's rapid growth. For example, Defendants falsely assured investors that they "ha[d] put internal controls in place that help to mitigate the risks that affect our business" (Misstatement 2) and had liquidity policies that "take into account the marketability of [the Bank's] assets, the source and stability of deposits, our wholesale borrowing capacity and the amount of our loan commitments" (Misstatement 11). In truth, Regulators had repeatedly deemed the Bank's risk practices and ability to mitigate risk as severely deficient (¶209), SBNY lacked the models and analysis necessary to account for its deposit stability (¶239), and tens of billions of dollars of its supposed liquidity were comprised of assets that not were pledgeable as collateral to secure short-term borrowings from the Federal Reserve in the event of a liquidity crunch (¶239).

Equally misleading were Howell's assurances that the Bank "really put on little to no risk" (Misstatement 10) and DePaolo's reassurance that, "[e]very month we model with an assumption that every single last crypto deposit is withdrawn" (Misstatement 27). At the time, Defendants had dramatically changed the risk profile of the Bank by taking on a myriad of significant risk that the Regulators confirmed were "not sufficiently identified, measured, and monitored." ¶236. As Defendants knew from Regulatory findings, "SBNY's most critical liquidity exposure came from the potential volatility associated with the high-level of uninsured deposits," which were even further overconcentrated into a shrinking number of single depositors' accounts. ¶87.

Defendants' arguments that these Misstatements were not misleading all fail. **First**, Defendants again argue that Misstatements 1, 2, 3, 11 and 38 were not false because the Bank's overall Composite rating remained a "2" for most of the Class Period. Susca Br. at 7. As set forth above, this argument fails for multiple reasons. *See supra* §I.A.2. Indeed, their argument ignores the myriad specific liquidity-related deficiencies found by the Regulators, and the Regulators' downgrade of the Bank's liquidity rating to a "3," all of which contradicted Defendants' public statements *and were the "root cause" of the Bank's downfall*. *See* ¶¶77-120, 169-92, 196-204.

Next, Defendants argue that Misstatements 2, 3 and 11 were not misleading because Defendants disclosed the total percentages of the Bank's deposits that were digital asset-related and uninsured. Susca Br. at 7 n.2; Lead Br. at 3-5. But these statements falsely assured investors the Bank was secure—in truth, it was exceedingly high risk due to its unstable asset base and severely deficient risk management practices. ¶¶209, 239. Defendants concealed that SBNY's deposits were overconcentrated into a few single depositors' accounts—eventually, just four depositors comprised over *$16 billion* in deposits, accounting for *14%* of the Bank's total *assets*. ¶¶67, 87, 95. Defendants do not—and cannot—cite anything showing *these* facts were disclosed.

Defendants also incorrectly argue that these Misstatements were not "false when made." Susca Br. at 7. The risk management deficiencies referenced in the Complaint were identified during the 2019 examination cycle (¶¶80-81), ***before*** Defendants began making Misstatements 2 and 3 in March 2021 (¶¶208, 210) and Misstatement 11 in May 2021 (¶238). And these deficiencies remained unremediated throughout the entire Class Period up to SBNY's failure in March 2023. *See* ¶¶91, 105, 114. Thus, here, unlike, *Rombach v. Chang*, 355 F.3d 164, 176 (2d Cir. 2004), the statements at issue "were false or misleading ***when made***."

**<u>Second</u>**, Defendants argue that Misstatement 2 touting the Bank's "internal controls" and "policies and procedures" is inactionable because the Complaint does not allege any specific deficiencies. Shay Br. at 10; Wyremski Br. at 10-11. In reality, these specific deficiencies found by the Regulators are detailed at length throughout the Complaint, including the SRs issued during the 2019 cycle that specifically found the Bank did not have sufficient "***internal controls*** relating to liquidity risk management, including the internal audit of the liquidity function." ¶¶89, 92 (2020 ROE: "inadequate liquidity contingency planning, liquidity stress testing, and internal controls continued to impede management's ability to identify and establish appropriate mitigating plans against the potential volatility of uninsured deposits."); ¶198 (SBNY's management and Board "did not prioritize appropriate risk management practices and internal controls."); ¶200 ("SBNY's practices were not commensurate with the institution's . . . risk profile . . . due to weaknesses with liquidity contingency planning, liquidity stress testing, and internal control.").

Next, Defendants argue that because the Regulators' findings related to liquidity, they cannot show Misstatement 2 was misleading because, in their view, Misstatement 2 "do[es] not concern liquidity at all." Shay Br. at 10-11. This is specious. Misstatement 2 is broadly framed as addressing "the risks that affect our business" (¶¶208, 278, 339), which, as a reasonable investor

would understand, encompasses liquidity risks, notwithstanding that liquidity was not explicitly mentioned in the ***non-exhaustive*** list Defendants provided. *See* Shay Br. at 11 (citing DX C at 11); Thus, the Bank's severe, undisclosed liquidity risk management deficiencies bear on the truth of Misstatement 2 and show it was materially misleading.

**Third**, Defendants incorrectly contend that Misstatement 3 was not false because it supposedly pertained to "*capital* stress testing, not *liquidity* stress testing." Shay Br. at 11; *see also* Wyremski Br. at 12. Defendants' supposed distinction is immaterial—the Regulators' found that SBNY's comprehensive contingency funding plan was deficient because it failed to "identify metrics that would measure the impact of ***stress events*** to ***liquidity and capital*** to ensure the institution could survive the entire stress time horizon." ¶106; *see also* ¶89 (noting that the Regulators issued SRs during liquidity target review based on SBNY's failure to adequately "[c]onsider the potential impact on capital from actions taken to raise liquidity").

Defendants' argument that Misstatement 3 was not false because it pertained to Defendants' compliance with forthcoming stress testing requirements fares no better. *See* Shay Br. at 11; Wyremski Br. at 12. In truth, the statement reflected present facts. It represented that SBNY "will ***continue to*** monitor and stress test" (¶210), portraying to investors that SBNY had done so in the past and giving the false impression SBNY was ***presently*** adequately stress testing its liquidity and capital. The Complaint alleges Defendants were not. As the Regulators determined, "SBNY ***never*** fully developed liquidity stress testing deposit assumptions" and "significant deficiencies were identified in the independent review of liquidity and funds management." ¶115.

**Fourth**, Defendants argue that Howell's Misstatement 10 claiming that, "we've really put on little to no risk" was not false because it purportedly dealt only with "specific capital ratios" and "*not* other risks of the Bank." Lead Br. at 38-39 (emphasis in original). Defendants after-the-

32

fact mischaracterization fails. Howell broadly addressed "the nature of [SBNY's] growth," and asserted "[w]e've grown cash, we've grown securities, and we've grown well-secured fund banking loans. So, we've really put on little to no risk[.]" Lead Br. at 39. This context only reinforces that investors would reasonably understand his comment to pertain broadly to risks to the Bank, and not just "specific capital ratios."

**Fifth**, Defendants challenge the falsity of Misstatement 11 claiming the Bank's liquidity policies "take into account the marketability of [the Bank's] assets, the source and stability of deposits, our wholesale borrowing capacity and the amount of our loan commitments." Defendants argue they "accurately convey[ed] the items the Bank considered under its liquidity management policies," but this simply ignores the Complaint's allegations that this statement was misleading because it did not disclose that: (i) the Bank lacked the models and tools necessary to account for "source and stability of [the Bank's] deposits"; and (ii) tens of billions of dollars of the Bank's supposed liquidity consisted of assets that could not support short-term borrowing in the event the Bank needed additional liquidity, as the Bank's collapse exposed. ¶239. At bottom, this statement created the misleading impression of a sound and appropriate liquidity management policy, which the Bank flatly lacked. *See Vivendi*, 381 F. Supp. 2d at 180-81.

Defendants' argument that Misstatement 11 was true because the Complaint "acknowledg[es] that the Bank *had* a liquidity management policy" is farcical. Lead Br. at 39. No investor would have understood this statement to mean that SBNY had *any* liquidity management policy—even one so utterly deficient and high-risk that it would ultimately cause the Bank's collapse. Defendants again ignore that they failed to disclose facts rendering Misstatement 11 misleading. This renders *In re Deutsche Bank* inapposite, because there, unlike here, the plaintiff "failed to identify any existing statements that would be rendered misleading by failing to disclose

33

a material fact." 2017 WL 4049253, at *7. Here, those facts are amply alleged.

**Sixth**, Defendants argue that DePaolo's Misstatement 27 that "[e]very month we model with an assumption that every single last crypto deposit is withdrawn" is not adequately alleged to be false because the Complaint does not "plead that the Bank did not perform the modeling exercise that DePaolo described." Lead Br. at 35. Here, again, Defendants myopically focus on literal falsity, ignoring the Complaint's allegations as to why Misstatement 27 was *misleading*—DePaolo's statement created a false impression that the Bank was appropriately monitoring and mitigating the risks presented by its reliance on digital asset-related deposits, when in reality the Bank was not. ¶310.

### 5. Misstatements Concerning Financial Reporting, Internal Controls and GAAP Compliance (Misstatements 4 and 38).

Defendants' statements that SBNY's reporting processes gave "reasonable assurance regarding the reliability of financial reporting" (Misstatement 4) and certifications of GAAP compliance (Misstatement 38) were materially misleading because these processes were grossly deficient and the Bank's financial statements did not comply with GAAP. ¶¶351-356. As alleged, the Bank's financial statements violated GAAP because: (i) they did not disclose the Bank's concentration in large, uninsured deposits (*see* ¶67), which presented a "severe impact" that was "at least reasonably possible" to materialize "in the near term" due to the potential volatility of these deposits; and (ii) as Regulators communicated to SBNY, the Bank "did not sufficiently establish policies and controls to address this key risk." ¶356.

Defendants' challenges to Misstatements 4 and 38 all fail. **First**, they argue these Misstatements were not materially misleading because the Bank disclosed that its "depositor base is more heavily weighted to larger uninsured deposits" and gave the "dollar amount and percentage" of its uninsured deposits. Lead Br. at 40; Shay Br. at 13. But the Complaint does not

allege they failed disclose this—rather, as the Regulators repeatedly warned, Defendants failed to disclose that SBNY's deposits were increasingly overconcentrated in single depositors' accounts to the point that just four depositors comprised over **$16 billion** in deposits, accounting for **14%** of the Bank's total *assets*. ¶¶67, 87. Identifying the Bank's total insured deposits and "refer[ing] during earnings calls to clients with large deposits" disclosed nothing about these concentrations. Wyremski also argues that SBNY disclosed in its 10-K that deposits from digital asset banking customers exceeded $20 billion at the end of 2021, and that declines in digital assets deposits can occur because of volatility in the value of digital assets and other factors. Wyremski Br. at 11. These purported warnings failed to tell investors that significant percentages of the Banks' deposits had been concentrated in just a few depositors, and that the concentration of deposits could lead to a liquidity crunch given the Bank's inability to mitigate and manage this unique concentration risk.[3] Moreover, any such warnings were nullified by Defendants' repeated reassurances of the Bank's sound liquidity, deposit stability, and even that there was "*zero* correlation between the price of Bitcoin and our deposit flows" (Misstatement 12)—depriving investors of *any* notice of the Bank's true fragility.

    **Second**, Defendants argue that there are no allegations that SBNY's internal controls were lacking. Lead Br. at 40. This argument ignores the Regulators' warnings to Defendants and KPMG that the Bank's controls were insufficient and "continued to impede management's ability to identify and establish appropriate mitigating plans against the potential volatility of uninsured deposits." *See supra* Facts §B; *see also* ¶356 ("SBNY did not sufficiently establish policies and

---

[3] *Ong v. Chipotle Mexican Grill, Inc.*, 2017 WL 933108, at *17 (S.D.N.Y. Mar. 8, 2017) and *Gissin v. Endres*, 739 F. Supp. 2d 488, 508 (S.D.N.Y. 2010) are both inapposite. In *Gissin*, the "plaintiffs fail[ed] to demonstrate that the relevant risk … had already transpired," whereas here, the liquidity and risk control problems existed when the Misstatements were made. 739 F.Supp. 2d at 510. In *Ong*, the defendants disclosed non-generic risks that were particular to their business (2017 WL 933108, at *17)—in contrast, here, Defendants' purported "cautions" were non-substantive boilerplate repeated verbatim year after year. *See infra* §I.B.4.

controls to address this key risk"). Wyremski's related argument about Misstatement 4 also fails—he argues SBNY warned investors that the internal controls may not prevent or detect misstatements, and that management merely *believed* the internal controls were effective. Wyremski Br. at 11. But Defendants *knew* they lacked adequate controls, as Regulators repeatedly found and reported to SBNY management. ¶87. For this reason alone, *Schiro v. Cemex, S.A.B. de C.V.*, 396 F. Supp. 3d 283, 299 (S.D.N.Y. 2019), is inapposite—where, unlike here, the plaintiff failed to allege defendants were put on notice that their controls were defective.

**Third**, Defendants argue that internal control statements cannot be false because the Complaint does not allege that any financial figures or data within the 10-K were inaccurate. Shay Br. at 13. However, the Complaint *does* identify inaccuracies within SBNY's 10-K's, namely known but undisclosed risks from concentrations of large depositors exposed to the crypto market, which renders *In re SunEdison, Inc. Securities Litigation*, 300 F. Supp. 3d 444, 468, 488 (S.D.N.Y. 2018) and *In re Braskem S.A. Securities Litigation*, 246 F. Supp. 3d 731, 758 (S.D.N.Y. 2017) inapposite. Defendants' failure to disclose and mitigate such risks after Regulators pointed to problems and red flags is sufficient to allege a GAAP violation and lack of internal controls. *See In re Eletrobras Sec. Litig.*, 245 F.Supp.3d 450, 468–69 (S.D.N.Y. 2017) (statements claiming strong internal controls were actionable when defendants were aware of "red flags" that "highlighted significant problems").

**Fourth**, Susca again bases his argument off the Regulators' statement that the Bank "appropriately" controlled risk. Susca Br. at 6-7. As set forth above in §I.A.2, this argument is meritless. The cited report states "the Bank failed to address key concerns fully and in a timely manner at the same time it was rapidly expanding its business operations." DX EE at 44; *see also* DX A at 2 ("[T]he root cause of SBNY's failure was poor management. SBNY's board of directors

and management pursued rapid, unrestrained growth without developing and maintaining adequate risk management practices and controls appropriate for the size, complexity and risk profile of the institution."). And in any event, Susca, as "senior management" of the Bank, "had an independent duty to ensure compliance with GAAP and maintain effective internal controls." *In re Diamond Foods, Inc., Sec. Litig.*, 2012 WL 6000923, at *8 (N.D. Cal. Nov. 30, 2012). Thus, he is wrong to suggest that he could, with no diligence, certify the Bank's GAAP compliance based upon a purported remark of the Regulators.

### 6.    Misstatements Concerning Regulatory Oversight (Misstatements 5, 6, 15 and 16).

Defendants falsely represented that the Bank was in good standing with Regulators. For instance, Defendants' representations that the Regulators were "comfortable with [the Bank]" because "[t]hey know our risk and compliance framework" (Misstatement 6) concealed numerous material adverse facts. *See supra* Facts §B (collecting allegations that SBNY's Regulators had in fact issued numerous MRBA and SRs finding serious deficiencies in SBNY's risk management practices; downgraded the Bank's liquidity rating; warned Defendants of their asset overconcentration and other risks; and admonished SBNY for not seriously heeding its warnings).

Defendants' challenges do not withstand scrutiny. To start, Defendants do not even challenge that Misstatements 5, 15 and 16 are adequately alleged to be misleading. Further, Defendants argue that Santora's Misstatement 6 is not adequately alleged to be false because he "accurately" stated "the positive working relationship that the Bank had with DFS concerning Signet at that time." Santora Br. at 8-10. Santora claims that "Plaintiff does not—and cannot— allege that Santora received or otherwise knew about (or recklessly disregarded) any of these MRBAs or SRs at the time of the Wells Fargo Forum." This is wrong. At this outset, Santora confuses falsity with scienter. As shown below in §I.C.1.j, Santora's scienter arguments fail given

the facts show his knowledge of and access to adverse information.

Even were the Court to consider Santora's improper reliance on a DFS press release that was not cited in the Complaint (*see Global Network Commc'ns, Inc. v. City of New York*, 458 F.3d 150, 157 (2d Cir. 2006)), the release is dated December 4, 2018—long before the events underlying this Action arose and more than two years before the start of the Class Period. *See.* DX QQQ at 1.

Santora attempts to improperly limit the context of his statements to "DFS's view of Signet" and cherry picks and ignores the immediate context. Santora Br. at 9 (claiming "Plaintiff cannot plausibly assert that Santora's comments related to the Bank's overall relationship with the Regulators"). His statements were a response to an analyst question about "the Regulators and the Regulators working with Signature," how he saw "the regulatory backdrop progressing going forward," and whether that would "continu[e] to become a differentiator and a benefit for ***Signet and Signature?***" His questions related to the company as a whole. ¶¶217-18.[4] And, in any event, Signet was a critical gateway for Signature's outsized portfolio of digital assets, one of the Regulators' core concerns. *See supra* Facts §B.

Despite affirmatively choosing to speak about these regulatory subjects, Defendants now contend that they were prohibited by law from disclosing the Regulators' deficiency findings that the Complaint alleges were necessary to render the Misstatements not misleading. Lead Br. at 23. This argument is baseless, as detailed below in §I.B.5.b.

## B.    The Individual Defendants' Remaining Challenges to the Misstatements Fail.

### 1.    The Alleged Misstatements Are not "Fraud by Hindsight."

Defendants reflexively characterize Plaintiff's claims as "fraud by hindsight." Seibert Br. at 14; Wyremski Br. at 7. This is wrong. The Complaint amply alleges that the Misstatements were

---

[4] Santora also repeats Defendants' refrain that his misstatements were not false because the Bank's Composite rating remained a "2" for most of the Class Period. Santora Br. at 9. This argument fails, as shown above in §I.A.2.

false when made based on: (1) the fact that Regulators had repeatedly informed Defendants of the problems at the Bank since the 2019 examination cycle, before the Misstatements were made (¶¶81-84); (2) the adverse Regulatory findings and communications occurred continuously during the Class Period, while the statements were issued (¶¶88-92, 105-16); and (3) despite these repeated warnings, Regulators determined that Defendants never remedied the problems they had identified (¶¶118, 200). These are not allegations of fraud by hindsight but rather contradictory facts known or available to Defendants when the misstatements were made. *See Freudenberg v. E\*Trade Fin. Corp.*, 712 F. Supp. 2d 171, 192 (S.D.N.Y 2010) ("misstatements of existing fact are not mere fraud by hindsight").

### 2. The Alleged Misstatements Are not Immaterial Puffery.

Defendants argue that certain statements concerning SBNY's financial security, including concerning the Bank's "well-diversified financial position," "low-risk profile," and "strong liquidity," are mere puffery. Lead Br. 24-25 (challenging Misstatements 1, 8, 13, 23, 28, 30, 34, 36 and 37). In addition, they argue that four other misstatements regarding SBNY's risk management practices, internal controls, and compliance with stress testing requirements, are puffery. Lead Br. at 26-29 (challenging Misstatements 2, 3 and 29); Shay Br. at 12-13 (challenging Misstatements 2, 3, 4, and 13). Materiality is generally a "delicate, fact-intensive" question that depends on all surrounding circumstances. *See Bricklayers & Masons Local Union No. 5 Ohio Pension Fund v. Transocean Ltd.*, 866 F.Supp.2d 223, 244 (S.D.N.Y. 2012). To constitute puffery, the Court must find that they are immaterial as a matter of law at the pleading stage. *Id.* ("In deeming a statement puffery at the motion to dismiss stage, courts must exercise great caution."). In assessing materiality, the Court must look to a "number of context-specific factors, including specificity, emphasis, and whether certain statements are designed to distinguish the company in some fashion that is meaningful to the investing public."

*In re Signet Jewelers Ltd. Sec. Litig.*, 389 F. Supp. 3d 221, 229 (S.D.N.Y. 2019).

Here, none of the statements can be considered immaterial puffery as a matter of law because there is at least a fact question as to their importance when viewed in context. All of these statements concerned issues that ultimately destroyed the Bank and were the focus of the Regulators and investors alike. Defendants made these statements despite known serious deficiencies in the Bank's liquidity planning, risk controls, and outsized concentration risks—material facts that were withheld from investors. *See supra* Facts §B. Positive assurances on critical subjects contradicting negative feedback from bank Regulators and the Bank's true state of affairs are actionable. *See Wells Fargo*, 2021 WL 4482102, at *19 (assurance that bank's program to mitigate risks was "making great progress" was not puffery given repeated criticism from bank's Regulators that program was not on track); *In re Ambac Fin. Grp., Inc. Sec. Litig.*, 693 F. Supp. 2d 241, 270 (S.D.N.Y. 2010) (mortgage guarantor's statements that it had "rigorous" and "conservative" underwriting standards were not puffery where defendant had lowered its standards); *Novak v. Kasaks*, 216 F.3d 300, 315 (2d Cir. 2000) ("defendants did more than just offer rosy predictions; the defendants stated that the inventory situation was 'in good shape' or 'under control' while they allegedly knew that the contrary was true"); *Arkansas Teacher Ret. Sys. v. Bankrate, Inc.*, 18 F.Supp.3d 482, 485 (S.D.N.Y. 2014) (Bank's description of impaired assets as "high quality" was materially misleading); *U.S. Bank Nat. Ass'n v. PHL Variable Ins. Co.*, 2013 WL 791462, at *7 (S.D.N.Y. Mar. 5, 2013) (description of policies as "flexible" "balanced" "appropriate" were actionable).

Accordingly, for each statement, there is at least a fact question as to their importance when viewed in context. *See BHP Billiton*, 276 F. Supp. 3d at 79 ("While certain statements, viewed in isolation, may be mere puffery," they "become material to investors" if "made repeatedly in an

effort to reassure the investing public about matters particularly important to the company and investors."); *In re Petrobras Sec. Litig.*, 116 F. Supp. 3d 368, 381 (S.D.N.Y. 2015) (viewed in context, "a reasonable investor could rely on them as reflective of the true state of affairs at the Company"); *Ambac Fin. Grp.*, 693 F. Supp. 2d at 270 (statements actionable "where a defendant affirmatively characterizes management practices as 'adequate,' 'conservative,' 'cautious,' and [the like]" but "intentionally or recklessly omits certain facts contradicting these representations").

Further, many of the Misstatements regarding SBNY's financial security, stress testing and risk controls were made in response to specific analyst questions or investor concerns. For instance, DePaolo made Misstatement 8 directly in response to an analyst question about the potential for withdrawals from "crypto related" accounts. ¶¶227-28. Similarly, Defendants made Misstatements 31, 34, 36 and 37 to assuage investor concern about the growing risks associated with volatility in the crypto-markets. ¶¶236, 333, 346-47. Misstatement 29 was issued to address investor concern over the Bank's exposure to "the current challenging digital asset landscape." ¶323. Such statements are not puffery. *See Washington State Inv. Bd. v. Odebrecht S.A.*, 461 F. Supp. 3d 46, 73 (S.D.N.Y. 2020) (statements made to reassure investors as to "specific risks . . . cannot be dismissed as mere puffery"); *Eletrobras*, 245 F. Supp. 3d at 463-64 (statements made "to reassure the investing public" not puffery); *In re Dentsply Sirona, Inc. Sec. Litig.*, 665 F. Supp. 3d 255, 284-85 (E.D.N.Y. 2023) (statements that company had "strong" business relationship in response to analyst questions were not puffery); *Makor Issues & Rights Ltd. v. Tellabs, Inc.*, 437 F.3d 588, 597 (7th Cir. 2006) (statement that demand "remained strong" went "well beyond puffery" when made in response to analyst questions).

And courts routinely reject similar puffery arguments where defendants repeatedly discuss issues and stress their importance to investors—exactly what Defendant did here. *BHP Billiton*,

276 F. Supp. 3d at 80 (statements were not puffery where defendants made "extensive, frequent, and prominent discussions of the topic in their disclosures to investors"). Naturally, investors in SBNY would care most deeply about the Bank's and its officials' statements about its liquidity, diversification, and risk management controls, and courts routinely find that statements concerning issues that most acutely affect a given industry are not puffery. *See In re Moody's Corp. Sec. Litig.*, 599 F. Supp. 2d 493, 501, 508-09 (S.D.N.Y. 2009) (statements about rating agency's integrity and independence were not puffery); *Bricklayers*, 866 F. Supp. 2d at 244 (drilling company's statement that its safety and training efforts were "extensive" was actionable). Indeed, the sheer fact that Defendants repeated the challenged misstatements dozens of times during the Class Period "communicates to investors what matters are particularly important." *In re Avon Sec. Litig.*, 2019 WL 6115349, *16 (S.D.N.Y. Nov. 18, 2019); *BHP Billiton*, 276 F. Supp. 3d at 80 ("By touting its commitment to safety to such a degree, [defendants] put the topic at issue such that we cannot say, as a matter of law, investors would not find these representations material.").

Defendants' cases are inapposite. In *ECA & Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co.*, the defendant's generic statements about risk management and integrity did not, as here, respond to specific investor concerns or contradict regulator findings about the company's then-present risks and lack of controls. 553 F.3d 187, 197, 205-06 (2d Cir. 2009). Similarly, *Plumber & Steamfitters Local 773 Pension Fund v. Danske Bank A/S* concerned generic anti-money laundering compliance statements ***three years before*** Regulators and the public became concerned over the defendant bank's practices. 11 F.4th 90, 96, 98, 103-04 (2d Cir. 2021); *see also Singh v. Cigna Corp.*, 918 F.3d 57, 60-61 (2d Cir. 2019) (same, and defendant's statements ***after*** receiving notice of regulatory noncompliance merely affirmed the importance of "integrity and compliance"). Nothing like those facts is present here, as Defendants claimed SBNY

had appropriate risk controls despite being told over and over by its Regulators that it did not.[5]

Finally, Defendants' fact-based arguments that it told investors SBNY was no longer subject to Dodd-Frank stress testing requirements, that it planned to conduct "idiosyncratic" tests, that FDIC's oversight would "evolve," or that no internal controls could "totally eliminate risk," are all irrelevant. Lead Br. at 28. None of these arguments dispels the falsity of Defendants' repeated claims that SBNY had appropriate risk management controls and adequate stress testing.

### 3.    The Alleged Misstatements Are not Non-Actionable Opinions.

Even where a statement is an opinion, an opinion statement is actionable in three circumstances, including if: (i) it does not "fairly align[] with the information in the issuer's possession at the time" (*Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 183 (2015)); (ii) it "contained one or more embedded factual statements that can be proven false" (*Abramson v. Newlink Genetics Corp.*, 965 F.3d 165, 175 (2d Cir. 2020)); or (iii) "the speaker subjectively disbelieved the statement" (*id.*). Each challenged statement is actionable.

**First**, Defendants incorrectly assert that their statements that Regulators were "comfortable with" (Misstatement 6) and "supportive" (Misstatement 16) of SBNY's management practices are non-actionable opinion because "the Complaint contains no allegations that the individuals stating these opinions did not genuinely believe them," *i.e.*, it does not allege "subjective falsity." Lead Br. at 30. These statements are not opinions as they do not include words like "believe" or "think"

---

[5] Most of Defendants' cases did not involve statements that contradicted known contemporaneous regulator findings or addressed investor concerns. *SRM Global Fund Ltd. P'ship v. Countrywide Fin. Corp.*, 448 F. App'x 116, 117-18 (2d Cir. 2011) (no allegations of regulator findings or specific investor concerns); *Bldg. Trades Pension Fund of W. Pa. v. Insperity, Inc.*, 2022 WL 784017, at *12 (S.D.N.Y Mar. 15, 2022) (same); *Ret. Bd. of the Policemen's Annuity & Benefit Fund of Chi. v. FXCM Inc.*, 333 F. Supp. 3d 338, 349 (S.D.N.Y. 2018) (same); *In re UBS AG Sec. Litig.* 2012 WL 4471265, at *14 (S.D.N.Y. Sept. 28, 2012) (same); *In re Wachovia Equity Sec. Litig.*, 753 F. Supp. 2d 326, 376 (S.D.N.Y. 2011) (same). The few cases Defendants cite involving regulator findings are missing allegations present here that defendants repeatedly failed to address the Regulators' concerns. *See In re Citigroup Sec. Litig.*, 2023 WL 2632258, at *16-17 (S.D.N.Y. Mar. 24, 2023) (unlike here, plaintiff failed to plead that defendants did not address the deficiencies identified by Regulators); *In re Liberty Tax, Inc. Sec. Litig.*, 435 F. Supp. 3d 457, 467 (E.D.N.Y. 2020) (same); *In re Deutsche Bank*, 2017 WL 4049253, at *6 & n.4 (same).

or otherwise indicate they are inherently subjective. *Omnicare*, 575 U.S. at 183 (opinions are beliefs or views that do not imply certainty and often include "I believe" or "I think").

Further, even if they were opinions, subjective falsity is not required. An opinion is actionable if it does not "fairly align[] with the information in the issuer's possession at the time." *Id.* at 189. Defendants' statements are actionable because they omitted the material facts showing Regulators were ***not*** comfortable with the Bank and had reported that SBNY had failed to correct myriad "critical" liquidity risk management deficiencies. ¶219. *Wells Fargo*, 2021 WL 4482102, at *14 (statements about Bank's compliance with regulator's findings were actionable given undisclosed letter from Federal Reserve detailing defendants' continued failures).[6]

Defendants argue Plaintiff "exaggerates the Regulators' conduct," noting that Regulators maintained SBNY's Composite score of "2" for much of the Class Period, noted some improvements in liquidity and controls and supported SBNY's adoption of Signet. Lead Br. at 18-20, 30. As shown above (*supra* §I.A.2), these arguments fail. Defendants fail to rebut they did not disclose the material deficiencies that Regulators continually warned them about during the Class Period.

**Second**, Defendants wrongly challenge Misstatements 7, 8, and 20. Lead Br. at 31; Seibert Br. at 12-13. Defendants' arguments fail because statements that "deposits are quite stable" (Misstatement 7) and "fairly sticky" (Misstatement 8), and "the price of Bitcoin doesn't have anything to do with our growth one way or the other" (Misstatement 20), are not opinions but rather statements of certitude. *See Omnicare*, 575 U.S. at 183.

Even if opinions, these statements are actionable because Defendants omitted material facts

---

[6] Defendants' cases are inapposite because none involved omissions of regulator concerns. *In re Express Scripts Holdings Co. Sec. Litig.*, 773 F. App'x 9, 13 (2d Cir. 2019) (statements that customer relationship was "great" did not omit regulator concerns); *In re Citigroup Sec. Litig.*, 2023 WL 2632258, at *18-19 (statements that bank was "rebuilding its relationship with Regulators" did not omit any "ongoing violations" cited by regulators).

about the basis of their statement; as Regulators concluded, the Bank did not have any deposit

study, model, or assumptions to support their assertions about the stability or stickiness of deposits.

*See supra* Facts §B. Nor had the Bank sufficiently conducted any specific analysis of its depositor

base, adverse market liquidity events, or the correlation between deposits and the price of Bitcoin.

*Id*.; *Omnicare*, 575 U.S. at 189 (omission of material facts about managements' "inquiry" into

their statements is actionable); *New England Carpenters Guaranteed Annuity and Pension Funds

v. DeCarlo*, 80 F.4th 158, 170 (2d Cir. 2023) ("[A] reasonable investor expects that opinion

statements rest on some meaningful inquiry . . . [not] "baseless off-the-cuff judgments."); *In re

Alibaba Grp. Holding Ltd. Sec. Litig.*, 2023 WL 2601472, at *11 (S.D.N.Y. Mar. 22, 2023)

(opinions actionable where defendants did not have a reasonable basis for their assertions).

Defendants claim Howell warned investors it was still "early on," and the Bank had "more

work to do" and analysts recognized there was some uncertainty. Lead Br. at 31. But the fact

remains that Defendants had no reasonable basis for their statements, yet conveyed the opposite to

investors. ¶¶222, 229, 287.[7]

Defendants' authorities on this point are inapposite. The Second Circuit's decision in *In re

Philip Morris International Inc. Securities Litigation*, 89 F.4th 408, 421 (2d Cir. 2023), where it

"rejected the proposition that a mere dispute about the proper interpretation of data" is off-point

because here, Plaintiff alleges that Defendants' assertions lacked any supporting analysis,

ultimately led to the collapse of the Bank, and were not just a mere misinterpretation of data.

Defendants' reliance on *In re Sanofi Securities Litigation*, 87 F. Supp. 3d 510, 545 (S.D.N.Y.

2015)), to argue that the Complaint impermissibly alleges "fraud by hindsight" fails. Here, there

---

[7] Moreover, Defendants' assertion that Plaintiff failed to show that deposits decreased when Bitcoin fell around March 2021, is a strawman. Lead Br. at 31. Plaintiff need only allege that Defendants did not disclose material facts about their lack of adequate inquiry into their statements. *Omnicare,* 575 U.S. at 189.

is no hindsight—the undisclosed facts that SBNY failed to appropriately analyze and mitigate its risks stemmed back to 2019, well before the challenged statements were made. ¶200.

**Lastly**, Defendants' scattershot attempts to reframe other Misstatements as non-actionable opinions fail. They challenge Misstatement 28 ("We haven't had any issues to liquidity at all"). Lead Br. at 32. This is not an opinion—it is clearly a categorical statement of historical fact. *See, e.g.*, *Abramson*, 965 F.3d at 176-77. Of course, even if it were an opinion, the statement concealed and omitted the many liquidity concerns expressed by the Regulators. ¶318.

Defendants also challenge Misstatements 1, 13, 15, 23, 29 and 30 concerning SBNY's risk profile and diversification. Lead Br. at 32. Even if these statements contain some subjective elements, they are still misleading because, as the Regulators told Defendants during the class Period, SBNY was overexposed to risks from a high concentration of depositors in the crypto space. ¶¶67, 87, 95, 109-10.

Defendants also assert that a few snippets of Misstatement 2 concerning SBNY's internal risk controls are opinion (Lead Br. at 32), but Defendants ignore the following portions of the statement that clearly are not opinion and were misleading: "We have put internal controls in place that help to mitigate the risks that affect our business. In addition, we have policies and procedures that further help mitigate risk and regulatory requirements that mandate that we evaluate, test and opine on the effectiveness of internal controls." ¶208. Further, even if they were opinions, they omitted material facts that management had not put in place adequate controls to mitigate risk (¶209), rendering them actionable (*Omnicare*, 575 U.S. at 183).

### 4.    Defendants' Forward-Looking/Cautionary Language Arguments Fail.

Defendants wrongly argue that Misstatements 2, 3, 11, 28, 32, and 33 are protected by the PSLRA's "safe harbor" provision for forward-looking statements. *See* Lead Br. at 33-34; Wyremski Br. at 8-10; Shay Br. at 9, 12. A defendant is not liable only if (1) the forward-looking

46

statement is "identified and accompanied by meaningful cautionary language"; (2) the forward looking statement is immaterial; or (3) "the plaintiff fails to prove that [the forward looking statement] was not made with actual knowledge that it was false or misleading." *In re Vivendi, S.A. Sec. Litig.*, 838 F.3d at 245. Under the first prong, defendants must show "that their cautionary language was not boilerplate and conveyed substantive information." *Id.* at 247. Defendants' arguments fail.[8]

**First**, these statements are not forward looking. *See* Lead Br. at 33; Wyremski Br. at 8-9; Shay Br. at 9, 12. Rather, each contains present or historical statements of fact. *See* Misstatements:

- Misstatement 2: "We *have put* internal controls in place that help to mitigate the risks that affect our business. In addition, *we have policies and procedures* that further help mitigate risk."

- Misstatement 3: The Bank "*has developed a process* to comply with the stress testing requirements."

- Misstatement 11: "Our liquidity management *is guided* by policies *developed and monitored* by our asset/liability management committee. . . These policies *take into account* the marketability of assets, the source and stability of deposits, our wholesale borrowing capacity and the amount of our loan commitments."

- Misstatement 28: "Right now, *we've been monitoring it* as we should on a minute-by-minute basis, and *we feel comfortable* that we'll be at that we want at any point in time. We *haven't had any issues to liquidity at all*."

- Misstatement 32: "[R]ight now, *we have* between cash and borrowing capacity, we can easily take care of any deposits leaving . . . *we've got adequate capacity* to cover all crypto deposits we leave in the bank. . . ."

- Misstatement 33: "*We also recognize* that it's important for us to have a diversified funding base . . . *we're* not just a crypto bank and we want that to come across loud and clear."

The safe harbor does not protect misleading statements "about historical and present facts," whether or not they are "couched as predictions of future events." *In re Vivendi Universal, S.A. Sec. Litig.*, 765 F. Supp. 2d 512, 569 (S.D.N.Y. 2011), *aff'd*, 838 F.3d 223 (2d Cir. 2016); *In re*

---

[8] Both Shay and Susca adopt the safe harbor arguments from the Lead Brief. *See* Susca Br. at 6; Shay Br. at 9. These blanket invocations of safe harbor arguments from the Lead Brief fail for the same reasons described herein.

*SLM Corp. Sec. Litig.*, 740 F. Supp. 2d 542, 556 (S.D.N.Y. 2010) ("[W]hen an allegedly false statement has both a forward-looking aspect and an aspect that encompasses a representation of present fact, the safe harbor provision of the PSLRA does not apply."); *see also Wells Fargo*, 2021 WL 4482102, at *18 ("The challenged statements were not 'forward-looking' because [the speaker] was describing the Bank's current or past progress—e.g., '*we're in* complete agreement'; '*we're in the midst* of implementing that'; '*we're continuing to* actively work and implement the new risk management framework.'"). At most, "these statements are only partially forward-looking and not protected." *In re Longtop Fin. Techs. Ltd. Sec. Litig.*, 2012 WL 2512280, at *9 n.141 (S.D.N.Y. June 29, 2012).

Defendants' arguments that Signature's public filings identified these statements as forward-looking in its public filings fails to pass muster. Lead Br. at 33; Wyremski Br. at 9. They cite no law suggesting that companies are able to insulate themselves from liability merely by claiming their own language is "forward-looking" without regard to the actual substance of the statements themselves.

**Second**, Defendants incorrectly contend that their statements were accompanied by "meaningful cautionary language." *See* Lead Br. at 33-34; Wyremski Br. at 8-9; Shay Br. at 12. As the outset, the aforementioned "misrepresentation of present or historical facts cannot be cured by cautionary language." *P. Stolz Family P'ship L.P. v. Daum*, 355 F.3d 92, 96-97 (2d Cir. 2004). That aside, the purported warnings cited by Howell, DePaolo, and Wyremski (*see* Lead Br. at 33-34; Wyremski Br. at 8-9) were couched as hypothetical risks in boilerplate repeated verbatim across Signature's filings. *See, e.g.,* DX H at 50-51 ("You should be aware that many factors ***could*** affect our actual financial results or results of operations and ***could*** cause actual results to differ materially from those in the forward-looking statements"); DX G at 44 (same); DX I at 49 (same);

DX J at 41 (same); DX K at 45 (same); DX L at 49 (same); DX F at 4 (same); *see also* DX C at 54 ("*[i]f a* significant portion of our deposits were withdrawn *we may need* to rely more heavily on more expensive borrowings and other sources of funding to fund our business and meet withdrawal demands" and such "events *could* materially and adversely affect our business, results of operations or financial condition."); DX F at 54 (same); DX D at 53 (same); *see also* DX D at 47 ("further volatility in the digital asset markets *may* adversely affect our deposits and, in turn, our business . . . liquidity, capital levels/ratios . . . financial condition and results of operations"); DX C at 54 ("We *may* not be able to raise the additional funding needed for our operations"); DX F at 55 (same); DX D at 53 (same); *see also* DX C at 52 ("if we were unable to borrow from the FHLB, we would need to find alternative sources of liquidity, *which may not be available*."); DX F at 52 (same); DX D at 50 (same); *see also* DX D at 54 ("the soundness of other financial institutions *could* adversely affect us."); DX C at 55 (same); DX F at 56 (same).

Such qualified warnings of hypothetical future adverse events are meaningless when, as here, the events warned of have already materialized. At the time of these purported warnings, Regulators had *already* informed Defendants of serious deficiencies in their risk management controls (¶206), including "an MRBA related to Liquidity Contingency Planning that remained outstanding from 2019 through SBNY's failure" (¶82). *See supra* Facts §B. Defendants' purported cautionary language does not "insulate from liability the failure to disclose that the risk ha[d] transpired." *Facebook,* 986 F. Supp. 2d at 515; *Panther Partners Inc. v. Jianpu Tech. Inc.*, 2020 WL 5757628, at *12 (S.D.N.Y. Sept. 27, 2020) (warnings are insufficient if "framed as mere hypotheticals" which "imply that the risk" is "theoretical," when it "has already materialized*"*).

In addition, Defendants' arguments that these purported warnings addressed the "specific risks and uncertainties" at issue (Wyremski Br. at 9) and were "specifically related" to the

misstatements (Lead Br. at 34) fall flat. Risks such as "deposit growth" were part of an itemized list of over 50 other risks that could befall the Company in a catch-all disclaimer that was repeated across Signature's filings. *See, e.g.*, DX H at 50-51; DX G at 44 (same); DX I at 49 (same); DX J at 41 (same); DX K at 45 (same); DX L at 49 (same); DX F at 4 (same). Nowhere did these purported "warnings" disclose, for instance, the fact that the Bank did not have sufficient "***internal controls*** relating to liquidity risk management, including the internal audit of the liquidity function" (¶89); the Bank's "inadequate liquidity contingency planning, liquidity stress testing, and internal controls continued to impede management's ability to identify and establish appropriate mitigating plans against the potential volatility of uninsured deposits" (¶92); and SBNY's management and Board "did not prioritize appropriate risk management practices and internal controls" (¶198). Indeed, DePaolo and Howell's reliance on *In re Weight Watchers International Inc. Securities Litigation*, 504 F. Supp. 3d 224, 255 (S.D.N.Y. 2020), undercuts their own argument. The *Weight Watchers* court found a four-part warning in a 10-K that "disclosed the exact risk of which Plaintiffs complain" and specific to changed circumstances at the company to be meaningful (*id.*)—a far cry from Signature's boilerplate disclaimers repeated monotonously across dozens of its filings.[9]

Likewise, contrary to DePaolo and Howell's assertion, there is no refuge in SBNY's vague disclaimers that it was "no longer . . . subject to the stress testing requirements established by the Dodd-Frank Act until it accumulates $250 billion of total consolidated assets." Lead Br. at 33-34.

---

[9] Santora's argument that his statements—including his conceded "non-disclosure of MBRAs and SRs"—were "immaterial in light of the Bank's risk disclosures to investors" fails for the same reasons. Santora Br. at 12-13. Moreover, Santora's claim that, "based on the FDIC's own standards, omission of the MRBAs and SRs was immaterial" (*id.*) is undercut by the FDIC's own admissions that (i) "[g]iven the recurring liquidity control weaknesses, SBNY's unrestrained growth, and management's slow response to address findings, it would have been prudent to downgrade the Management component rating to '3,' (i.e., needs improvement) as early as the second half of 2021" and (ii) its limited resources "slowed earlier identification and reporting of SBNY weaknesses." DX A at 3. At most, Santora has conceded that he successfully deceived an overburdened regulator.

At the time those warnings were made, Regulators had already informed Defendants that their risk management and liquidity processes were deficient, rendering these "warnings" insufficient to guard against the already materialized risk of a liquidity failure. *See* §§I.A, I.B.4.

**Third**, Defendants had actual knowledge that their statements were false. *See* Facts §§B, D. Thus, the gap between what Defendants said and what Regulators repeatedly informed them of during the Class Period alone removes the statements from safe harbor protection.

Defendants' actual knowledge of the undisclosed deficiencies in their risk management and liquidity processes renders the authorities they cite inapposite. *See In re Aceto Corp. Sec. Litig.*, 2019 WL 3606745, at *7 (E.D.N.Y. Aug. 6, 2019) ("no evidence that defendants knew, as of February 1, 2018, that the government contracts would in fact be terminated"); *Gregory v. ProNAi Therapeutics Inc.*, 297 F. Supp. 3d 372, 404-05 (S.D.N.Y. 2018) (there was no "fail[ure] to warn of specific risks to investors on which [defendant] was well aware").

### 5. Defendants' Remaining Arguments that their Statements Are Inactionable Fail.

#### a. Defendants' "Maker" and "Group Pleading" Arguments Fail.

Defendants wrongly attempt to evade liability by claiming that they were not the "maker" of certain misstatements under *Janus Capital Group, Inc. v. First Derivative Traders, Inc.*, 564 U.S. 135 (2011). *See* Susca Br. at 8-9 (Misstatement 1); Lead Br. at 36 n.12 (Misstatements 21, 22); Wyremski Br. at 5-6 (Misstatements 28, 29, 30, 34); Santora Br. at 6 (Counts I and II).

These arguments are a strawman. **First**, as a preliminary matter, *Janus*'s reasoning does not apply to corporate officers' liability, and courts have refused to extend the decision's holding in such cases. *See, e.g., City of Pontiac Gen. Emps.' Ret. Sys. v. Lockheed Martin Corp.*, 875 F. Supp. 2d 359, 374 (S.D.N.Y. 2012) ("[*Janus*] addressed only whether third parties can be held liable for statements made by their clients. Its logic rested on the distinction between secondary

liability and primary liability, and has no bearing on how corporate officers who work together in the same entity can be held jointly responsible on a theory of primary liability.").[10]

**Second**, even if *Janus* were to apply, the Complaint fully satisfies it because it attributes each misstatement to the responsible speakers and/or signatories of SEC filings. *See* PX 1. Nothing further is required. *See Janus Cap. Grp., Inc,* 564 U.S. at 142 ("One 'makes' a statement by stating it."); *City of Roseville Emps.' Ret. Sys. v. EnergySolutions, Inc.*, 814 F. Supp. 2d 395, 417 (S.D.N.Y. 2011) ("no dispute" that signatories to public filings "made" the misleading statements contained therein under *Janus*). Thus, the Complaint does not engage in "group pleading."

Howell tries to escape liability for misstatements in a press release that "referenced Defendant Howell's appearance at a forthcoming investor conference." Lead Br. at 36 n.6. Although the press release does not quote him, this does not exculpate Howell. *Janus* does not "imply that there can be only one 'maker' of a statement in the case of express or implicit attribution." *EnergySolutions*, 814 F. Supp. 2d at 417 n.9. Howell lent his imprimatur to the press release and is responsible for its contents. *See Pfizer*, 2012 WL 983548, at *4 ("While statements in Pfizer's press releases were not explicitly attributed to the Individual Defendants, *Janus* recognized that attribution [can] be implicit from surrounding circumstances.").

Defendant Wyremski argues that he was not the "maker" of Misstatement 34. *See* Wyremski Br. at 6 n.6. Wyremski cites no authority in support of this argument, concedes that he signed the SEC filing with which the press release containing this Misstatement was filed, and ignores that the header of the press release explicitly refers investors to Wyremski "for further

---

[10] *See also, e.g.*, *In re Stillwater Cap. Partners Inc. Litig.*, 853 F.Supp.2d 441, 460 (S.D.N.Y. 2012) (officers faced liability for misstatements not publicly attributed to them because "[t]his situation differs from *Janus*, which involved two separate entities and whether statements of one could be attributed to the other"); *In re Pfizer Inc. Sec. Litig.*, 2012 WL 983548, at *4 (S.D.N.Y. Mar. 22, 2012) (distinguishing *Janus* because plaintiffs did not seek to hold a corporate actor liable for statements over which another corporation had ultimate control"); *In re Merck & Co., Inc. Sec., Deriv., & ERISA Litig.*, 2011 WL 3444199, at *25 (D.N.J. Aug. 8, 2011) (distinguishing *Janus* in case of officer liability).

information." DX JJJ at 6.

> **b.    Defendants' Arguments About Regulatory Confidentiality Are a Red Herring.**

Defendants argue that the pervasive, undisclosed deficiencies in the Bank's risk practices cannot support a claim here because Defendants: (i) "had no duty to disclose regulatory comments"; and (ii) "were **prohibited** from doing so by federal and state regulations." Lead Br. at 22-23 (emphasis in original); *see also* Wyremski Br. at 12-13; Santora Br. at 9. These arguments fail.

In essence, Defendants are arguing that when a regulator tells a bank of a severe and potentially fatal deficiency, the bank's management is entitled under the securities laws to affirmatively make misleading statements about the facts at issue. Unsurprisingly, no court has ever held as much.[11] And the result would be perverse: it would allow senior executives to affirmatively mislead investors about critical facts with impunity.

Moreover, the argument misapprehends the nature of Plaintiff's claims and ignores controlling law. Plaintiff is **not** contending that Defendants had a standalone duty to publish the Regulators' reports. Rather, once Defendants decided to speak on subjects such as liquidity, risk management, and their relationship with Regulators, they were obligated to disclose the full underlying facts, including the Bank's underlying material deficiencies. As noted above, it is well-settled that "once a company speaks on an issue or topic," as Defendants did here, "there is a duty to tell the whole truth." *Meyer*, 761 F.3d at 250-51. This duty holds firm where the matters at issue concern regulatory oversight or compliance. Courts find actionable "descriptions of processes that

---

[11] Defendants' reliance on *In re Nextcard Securities Litigation*, 2005 WL 6342406 (N.D. Cal. Feb. 7, 2005) is misplaced. There, the plaintiffs "failed to allege facts demonstrating that any particular defendant had a duty to disclose" the underlying facts. *Id.* at *11. Here, Defendants' affirmative misstatements triggered a duty to disclose the deficiencies at issue, and they could have disclosed them without referencing the Regulators' specific reports.

a company takes to comply with regulatory requirements, even if technically true, where they omit information that inaccurately gave comfort to investors that reasonably effective steps were being taken to comply." *See Karimi,* 607 F. Supp. 3d at 393 (quoting *Meyer*, 761 F.3d at 251) ("[I]nvestors would be misled by a statement [describing specific processes] if in fact the [processes] were then failing to prevent substantial violations."); *Wells Fargo*, 2021 WL 4482102, at *20 ("Even if Mr. Sloan did not have a duty to disclose the Regulators' rejections because the information was confidential, the answer he did provide was misleading given the context, and in need of further clarification or additional information."); *Habelt v. iRhythm Techs., Inc.*, 83 F.4th 1162, 1175 n.14 (9th Cir. 2023) ("[W]hen [defendants] choose to speak on voluntary matters" involving regulatory scrutiny, they have a duty to avoid misleading investors "about [the defendants'] cooperation with Regulators or about concerns expressed by Regulators.").

Defendants could have fulfilled their obligations under the securities laws by either: (1) declining to speak on these subjects, or (2) speaking on those subjects and disclosing all the material underlying ***facts***, without disclosing specific Regulator communications. Even if the Regulators' reports may be confidential under some circumstances, the ***underlying fact*** of the severely deficient state of Signature's liquidity and risk management system was not required to be kept confidential—and Defendants certainly had no license to mislead about those facts.

## C.    The Complaint Alleges a Strong Inference of the Individual Defendants' Scienter.

To determine whether scienter is adequately alleged, "courts must . . . accept all factual allegations in the complaint as true." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.,* 551 U.S. 308, 309 (2007). As the Supreme Court has instructed, the question is "whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Id.* at 322-23 (emphasis in original). The inference

54

of scienter "need not be irrefutable, *i.e.,* of the smoking-gun genre, or even the most plausible of competing inferences," and need only be "cogent and at least as compelling as any opposing inference." *Id.* at 324. If competing inferences are equal, "the tie . . . goes to the plaintiff." *In re Salix Pharm, Ltd.,* 2016 WL 1629341, at *13 (S.D.N.Y. Apr. 22, 2016).

"To establish scienter, a complaint may (1) allege facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness, or (2) allege facts to show that defendants had both motive and opportunity to commit fraud." *Set Capital LLC v. Credit Suisse Grp. AG*, 996 F.3d 64, 78 (2d Cir. 2021). "Motive is not required to plead scienter." *Freudenberg*, 712 F. Supp. 2d at 200. "[S]ecurities fraud claims typically have sufficed to state a claim based on recklessness when they have specifically alleged defendants' knowledge of facts or access to information contradicting their public statements." *Novak*, 216 F.3d at 308; *In re Van der Moolen Holding N.V. Sec. Litig.*, 405 F. Supp. 2d 388, 406 (S.D.N.Y. 2005) (scienter from "facts which come to a defendant's attention that would place a reasonable party in defendant's position on notice").

### 1.    The Complaint Alleges All Individual Defendants' Scienter Based on Conscious Misbehavior or, at a Minimum, Recklessness.

#### a.    Regulators' Findings and Reports Support Scienter.

"Relevant warnings from . . . Regulators are widely recognized to be evidence of scienter." *Karimi*, 607 F. Supp. 3d at 397-98; *see also Christine Asia Co. v. Yun Ma*, 718 F. App'x 20, 22 (2d Cir. 2017) (scienter found where Regulators gave warnings at "high-level" meeting with senior company officials); *Fryman v. Atlas Fin. Holdings, Inc.*, 2022 U.S. Dist. LEXIS 70597, at *69 n.13 (N.D. Ill. Apr. 18, 2022) (scienter found where "Defendants made false or misleading statements while in possession of information . . . from state regulatory orders"); *In re Able Labs. Sec. Litig.*, 2008 U.S. Dist. LEXIS 23538, at *57 (D.N.J. Mar. 24, 2008) (scienter found where regulators' letter gave "notice to the defendants that serious problems existed" and investigation

found "numerous problems . . . continued").

Here, the Complaint alleges a strong inference of scienter based on the Regulators' findings conveyed to Defendants through multiple meetings, letters and written reports before and during the Class Period. ¶¶400-04. These findings gave Defendants actual knowledge that SBNY lacked critical liquidity and risk management controls and could not identify, analyze or address the bank's liquidity problems and risks. For example, the Regulators found that SBNY had: (i) "critical liquidity exposure" from overconcentration in large depositors, particularly those in the digital asset space (¶86); (ii) "inadequate liquidity contingency planning, liquidity stress testing, and internal controls" and could not "identify and establish appropriate mitigating plans against the potential volatility" (¶92); and (iii) failed to establish "an appropriately-sized liquidity buffer," had not developed appropriate "deposit assumptions," and could not accurately assess "the impact of adverse events to capital levels" (¶94).

Most Defendants cannot (or in many instances, do not) dispute that as members of SBNY's Board and senior management, they received all of Regulators' findings set forth in the Complaint. Defendant Shay, as Chairman of SBNY's Board during the Class Period, indisputably received the Regulators' MRBAs, SRs, and other of the Regulators' findings that were shared with the Bank's Board. ¶¶80-81, 90, 94, 95, 113, 116. DePaolo (CEO) and Howell (COO) concede they received the Regulators' findings and were "taking steps" to respond. Lead Br. at 48-51. Defendant Susca (CFO until June 30, 2021 and CAO thereafter) similarly concedes that the Regulators' 2019 and 2020 ROEs were "available to [him] at the time [he] made [his alleged] misstatements." Susca Br. at 7. Defendant Wyremski likewise does not deny he received the Regulators' findings (nor can he given his senior positions), and instead argues the Complaint fails to "allege with specificity [he] *received and reviewed* any specific report." Wyremski Br. at 15 (emphasis in original). But

the Complaint need not allege Wyremski **reviewed** the reports, only that he had **access** to them. *In re CarLotz, Inc. SEC Litig.*, 2024 U.S. Dist. LEXIS 61722, at *48 (S.D.N.Y. Mar. 29, 2024) ("[A]ccess to information is sufficient" to show scienter). Indeed, given Wyremski's position as CFO, "it strains credulity that he could remain ignorant of the company's [challenged practices] while the CEO and other senior managers were aware of them." *Ambac Fin. Grp.*, 693 F. Supp. 2d at 269. Defendants Santora and Seibert argue they did not receive any of the reports or findings at issue, but these arguments fail, as shown below in §I.C.1.j. There is no credible dispute that Defendants had actual knowledge of the Bank's critically deficient liquidity and risk controls.

Faced with these damning facts, Defendants seek to construct a counternarrative on the basis that: (i) certain aspects of the Bank received "positive ratings" from the Regulators during the Class Period (Lead Br. at 48); and (ii) Defendants were "taking steps to respond to the Regulators' concerns" (Lead Br. at 50). Both arguments fail.

**First**, Defendants point to the fact that the Bank's overall "Composite" rating remained a "2" until shortly before its failure. Lead Br. at 48. But this misses the mark. As explained above (*supra* §I.A.2), Defendants' myopic focus on the Bank's overall rating Defendants simply ignores the relevant allegations in the Complaint that, shortly **before** the Class Period began, the Regulators downgraded SBNY's **liquidity rating** from a "2" to a "3" (¶82) because SBNY no longer had "satisfactory liquidity levels and funds management practices." *See* DX FF §§1.1-23, 1.1-27.

Moreover, this argument misses the key point that the Regulators' findings show that Defendants had knowledge of the widespread failures in the Bank's liquidity and risk management practices that undermined the truth of their public representations, as summarized above. *See supra* Facts §§B, D. At most, Defendants raise fact questions concerning the relevance and weight of the Bank's overall Composite rating in comparison to the specific liquidity deficiencies and

downgrade, which cannot properly be resolved at this stage, given the Court must "continue to draw all reasonable inferences in the [plaintiff's] favor" when considering disputed facts and materials. *SEC v. Ripple Labs, Inc.*, 2022 WL 762966, at *1 (S.D.N.Y. Mar. 11, 2022).

None of the authorities Defendants cite support their argument. They rely heavily on *In re Alkermes Public Co. Securities Litigation*, 523 F. Supp. 3d 283 (E.D.N.Y. 2021), but that case involved alleged false assurances to investors that a drug in trial would be approved, and the court found that FDA reports did not raise a strong inference of scienter because they "d[id] not reveal any information conveyed to [the company] that should reasonably have been interpreted to suggest that FDA approval of [the drug] was not possible or even unlikely." Here, by contrast, the Regulators' findings confirm that the Bank's risk management practices were deficient (*supra* Facts §B) in ways that rendered misleading their public assurances that these risks were being adequately modeled and managed (*supra* Facts §D).

Defendants' other authorities are inapposite because they involve regulator reports that: (i) raised deficiencies that did not relate to the alleged misstatements (*Kuriakose v. Fed. Home Loan Mortg. Corp.*, 897 F. Supp. 2d 168, 181 (S.D.N.Y. 2012)); (ii) expressed a regulatory concern to the defendants without making any finding its risk practices were deficient (*In re Manulife Fin. Corp. Sec. Litig.*, 2012 WL 4108104, *7 (S.D.N.Y. Sept. 19, 2012)); (iii) contained no information showing the regulators had informed the defendants of their deficiency findings at the time of the alleged misstatements (*Hammer v. Frontier Fin. Corp.*, 2012 WL 13020032, at *3 (W.D. Wash. Apr. 20, 2012)); or (iv) did not show "[the defendant] knowingly ignored [the regulator's] recommendations or requirements that would have prevented the Bank's failure or their loss" (*In re Franklin Bank Corp. Sec. Litig.*, 782 F.Supp.2d 364, 390-92 (S.D. Tex. 2011)).

Here, by contrast, the Regulators' findings: (i) directly pertain to Defendants' alleged

Misstatements; (ii) not only expressed concerns, but actually found the Bank's risk management practices were inadequate and required immediate remediation; (iii) were conveyed and known to Defendants by the time the Misstatements were made; and (iv) were "generally dismiss[ed]" by Defendants (¶¶198, 202) and went substantially unremedied between the time they were issued in 2019 and the Bank's failure in 2023 (¶105).

**Second**, Defendants' argument that scienter is not pled because they were "taking steps to respond to the Regulators concerns" (Lead Br. at 50) badly misses the mark. To start, it admits Defendants **knew** the Regulators' findings, confirming their knowledge of the information that establishes their scienter. *In re Toyota Motor Corp. Sec. Litig.*, 2011 WL 2675395, at *4 (C.D. Cal. July 7, 2011) (scienter found where "steps . . . to address" safety problem "showed management's awareness of the problems and potential reasons for them"). Defendants do not argue they disclosed the regulatory deficiencies to the market and were working to remediate them—Defendants admit they concealed these deficiencies while they publicly touted the Bank's "low risk profile" (Misstatement 1), "robust liquidity position" (Misstatement 34), "effective internal control[s]" (Misstatement 4), "quite stable" deposits (Misstatement 7), and, with no hint of irony, "very strong partner[ship] with [the Regulators]" (Misstatement 6). This only reinforces scienter. *See Fryman*, 2022 U.S. Dist. LEXIS 70597, at *72 (scienter found where "Defendants were attempting to fix the material deficiencies identified in the regulatory reports while concealing that they were doing so").

Moreover, the evidence Defendants offer for the "steps" they were taking is merely a snippet from the FDIC Report stating, in 2020, that "management **began addressing** the deficiencies identified in the 2019 Liquidity targeted review." DX A at 50. But the same Report confirms that, as Defendants were informed in a July 9, 2020 supervisory letter, the "steps" they

59

reference were inadequate. DX A at 50-51; ¶112. Indeed, the Regulators confirmed "SBNY never adequately addressed the liquidity risk management concerns" (¶200) and the liquidity-related MRBA from 2019 went unremedied all the way until Bank's collapse in 2023 (¶401).

Defendants' cited authorities are inapposite. Unlike in *In re Hain Celestial Group Inc. Securities Litigation*, 2022 WL 18859055, at *30 (E.D.N.Y. Nov. 4, 2022), where the court found that the defendants' "remedial efforts ***after*** the Class Period" did not show "***concomitant*** awareness" of falsity (*id.*), the Regulators' warnings and Defendants' so-called "steps" were taken ***during*** the Class Period. ¶¶420-21. And to the extent Defendants argue they perceived the Bank's problems differently than the Regulators, "this sort of argument is not countenanced by the securities laws." *SEC v. GenAudio Inc.*, 32 F.4th 902, 925 (10th Cir. 2022) (defendant's purported "subjective belief" cannot "absolve [him] of liability"). In all events, the sole question is whether Defendants knew of or had access to facts undermining their public statements—and they certainly did. *CarLotz,* 2024 U.S. Dist. LEXIS 61722, at *48 (alleged knowledge of or access to facts contrary to public representations sufficient to show scienter).

> **b.    Defendants Repeatedly Misled the Regulators as to the Bank's Available Liquidity During the Weekend Leading up to SBNY's Collapse.**

Courts "ascribe[] significance, in the scienter analysis, to the means by which the [facts revealing fraud] were ultimately exposed." *See, e.g., In re Barclays PLC Sec. Litig.*, 2024 U.S. Dist. LEXIS 31366, at *67 (S.D.N.Y. Feb. 23, 2024). In the weekend leading up to the Bank's collapse, Defendants lied to the Regulators about the Bank's liquidity, as the Regulators would later document: "Signature repeatedly provided unreliable information to the Regulators over the weekend, and its final liquidity projections were not credible." ¶22.

These undisputed allegations powerfully reinforce the finding of scienter for Misstatements made throughout the Class Period in two ways. **<u>First</u>**, they reveal that, contrary to Defendants'

public assurances concerning the Bank's "robust liquidity position," the Bank lacked the most elementary understanding of its assets and collateral. Despite assuring investors of the Bank's "strong liquidity profile" on March 9, 2023 (¶346), when the time came to demonstrate this liquidity literally ***one day later***, SBNY "struggled to identify readily available liquidity" (¶346), and could not even "provide reliable and consistent data about its available liquidity or the amount of pending withdrawals" (¶379). The total absence of effective liquidity management systems did not arise overnight.

      **<u>Second</u>**, when the liquidity crisis they assured investors for years would be a "non-event" arrived and exposed the Bank's long-concealed deficiencies, Defendants did not come clean to the Regulators. Instead, they repeatedly lied to Regulators about the Bank's liquidity—actions that a truly innocent actor would not take. When Defendants finally began providing the Regulators information behind its liquidity position, the Regulators found it was facially and obviously false. ¶¶173-75. SBNY misled the Regulators about: "(i) the near-total absence of meaningful collateral and assets SBNY could use to satisfy existing withdrawal requests; (ii) the exponentially-growing billions of dollars in estimated withdrawal requests over the weekend; (iii) inflated deposit inflows from clients following the crash of [Silicon Valley Bank], which the Board and senior management doubled and presented on a false timeline; and (iv) projections for SBNY's liquidity, which DFS coined 'inaccurate,' 'unreliable,' and 'not credible.'" ¶176. When the Regulators finally saw the Bank's true liquidity position, they concluded "it was clear there was no reasonable possibility that the Bank could continue operating." *Id*. For example, after struggling to identify pledgeable assets needed for liquidity on March 10, 2023 (the last business day before the Bank's failure), Defendants "insisted that Signature had over $5 billion valuable pledgeable securities available for Monday." ¶179. But upon examination, the Regulators determined they were worth just $900

million, more than 80% below the amount Defendants had claimed. *Id*. Defendants' attempt to

mislead Regulators when the moment of truth was upon them powerfully reinforces scienter here.

**c.    FE Accounts Confirm the Bank's Lack of Adequate Liquidity and Risk Controls and Defendants' Awareness of these Facts.**

The inference of scienter here is further supported by factual accounts of former SBNY

employees, who corroborated the Regulators' deficiency findings and show Defendants'

awareness of facts undermining their public representations. *See supra* Facts §C. "A complaint

may rely on information from confidential witnesses if they are described in the complaint with

sufficient particularity to support the probability that a person in the position occupied by the

source would possess the information alleged." *Emps.' Ret. Sys. of Gov't of the Virgin Islands v.*

*Blanford*, 794 F.3d 297, 300 (2d Cir. 2015). Defendants' scienter challenges all fail.

**First**, Defendants incorrectly argue that the FE's statements "amount to mere opinions"

that cannot support scienter. Lead Br. at 51. The FE accounts provide facts showing Defendants

had knowledge of information contradicting their public statements. For example, contrary to

Defendants' Misstatements that SBNY was mitigating its overconcentration risks by adhering to

concentration limits, so much so that "we've had to turn down deposits because we have limitations

or we set internal limitations on concentrations" (Misstatement 9), FE-4 recounted a specific

instance where Defendant DePaolo overrode FE-4's concerns about onboarding a new depositor

in pursuit of unrestrained deposit growth. ¶150. DePaolo's awareness of these facts undermining

the truth of his public statements supports a finding of scienter. Defendants' reliance on *Local No.*

*38 International Brotherhood of Electrical Workers Pension Fund v. American Express Co.*, 724

F. Supp. 2d 447, 460 (S.D.N.Y. 2010) is misplaced. There, the court held that former employees'

accounts did not support a finding of scienter because they offered only "anecdotes and conclusory

statements of belief." *Id.* at 460. Here, by contrast, FE-4's account provides facts based on personal

62

knowledge, including the specific dollar value of the prospective clients' accounts and the direct involvement of Defendant DePaolo. ¶150.

Equally meritless is Defendants' claim that FE-1, FE-2 and FE-3 "fail to offer any factual underpinnings" for their conclusions that the Bank's risk protocols were lacking. Lead Br. at 51. Each of these FEs occupied positions in relevant areas concerning the Bank's liquidity and risk management practices. ¶¶119, 120, 150. Moreover, each FE identified specific holes in the Bank's risk management practices: (i) FE-1 reported the Bank's liquidity models lacked the ability to adequately back-test, meaning they could not compare projections to actual results (¶97); (ii) FE-2 reported that, when the Bank asked him to conduct risk assessments on digital asset clients, he was not asked to review the potential volatility of a prospective client's balances (¶119); and (iii) FE-3 reported that, in a 2022 audit, they found DePaolo and other personnel's "main control for managing liquidity risk" was tracking deposits over $250 million in an excel spreadsheet (¶120). Thus, unlike *City of Dearborn Heights Act 345 Police & Fire R v. Axonyx, Inc.*, 374 F. App'x 83, 85 (2d Cir. 2010), the FEs "factual underpinnings" are provided here. This case is also nothing like *Campo v. Sears Holdings Corp.*, 371 F. App'x 212, 217 (2d Cir. 2010), where the Second Circuit discredited confidential witnesses who "expressly disclaimed the allegations attributed" to them or came to admit they lacked personal knowledge of the matters at issue. *Id.* at 216.

**Second**, Defendants speciously argue that FE-3's account actually negates scienter by showing DePaolo was engaged "in an effort to manage the Bank's liquidity." Lead Br. at 52. But given the Regulators finding that "SBNY *never* adequately addressed" the Bank's liquidity problems (¶200), DePaolo cannot credibly argue these "efforts" sufficiently ameliorated the Bank's undisclosed problems. Indeed, consistent with the Regulators' findings, FE-3 reported that DePaolo's "efforts" were ineffective in managing SBNY's risks because the Bank's "main

control" to manage its liquidity risks was essentially like "looking in the rearview mirror." ¶120. This does not refute, but reinforces the strong inference of scienter.

Howell's expression of "frustration" with the Bank's open regulatory deficiencies also does not negate scienter. Lead Br. at 51 (arguing "it shows that Bank management was concerned with and addressing risk management issues"). The claims here concern not Defendants' mismanagement of SBNY, but their misrepresentations to investors. Accordingly, Howell's purported frustration with the Bank's open regulatory deficiencies cannot absolve him of liability for making statements to investors that were knowingly or recklessly misleading in light of those open deficiencies. *See Fryman*, 2022 U.S. Dist. LEXIS 70597, at *72 (scienter found where "Defendants were attempting to fix the material deficiencies identified in the regulatory reports while concealing that they were doing so").

### d. Defendants' Repeatedly Spoke About Issues at the Center of the Alleged Fraud.

The inference of scienter is more compelling where, as here, the alleged misstatements concern "a subject about which investors and analysts often inquired." *New Orleans Emp.'s. Ret. Sys. v. Celestica, Inc.*, 455 F. App'x 10, 14 (2d Cir. 2011); *Hedick v. The Kraft Heinz Company*, 2021 WL 3566602, at *13 (N.D. Ill. Aug. 11, 2021) (acknowledging scienter found where a "defendant speaks extensively on topic that he knows is a subject about which investors and analysts often inquired").

Here, investors and analysts were hyper focused on the Bank's liquidity, deposit stability, risk management practices, and standing with Regulators. ¶124. Indeed, Defendants made many of the alleged Misstatements in direct response to analyst questions on these key issues. *See, e.g.*, ¶¶126, 302. And Defendants repeated their false assurances as investor concerns mounted in the midst of the Bank's collapse, such as by touting SBNY's "strong liquidity position" mere days

64

before its failure exposed it had none. ¶346.

Given their repeated statements on these key issues of investor and analyst focus, "this Court can reasonably conclude either that Defendants [had] access to information regarding [the subject of the Misstatements], or . . . were recklessly indifferent to the truth or falsity of their [] statements and never bothered to investigate [them]." *Avon*, 2019 WL 6115349, at *20; *see also Hawaii Structural Ironworkers Pension Tr. Fund v. AMC Ent. Holdings, Inc.*, 422 F. Supp. 3d 821, 850 (S.D.N.Y. 2019) ("[T]o speak so knowledgeably regarding [the basis of the alleged fraud], [defendant] must have educated himself . . . presumably by reviewing data given to him . . . [and] performing his own due diligence.").

Defendants make no attempt to grapple with this law or these facts, but instead claim the Complaint seeks to allege scienter based only on Defendants' "high-level" positions. Lead Br. at 52 n.21. This is clearly wrong. *See supra* §I.C.1.a. Given these facts showing Defendants' knowledge of and access to adverse, undisclosed information, their authorities all miss the mark. *See In re Rockwell Med., Inc. Sec. Litig.*, 2018 WL 1725553, at *14 (S.D.N.Y. Mar. 30, 2018) (no scienter alleged solely "by virtue of [defendants'] status as senior managers and/or directors at the corporation"); *In re MSC Indus. Direct Co., Inc.*, 283 F. Supp. 2d 838, 848-49 (E.D.N.Y. 2003) (no scienter where the plaintiff alleged "no specific facts that support the contention that the defendants should have learned of the accounting errors earlier.").

> **e.    Defendants Were Personally Responsible for Designing and Implementing the Bank's Liquidity and Risk Management.**

The inference of scienter is strengthened by the Complaint's allegations that Defendants DePaolo, Shay, Howell, Susca, and Wyremski served on committees within SBNY that were specifically responsible for developing and monitoring policies to oversee the Bank's risk and liquidity management functions (¶¶405-09). Their membership on these committees reinforces

scienter by supporting the inference of their knowledge of and access to facts about the Bank's deficient liquidity and risk management practices. *See Washington Mutual*, 694 F. Supp. 2d at 1209-10 (scienter pled based on defendants "attend[ing] monthly Enterprise Risk Committee meetings where all aspects of risk across the bank were discussed."); *In re Citigroup Inc. Sec. Litig.*, 753 F. Supp. 2d 206, 238 (S.D.N.Y. 2010) (scienter pled based on the defendants "attend[ing] meetings in the summer of 2007 that addressed Citigroup's CDO exposure.").

Defendants do not dispute the Complaint's allegation that their membership on this committee supports the conclusion they were aware of the liquidity and risk deficiencies found by the Regulators. Nor can they, as it would "thoroughly strain credulity to imagine" that the risk management deficiencies repeatedly found by the Regulators would not have been conveyed to the committee at SBNY responsible for addressing these issues. *In re Complete Mgmt. Sec. Litig.*, 153 F. Supp. 2d 314, 325 (S.D.N.Y. 2001) (finding scienter based on defendants' knowledge of facts "by virtue of their positions . . . and the interactions . . . that those positions demanded").

### f. Defendants Regularly Monitored and Issued Specific Denials about SBNY's Weakening Liquidity.

Defendants' scienter is further strengthened by facts pled in the Complaint showing Defendants (i) regularly monitored the Bank's liquidity positions leading up to the Bank's collapse (¶420); and (ii) falsely denied SBNY's weakening liquidity as these risks materialized at key points throughout the Class Period (¶415).

Defendants do not dispute (and affirmatively acknowledge) that they regularly monitored the Bank's liquidity position throughout the Class Period. Lead Br. at 52. Given the Complaint's allegations that this monitoring gave Defendants knowledge and/or access to information showing their statements touting the Bank's strong liquidity position were false (or at least reckless), this "supports a strong inference of scienter." *CarLotz,* 2024 U.S. Dist. LEXIS 61722, at *49 (scienter

66

where defendants "were in fact monitoring contemporaneous statistics about the company's inventory and inventory mix").

In their public statements assuring investors that they closely monitored SBNY's liquidity risks on a regular basis, Defendants specifically denied having any liquidity issues, even as the negative consequences of SBNY's decision to cater to digital asset depositors materialized during the "crypto winter" of 2022 and leading up to the Bank's failure in 2023. ¶415. For example, DePaolo proclaimed on an earnings call at the end of 2022 that "[w]e haven't had any issues to liquidity at all." ¶318 (Misstatement 28). In the final days before SBNY's collapse, Howell likewise told investors that SBNY "intentionally maintain[s] a high level of capital, strong liquidity profile, and solid earnings." ¶415 (Misstatement 34). These risk denials, which DePaolo and Howell knew to be false when made, support a finding of scienter. *See In re Signet Jewelers Ltd. Sec. Litig.*, 2018 WL 6167889, at *15 (S.D.N.Y. Nov. 26, 2018) (scienter regarding omission of negative credit exposure when defendants had said "we fully understand the credit risk," "we watch it closely," "we have every confidence in the way we manage our credit portfolio," "management monitors credit exposure"); *Pirnik v. Fiat Chrysler Automobiles, N.V.*, 2016 WL 5818590, at *7 (S.D.N.Y. Oct. 5, 2016) (scienter where "Defendants frequently discussed regulatory compliance in press releases, earnings calls and SEC filings").

These alleged facts support a strong and plausible inference that DePaolo and Howell either knew of negative material, undisclosed information that contradicted their statements, or failed to investigate the necessary facts before issuing these denials. Here, again, Defendants' only response is to argue, incorrectly, that these allegations seek to base scienter on Defendants' high-level positions alone. Lead Br. at 52 n.21.

### g.    The Core Operations Doctrine Supports Scienter.

That the subject of the Misstatements concerned core aspects of the Bank's operations

67

provides "supplemental support for allegations of scienter." *AMC*, 422 F.Supp.3d at 852.[12]

Defendants do not dispute that SBNY's liquidity and risk management controls were critical to the Bank's survival, as evidenced regulatory scrutiny and warnings of SBNY's "urgent need for robust risk management practices" (¶106) and Defendants' many public statements emphasizing the importance of the Bank's liquidity and risk management practices to its business (¶413). That the fraud concerned SBNY's core operations strengthen the inference of scienter. *Oklahoma Firefighters Pension & Ret. Sys. v. Lexmark Int'l, Inc.*, 367 F. Supp.3d 16, 38 (S.D.N.Y. 2019). Further underscoring this point, given the role of the liquidity failures in causing the Bank's ensuing collapse, "the magnitude of the aftershock suggests more than a careless mistake or trivial miscalculation by [SBNY's] executives." *Id.*

### h.    GAAP Violations Contribute to a Strong Inference of Scienter.

The Individual Defendants advance several incorrect arguments (Lead Br. at 53) contending that the Complaint does not adequately allege their scienter for their alleged Misstatements concerning Financial Reporting, Internal Controls and GAAP Compliance.

Defendants' arguments all fail. **First**, Defendants repeat their baseless refrain that "Plaintiff has failed to allege a material misrepresentation with respect to the Bank's financial statements." Lead Br. at 53. The Individual Defendants' Misstatements 4 and 38 were materially misleading because they failed to disclose, in violation of GAAP, (i) specific facts concerning the Bank's overconcentration in large, uninsured depositors, and (ii) deficiencies in its management of these overconcentration risks.

**Second**, Defendants argue that even if GAAP required disclosure of the facts they allegedly

---

[12] Defendants' sole authority on this point is not to the contrary. In *Das v. Rio Tinto PLC*, the court "considered [core operations] allegations to constitute supplementary but not independently sufficient means to plead scienter." *Das*, 332 F. Supp. 3d 786, 816 (S.D.N.Y. 2018).

failed to disclose (which it did), the Complaint fails to allege they were ***aware*** GAAP required disclosure of these facts. Lead Br. at 53. This argument is baseless. In order to affirmatively represent that SBNY's statements complied with GAAP, Defendants "must have educated [themselves] . . . by performing [their] own due diligence (*AMC Ent. Holdings, Inc.*, 422 F. Supp. 3d at 850) or were reckless by failing to investigate the necessary facts to make these representations (*Dobina v. Weatherford Int'l Ltd.*, 909 F.Supp.2d 228, 246 (S.D.N.Y. 2012)).

Defendants' authorities on this point are inapposite. *In ECA, Loc. 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187, 202 (2d Cir. 2009), the GAAP violations were immaterial, and thus the plaintiffs "did not adequately plead that [the defendant] knowingly or recklessly failed to comply." Here, by contrast, Defendants do not and cannot dispute the materiality of the undisclosed facts. *In re Carter-Wallace, Inc. Securities Litigation*, 150 F.3d 153, 157 (2d Cir. 1998) is also off point. *Id.* (facts rendering Defendants' financial reporting violative of GAAP did not exist until after their alleged misstatements were made).

**Third**, Defendants argue that that KPMG's auditing of the misstatements that Plaintiff alleges violated GAAP negates scienter. Lead Br. at 53. Defendants are wrong. Defendants' attempt to use KPMG's audits to immunize their misstatements from liability fails to account for the fact that, as alleged in the Complaint, KPMG's audits were themselves deficient and materially misled investors, as shown below in §II.

### i.    Defendants' Purported Steps to "Limit" Crypto-Related Deposits Do Not Negate Scienter.

Defendants argue that any inference of scienter is negated because in December 2022, toward the very ***end*** of the Class Period, the Bank purportedly "took steps to reduce its deposits and limit potential future losses." Lead Br. at 54. This argument fails for multiple reasons.

**First,** by this late into the Class Period, Defendants had ***already*** misled investors by

assuring them of the Bank's adequate liquidity, even in times of volatility, and concealing that SBNY deposits were highly concentrated in a small number of customers. Put simply, Defendants created this problem and hid it from investors, so even taken at face value, Defendants' purported efforts were way too little, too late. Indeed, the "steps" they took were not taken until December 2022, *years after* the Regulators found their liquidity risks deficiently managed. **Second**, Defendants fail to substantiate this argument. They cite Howell's announcement that Signature would be "shrink[ing] its deposits tied to cryptocurrencies by $8 billion to $10 billion." ¶466. But this merely expressed an *intention* to limit its deposits. Defendants cite nothing showing they actually implemented any changes. **Third**, the innocent inference Defendants proffer here falls flat in light of the Complaint's allegations and Regulators' findings that Defendants never fixed the problems and even deceived the Regulators all the way up to the final moments of the Bank's failure, such as by "repeatedly provid[ing] unreliable information and final liquidity projections [that] were not credible." ¶22.

### j.    Individual Defendants' Remaining Arguments Fail.

***Defendant Santora***. Santora made Misstatement 6, in which he misleadingly claimed that the Regulators were "a very strong partner with [SBNY]" and "know our risk and compliance framework." ¶218. The Complaint alleges Santora had scienter for this Misstatement because when he made it on March 5, 2021, he either knew of the adverse Regulatory findings against SBNY or was reckless in not knowing them. ¶400.

Santora's arguments challenging his scienter all fail. **First**, Santora argues he could not have known about any of the MRBAs or SRs as alleged, because these were supposedly only conveyed to SBNY's Board and "senior management," whereas Santora claims "he never served in senior management." Santora Br. at 2 (citing Compl. ¶36). But Santora fails to cite anything in the record to substantiate that he was not a "senior" manager informed of the Regulators' findings.

In fact, Paragraph 36 describes him as "SBNY's **Chief Payments Officer**," a senior level position in one of the Bank's most important sectors. **Second**, Santora's argument fails because the inference that he lacked any knowledge of the MRBAs and SRs is not "more compelling" than the allegations that he knew of or had *access* to this information. Here, the Regulators' findings were heavily documented over the course of years and widely communicated to the Bank's leadership. ¶400. Thus, "it would be absurd to suggest that management was without knowledge of the matter." *In re Barclays PLC Sec. Litig.*, 2024 U.S. Dist. LEXIS 31366, at *64. **Third**, the Court can readily infer Santora's scienter from the content of his Misstatement because he held himself out as knowledgeable about the Bank's relationship with the Regulators—at a minimum, he was reckless in failing to know about the MRBAs and SRs before speaking on the subject. *AMC*, 422 F. Supp. 3d at 850; *In re Alstom SA Sec. Litig.*, 454 F. Supp. 2d 187, 201 (S.D.N.Y. 2006).

 **_Defendant Seibert_**. Seibert made Misstatement 20, in which he assured investors that "the price of Bitcoin doesn't have anything to do with [SBNY's] growth." The Complaint alleges Seibert had scienter for this Misstatement because when he made it on March 11, 2022, he either knew or was recklessly indifferent to the fact that SBNY lacked the models and analytical tools to support his claim. ¶287.

 Seibert argues he could not have known about SBNY's lack of these models and tools because he claims (with no factual support) that he did not receive the Regulators' reports documenting this finding. Seibert Br. at 16. But this argument misses the mark. To start, there is an inference that Seibert was aware of the Regulators' findings as a member of SBNY's management and his specific position as SBNY's Managing Group Director and Senior Vice President **of Digital Asset Banking** (¶55), which was a key area involved in the Regulators' reviews. These facts quintessentially support the inference of scienter. *See, e.g.*, *Strougo v.*

*Barclays PLC*, 105 F. Supp. 3d 330, 351 (S.D.N.Y. 2015) (scienter found where the defendant "was the head of [the bank department]" that was "the driving force behind the Company's goal" and "held himself out to the public as intimately knowledgeable about [the subject of the misstatement]."). Simply put, it "strains credulity that [Seibert] could remain ignorant" of the Regulators' findings that centered on the risks ***created by the department he oversaw, and that were widely distributed to senior management and the Board***. *Ambac Fin. Grp.,* 693 F. Supp. 2d at 268. Moreover, the authorities Seibert cites are inapposite for a basic reason—they involved the alleged concealment of information that was, in fact, publicly disclosed.[13] Here, SBNY's undisclosed lack of supporting modeling and analytical tools was indisputably not public.

***Defendant Wyremski***. Wyremski argues that he "could not have acted with conscious recklessness in his statements about internal controls and GAAP" because "the very speed of deposit flight was never anticipated by Signature's banking Regulators, and therefore could not have been required for Signature's management to consider." Wyremski Br. at 17. This highly fact intensive argument fails because: (1) the entire purpose of a sound liquidity plan is to prepare ***ahead of time for significant market turbulence***, and this is especially true when a material portion of deposits are related to volatile assets such as crypto (¶¶54-72, 203-04); (2) Defendants, in fact, expressly assured investors the Bank ***was*** prepared for such an turbulent event, including that "we can easily take care of any deposits leaving, any and all deposits if they were to leave the ecosystem . . . it's a nonevent" (¶303; *see also* ¶¶124-137); (3) for years, Regulators specifically informed Defendants they were ***not*** prepared for a significant adverse market event, specifically faulting Defendants' "lack of preparedness for an unanticipated liquidity event" (¶192; *see also*

---

[13] *In re Scholastic Corp. Sec. Litig.,* 252 F.3d 63, 76 (2d Cir. 2001); *In re Pfizer, Inc. Sec. Litig.*, 538 F. Supp. 2d 621, 637 (S.D.N.Y. 2008); *In re GeoPharma, Inc. Sec. Litig.*, 399 F. Supp. 2d 432, 452 (S.D.N.Y. 2005).

¶77-120); and (4) Regulators determined that the "root cause" of the Bank's collapse was Defendants' failure to remedy the problem Regulators had warned them of for years (¶¶196-204). Defendants were not blindsided by the longstanding problems; they knew full well they existed before the stress event occurred.

### 2. The Complaint Also Alleges Certain Individual Defendants' Scienter Based on Motive and Opportunity.

While the law is clear that "[m]otive is not required to plead scienter" (*Freudenberg*, 712 F. Supp. 2d at 200), its presence only strengthens the already strong inference of scienter.

### a. The LTI compensation plan incentivized DePaolo, Shay, and Howell to conceal the allegedly omitted facts in pursuit of unrestrained deposit growth.

Defendants DePaolo, Howell, and Shay were incentivized to pursue unrestrained deposit growth *without* adhering to appropriate risk management measures because they benefitted from an LTI Plan under which *half* of their LTI compensation came from deposit growth. ¶122. Defendants argue that the millions of dollars of incentive payments DePaolo, Shay, and Howell received for pursuing this unrestrained deposit growth are insufficient to plead scienter based on motive. Lead Br. at 42; Shay Br. at 15. This argument fails for two reasons.

**First**, as this Court has recognized, while "[a] generalized desire for financial benefit does not *alone* constitute scienter," "the requisite strong inference may arise when the complaint alleges that defendants . . . benefitted in a concrete and personal way from the purported fraud." *Manavazian v. ATEC Grp., Inc.*, 160 F. Supp. 2d 468, 478 (E.D.N.Y. 2001) (Block, J.). Defendants do not even attempt to argue that the LTI benefits alleged in the Complaint, which amounted to millions of dollars of additional compensation specifically to DePaolo, Howell, and Shay (¶424) were not "concrete and personal." Thus, their reliance on cases rejecting motive allegations that

73

are "common to all corporate executives" is misplaced.[14] Defendants' authorities are similarly inapposite. In *In re Donna Karan International Securities Litigation*, 1998 WL 637547, at *19 (E.D.N.Y. Aug. 14, 1998), the court declined to find scienter "based ***solely*** upon . . . incentive compensation," which is not what Plaintiff attempts to do here as explained above. **Second**, Defendants misstate the law. The Second Circuit did not, as Defendants suggest, hold that incentive compensation can never support a finding of scienter. Lead Br. at 42 (arguing that the "Second Circuit has made clear incentive compensation can hardly be the basis on which an allegation of fraud is predicated"). Rather, *Acito v. IMCERA Grp., Inc.*, 47 F.3d 47, 54 (2d Cir. 1995), stands for the unremarkable proposition that, "***without more***, executive compensation ***dependent upon stock value*** does not give rise to . . . scienter." *Id.* at 57.

Here, Plaintiff does not allege scienter based solely on these allegations, but rather that it supports a finding of scienter in combination with multiple other bases, such as knowledge of contrary facts. Moreover, the LTI Plan did not make Defendants' compensation "dependent ***upon stock value***," but rather on SBNY's unrestrained deposit growth and lack of corresponding risk management protocols that would have (appropriately) restrained it. ¶122.

### b.   DePaolo, Howell, Shay and Susca's suspicious and unusual stock sales support scienter.

"[U]nusual insider trading activity during the class period" may "permit an inference of bad faith and scienter." *Stevelman v. Alias Rsch. Inc.*, 174 F.3d 79, 82 (2d Cir. 1999). Here, DePaolo, Howell, Shay and Susca each sold tens of thousands of shares of SBNY stock and reaped millions when SBNY's share price was artificially inflated by Defendants' misstatements. ¶¶426-

---

[14] *ECA & Local 134 IBEW Joint Pension Tr. of Chic. v. JP Morgan Chase Co.*, 553 F.3d 187, 198 (2d Cir. 2009); *see also Novak v. Kasaks*, 216 F.3d 300, 307 (2d Cir. 2000); *Kalnit v. Eichler*, 264 F.3d 131 (2d Cir. 2001); *In re Chembio Diagnostics, Inc. Sec. Litig.*, 586 F. Supp. 3d 199, 218-19 (E.D.N.Y. 2022); *Ferber v. Travelers Corp.*, 785 F. Supp. 1101, 1107 (D. Conn. 1991)

42. DePaolo, Howell and Susca sold large percentages of their holdings (22%, 67%, and 29%, respectively) during the Class Period, in amounts that far exceed their sales during the year preceding the Class Period. ¶¶427-28 (DePaolo sold twice as many shares in 2021 as 2020), 431-32 (Howell sold four times as many), 439-40 (Susca sold three times as many). Further, Shay sold over 24,000 of his shares during the Class Period in 2021 despite not having sold *a single* share the year before. ¶¶435-36. These sales rewarded Defendants handsomely, generating gross proceeds of: (i) $19,492,453.93 for DePaolo (¶427); (ii) $19,354,687.12 for Howell (¶431); (iii) $5,431,120.82 for Shay (¶435); and (iv) $6,469,461.76 for Susca (¶439).

Moreover, all of these unusual transactions were suspiciously timed to occur after they were awarded compensation under the LTI plan that incentivized Defendants to boost deposits (¶¶429, 433, 437, 441), just days and weeks after Defendants made misstatements boosting SBNY's share price (¶¶430, 434, 438, 442), or just weeks before the first disclosure in May 2022 that sent the stock price tumbling down (¶¶138-40, 427, 431, 439). Courts routinely find that such stock sales that are "suspicious in timing or amount" support a finding of scienter. *See, e.g., In re Oxford Health Plans, Inc. Sec. Litig.,* 187 F.R.D. 133, 139 (S.D.N.Y.1999).

Defendants raise a hodgepodge of factual disputes as to whether the alleged sales were suspicious that all fail. Lead Br. at 43-47; Shay Br. at 15-16.

**First**, Defendants argue that their stock sales may have been for innocent reasons, such as "to diversify [defendants'] portfolio" or "to pay taxes." Lead Br. at 43. Defendants cite nothing to substantiate these assertions, and the Court should not credit or consider them on a Rule 12 motion. *In re EVCI Colls. Holding Corp. Sec. Litig.,* 469 F.Supp.2d 88, 100 (S.D.N.Y.2006) (scienter not defeated where "there might be an innocent explanation for the timing of [defendant]'s sale"). Defendants' reliance on *Ressler v. Liz Claiborne, Inc.*, 75 F. Supp. 2d 43, 60 (E.D.N.Y. 1998) is

misplaced. There, unlike here, the stock sales "did not closely follow the alleged misstatements" and most were "remote in time from any misstatements" by several months. *Id.*

**Second**, Defendants argue that Plaintiff's comparison of Class Period sales to 2020 was misleading given the uncertainty due to the COVID pandemic and 2019 should also have been included in the comparison because Defendants "also sold vested stock awards in March 2019." Lead Br. at 44; *see also* Shay Br. at 17 (also including years 2016, and 2017, but notably excluding 2018 when he presumably also did not sell a single share). But even if Defendants' 2019 sales are considered, all four Defendants sold substantially more shares in 2021 than they did in 2019, in similar multiples as 2021 compared to 2020. DX XX (DePaolo sold more than twice as many shares in 2021 as 2019); DX ZZ (Howell sold approximately four times as many shares in 2021 as 2019); DX CCC (Susca sold approximately three times as many shares in 2021 as 2019); and DX FFF (Shay sold approximately 60% more shares in 2021 as 2019, 2017 or 2016). No matter how Defendants try to slice it, their stock sales during the Class Period were unusual.

**Third**, Defendants argue their stock sales in March and April 2021, which the Complaint alleges were suspiciously timed around SBNY's 2020 Form 10-K and an April 23, 2021 earnings call, were not suspicious because sales after earnings releases are "common place." Lead Br. at 44-45. This argument and the inference Defendants seek ignores entirely that the law prohibits such sales when, as here, the seller is in possession of material non-public information. *See Blanford*, 794 F.3d at 308 (sales after quarterly calls that falsely assured investors and boosted stock price are suspicious).

Defendants' authorities are not to the contrary. In *City of Brockton Retirement System v. Shaw Group Inc.*, 540 F. Supp. 2d 464, 475-76 (S.D.N.Y. 2008), the stock sales occurred after issuance of financial statements that were not alleged to be false or misleading, and "***before*** any

alleged misrepresentations were made"—which is not the case here. *Id. In re Bear Stearns Cos.*

*Securities, Derivative, & ERISA Litigation*, 763 F. Supp. 2d 423, 500 (S.D.N.Y. 2011) is inapposite

because there, the court found trading after issuance of a company's financial statement was

"appropriate and commonplace" (and thus does not support scienter), but only "in the absence of

***other*** allegations suggesting motive." *Chapman v. Mueller Water Prods., Inc.*, 466 F. Supp. 3d

382, 412 (S.D.N.Y. 2020). Here Plaintiff amply alleges these other allegations of scienter.

**Fourth**, Defendants argue their stock sales cannot support scienter because: (1) they were

not made at the height of SBNY's share price; (2) they occurred over a year before the first alleged

corrective disclosure; and (3) the Defendants did not sell stock at the end of the Class Period. Lead

Br. at 45. These arguments all fail.

Defendants cite no law for the proposition that their stock sales must have occurred at the

***height*** of SBNY's share price to support scienter, and further ignores the relevant facts pled: they

sold at $242 ***after*** a run-up in the share price from $219.23 following their April 21, 2021

misstatements. The fact that the share price continued to rise after their sales does not negate these

facts. Thus, unlike *Ronconi v. Larkin*, 253 F.3d 423, 436 (9th Cir. 2001), where the Defendants

"sold too soon to be taking advantage of their allegedly fraudulent statements," Defendants' April

2021 sales here took advantage of the bump created by their Misstatements.

Further, Defendants also fail to explain how the length of time between the April 2021

sales and the first corrective disclosure in May 2022 negates scienter, since DePaolo, Howell, and

Susca sold tens of thousands of shares netting more than $11 million on March 23, 2022 ***just ahead***

***of the first disclosure*** in May 2022. The fact that Defendants engaged in *other* suspicious sales

more than two months before the first corrective disclosure does not negate scienter. *See Blanford*,

794 F.3d at 308 (stock sales nine months, seven months, and five months before corrective

disclosure were suspicious).[15] Defendants' argument that they did not sell at the end of the Class Period simply ignores the fact that they **did** sell just before the truth began to emerge in May 2022.

**Fifth**, Defendants incorrectly argue that there can be no finding of scienter because (1) Defendants Howell and Shay bought some stock between March 8, 2023 and March 10, 2023, and (2) DePaolo, Shay, and Susca allegedly "retained far more Signature common shares than they sold during the Class Period." Lead Br. at 46. But it is undisputed that Howell and Shay sold far more stock than they purchased during the Class Period. ¶431 (Howell sold more than 59,000 shares than he purchased); ¶435 (Shay sold more than 19,000 than he purchased). In any case, "there is no per se rule that stock purchases negate any inference of scienter, including an inference based on recklessness." *In re Fannie Mae 2008 Sec. Litig.*, 2011 WL 13267340, at *3 (S.D.N.Y. Apr. 11, 2011) (scienter pleaded for executives who bought stock on market); *cf. In re Oxford Health Plans, Inc. Sec. Litig.*, 187 F.R.D. 133, 140 (S.D.N.Y. 1999) (holdings of vested options and shares gained by exercising options that were about to expire did not negate scienter).[16]

Equally infirm is Defendants' claim that the Court cannot find scienter because they retained some of their stock during the Class Period. As a practical matter, they could not have sold all their stock. Moreover, this argument misstates the law. *See Stevelman*, 174 F.3d at 82 (finding inside sales supported scienter where CEO retained 60% of his shares and other insiders retained much higher percentages); *accord In re Oxford Health Plans,* 187 F.R.D. at 139–40; *In re Guilford Mills, Inc. Sec. Litig.*, 1999 WL 33248953, *5 (S.D.N.Y. July 21, 1999). And *In re*

---

[15] *In re Hain Celestial Grp. Inc. Sec. Litig.*, 2022 WL 18859055, at *25 (E.D.N.Y. Nov. 4, 2022) is inapposite. There, defendants' **last** sales occurred more than eight months before first corrective disclosure. Here, Defendants' 2022 sales were made just **weeks** before the first corrective disclosure on May 16, 2022. ¶¶138-39, 427, 431.

[16] Defendants' reliance on *In re Keyspan Corp. Securities Litigation*, 383 F. Supp. 2d 358, 382 (E.D.N.Y. 2003) and *In re Metricom Securities Litigation*, 2004 WL 966291, at *35 (N.D. Cal. Apr. 29, 2004) is misplaced. In those cases, (i) the defendants **increased** their stock holdings during the Class Period; (ii) the timing of their sales was not suspicious, and (iii) there were no scienter allegations based on knowledge or recklessness for the court to consider in tandem with motive.

*DraftKings Inc. Securities Litigation.*, 650 F. Supp. 3d 120, 175 (S.D.N.Y. 2023) is inapposite. There, the defendants' retention of stock weighed against scienter because there were no other allegations defendants' stock transactions during the Class Period were suspicious, which ***are*** alleged here.

## II.     THE COMPLAINT ADEQUATELY ALLEGES A 10B-5(B) CLAIM AGAINST KPMG.

### A.     The Complaint Adequately Alleges that KPMG Made Materially False or Misleading Statements.

#### 1.     KPMG Falsely Certified SBNY's Financial Statements as GAAP Compliant (Misstatements 39, 41, 43).

ASC 275 requires that a company disclose certain risk concentrations, including group concentrations, if a number of counterparties or items that have similar economic characteristics collectively expose the company to a particular kind of risk. ¶353. ASC 275 lists specific concentrations that a company must disclose, including "the volume of business transacted with a particular customer, supplier, lender, grantor, or contributor." ¶364. ASC 275 requires that a company disclose such concentrations when: (a) "[t]he concentration exists at the date of the financial statements"; (b) "[t]he concentration makes the institution vulnerable to the risk of a near-term severe impact"; and (c) "[i]t is at least reasonably possible that events that could cause the severe impact will occur in the near term." ¶¶354, 365. A "severe impact" arises when a concentration could have "[a] significant financially disruptive effect on the normal functioning of an entity." ¶¶355, 365.

Where a company fails to make a required GAAP disclosure, including regarding risk concentrations, an auditor's opinion certifying that the company's financial statements comply with GAAP constitutes a materially false or misleading statement to the company's investors. *See Bear Stearns,* 763 F. Supp. 2d at 512-13; *see also In re Washington Mut., Inc. Sec., Deriv. &*

*ERISA Litig.*, 694 F. Supp. 2d 1192, 1224 (W.D. Wash. 2009) (auditor's "affirmation that the financial statements were presented in conformity with [GAAP]" was false "because the financial statements were not prepared in conformity with GAAP, given the improper understatement of the [a]llowance.").[17] In *Bear Stearns*, for instance, the court held that the company's auditor made actionable misrepresentations regarding the company's compliance with GAAP when the company failed to make meaningful disclosures in its financial statements regarding the company's risk concentrations in the subprime and collateralized debt obligation markets. 763 F. Supp. 2d at 512-13.

KPMG failed to ensure that SBNY submitted financial statements that conformed with GAAP. Specifically, although it was required to by GAAP, SBNY failed to disclose its customer concentration risk during the Class Period in violation of GAAP. *See supra* §I.A.5. These concentrations included:

- **Fiscal Year 2020**: 55 percent of total deposits ($35 billion) were concentrated in 196 clients. ¶95.

- **Fiscal Year 2021**: 40 percent of total deposits ($40 billion) concentrated in only 60 clients and 14 percent of SBNY's total assets ($16 billion) concentrated in four customers, three of whom were digital asset customers. ¶¶109-10.

These significant customer concentrations, without the appropriate risk management and mitigation systems (*see supra* Facts §B), presented a near-term "severe impact" carrying the clear possibility of having a financially disruptive effect on the Bank, including as to the Bank's liquidity position. ¶356. As a result, the Complaint adequately alleges that KPMG misrepresented that SBNY's financial statements complied with GAAP when, in fact, these representations were contradicted by undisclosed material information. *See Bear Stearns*, 763 F. Supp. 2d at 512-13;

---

[17] *See also In re Deutsche Bank AG Sec. Litig.*, 2016 WL 4083429, at *11 (S.D.N.Y. July 25, 2016) (holding that the company defendants made actionable misstatements by failing to disclose the risks and uncertainties corresponding with its subprime exposure, which were sufficiently "severe").

*Washington Mutual*, 694 F. Supp. 2d at 1224.

KPMG does not contest that the Complaint pleads requisite facts to support that SBNY's customer concentrations met the criteria of ASC 275-10-50-16, *i.e.*, the customer concentrations existed at the date of the financial statements, made SBNY vulnerable to the risk of a near-term severe impact, and were at least reasonably possible to occur in the near term. *See generally* KPMG Br. at 13-15. KPMG instead sets forth two unpersuasive arguments based upon highly technical, fact-sensitive positions that are both incorrect and not suitable for determination on a motion to dismiss. *See In re CitiGroup Inc. Bond Litig.*, 723 F. Supp. 2d 568, 594 (S.D.N.Y. 2010) (holding application of GAAP to concentration risk disclosures based upon competing interpretations "is not [an] issue[] for resolution at th[e] [motion to dismiss] stage").

**First**, without disputing whether a concentration existed, KPMG argues that SBNY was exempted from disclosure of the risk concentration alleged here. KPMG Br. at 14. KPMG points to ASC 275-10-50-19, which states that "[c]oncentrations of financial instruments . . . are not addressed in this Subtopic." *Id.* Based on this, KPMG claims that because bank deposits fall within the definition of "financial instruments," "GAAP d[id] not require the disclosure of uninsured deposit concentrations." *Id.* But KPMG's argument rests on a flawed reading. ASC 275-10-50-19 does not provide any exemption, but rather only states that certain concentrations of "financial instruments" are "not addressed." But the concentration forming the basis of Plaintiff's claim—the Bank's significant concentration of the Bank's operations in few, large customers—is squarely addressed within ASC 275. ASC 275-10-50-18 states: "[c]oncentrations, including known group concentrations, described below ***require disclosure***" including "concentrations in the volume of business transacted with a particular customer, supplier, lender, grantor, or contributor." Moreover, SBNY's concentration risk was much broader than risks stemming from "financial instruments"

81

as SBNY's concentration in these disclosures left it vulnerable to liquidity, reputational, and regulatory risk, and thus fell within grounds of disclosures. *See* ASC 275-10-50-16 ("[v]ulnerability from concentrations arises because an entity is exposed to risk of loss greater than it would have had it mitigated its risk through diversification"). SBNY's belated acknowledgment in its 2022 Form 10-K that "the size of individual client relationships" needed rightsizing "to achieve a more granular and stable deposit base" confirms that SBNY was required to make this concentration disclosure. *See* DX D at 8.

**Second**, KPMG's claim that SBNY fully disclosed its uninsured deposit concentration fares no better, as it relies on the fact that that SBNY disclosed "the amount and percentage of uninsured deposits" and provided a generic risk disclosure that "deposit outflows can occur . . . because clients with uninsured deposits may seek greater financial security during prolonged periods of extremely volatile and unstable market conditions." *See* KPMG Br. 14-15. Tellingly, KPMG does not claim that SBNY disclosed the facts that Plaintiff alleges were omitted here: that the Bank's operations were significantly concentrated in few, large customers, and that SBNY lacked the systems to manage this concentration risk. These are the particular facts the Complaint alleged GAAP required SBNY to disclose, and KPMG failed to flag this omission as a violation of GAAP. ¶¶357-66. At best, KPMG's truth-on-the-market "arguments create a question of fact which cannot be resolved at this juncture." *In Re Fannie Mae 2008 Sec. Litig.*, 891 F. Supp. 2d 458, 476 n.12 (S.D.N.Y. 2012).[18]

### 2. KPMG's Opinions on SBNY's Internal Controls Were False or Misleading (Misstatements 40, 42, 44).

KPMG's audit reports also issued "unqualified opinions on the effectiveness" of SBNY's

---

[18] KPMG's reliance on *Brown v. E.F. Hutton Group, Inc.*, 991 F.2d 1020, 1032 (2d Cir. 1993), a summary judgment decision decided on an "extensive record," confirms that KPMG's argument is premature.

ICFR and stated that KPMG reached this conclusion consistent with PCAOB. ¶367.

PCAOB AS 2201 establishes the framework for auditors performing audits of a company's ICFR. Under this standard, KPMG was required to evaluate "entity-level controls [] important to the auditor's conclusion about whether the company has effective [ICFR]." AS 2201.22. KPMG needed to assess the Bank's controls, including "[t]he company's risk assessment process" and "[p]olicies that address significant business control and risk management practices." AS 2201.24. If KPMG detected a deficiency through this review, the severity of the deficiency would "not depend on whether a misstatement actually has occurred but rather on whether there is a reasonable possibility that the company's controls will fail to prevent or detect a misstatement." AS 2201.64.

KPMG was also required to identify and assess risks of material misstatement in the financial statements. *See* AS 2110.01. Auditors assess the risk of material misstatement by "understanding [] the company and its environment," including the "events, conditions, and company activities that might reasonably be expected to have a significant effect on the risks of material misstatement." ¶372; AS 2110.07; AS.2110.15 ("business risks" that "might result in material misstatement," include: (i) expansion of the business; (ii) current and prospective financing requirements; (iii) regulatory requirements; and, (iv) new products and services.").

When auditors state without a reasonable basis that a company's ICFR are effective and that the auditor reached that conclusion in accordance with PCAOB standards, courts find those statements to be false and misleading. *See Washington Mutual*, 694 F. Supp. 2d at 1224 (finding statement auditor issued misleading and false statement that its internal control reports were audited "in accordance with the PCAOB's standards."); *In re Silver Wheaton Corp. Sec. Litig.*, 2019 WL 1512269, at *12 (C.D. Cal. Mar. 25, 2019) (holding that auditor's "PCAOB Standards Statement was false").

Here, KPMG stated that it "audited [SBNY's financial statements] in accordance with the standards of the [PCAOB]" when issuing "an unqualified opinion on the effectiveness of the Company's internal control over financial reporting" (Misstatements 40, 42, 44). As alleged in the Complaint, at the time KPMG issued its clean audits of SBNY, SBNY had become deeply concentrated in large customer deposits, but "did not sufficiently establish policies and controls to address this key risk." ¶¶101; *see also* ¶¶387, 392, 397. The Regulators documented repeated deficiencies with SBNY's controls over liquidity risk and customer concentrations. *See supra* Facts §B. And, as noted above, the Regulators concluded that the "sufficiency of Signature's liquidity was unclear and could not be accurately assessed due to the outstanding issues with the Bank's liquidity stress testing." ¶92.

Given such facts, KPMG's ICFR conclusions lacked a reasonable basis because these opinions were issued without regard to whether SBNY had in place internal controls to address and report to investors all material risks required under GAAP, including risk concentrations. ¶¶367-73. Under both PCAOB AS 2201 and 2110, an auditor is to consider and test, among other things, entity level controls, including SBNY's "risk assessment process" and "[p]olicies that address significant business control and risk management practices," and to examine how certain "business risks" might result in material misstatement. *See* AS 2201.24; AS 2110.15. That KPMG failed to ensure that SBNY made the required disclosures in its financial statements shows that KPMG did not audit SBNY consistent with PCAOB Standards and that it issued its audit opinions without a reasonable basis. *See Washington Mutual*, 694 F. Supp. 2d at 1223 (holding auditor falsely stated that company "maintained effective internal controls over financial reporting" when the company was "operating without adequate controls in place to ensure compliance with the

[c]ompany's underwriting and appraisal standards").[19]

KPMG attempts to defend its internal control assessments by arguing that the Complaint details "enterprise risk management and corporate governance deficiencies" and such issues fell outside the scope of its responsibilities. KPMG Br. at 2. But this narrowed view fails because it selectively relies on certain auditor requirements, while ignoring others. To begin, this argument cannot suffice at this stage as it advances a competing interpretation of how auditing requirements apply in a highly fact-sensitive context and thus is better suited for determination at a later stage of this proceeding. *Cf. SEC v. Caserta*, 75 F.Supp.2d 79, 91 (E.D.N.Y.1999) ("Whether GAAP has been violated is a fact-specific issue" which "[f]requently . . . turns on expert testimony.")*.

The Court should also reject KPMG's argument because it has been directly rejected by the SEC's Chief Accountant: "[w]hen evaluating control deficiencies identified outside of an issuer's financial reporting objective, management and auditors should consider the root cause of the deficiency and whether it impacts the issuer's ICFR conclusions." *See* Paul Munter, *The Importance of a Comprehensive Risk Assessment by Auditors and Management*, U.S. Securities and Exchange Commission (Aug. 25, 2023)[20] (citing COSO Framework's principle #17). "For example, ***the root cause behind a regulator's findings related to enterprise-wide governance and controls***, while not directly related to financial reporting control activities, ***could have an impact on management's ICFR conclusions due to their impact on the risk assessment and monitoring components of ICFR***." *Id.* SEC Chief Accountant Munter's conclusions confirm that, under the PCAOB Standards, KPMG was required to consider the deficient governance and controls

---

[19] Because the Complaint alleges that SBNY's financial statements misled investors by violating GAAP, KPMG's authorities are inapposite. *See Green v. Deutsche Bank AG*, 2019 WL 4805804, at *3 (S.D.N.Y. Sept. 30, 2019); *In re Qiwi plc Sec. Litig.*, 2023 WL 7283619, at *13 (E.D.N.Y. Nov. 3, 2023).

[20] Available at: https://www.sec.gov/news/statement/munter-importance-risk-assessment-082523.

impacting SBNY's liquidity—and thus its ability to survive—during the course of its audit.
Because it failed to, KPMG misled investors.

### B.    The Complaint Alleges a Strong Inference of KPMG's Scienter.

When assessing the scienter of an auditor defendant, courts consider whether the
"accounting practices were so deficient that the audit amounted to no audit at all, or an egregious
refusal to see the obvious, or to investigate the doubtful, or that the accounting judgements which
were made were such that no reasonable accountant would have made the same decisions if
confronted with the same facts." *Bear Stearns*, 763 F. Supp. 2d at 511. Here, the Complaint pleads
myriad facts and "red flags" that, when taken together, raise a strong inference that KPMG knew
or was reckless to disregard that SBNY's financial statements for fiscal years 2020, 2021, and
2022 were not submitted in accordance with GAAP and KPMG issued its ICFR and PCAOB
conclusions without a reasonable basis. These facts support an inference of scienter that is "at least
as likely as any plausible opposing inference," *Tellabs*, 551 U.S. at 328 (emphasis in original):

- ***Amplifying Customer Concentrations.*** KPMG knew the concentration risks raised
  above were significant, involved volatile cryptocurrency customers, and became more
  severe during the course of the Class Period.

- ***Regulator Concerns Regarding Bank's Increasing Concentrations and Deposit
  Instability.*** KPMG knew that in the 2019 ROE, Regulators "began reporting concerns
  about the level of uninsured deposits concentrated in a small number of depositors,
  with very large deposits, including digital asset-related deposits." ¶86. Regulators
  specifically flagged in the 2021 ROE that "[t]he combination of rapid deposit growth,
  increasing funding concentrations, and unknown deposit stability had contributed to an
  increasing liquidity risk profile, which highlighted the urgent need for robust risk
  management practices that enable the board and management to adequately control
  liquidity risk and limit potential adverse financial impacts on the bank." ¶106. Also,
  during the 2021 examination cycle, Regulators concluded the digital asset exposure
  "exposed SBNY to greater susceptibility to liquidity, reputation, and regulatory risk
  due to the uncertainty and volatility of the digital asset space." ¶102

- ***SBNY's Disregard of Key Risk Indicators Regarding Concentration Limits.*** KPMG
  knew that during the 2021 examination cycle, SBNY's Regulators specifically flagged
  that the Bank's "digital asset-related deposits rose well above the key risk indicator set
  for those deposits at 10 percent of total assets. Instead of decreasing deposits to meet

the previously prescribed limit, SBNY management increased the limit to 35 percent of total assets in December 2021." ¶111. The Regulators found that "[t]here was no evidence of appropriate analysis or stress testing being completed to support the limit increase." ¶111.

- ***SBNY's Failure to Mitigate Concentration Risk: Deficient Liquidity Stress Testing***: KPMG knew that, in the 2019 ROE, Regulators concluded "liquidity risk management practices were not commensurate with the institution's complexity, risk profile, and scope of operations due to weakness with liquidity contingency planning, liquidity stress testing, and internal controls." ¶83; *see also* ¶84. "Regulators noted significant weaknesses in the Bank's liquidity contingency planning, ***including that the risk exposure presented by the concentration of uninsured deposits was not sufficiently identified, measured, and monitored***." ¶87. Indeed, Regulators issued far-reaching conclusions about significant deficiencies in the Bank's liquidity stress testing (*see* ¶¶84-85), and issued the Bank a MRBA and 18 SRs related to the Bank's deficient liquidity stress testing. ¶88. SBNY never fully corrected these deficiencies before it failed. ¶¶114-115, 118, 196-204.

- ***SBNY's Failure to Mitigate Concentration Risk: Inability to Test Stability of Deposits***: KMPG knew that, as one of the key features of the Bank's risk management failings, SBNY could not appropriately test the stability of deposits, nor could it design appropriate methods of responding to potential instability within its deposit base. For example, during the 2020 ROE, Regulators noted that "management had not developed a metric to identify the impact of adverse events to capital levels or the limitations of remediation plans. In addition, deposit assumptions remained in development, sensitivity testing had not been completed, and accurate rate caps had not been modeled." ¶93.

Thus, KPMG knew SBNY faced significant concentration risk given its dependence on large customers, that SBNY was failing to abide by internal risk limits, and lacked fundamental internal controls over its liquidity risk. These "red flags" alerted KPMG to risks of material misstatements in SBNY's financial statements and weaknesses in SBNY's internal controls. *See In Re AOL Time Warner Sec. & "ERISA" Litig.*, 381 F. Supp. 2d 192, 240 (S.D.N.Y. 2004) ("Allegations of 'red flags,' when coupled with allegations of GAAP and GAAS violations, are sufficient" to show auditor scienter); *In Re IMAX Sec. Litig.*, 587 F. Supp. 2d 471, 483–84 (S.D.N.Y. 2008) (KPMG "disregarded specific red flags that would place a reasonable auditor on notice that the audited company was engaged in wrongdoing to the detriment of investors"); *Bear*

*Stearns*, 763 F. Supp. 2d at 512.[21]

Indeed, that Regulators informed KPMG of fundamental issues with SBNY's concentration risks and risk assessment process supports scienter. *See In re Wilmington Trust Sec. Litig.*, 29 F. Supp. 3d 432 (D. Del. 2014) (finding scienter from combination of GAAP violations and regulator's deficiency findings); *In re Am. Bus. Fin. Servs., Inc. Noteholders Litig.*, 2008 WL 3405580 (E.D. Pa. Aug. 11, 2008) (same).

*Bear Stearns* is instructive. There, the court concluded that the "red flags" alleged by the plaintiffs—when considered with accompanying GAAS and GAAP violations and the magnitude of the alleged fraud—showed the auditor's "reckless disregard sufficient to establish scienter." *Id.* at 517. There, the red flags included: (i) Bear Stearns' concentration of mortgage securities in excess of its internal policy limits; (ii) that GAAS required the auditor to test Bear Stearns' internal controls to establish the fair value of its assets at issue; (iii) the auditor's failure to test internal controls for potential abuses; and (iv) the SEC warned Bear Stearns every year during the Class Period about the deficiencies in its models exposures from the assets at issue. *Id.* at 512-20.

Here, the Complaint alleges similar "red flags": (i) SBNY concentrated digital asset deposits in excess of internal policy limits, and then simply raised internal policy limits without justification (¶111); (ii) SBNY's relied on large customers that consisted of a substantial share of the Bank's operations (¶¶95, 109-10); (iii) Regulators repeatedly found and reported to SBNY that its models and assumptions regarding deposit stability and, liquidity stress, and were undeveloped and deficient (¶¶83-88, 92-93, 102, 106); (iv) Regulators flagged the "urgent need" for appropriate risk practices (¶¶106-07); and (v) despite these serious risks and deficiencies, SBNY's executives

---

[21] KPMG's authorities are inapposite, as they involved red flags that were unknown to the auditor. *See In re Advanced Battery Techs., Inc.*, 781 F.3d 638, 644–45 (2d Cir. 2015) (red flags only apparent from materials which the auditor was not required to review); *Iowa Pub. Emp.'s Ret. Sys. v. Deloitte & Touche LLP*, 919 F. Supp. 2d 321, 335-36 (S.D.N.Y. 2013) (red flags apparent from comparing materials auditor had no obligation or opportunity to review).

issued specific denials to investors about the same risks known to KPMG (*see, e.g.*, ¶47).[22]

KPMG claims that the "red flags" identified in the Complaint based on the Regulators' reports were not sufficiently severe because they "ultimately concluded that the Bank overall was fundamentally sound." KPMG Br. at 18. This argument fails, as shown above in response to similar arguments by the Individual Defendants. *See supra* §I.A.2. At most, KPMG's argument impermissibly asks the Court to weigh evidence at the motion to dismiss stage and thus must be rejected. *See Lonegan v. Hasty*, 436 F. Supp. 2d 419, 429–30 (E.D.N.Y. 2006) (weighing contrary portions of regulatory reports presents fact issues on scienter inappropriate for a Rule 12 motion).

KPMG's conflicts of interest with SBNY's key personnel further strengthen the inference of scienter here. Most notably, Keisha Hutchinson, the KPMG audit partner in charge of auditing SBNY's 2020 financial statements, joined SBNY as its Chief Risk Officer just three months after issuing a clean audit opinion. *See SEPTA v. Orrstown Fin. Servs., Inc.*, 2022 WL 3572474, at *67-75, 75 n.36 (M.D. Pa. Aug. 18, 2022) (auditor's conflicts of interest contributed to scienter); *In re E.S. Bankest, L.C.*, 2010 WL 1417732, at *2, 4-5 (S.D. Fla. Apr. 6, 2010) (same). These facts support the requisite inference that KPMG recklessly disregarded known issues with SBNY's financial statements for fiscal years: (i) 2020 based on Hutchinson impending hire by SBNY; and (ii) 2021 and 2022 based on Hutchinson's position overseeing SBNY's risk function.[23]

---

[22] Because KPMG failed to disclose SBNY's concentration risk as required under GAAP, the cases cited by KPMG where the company disclosed the exact facts that the plaintiff alleged were omitted are inapposite. *See, e.g.*, *In Re Bank of Am. AIG Disclosure Sec. Litig.*, 980 F. Supp. 2d 564, 586 (S.D.N.Y. 2013).

[23] SBNY's hiring of the audit partner who signed off on its financial statements during the period of alleged violations renders KPMG's authorities inapposite. *See, e.g.*, *Dobina*, 909 F. Supp. 2d at 253 (company hired personnel from auditing firm "some seven years before the class period"). KPMG also relies on inapposite authority where there was no underlying issue with the financial statements (*New Jersey v. Sprint Corp.*, 314 F. Supp. 2d 1119, 1147 (D. Kan. 2004)) and where the court simply considered whether an auditor's financial motivation to retain business supported the strong scienter inference (*In re Royal Ahold N.V. Sec. & ERISA Litig.*, 351 F. Supp. 2d 334, 391 (D. Md. 2004)).

## III.    THE COMPLAINT ADEQUATELY ALLEGES A SCHEME LIABILITY CLAIM.

Defendants are liable under subsections (a) and (c) of Rule 10b-5 for disseminating false and misleading statements and engaging in other deceptive conduct, including by inflating the Bank's deposits without regard to the Bank's risk controls and disseminating false statements to analysts. *See Lorenzo v. SEC*, 139 S. Ct. 1094, 1101-03 (2019). In so holding, the Supreme Court clarified that provisions of Rule 10b-5(a) and (c) "capture a wide range of conduct," and firmly established that scheme liability claims may be brought in circumstances where false and misleading statements are part and parcel of the scheme. *Id.* (rejecting argument that "scheme liability claims . . . are violated only when conduct other than misstatements is involved").

Contrary to Defendants' argument (Lead Br. at 58-59), the Complaint alleges that Defendants committed a deceptive act beyond the false and misleading statements, as required by the Second Circuit's decision in *SEC v. Rio Tinto plc.*, 41 F.4th 47, 49 (2d Cir. 2022). Specifically, the Complaint alleges: (i) DePaolo, Shay, Howell, Susca, and Wyremski allowed deficiencies by Regulators to go unaddressed for years in order to boost the Bank's deposits, and misled Regulators as the Bank was collapsing (¶¶79, 408); (ii) DePaolo, Shay, and Howell pursued unrestrained risky deposit growth to reap millions in compensation from the LTI plan (¶121); (iii) DePaolo and Howell disseminated misstatements to analysts (¶133); and (iv) DePaolo, Shay, Susca, and Howell made a series of large and suspicious stock transactions (¶426).

Defendants' participation in the scheme to boost the Banks' deposits, ignore regulator warnings, mislead Regulators, and reap millions in compensation is similar to deceptive conduct that other courts have found to constitute a scheme. *SEC v. Sequential Brands Grp., Inc.*, 2021 WL 4482215, at *6 (S.D.N.Y. Sept. 30, 2021) (falsely boosting company's goodwill); *SEC v. Sugarman*, 2020 WL 5819848, at *7 (S.D.N.Y. Sept. 30, 2020) (a misleading memo presented to the board of directors regarding an acquisition). Moreover, Defendants' knowing transmittal of

false statements to analysts is precisely what the Supreme Court found counted as deceptive conduct in *Lorenzo*, 139 S. Ct. at 1101-03.[24]

Lastly, Defendants argue that Plaintiff cannot establish reliance on Defendants' "false statements to Regulators" in the days immediately preceding the Bank's seizure. Lead Br. at 59. This argument is entirely irrelevant—here, the fraud-on-the-market presumption establishes that investors relied on Defendants' statements that were enabled by Defendants' deceptive conduct. *See Eletrobras*, 245 F. Supp. 3d at 472 (reliance adequately pled for scheme liability where defendants' deceptive conduct made the alleged false statements "necessary or inevitable"). Moreover, the argument does not address the many ***other*** deceptive acts in addition to the misstatements on which the market did rely.

## IV. THE COMPLAINT ADEQUATELY ALLEGES LOSS CAUSATION.

The Supreme Court has explained that pleading rules for loss causation "are not meant to impose a great burden on a plaintiff," who need only provide a "short and plain statement" that provides "some indication of the loss and causal connection that the plaintiff has in mind." *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 337 (2005). Loss causation "is a matter of proof at trial and not to be decided on a Rule 12(b)(6) motion." *Emergent Capital Inv. Mgmt., LLC. v. Stonepath Grp., Inc.*, 343 F.3d 189, 197 (2d Cir. 2003).

The Complaint readily meets this minimal burden. The truth concealed by Defendants' misstatements and omissions was revealed to investors through a series of four corrective disclosures that progressively exposed the instability of the Bank's deposits and poor liquidity management, culminating in the Bank's collapse. ¶¶452-71. SBNY's share price fell with each

---

[24] Both *In re Turquoise Hill Resources Ltd. Securities Litigation*, 625 F. Supp. 3d 164, 247-53 (S.D.N.Y. 2022) and *Plumber & Steamfitters Local 773 Pension Fund v. Danske Bank A/S*, 11 F.4th 90 (2d Cir. 2021) are inapposite, because there, the plaintiffs alleged no deceptive conduct other than the false and misleading statements.

disclosure. ¶¶456 (drop from $201.20 to $186.93), 461 (drop from $196.12 to $187.28), 467 (drop from $125.70 to $116.99), 470 (drop from $70.00 when trading halted to $0.13). Analysts and market commentators linked these declines to new information about Signature related to Plaintiff's claims, including the revelation of its deposit instability and poor liquidity management. ¶¶459, 463-64, 471. At this stage, these loss causation allegations more than suffice. *AMC Ent. Holdings, Inc.*, 422 F. Supp. 3d at 855.

The Individual Defendants' arguments miss the mark. **<u>First</u>**, they wrongly contend that Defendants must have specifically denied the very facts later revealed by the corrective disclosures. Lead Br. at 55-57; Wyremski Br. at 18; Shay Br. at 18-19; Seibert Br. at 18. Courts do not "require a corrective disclosure [to] be a 'mirror image' tantamount to a confession of fraud." *Freudenberg*, 712 F. Supp. 2d at 202; *see also In re Vivendi, S.A. Sec. Liti*g., 838 F.3d at 262 (loss causation may be established "through events constructively disclosing the fraud"). Defendants misrepresented Signature's stability to investors, including falsely touting the Bank's "robust liquidity position" (Misstatement 34), the "stickiness" of the Bank's deposits (Misstatement 8), and the "strong risk-based capital ratios reflect the relatively low risk profile of the Bank's balance sheet" (Misstatement 1), despite Regulators' longstanding warnings of material deficiencies across these and other critical areas of the Bank's infrastructure (¶¶77-120). The severity of these deficiencies came to light through the alleged partial corrective disclosures. ¶¶452-71. Loss causation is pled here because these disclosures revealed "that defendants [had] concealed a broad risk . . . by misleading the public on particular facts and denying the risk." *In re Vivendi Universal, S.A. Sec. Litig.*, 634 F. Supp. 2d 352, 369 (S.D.N.Y. 2009).

The Second Circuit's decision in *In re Vivendi, S.A. Securities Litigation*, 838 F.3d 223, 262 (2d Cir. 2016), is instructive. There, as here, "Vivendi's alleged misstatements concealed its

liquidity risk, and a series of events . . . made the truth about that liquidity crisis come to light." *Id.* Those events "revealed the truth about Vivendi's liquidity risk, and that concealment of 'the subject' of Vivendi's alleged misstatements—its liquidity risk—was therefore 'the cause of the actual loss suffered' by Plaintiffs" (*id.*)—precisely the same causation theory here, as Defendants' misrepresentations about the true instability of the SBNY's liquidity and risk practices came to light through a series of liquidity stress events. ¶¶452-71.

**Second**, DePaolo and Howell's arguments are premature and fail on the merits. Lead Br. at 31, 56. Whether or when "news of the truth had entered the market and dissipated the effects of prior misstatements[] is a matter for trial." *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 482 n.11 (2013); *Ganino v. Citizens Utilities Co.*, 228 F.3d 154, 167 (2d. Cir. 2000) ("The truth-on-the-market defense is intensely fact-specific and is rarely an appropriate basis for dismissing a §10(b) complaint.").

Nevertheless, Defendants fail to establish that prior to the alleged disclosures, "the corrective information . . . [was] conveyed to the public with a degree of intensity and credibility sufficient to counter-balance effectively any misleading information created by the alleged misstatements." *Ganino*, 228 F.3d at 167. Indeed, Defendants ignore that analysts and market commentators treated these disclosures as new information (¶¶459, 463-64, 471), which warrants rejection of the truth on the market defense (*In re MBIA, Inc., Sec. Litig.*, 700 F. Supp. 2d 566, 582 (S.D.N.Y. 2010)). Additionally, each of the four alleged corrective disclosures were followed by a significant decline in Signature's stock price—a telltale indicator of "new news." *See In re Vivendi Universal, S.A. Sec. Litig.*, 381 F. Supp. 2d at 182 (rejecting truth on the market defense based on "the precipitous [stock] drop" after corrective disclosures). At most, Defendants raise

fact disputes inappropriate for resolution at this stage.[25]

Defendants' reliance on *In re Omnicom Group, Inc. Securities Litigation*, 597 F.3d 501 (2d Cir. 2010), is misplaced. *Omnicon* was a summary judgment opinion, and courts have cautioned against applying it at the motion to dismiss stage. *See Bishins v. CleanSpark, Inc.*, 2023 WL 112558, at *12 (S.D.N.Y. Jan. 5, 2023). And in *Omnicon*, the allegedly concealed information was in fact already public. Here, it is undisputed that the Regulators' warnings were not public.

**Third**, Defendants' arguments that "unforeseeable" bank closures were the sole cause of Signature's collapse misses the mark. *See* Lead Br. at 57; Wyremski Br. at 18. To start, Defendants argument raises a merits question that must be resolved through detailed fact and expert evidence and cannot be resolved at this stage. *See Fin. Guar. Ins. Co. v. Putnam Advisory Co., LLC*, 783 F.3d 395, 404–05 (2d Cir. 2015).

Moreover, Signature's collapse was a foreseeable consequence of the alleged fraud. The Bank's risk concentrations, poor deposit stability, liquidity management, and other risk management deficiencies identified by Regulators—which Defendants concealed from investors—left it particularly vulnerable to a bank run. *See supra* Facts §B. Contrary to Defendants' assertion, whether the bank run prompted Regulators to "reconsider their existing liquidity guidance" (Lead Br. at 58) is irrelevant and ignores the Regulators' ultimate conclusions the "root cause of the bank's failure" was its poor liquidity management policies—which had long been deficient under the Regulators' then-existing standards. *See* ¶192.

Defendants' cases do not suggest a contrary result; each involved distinguishable facts. *In re Merrill Lynch & Co. Rsch. Reports Sec. Litig.*, 568 F. Supp. 2d 349, 364 (S.D.N.Y. 2008) ("long,

---

[25] *Kuriakose v. Fed. Home Loan Mortg. Corp.* 897 F. Supp. 2d 168, 177 (S.D.N.Y. 2012) is inapposite because there, "all relevant information was already available to investors."

steady decline in [share] value . . . proceeded apace with the 'crater[ing]' of the Internet sector" before the corrective disclosure); *Stratte-McClure v. Morgan Stanley*, 598 F. App'x 25, 29 (2d Cir. 2015) (alleged curative reports "did not disclose any underlying circumstance that [was] concealed or misstated"); *Cent. States, Se. & Sw. Areas Pension Fund v. Fed. Home Loan Mortg. Corp.*, 543 F. App'x 72, 74 (2d Cir. 2013) ("all relevant information was already available" and price declines occurred before the alleged corrective events).

**Lastly**, KPMG's loss causation arguments fare no better. There is no disconnect between the alleged corrective disclosures and KPMG's audit opinions—KPMG, like the Individual Defendants, issued Misstatements that concealed risks surrounding SBNY's financial statements and internal control framework (*see supra* Facts §D), which were the very risks that materialized. KPMG's authorities all miss the mark, as they concern situations where, unlike here, there was a clear mismatch between the fraud alleged and corrective disclosures. *See Amorosa v. AOL Time Warner Inc.*, 409 F. App'x 412, 416 (2d Cir. 2011) (correctives did not "address[] AOL's accounting practices," which was the subject of the alleged fraud); *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 177 (2d Cir. 2005) (correctives did not reveal the fraud alleged, which plaintiffs conceded was not revealed until much later). And *Amorosa* did not, as KPMG suggests, hold that a corrective disclosure must concern the audit opinion specifically. Rather, it found an alleged corrective insufficient because it ***neither*** "implicated E & Y's audit opinion" ***nor*** concerned the subject of the alleged fraud. *Amorosa*, 409 F. App'x at 416.

## CONCLUSION

Plaintiff requests that Defendants' motions to dismiss be denied in their entirety. Should the Court grant any part of Defendants' Motions, Plaintiff respectfully requests leave to amend under Rule 15(a).

Dated: April 19, 2024

Respectfully submitted,

**BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP**

*/s/ John Rizio-Hamilton*
John Rizio-Hamilton
Jeremy P. Robinson
John J. Esmay
Alexander Noble
Jonathan G. D'Errico
1251 Avenue of the Americas
New York, NY 10020
Telephone: (212) 554-1400
Facsimile: (212) 554-1444
johnr@blbglaw.com
jeremy@blbglaw.com
john.esmay@blbglaw.com
alexander.noble@blbglaw.com
jonathan.derrico@blbglaw.com

Sharan Nirmul
Richard A. Russo, Jr. (admitted *pro hac vice*)
Joshua A. Materese (admitted *pro hac vice*)
Nathaniel C. Simon (admitted *pro hac vice*)
**KESSLER TOPAZ MELTZER & CHECK, LLP**
280 King of Prussia Road
Radnor, PA 19087
Telephone: (610) 667-7706
Facsimile: (610) 667-7056
snirmul@ktmc.com
rrusso@ktmc.com
jmaterese@ktmc.com
nsimon@ktmc.com

*Lead Counsels for Lead Plaintiff Sjunde AP-Fonden and the Class*

## CERTIFICATE OF SERVICE

I hereby certify that on the 19th day of April, 2024, I served: (1) Lead Plaintiff's Omnibus Memorandum of Law in Opposition to Defendants' Motions to Dismiss the Consolidated Complaint; (2) Declaration of John Rizio-Hamilton in Support of Lead Plaintiff's Opposition, with Exhibit 1; and (3) Cover Letter, via electronic mail to all counsel of record in the above-captioned litigation.

*/s/ Alexander Noble*
Alexander Noble