**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SJUNDE AP-FONDEN, Individually and on Behalf of All Others Similarly Situated, <br><br>                    Plaintiff, <br><br>        vs. <br><br> JOSEPH J. DEPAOLO, ERIC HOWELL, FRANK SANTORA, JOSEPH SEIBERT, SCOTT A. SHAY, VITO SUSCA, STEPHEN D. WYREMSKI, and KPMG, LLP, <br><br>                  Defendants. | No. 1:23-CV-01921-FB-JRC |

**REPLY IN SUPPORT OF DEFENDANTS**
**JOSEPH J. DEPAOLO AND ERIC HOWELL'S MOTION TO DISMISS**
**CONSOLIDATED CLASS ACTION COMPLAINT**

**TABLE OF CONTENTS**

I.     PLAINTIFF FAILS TO ALLEGE A MATERIAL MISSTATEMENT ................................... 1

       A.     Many of the Challenged Statements Are Inactionable Puffery ...................... 1

       B.     Many of the Challenged Statements Are Inactionable Opinions ................... 4

       C.     Forward-Looking Statements Are Protected by the PSLRA's Safe Harbor ................11

       D.     Plaintiff Does Not Allege that the Statements Were Half-Truths............................... 13

              1.     There Is No Duty to Disclose All Material Information ..................................... 13

              2.     Statements Must Be Evaluated in Their Full Context ......................................... 15

              3.     Statements Regarding the Bank's Concentration and Diversification Were
                     Not Half-Truths (Stmts. 9, 17-19, 23, 29, 31, 33) ............................................ 15

              4.     Statements Regarding Signature's Liquidity and Risk Profile Were Not Half-
                     Truths (Stmts. 22, 28, 32, 34, 36, and 37) ......................................................... 16

              5.     Statements Regarding Deposit Stability and Correlation to Crypto Prices
                     Were Not Half-Truths (Stmts. 7, 8, 12, 14, 21, 24-26, 30, 35)........................... 17

              6.     Statements Regarding Modeling and Analysis Were Not Half-Truths (Stmts.
                     2, 3, 10, 11, and 27) ......................................................................................... 18

II.    PLAINTIFF FAILS TO ALLEGE SCHEME LIABILITY .................................................. 19

III.   PLAINTIFF FAILS TO PLEAD SCIENTER........................................................................ 20

       A.     The Regulator Feedback Does Not Raise a Strong Inference of Scienter.................... 20

       B.     Plaintiff's Fallback Arguments About Actual Knowledge Do Not Establish Scienter   23

       C.     Plaintiff Does Not Adequately Plead Scienter Through Motive or Opportunity ......... 24

CONCLUSION..................................................................................................................... 25

**TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*In re Able Lab'ys Sec. Litig.*
2008 WL 1967509 (D.N.J. Mar. 24, 2008)........................................................................ 22-23

*In re Aceto Corp. Sec. Litig.*,
2019 WL 3606745 (E.D.N.Y. Aug. 6, 2019) ...........................................................................13

*In re Alkermes Public Ltd. Co. Sec. Litig.*,
523 F. Supp. 3d 283 (E.D.N.Y. 2021) ...............................................................................21, 22

*In re Amarin Corp. PLC Sec. Litig.*,
2016 WL 1644623 (D.N.J. Apr. 26, 2016) .............................................................................21

*In re Ambac Fin. Grp., Inc. Sec. Litig.*,
693 F. Supp. 2d 241 (S.D.N.Y. 2010) .....................................................................................3

*Arkansas Pub. Emps. Ret. Sys. v. Bristol-Myers Squibb Co.*,
28 F. 4th 343 (2d Cir. 2022) ....................................................................................................7

*In re BHP Billiton Ltd. Sec. Litig.*,
276 F. Supp.3d 65 (S.D.N.Y. 2017)..........................................................................................3

*In re Bear Stearns Cos., Inc. Secs., Deriv., & ERISA Litig.*,
763 F. Supp. 2d 423 (S.D.N.Y. 2011) ......................................................................................7

*In re Bristol-Myers Squibb Co. CVR Sec. Litig.*,
658 F. Supp. 3d 220 (S.D.N.Y. 2023)....................................................................................13

*Buhrke Family Rev. Trust v. U.S. Bancorp.*,
2024 WL 1330047 (S.D.N.Y. Mar. 28, 2024) ...................................................................3, 14

*Christine Asia Co. v. Ma*,
718 F. App'x 20 (2d Cir. 2017) .............................................................................................22

*In re Citigroup Inc. Bond Litig.*,
723 F. Supp. 2d 568 (S.D.N.Y. 2010)....................................................................................11

*In re Citigroup Sec. Litig.*,
2023 WL 2632258 (S.D.N.Y. Mar. 24, 2023) ............................................................... passim

*City of Pontiac Policemen's and Firemen's Ret. Sys. v. UBS AG*,
752 F.3d 173 (2d Cir. 2014)......................................................................................................2

*Das v. Rio Tinto PLC,*
   332 F. Supp. 3d 786 (S.D.N.Y. 2018)................................................................24

*In re Deutsche Bank AG Sec. Litig.,*
   2016 WL 4083429 (S.D.N.Y. July 25, 2016) ..........................................11

*In re Deutsche Bank AG Sec. Litig.,*
   2017 WL 4049253 (S.D.N.Y. June 28, 2017) ..........................................16

*Diehl v. Omega Protein Corp.,*
   339 F. Supp. 3d 153 (S.D.N.Y. 2018)...........................................2, 14

*ECA & Local 134 IBEW Joint Pension Tr. of Chic. v. JP Morgan Chase Co.,*
   553 F.3d 187 (2d Cir. 2009)........................................................3

*In re Electrobas Sec. Litig.*
   245 F. Supp. 2d 450 (S.D.N.Y. 2017)..........................................11

*In re Express Scripts Holdings Co. Sec. Litig.,*
   773 Fed. App'x 9 (2d Cir. 2019)................................................9

*In re Fannie Mae 2008 Sec. Litig.,*
   2011 WL 13267340 (S.D.N.Y. Apr. 11, 2011)...................................25

*In re FBR Inc. Sec. Litig.,*
   544 F. Supp. 2d 346 (S.D.N.Y. 2008)..........................................14

*In re Ferroglobe PLC Securities Litig.,*
   2020 WL 658715 (S.D.N.Y. Nov. 11, 2020)....................................15

*In re Franklin Bank Corp. Sec. Litig.*
   782 F. Supp. 2d 364 (S.D. Tex. 2011) .....................................21, 22

*Fryman v. Atlas Fin. Holdings, Inc.,*
   2022 WL 1136577 (N.D. Ill. Apr. 18, 2022) ..................................22

*In re Grab Holdings Ltd. Sec. Litig.,*
   2024 WL 1076277 (S.D.N.Y. Mar. 12, 2024) ..................................3

*Green v. Deutsche Bank AG,*
   2019 WL 4805804 (S.D.N.Y. Sept. 30, 2019)..................................11

*Hammer v. Frontier Fin. Corp.,*
   2012 WL 13020032 (W.D. Wash. Apr. 20, 2012)................................22

*Hawaii Structural Ironworkers Pension Tr. Fund v. AMC Ent. Holdings, Inc.,*
   422 F. Supp. 3d 821 (S.D.N.Y. 2019)..........................................24

iii

*In re Henry Schein, Inc. Sec. Litig.*,
    2019 WL 8638851 (E.D.N.Y. Sept. 27, 2019) ...................................................................23

*In re Iconix Brand Grp., Inc.*,
    2017 WL 4898228 (S.D.N.Y. Oct. 25, 2017) ...................................................................24

*Jiajia Luo v. Sogou, Inc.*,
    465 F. Supp. 3d 393 (S.D.N.Y. 2020)...................................................................14

*Karimi v. Deutsche Bank AG*,
    607 F. Supp. 3d 381 (S.D.N.Y. 2022)...................................................................22

*In re Keyspan Corp. Sec. Litig.*,
    383 F. Supp. 2d 358 (E.D.N.Y. 2003) ...................................................................25

*Kuriakose v. Fed. Home Loan Mortg. Corp.*,
    897 F. Supp. 2d 168 (S.D.N.Y. 2012)...................................................................22

*Lachman v. Revlon, Inc.*,
    487 F. Supp. 3d 111 (E.D.N.Y. 2020) ...................................................................23

*In re Lehman Bros. Sec. & ERISA Litig.*,
    709 F. Supp. 2d 258 (S.D.N.Y. 2011)...................................................................16

*Linenweber v. Southwest Airlines Co.*,
    2023 WL 6149106 (N.D. Tex. Sept. 19, 2023)...................................................................11

*Lorenzo v. SEC*,
    587 U.S. 71 (2019)...................................................................19

*Macquarie Infrastructure Corp. v. Moab Partners L.P.*,
    601 U.S. 257 (2024)...................................................................13

*Manavazian v. ATEC Group, Inc.*,
    160 F. Supp. 2d 468 (E.D.N.Y. 2001) ...................................................................24

*In re Manulife Fin. Corp. Sec. Litig.*,
    2012 WL 4108104 (S.D.N.Y. Sept. 19, 2012)...................................................................22

*Martin v. Quartermain*,
    732 Fed. App'x 37 (2d Cir. 2018)...................................................................6

*Menaldi v. Och-Ziff Cap. Mgmt. Grp. LLC*,
    277 F. Supp. 3d 500 (S.D.N.Y. 2017)...................................................................14

*Merritt v. Molecular Partners AG*,
    2024 WL 495140 (S.D.N.Y. Feb. 5, 2024)...................................................................5

*In re Meta Materials, Inc. Sec. Litig.*,
   2023 WL 6385563 (E.D.N.Y. Sept. 29, 2023) ..........................................................12, 13, 14

*Meyer v. Jinkosolar*
   761 F.3d 245 (2d Cir. 2014)...............................................................................................14

*In re Moody's Corp. Sec. Litig.*,
   599 F. Supp. 2d 493 (S.D.N.Y. 2009)..................................................................................3

*Ohio Pub. Emps. Ret. Sys. v. Discovery, Inc.*,
   2024 WL 446466 (S.D.N.Y. Feb. 5, 2024)..........................................................................15

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
   575 U.S. 175 (2015)...........................................................................................................11

*In re PetroChina Co. Ltd. Sec. Litig.*,
   120 F. Supp. 3d (S.D.N.Y. 2015) .......................................................................................11

*In re Philip Morris Int'l Inc. Sec. Litig.*,
   89 F.4th 408 (2d Cir. 2023) .............................................................................................4, 6

*Plumber & Steamfitters Local 773 Pension Fund v. Danske Bank A/S*,
   11 F.4th 90 (2d Cir. 2021) .................................................................................................19

*In re QIWI PLC Secs. Litig.*,
   2023 WL 7283619 (E.D.N.Y. Nov. 3, 2023).......................................................................19

*In re Refco, Inc. Sec. Litig.*,
   609 F. Supp. 2d 304 (S.D.N.Y. 2009).................................................................................20

*Ressler v. Liz Claiborne, Inc.*,
   75 F. Supp. 2d 43 (E.D.N.Y. 1998) ...............................................................................24, 25

*Ret. Fund v. Biovail Corp.*,
   615 F. Supp. 2d 218 (S.D.N.Y. 2009).................................................................................21

*In re Sanofi Sec. Litig.*,
   87 F. Supp. 3d 510 (S.D.N.Y. 2015)...................................................................................21

*SEC v. Rio Tinto plc.*,
   41 F.4th 47 (2d Cir. 2022) .................................................................................................20

*SEC v. Sequential Brands Grp., Inc.*,
   2021 WL 4482215 (S.D.N.Y. Sept. 30, 2021).....................................................................20

*SEC v. Sugarman*,
   2020 WL 5819848 (S.D.N.Y. Sept. 30, 2020).....................................................................20

*Singh v. Cigna Corp.*
    918 F.3d 57 (2d Cir. 2019) ................................................................ 2-3, 14

*Slayton v. Am. Exp. Co.*,
    604 F.3d 758 (2d Cir. 2010) ....................................................................23

*Stoneridge Inv. Partners, LLC v. Sci.-Atlanta*,
    552 U.S. 148 (2008) ..................................................................................20

*In re Synchrony Fin. Sec. Litig.*,
    988 F.3d 157 (2d. Cir. 2021) ........................................................ 1-2, 4, 8

*Tongue v. Sanofi*,
    816 F.3d 199 (2d Cir. 2016) ..........................................................4, 5, 6, 7

*In re Toyota Motor Corp. Sec. Litig.*,
    2011 WL 2675395 (C.D. Cal. July 7, 2011) ............................................23

*In re Turquoise Hill Res. Ltd. Sec. Litig.*,
    625 F. Supp. 3d 164 (S.D.N.Y. 2022) ......................................... 12, 13, 20

*Vallabhaneni v. Endocyte*,
    2016 WL 51260 (S.D. Ind. Jan. 4, 2016) ................................................21

*Villare v. Abiomed, Inc.*,
    2021 WL 4311749 (S.D.N.Y. Sept. 21, 2021) ......................................3, 8

*In re Washington Mut., Inc. Sec., Deriv. & ERISA Litig.*
    694 F. Supp. 2d 1192 (W.D. Wash. 2009) ..............................................11

*In re Wells Fargo & Co. Sec. Litig.*,
    2021 WL 4482102 (S.D.N.Y. Sept. 30, 2021) ..........................................3

*Woolgar v. Kingstone Companies, Inc.*,
    477 F. Supp. 3d 193 (S.D.N.Y. 2020) ......................................................24

The crux of Plaintiff's Complaint is that Signature Bank ("Signature" or the "Bank") made numerous misstatements because it failed to disclose negative feedback from regulators.  As discussed in DePaolo and Howell's motion to dismiss ("Motion" or "Mot."), however, Plaintiff's claims fail because the challenged statements are non-actionable puffery, opinions, or forward-looking statements, and because the statements were not false or misleading.

In response, Plaintiff argues that, because the Bank made general statements about its compliance functions, it was duty bound to disclose all feedback from regulators.  Plaintiff's theory is flatly contrary to relevant precedent.  Its application would also effectively result in every bank in the country—nearly all made the same sort of generic statements—needing to disclose every potentially negative piece of feedback received from a regulator.  Moreover, until the day before the Bank closed, the FDIC rated Signature as a "2"—a bank that is "fundamentally sound," with satisfactory risk management practices, and "no material supervisory concerns."  Plaintiff neither offers support for its broad, novel theory, nor explains why the Court should adopt it in the face of controlling, contrary precedent.  Plaintiff's Complaint should be dismissed.

## I.      PLAINTIFF FAILS TO ALLEGE A MATERIAL MISSTATEMENT

### A.      Many of the Challenged Statements Are Inactionable Puffery

As DePaolo and Howell showed, Plaintiff's claims fail because most of the challenged statements are textbook puffery.  Mot. 24-29; *see also* Ex. WWW, Misstatement Chart (identifying puffery statements).[1]  The Second Circuit has repeatedly held that generic statements regarding a company's "risk management strategy, asset quality, and business practices" are not actionable because they are "too general to cause a reasonable investor to rely upon them."  *In re Synchrony Fin. Sec. Litig.*, 988 F.3d 157, 170 (2d. Cir. 2021); *see also* Mot. 24-30 (citing *ECA*, *SRM*, *Danske*

---

[1] References to "Ex. __" are citations to the Declaration of Peter L. Simmons dated February 13, 2024 and the Supplemental Declaration of Peter L. Simmons dated May 24, 2024.

*Bank*, *UBS*, *Singh*, and *Express Scripts*).  As in those cases, general statements regarding the Bank's risk management practices are not actionable.  *See* Stmt. 2 ("internal controls in place that help to mitigate the risks that affect our business"); *see also* Stmts. 3, 29.   Likewise, non-specific statements concerning the Bank's deposits, liquidity, and business are classic puffery.  *See* Stmt. 8 ("fairly sticky deposits"); Stmt. 34 ("robust liquidity position"); Stmt. 15 ("Our banking model is pretty straightforward"); *see also* Stmts. 7, 10, 11, 18, 22, 23, 26, 28, 30, 36, 37.  The same is true for statements regarding the Bank's relationship with its regulators.  *See* Stmt. 5 ("They've been very good to us"); *see also* Stmts. 7, 16.

Plaintiff's attempts to distinguish these controlling cases by claiming they do not involve statements that "contradict regulator findings," Opp. 42; *see also id.* 43 n.5, fail for two reasons.  *First*, Plaintiff conflates the distinct concepts of scienter—whether the statements were knowingly false—and materiality—whether the statements were puffery.   But as the Second Circuit has explained, claims that "statements were knowingly and verifiably false when made does not cure their generality, which is what prevents them from rising to the level of materiality."  *City of Pontiac Policemen's and Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173, 183 (2d Cir. 2014).

*Second*, courts routinely apply the puffery doctrine to the sorts of statements at issue here, where the speaker remains silent about concurrent regulatory issues.  *See, e.g.*, *In re Citigroup Sec. Litig.*, 2023 WL 2632258, *13-15 (S.D.N.Y. Mar. 24, 2023) (bank received regulator reports identifying deficiencies); *Diehl v. Omega Protein Corp.*, 339 F. Supp. 3d 153, 162 (S.D.N.Y. 2018) (statements were puffery "[r]egardless of whether Omega had properly implemented the compliance program" required by plea agreement).  Indeed, in *Singh v. Cigna Corp.*, the Second Circuit found "vague corporate statements affirming the importance of regulatory compliance" inactionable despite the company's receipt of 75 notices of regulatory infractions, labeling

plaintiffs' claims a "creative attempt to recast corporate mismanagement as securities fraud." 918 F.3d 57, 59-60 (2d Cir. 2019). Plaintiff's attempts at the same gambit should fare no differently.

Plaintiff next argues dismissal is inappropriate because some statements were repeated or made to analysts. Opp. 41-42. But non-actionable generalities do not become actionable if said twice. *See, e.g.*, *Villare v. Abiomed, Inc.*, 2021 WL 4311749, *15 (S.D.N.Y. Sept. 21, 2021) ("the repetition of puffery does not, by itself, render it actionable"). And many cases find statements made to analysts or repetitive statements to be puffery. *See, e.g.*, *In re Grab Holdings Ltd. Sec. Litig.*, 2024 WL 1076277, *24 (S.D.N.Y. Mar. 12, 2024) ("every statement made in response to an analyst's question, no matter how vacuous or jargon-laden that statement might be" is not actionable); *Buhrke Family Rev. Trust v. U.S. Bancorp.*, 2024 WL 1330047, *8-9 (S.D.N.Y. Mar. 28, 2024) (statements made in multiple SEC filings and at investment conferences remained puffery); *Citigroup*, 2023 WL 2632258, *3-9 (same).[2] Nor can Plaintiff avoid dismissal by arguing that the statements related to important topics. As the Second Circuit has held, there is a difference between the importance of an *issue* and the materiality of a *statement* on that issue. *See ECA & Local 134 IBEW Joint Pension Tr. of Chic. v. JP Morgan Chase Co.*, 553 F.3d 187, 206 (2d Cir. 2009) ("While a bank's reputation is undeniably important, that does not render a particular statement by a bank regarding its integrity per se material.").

Finally, Plaintiff's cases finding certain statements made to reassure the market actionable are inapposite. Opp. 41. Those statements, referring to the Bank's "strong capital," "robust

---

[2] It is also worth noting that Plaintiff's cases involve *far* more specific statements than were made here. *See In re Wells Fargo & Co. Sec. Litig.*, 2021 WL 4482102 (S.D.N.Y. Sept. 30, 2021) (bank's compliance with specific terms of consent order); *In re BHP Billiton Ltd. Sec. Litig.*, 276 F. Supp. 3d 65, 79 (S.D.N.Y. 2017) ("quite specific representations or guarantees"); *In re Ambac Fin. Grp., Inc. Sec. Litig.*, 693 F. Supp. 2d 241, 272 (S.D.N.Y. 2010) ("specific statements that Ambac's CDO portfolio was currently outperforming the market and relevant indices"); *In re Moody's Corp. Sec. Litig.*, 599 F. Supp. 2d 493, 509 (S.D.N.Y. 2009) ("verifiable actions it was taking to ensure its independence").

liquidity," and "diversification," were made in the context of specific disclosure of key financial metrics such as detailed capital ratios and liquidity information. Mot. 12-16. These disclosures gave investors the "numerical metrics they needed to determine whether they agreed" with the Bank's subjective views. Thus, these statements are not actionable. *Synchrony*, 988 F.3d at 172.

> **B.   Many of the Challenged Statements Are Inactionable Opinions**

Plaintiff's claims also fail because many of the challenged statements are inactionable opinions. *See* Mot. 29-33; Ex. WWW (identifying opinion statements). Plaintiff contends that every opinion statement was misleading because it omitted the same facts about (1) alleged deficiencies or concerns identified by regulators and/or (2) the Bank's alleged overexposure to risks in the digital asset space. This expansive, one-size-fits-all approach runs contrary to controlling authority.

When evaluating an opinion, the "core inquiry is whether the omitted facts would conflict with what a reasonable investor would take from the statement itself." *Tongue v. Sanofi*, 816 F.3d 199, 210 (2d Cir. 2016) (citation omitted). Opinions must be evaluated in context and are not actionable merely because "an issuer knows, but fails to disclose, some fact cutting the other way." *Id.* Under this standard, none of the DePaolo or Howell opinions are actionable.

**Diversified assets (Stmts. 23, 29, 31, 33)**: Plaintiff alleges that DePaolo and Howell misrepresented that the Bank "has diversified across many different businesses and has not relied on any single one area." *See* Stmt. 23; *see also* Stmts. 29, 33. At the outset, these types of statements are opinions because they simply reflect DePaolo's and Howell's subjective views—*i.e.*, there is no objective standard for determining diversification. *In re Philip Morris Int'l Inc. Sec. Litig.*, 89 F.4th 408, 418 (2d Cir. 2023) (subjective views are opinions).

Plaintiff argues that these statements were misleading in light of the Bank's concentration of deposits with respect to particular digital asset customers or from the digital asset industry

generally.  Opp. 18.  Plaintiff is again wrong.  *First*, these statements do not relate to individual customers.  For instance, Statement 23 provides that the Bank had not relied on any single "area"— a reference to a line of business.  Indeed, DePaolo made that statement shortly after explaining that the Bank had added "new teams, such as the healthcare banking and finance team."  Ex. P, 2022 Q2 Earnings Call Tr. at 6.  As such, DePaolo had no duty to disclose information about individual customers.  *See Tongue*, 816 F.3d at 213-14 (opinions about clinical trial results did not require disclosure of FDA's concerns over study design); *Merritt v. Molecular Partners AG*, 2024 WL 495140, *6 (S.D.N.Y. Feb. 5, 2024) (opinions regarding benefits of developing treatment did not require disclosure that competitor's clinical trials were further along).

Moreover, Plaintiff did not plead facts and does not claim that the Bank's deposits were *not* diversified across industries.  Nor does Plaintiff dispute that the Bank did business across dozens of industries.  *See, e.g.*, Ex. F, 2021 Form 10-K at 10.  Finally, to the extent Plaintiff argues that these statements were misleading because the Bank's digital asset industry deposits were too large, the argument fails because the Bank annually disclosed the amount of digital asset industry deposits, as well as quarterly fluctuations.  Mot. 8.  Investors could not have been misled regarding digital asset industry deposit concentrations—they had the actual numbers.

**Deposit stability and lack of correlation to crypto prices (Stmts. 7, 8, 12, 14, 21, 25, 26, 30)**:  The Motion established that DePaolo's and Howell's statements that digital asset industry deposits were "quite stable" or "pretty stable" (Stmt. 7), and that "we feel that they are fairly sticky deposits" (Stmt. 8), are not actionable because (1) Plaintiff failed to plead any facts showing they were not accurate when made, and (2) they are inactionable opinions.  Mot. 31.  In response, Plaintiff asserts that these are "statements of certitude."  Opp. 44.  But there is nothing certain

about the expressions "fairly sticky" or "quite" or "pretty" stable.  *See Philip Morris*, 89 F.4th at 419 ("sound," "qualified," and "adequate" are all opinions).

Plaintiff alternatively contends that these statements are misleading because the Bank "did not have any deposit study, model, or assumptions to support" them, relying upon the FDIC Report as support.  Opp. 44-45.  But that report *refutes* Plaintiff's argument: the FDIC stated that the Bank did not have a "fully developed" model—not that it had no model at all.  Opp. 24; Compl. ¶ 127.  In fact, the FDIC noted that, in 2021, the Bank "engaged a consultant to complete a deposit study to identify trends in depositor behavior" and implemented a "new Liquidity Model," which was a "significant improvement."  Ex. A, FDIC Report at 53.

Finally, Plaintiff has no answer for the fact that DePaolo and Howell told investors that the Bank's experience with digital asset industry deposits was in the "early stages" and "we've got more work to do in modeling through it, seeing more history and data."  Given these warnings, no reasonable investor would have been misled.  *See Martin v. Quartermain*, 732 Fed. App'x 37, 42 (2d Cir. 2018) (opinions not actionable where "disclaimers" made clear they were "preliminary"); *Tongue*, 816 F.3d at 211 (opinions were not misleading given "numerous caveats").

Plaintiff similarly argues that DePaolo and Howell made misrepresentations regarding the correlation between the Bank's deposits and the value of cryptocurrencies.  For instance, Plaintiff alleges that Howell made misstatements in June 2021 (Stmt. 12) and July 2021 (Stmt. 14) when he stated that the Bank had not seen any such correlation.  However, these statements were made before the "crypto winter" and before any correlation allegedly emerged.  Indeed, Plaintiff fails to allege a single fact showing that a correlation existed when these statements were made.

Instead, Plaintiff argues the Bank did not have sufficient models to test such correlations.  Opp. 25.  But Plaintiff again plays with the calendar, misleadingly relying on

regulator feedback given *after* the challenged statements were made. *Compare* Opp. 24-25 (relying on 2021 exam cycle feedback) *with* Opp. 10 (2021 exam cycle findings not communicated until June 7, 2022, *after* Statements 12 and 14 were made). Moreover, Plaintiff's argument relates to alleged mismanagement, not fraud. As such, Plaintiff's allegations are nothing like *In re Bear Stearns Cos., Inc. Secs., Deriv., & ERISA Litig.*, where the defendant published a specific risk metric it knew was improperly calculated. 763 F. Supp. 2d 423, 457 (S.D.N.Y. 2011).

**Liquidity and risk profile (Stmts. 22, 28, 32, 34, 36, 37)**: Plaintiff challenges statements by DePaolo and Howell regarding the Bank's liquidity, including that the Bank had a "robust" and "strong" liquidity position. Stmts. 34, 36; *see also* Stmts. 22, 37. In addition to being textbook puffery, these statements are opinions. *See Arkansas Pub. Emps. Ret. Sys. v. Bristol-Myers Squibb Co.*, 28 F. 4th 343, 355 (2d Cir. 2022) ("strongly designed" was opinion). Plaintiff claims that these statements were misleading because the Bank did not disclose regulatory concerns. Opp. 20. But, again, the Bank had no duty to do so. *See Tongue*, 816 F.3d at 213-14.

In addition, these statements were not misleading in context. Every quarter the Bank disclosed details of its liquidity position; the amount and percentage of its uninsured deposits; and its deposits from digital assets clients. Mot. 4, 8, 13. Likewise, Statements 34, 36, and 37 were accompanied by updated financial information. *See* Ex. JJJ, Jan. 17, 2023 Form 8-K; Ex. JJ, Mar. 9, 2023 Press Release. Thus, investors had ample data to draw their own conclusions.

The Bank also provided meaningful warnings regarding its liquidity throughout the class period. Mot. 13-16. Just days before Statements 36 and 37 were made, the Bank augmented its risk disclosures (1) to highlight "extreme digital asset price volatility" which "resulted in declines in the Bank's digital asset deposits," and (2) to warn that "further volatility . . . may adversely affect our deposits and, in turn, our . . . liquidity." *Id.* at 11. Given these disclosures and warnings,

no reasonable investor would view DePaolo's or Howell's real-time views concerning the Bank's liquidity as guarantees that the Bank would survive an "unprecedented" bank run. *Id.* at 17 (quoting Ex. A, FDIC Report at 40); *see also Synchrony*, 988 F.3d at 172 (opinions not misleading where "investors were given warning signs and numerical metrics"); *Villare*, 2021 WL 4311749, *20 (opinions not misleading where defendants disclosed "relevant financial data" and related risks). Nor does Plaintiff cite any law suggesting that DePaolo or Howell were supposed to foresee and disclose what the regulators themselves found to be unprecedented and unforeseen.

Finally, Plaintiff ignores many details of the regulatory reports showing that the Bank took steps to improve its contingency funding plan and bolster its liquidity. For example, the regulators acknowledged during the 2021 examination cycle that the Bank's new liquidity model was a "significant improvement" and "provided the opportunity to readily identify, measure, and monitor the potential impact of liquidity stress events." Ex. EE, DFS Report at 26-27. Moreover, "at the end of 2021," the Bank "had almost $29.8 billion in cash and interest-bearing bank balances, which was a 140 percent increase" over 2020. Ex. A, FDIC Report at 21.

**Modeling and analysis (Stmts. 2 and 15)**: Plaintiff argues that the statement "[w]e believe that our risk management processes will help keep our risks to a manageable level" (Stmt. 2) was misleading because the Bank had not put in place adequate controls to mitigate risk. Opp. 46. In addition to being puffery, this statement is a classic opinion. Plaintiff does not allege facts showing that DePaolo (or anyone else at the Bank) did not genuinely hold this opinion. Moreover, the opinion was supported by feedback from the regulators, who gave the Bank an overall CAMELS rating of "2"—meaning its "[o]verall risk management practices are satisfactory relative to the institution's size, complexity, and risk profile." Mot. 18-19 (quoting Ex. FF, FDIC Manual § 1.1-23).

Plaintiff next argues that Howell's statement that the Bank had "put on little to no risk" referred to the overall risks of the Bank.  Opp. 32-33 (discussing Stmt. 10).  The Motion, however, demonstrated that this statement was made in response to a question about specific capital ratios and referred to those capital ratios.  Mot. 38-39.  Plaintiff claims that this statement was not about capital ratios, noting that Howell referred to the Bank's growing cash, securities, and well-secured loans.  But Howell's reference to these assets related to capital ratios because when calculating capital ratios, banks compare core capital to risk-weighted assets.  *See, e.g.*, https://www.investopedia.com/terms/c/common-equity-tier-1-cet1.asp.  Howell merely noted that the growth in assets did not significantly increase the assets' risk-weight.  Thus, read in context, the statement is not misleading.  *Citibank*, 2023 WL 2632258, *18 (rejecting attempt to take capital ratio statement out of context).

**Regulatory oversight (Stmts. 5, 15, 16)**:  As shown in the Motion, statements about the Bank's relationship with regulators, including "they've been very good to us" and are "supportive of us" (Stmts. 5, 16), are both puffery and non-actionable opinions.  Mot. 20.  Plaintiff argues they are not opinions, but courts in this Circuit disagree.  The Second Circuit has held that a statement describing a business relationship as "great" is an opinion.  *In re Express Scripts Holdings Co. Sec. Litig.*, 773 Fed. App'x 9, 13 (2d Cir. 2019).  Likewise, a bank's statement that it "had been rebuilding its relationship with regulators" is an opinion.  *Citibank*, 2023 WL 2632258, *18.  Plaintiff cites no contrary precedent.

Plaintiff also fails to show that these statements were misleading.  When viewed in context, the statements concerned the Bank's Signet platform—not its risk management.  In Statement 5, DePaolo referred to "approval for Signet" immediately after saying "[t]hey've been very good to us."  In Statement 16, DePaolo referred to "supportive" regulators when talking about

"enhancements to Signet." These statements do not express or imply that regulators were supportive of every practice at the Bank, let alone its risk management.

Plaintiff also claims that Howell's answer to a question about whether there would be changes to the Dodd-Frank stress testing regulations (Stmt. 15) was misleading because the Bank had a high concentration of digital asset industry deposits. Opp. 46. Not so. *First*, Howell's predictions about what might happen depending on hypothetical regulatory changes that neither the Bank nor analysts had any visibility into are by definition an opinion. *Second*, Howell's answer did not relate to digital assets, so there is no conflict between his answer and the allegedly omitted facts. *Third*, the Bank *did* disclose its digital asset industry deposits. Mot. 8. *Finally*, as discussed below, Howell's opinion is protected by the PSLRA's safe harbor provision given the Bank's risk disclosures regarding Dodd-Frank requirements. *See, e.g.*, Ex. C, 2020 Form 10-K at 27-28.

**Financing reporting and internal controls (Stmts. 4, 38)**: The Motion established that DePaolo's opinions about the Bank's internal controls over financial reporting ("ICFR") (Stmt. 4) and the preparation of its financial statements in accordance with GAAP (Stmt. 4) were not misleading because (1) the Bank disclosed its concentration of uninsured deposits; (2) Plaintiff failed to plead facts showing that the ICFR statement was false; and (3) no GAAP violation occurred. Mot. 39-41. In response, Plaintiff argues that (1) the ICFR statement is actionable because regulators allegedly warned the Bank that it had insufficient risk management controls related to uninsured deposits, and (2) the Bank's financial statements violated GAAP by not disclosing individual customer concentration information. Opp. 34-36.

Plaintiff's argument regarding the ICFR statement wrongly conflates financial reporting with risk management. ICFR "is a term of art describing processes directly related to financing reporting." *Linenweber v. Southwest Airlines Co.*, 2023 WL 6149106, *9 (N.D. Tex. Sept. 19,

10

2023).  Courts routinely dismiss ICFR claims based on risk deficiencies, rather than financing reporting deficiencies.  *Id.*; *Green v. Deutsche Bank AG*, 2019 WL 4805804, *2-3 (S.D.N.Y. Sept. 30, 2019); *In re PetroChina Co. Ltd. Sec. Litig.*, 120 F. Supp. 3d, 340 (S.D.N.Y. 2015).[3]  Because Plaintiff does not plead facts showing any material deficiencies in the Bank's financial reporting processes, the ICFR claim fails.

Plaintiff's GAAP claim fares no better because ASC 275 did not require the Bank to disclose customer concentration information.  Mot. 41.  Tellingly, Plaintiff does not come forward with a single case holding otherwise.[4]

Finally, even if Plaintiff could show that either statement was false, its claim would still fail because the mere fact that an opinion turns out to be wrong does not make it actionable. *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 186 (2015). Plaintiff fails to plead any facts showing that DePaolo did not believe these statements when made or that he knew of, but ignored, any material weakness in financial reporting or GAAP violations. *See Citibank*, 2023 WL 2632258, *18-19 (dismissing GAAP and ICFR claims for failure to allege knowledge of violations).  Moreover, DePaolo had a basis for these opinions given the clean audit opinions by the Bank's independent auditors.  *See, e.g.*, Ex. F, 2021 Form 10-K at 112, F-2.

### C.    Forward-Looking Statements Are Protected by the PSLRA's Safe Harbor

DePaolo and Howell showed that several of their statements are protected by the PSLRA's safe harbor.  Mot. 33-34; Ex. WWW (identifying statements).  In response, Plaintiff argues that

---

[3] Unlike the company in *In re Electrobas Sec. Litig.*, the Bank has not acknowledged any material weaknesses in internal controls with respect to accounting.  245 F. Supp. 2d 450, 486 (S.D.N.Y. 2017).

[4] *Bear Stearns*, *In re Deutsche Bank AG Sec. Litig.*, 2016 WL 4083429 (S.D.N.Y. July 25, 2016), and *In re Citigroup Inc. Bond Litig.*, 723 F. Supp. 2d 568 (S.D.N.Y. 2010), all dealt with concentrations in subprime CDO securities under SOP 94-6, which does *not* address "financial instruments."  Demand deposits are "financial instruments."  Mot. 41. *In re Washington Mut., Inc. Sec., Deriv. & ERISA Litig.* did not address concentration issues at all, but rather loan loss reserves.  694 F. Supp. 2d 1192, 1206 (W.D. Wash. 2009).

these statements should not be protected because (1) they were not forward looking; (2) they were not accompanied by meaningful cautionary language; and (3) DePaolo and Howell knew they were false.  Opp. 46-51.  Plaintiff is wrong on all three fronts.

Forward-looking statements are "statements whose truth cannot be ascertained until some time after they are made." *In re Meta Materials, Inc. Sec. Litig.*, 2023 WL 6385563, *13 (E.D.N.Y. Sept. 29, 2023) (citation omitted).  Statements that the Bank "will continue to monitor and stress test its capital" (Stmt. 3) and "would" be able to cover digital asset industry deposits "if" they left (Stmt. 32) speak to the future.  *See also* Stmt. 9 ("we *expect continued* deposit growth"); Stmt. 15 (answering question whether to "expect any changes on the regulatory front"); Stmt. 22 ("remains well-positioned" and "reiterates guidance" for asset growth); Stmt. 26 (answering question whether to expect "volatility for the rest of the year"); Stmt. 28 (prediction of where "we'll be" regarding cash balances).  Even if parts of these statements were not forward looking, the safe harbor would still apply.  *In re Turquoise Hill Res. Ltd. Sec. Litig.,* 625 F. Supp. 3d 164, 211 (S.D.N.Y. 2022).

Plaintiff's argument that the Bank did not provide meaningful warnings again ignores the full picture of everything disclosed.  The Bank specifically warned that (1) its "primary source of liquidity has been core deposit growth;" (2) its "depositor base [was] more heavily weighted to larger uninsured deposits;" (3) unstable market conditions could cause those depositors to leave; (4) volatility in the digital assets market could adversely affect deposits and liquidity; (5) it was not subject to Dodd-Frank stress testing requirements; and (6) it may not be able to raise alternative funding.  Mot. 3-16.  The Bank also disclosed—*every quarter*—amounts and percentages of uninsured deposits, fluctuations in digital asset industry deposits (including outflows during and after the "crypto winter"), and detailed liquidity numbers.  *Id.* 4-5, 8.  In other words, the Bank not

12

only disclosed important factors that could adversely impact its business, but also gave investors data to draw their own conclusions.  These robust disclosures easily satisfy the safe harbor.  *See, e.g.*, *Meta*, 2023 WL 6385563, *13; *Turquoise Hill*, 625 F. Supp. 3d at 216-17; *In re Aceto Corp. Sec. Litig.*, 2019 WL 3606745, *5-6 (E.D.N.Y. Aug. 6, 2019).[5]

Finally, Plaintiff wrongly argues that the safe harbor does not apply because DePaolo and Howell purportedly knew their statements were false.  Not only has Plaintiff failed to plead that DePaolo or Howell actually knew that their statements were false, but the safe harbor protects statements that were either protected by cautionary language *or* made without actual knowledge of falsity.  *In re Bristol-Myers Squibb Co. CVR Sec. Litig.*, 658 F. Supp. 3d 220, 238 (S.D.N.Y. 2023).  Because the cautionary language prong is met here, even the alleged presence of actual knowledge, if it existed, would not defeat safe harbor protection.  *Turquoise Hill*, 625 F. Supp. at 210.

**D.**     **Plaintiff Does Not Allege that the Statements Were Half-Truths**

Plaintiff argues that DePaolo and Howell made statements that were "half-truths" because they failed to disclose negative feedback from regulators.  Opp. 17-37.  Because Plaintiff does not allege facts showing that these statements were actually half-truths, there was no duty to say more.

1.     There Is No Duty to Disclose All Material Information

As the Supreme Court recently confirmed, there is no duty to disclose every material fact. *Macquarie Infrastructure Corp. v. Moab Partners L.P.*, 601 U.S. 257, 265 (2024).  Rather, companies must disclose only information that is "necessary" to ensure that statements made are not misleading.  *Id.* at 891.  As this Court recently explained, "the requirement to be complete and

---

[5] Plaintiff wrongly argues that the risk disclosures were inadequate because they were framed as hypotheticals when the risk had already materialized.  Plaintiff pleads no facts showing that the Bank suffered any adverse liquidity event until the unprecedented bank run, *i.e.*, *after* the alleged misstatements and associated risk disclosures were made.  *See Citibank*, 2023 WL 2632258, *19 ("an increase in risk does not mean that the risk has already come to pass").

accurate . . . does not mean that by revealing one fact . . . one must reveal all others that, too, would be interesting . . . but means only such others, if any, that are *needed* so that what was revealed would not be so incomplete as to mislead." *Meta*, 2023 WL 6385563, *16. Specifically, to give rise to a duty to disclose, the statement must both be misleading and "relate closely" to the allegedly omitted information. *Buhrke*, 2024 WL 1330047, *11.

Given this limited duty, courts routinely reject arguments that companies must disclose potential compliance violations whenever they state that they have a "compliance program to address legal and regulatory requirements" or "comprehensive policies . . . to monitor compliance." *Menaldi v. Och-Ziff Cap. Mgmt. Grp. LLC*, 277 F. Supp. 3d 500, 511-513 (S.D.N.Y. 2017) (no duty to disclose FCPA violations); *see also Jiajia Luo v. Sogou, Inc.*, 465 F. Supp. 3d 393, 408-09 (S.D.N.Y. 2020) (disclosures regarding content controls did not require disclosure that controls were materially inadequate); *Diehl*, 339 F. Supp. 3d at 163-64 (disclosure that plea agreement required compliance program did not require disclosure that company was violating agreement); *In re FBR Inc. Sec. Litig.*, 544 F. Supp. 2d 346, 359-60 (S.D.N.Y. 2008) (no duty to disclose insider trading scheme based upon disclosures that company had a "corporate wide risk management program").

Plaintiff relies upon *Meyer v. Jinkosolar* to argue that "once a company speaks on an issue or topic" it has "a duty to tell the whole truth." 761 F.3d 245, 250 (2d Cir. 2014). Plaintiff, however, ignores Second Circuit case law distinguishing *Meyer* because, unlike here, it involved *detailed* statements regarding *specific* compliance programs. *Singh*, 918 F.3d at 63. To the extent Plaintiff relies upon *Meyer* to argue that the Bank had a duty to disclose feedback from regulators on a topic merely because it mentioned the topic, Plaintiff's argument is contrary to the precedent cited above, including the Supreme Court's holding in *Macquarie*.

2.      Statements Must Be Evaluated in Their Full Context

When determining whether a statement is misleading, "the Supreme Court has directed courts to examine the statement, whether of fact or opinion, 'in light of all surrounding text,' 'in its full context,' and from the perspective of a 'reasonable investor.'" *In re Ferroglobe PLC Securities Litig.*, 2020 WL 658715, *5 (S.D.N.Y. Nov. 11, 2020) (quoting *Omnicare*, 575 U.S. at 190). Here, none of the statements is false or misleading in context.

3.      Statements Regarding the Bank's Concentration and Diversification Were Not Half-Truths (Stmts. 9, 17-19, 23, 29, 31, 33)

Plaintiff alleges that DePaolo and Howell made misstatements regarding concentration limits and diversification of the Bank's deposits. As discussed above, Plaintiff's arguments regarding diversification (Stmts. 23, 29, 31, and 33) fail because the statements are inactionable opinions. Moreover, Plaintiff misreads the statements or takes them out of context. For instance, Plaintiff alleges that DePaolo and Howell misstated that the Bank had "internal limitations on concentrations" and "turned down deposits." Stmts. 9, 17-19. But Plaintiff's claim lacks merit because (1) the statements were too generic to be actionable; and (2) Plaintiff does not allege facts showing that the Bank did not have concentration limits or never turned away deposits. Mot. 37.

In response, Plaintiff contends that the statements were false because, in December 2021, the Bank increased its concentration limit without adequate stress testing. Opp. 18. But each of the statements at issue were made *before* the Bank increased its concentration limit. *See* Ex. A, FDIC Report at 53. In addition, a company is not required to disclose changes to its internal strategies "unless it has previously stated its intention to adhere exclusively to a particular strategy." *Ohio Pub. Emps. Ret. Sys. v. Discovery, Inc.*, 2024 WL 446466, *9 (S.D.N.Y. Feb. 5, 2024). Here, the Bank never stated that its concentration limit would remain static. Nor had it disclosed a specific percentage. As such, an internal change from one metric to another could not

15

have misled anyone.[6]  Finally, allegations that the Bank failed to perform sufficient testing sound in mismanagement, not fraud.  *In re Deutsche Bank AG Sec. Litig.*, 2017 WL 4049253, *7 (S.D.N.Y. June 28, 2017).

Plaintiff further claims that DePaolo's December 2022 statement that "we don't want to be beholden to any one industry or any one individual client" (Stmt. 31) was a misrepresentation.  But Plaintiff alleges no facts showing DePaolo misstated the Bank's goal.  Moreover, the statement was made in connection with the Bank's announcement that it would be limiting its digital asset industry deposits, and the Bank *did*, in fact, reduce such deposits by billions of dollars.  Mot. at 37-38.  Plaintiff tellingly does not address these arguments.

4.  Statements Regarding Signature's Liquidity and Risk Profile Were Not Half-Truths (Stmts. 22, 28, 32, 34, 36, and 37)

Plaintiff argues that DePaolo and Howell misrepresented the Bank's liquidity and risk profile.  But as discussed above, these statements accurately conveyed honestly held opinions.  Moreover, Plaintiff again takes the statements out of context.  For instance, Plaintiff alleges that DePaolo falsely stated in October 2022 that "we haven't had any issues to [sic] liquidity at all."  Stmt. 28.  But Plaintiff does not allege that Bank had experienced a "liquidity issue" prior to October 2022.  Nor does this statement imply anything about the Bank's risk controls.

Plaintiff argues that Howell misspoke by stating that "we've got adequate capacity to cover all crypto deposits we leave in the bank."  Stmt. 32.  Once again, Plaintiff does not allege facts showing that the statement was false—*i.e.*, that digital asset industry deposits exceeded liquidity in December 2022—nor could it.  The Bank's cash and borrowing capacity exceeded its digital

---

[6] Plaintiff's reliance on *In re Lehman Bros. Sec. & ERISA Litig.*, fails because, unlike here, (1) the defendant's statement that it "enforced adherence to its risk policies" was "in considerable tension" with revisions to the risk limits, and (2) the plaintiff had alleged "frequent, significant" changes.  709 F. Supp. 2d 258, 285 (S.D.N.Y. 2011).

assets as of December 2022 by over *$13 billion*. *See* Ex. D, 2022 Form 10-K at 8, 102, F-5 (cash of $5.9 billion; borrowing capacity of $25.3 billion; digital asset industry deposits of $17.8 billion).

Lastly, Plaintiff argues that Howell's statement was false because the Bank failed following massive withdrawals in March 2023. Opp. 23. But that is an improper claim of fraud by hindsight. Moreover, Plaintiff does not allege that it was the withdrawal of digital asset industry deposits that caused the Bank to be taken over (it was not). Rather, it was the contagion from other banks' failures that caused a massive run on all deposits. Mot. 16.

5.     <u>Statements Regarding Deposit Stability and Correlation to Crypto Prices<br>Were Not Half-Truths (Stmts. 7, 8, 12, 14, 21, 24-26, 30, 35)</u>

Plaintiff argues that DePaolo and Howell made misstatements regarding the Bank's deposit stability and correlation to digital asset prices. As discussed above, most of these statements are opinions. Stmts. 7, 8, 12, 14, 21, 25, 26, 30. Moreover, Plaintiff does not plead facts showing that these statements were false or misleading when read in context.

For instance, Plaintiff argues that DePaolo misrepresented that the Bank held "no cryptocurrencies." Stmt. 24. Plaintiff does not argue that this statement was false, but rather that the statement falsely implied that the Bank "was not susceptible to risks related to the digital asset volatility." Opp. at 26. DePaolo, however, noted *in the same statement* that the value of cryptocurrencies had recently declined and that the Bank had suffered a *$2.4 billion* decline in digital asset industry deposits. Mot. 36. As such, DePaolo's statement was not misleading.

Likewise, Plaintiff pleads no facts showing that Howell made a misstatement during the same earnings call when he stated that he was "pretty pleased" that the Bank had lost only 10% ($2.4 billion) of its digital asset industry deposits. Stmt. 25. Plaintiff does not allege facts showing that Howell's figures were inaccurate. Rather, Plaintiff argues that, when Howell was asked about the connection between the price of digital assets and the Bank's deposits, he "falsely reassured

17

investors that [the Bank] was adequately protected against upheaval in the crypto industry." Opp. 27. Howell did no such thing. In actuality, he responded that the question was "tough to answer;" that 10% of the digital asset industry deposits had been lost; and that the crypto winter was "going to be a headwind for a little while." Ex. P, 2022 Q2 Earnings Call Tr. at 10.

Next, Plaintiff misrepresents what the Bank said in its November 15, 2022 press release. Plaintiff alleges that the Bank said that its "deposits in the digital asset arena remained stable." Stmt. 30. What the Bank actually said, however, was that "*[a]s of November 14, 2022*, the Bank's deposits in the digital asset arena remained stable *when compared with balances of $23.5 billion at September 30, 2022*." Ex. KK, Nov. 15, 2022 Press Release at 1 (emphasis added). When reviewed fairly in context, this statement in no way conveyed that the Bank's digital asset industry deposits would remain forever stable. Indeed, this press release was issued months after the Bank had announced that it lost billions of dollars' worth of such deposits during the crypto winter.

Finally, Plaintiff argues that the Bank's January 21, 2023 press release misleadingly stated that the Bank had intentionally decreased its digital asset industry deposits and replaced those deposits with additional borrowing from the FHLB. Opp. 28 (discussing Stmt. 35). While Plaintiff appears to concede that the Bank's statements were "accurate," it asserts that the Bank was obligated to disclose that its deposit stability and liquidity risks were not "adequately managed." Because the Bank's statement was true and implied nothing about the stability of its deposits, Plaintiff's argument is contrary to precedent (*see supra* § I. D. 1), and, in any event, management had no obligation to engage in self-flagellation by disclosing purported mismanagement. Mot. 23.

6.    Statements Regarding Modeling and Analysis Were Not Half-Truths (Stmts. 2, 3, 10, 11, and 27)

Plaintiff argues that DePaolo and Howell made misstatements regarding the Bank's modeling and controls. Two of the statements were opinions. *See* Stmts. 2, 10. Moreover,

18

Plaintiff fails to plead that any were false or misleading.  For instance, Plaintiff claims that DePaolo misstated that the Bank "model[s] with an assumption that every single last crypto deposit is withdrawn."  Stmt. 27.  DePaolo and Howell, however, established that: (1) Plaintiff failed to plead facts showing that the statement is false—*i.e.*, that the Bank did not perform this modeling exercise;[7] and (2) in any event, the Bank's liquidity exceeded its digital asset industry deposits. Mot. 35.  Rather than addressing these arguments, Plaintiff asserts that DePaolo and Howell had a duty to disclose negative feedback from the regulators.  Opp. 34.  Once again, the case law cited above refutes Plaintiff's claim.  *See supra* § I. D. 1.

## II.    PLAINTIFF FAILS TO ALLEGE SCHEME LIABILITY

Count II should be dismissed because Plaintiff improperly incorporates all of its prior allegations into that count rather than "articulate with precision the contours of an alleged scheme." *Plumber & Steamfitters Local 773 Pension Fund v. Danske Bank A/S*, 11 F.4th 90, 105 (2d Cir. 2021); *see also In re QIWI PLC Secs. Litig.*, 2023 WL 7283619, *20 (E.D.N.Y. Nov. 3, 2023). Plaintiff also fails to state a scheme liability claim because it does not plead a deceptive act. Instead, Plaintiff alleges only misrepresentations.  Mot. 58-60.

Plaintiff argues that Defendants can be liable under *Lorenzo* because they allegedly disseminated false statements to analysts.  Opp. 90 (citing *Lorenzo v. SEC*, 587 U.S. 71 (2019)). But *Lorenzo* held that scheme liability can arise when a defendant knowingly disseminates "a false statement *made by another*."  *Turquoise Hill*, 625 F. Supp. at 248.  Here, Plaintiff alleges that Defendants *themselves* made the false statements.  As such, the claim fails.  *Id.*; *SEC v. Rio Tinto*

---

[7] The absence of factual allegations demonstrating falsity likewise dooms Plaintiff's claim regarding Statement 11. *See*, *e.g.*, Mot. at 39 (Plaintiff does not allege facts showing that the Bank failed to consider the identified liquidity factors).  Statement 3 is non-actionable puffery and protected by the safe harbor.  Lastly, Plaintiff fails to plead facts showing that Statements 4 and 38 (regarding GAAP compliance) or Statements 5, 15, and 16 (regarding relationships with regulators) were half-truths.  These statements are inactionable opinions.

*plc.*, 41 F.4th 47, 55 (2d Cir. 2022) (rejecting effort to "repackage . . . misstatement claims as scheme liability claims").

Likewise, Plaintiff attempts to plead that DePaolo and Howell engaged in deceptive conduct by: (1) failing to address regulator findings; (2) pursuing deposit growth to reap extra compensation; and (3) selling Signature stock. Opp. 90. These warmed-over allegations of non-actionable mismanagement, misrepresentations, and scienter are nothing like the conduct at issue in the cases Plaintiff cites. *See SEC v. Sequential Brands Grp., Inc.*, 2021 WL 4482215, *6 (S.D.N.Y. Sept. 30, 2021) (defendants intentionally "covered up" and "discard[ed]" evidence of accounting misstatements); *SEC v. Sugarman*, 2020 WL 5819848, *7-9 (S.D.N.Y. Sept. 30, 2020) (defendants gained "access to client funds to sell those clients sham securities" and hid a "purchase through a series of fraudulent transactions").

Lastly, Plaintiff cannot save its claim by pointing to alleged misstatements made to regulators (not the market) the weekend before the Bank was taken over (when the markets were closed) because Plaintiff could not have relied on these statements. Mot. 59-60. Plaintiff argues that reliance is presumed under the fraud on the market doctrine, but numerous courts have rejected attempts to rely upon that doctrine where, as here, the allegedly deceptive conduct was not publicly disclosed. *Stoneridge Inv. Partners, LLC v. Sci.-Atlanta*, 552 U.S. 148, 160 (2008); *Turquoise Hill*, 625 F. Supp. 3d at 254; *In re Refco, Inc. Sec. Litig.*, 609 F. Supp. 2d 304, 317-18 (S.D.N.Y. 2009).

## III.   PLAINTIFF FAILS TO PLEAD SCIENTER

### A.   The Regulator Feedback Does Not Raise a Strong Inference of Scienter

Plaintiff's primary argument is that negative regulator feedback "gave Defendants actual knowledge that [the Bank] lacked critical liquidity and risk management controls." Opp. 56. Courts, however, refuse to find scienter where negative regulator feedback is "muted by a series

of encouraging regulatory decisions."  Mot. 49 (quoting *In re Alkermes Public Ltd. Co. Sec. Litig.*, 523 F. Supp. 3d 283, 295 (E.D.N.Y. 2021)); *see also In re Sanofi Sec. Litig.*, 87 F. Supp. 3d 510, 545 (S.D.N.Y. 2015) (regulator presented mix of negative feedback and encouraging findings); *In re Amarin Corp. PLC Sec. Litig.*, 2016 WL 1644623 (D.N.J. Apr. 26, 2016) (regulator permitted company to use placebo that was the subject of negative feedback); *Fort Worth Emps.' Ret. Fund v. Biovail Corp.*, 615 F. Supp. 2d 218, 228 (S.D.N.Y. 2009) (FDA preference for single-dose study methodology did not establish scienter where agency never disapproved of multiple-dose studies).

Likewise, courts have declined to find scienter where a regulator was not forceful or failed to take significant regulatory action.  In *In re Franklin Bank Corp. Sec. Litig.*, the FDIC issued ROEs and lowered a bank's overall rating to a "3," and the OIG concluded that the bank's management had pursued a "high risk business strategy without adequate risk management practices and controls."  782 F. Supp. 2d 364, 388, 390 (S.D. Tex. 2011).  Nevertheless, the court found scienter was not adequately pleaded because, as the OIG noted, the FDIC could have better ensured that the bank "established and appropriately implemented controls and risk limitation and mitigation strategies."  *Id.* at 391; Mot. 49-50; *Vallabhaneni v. Endocyte*, 2016 WL 51260 (S.D. Ind. Jan. 4, 2016) (no scienter where regulator could have taken more forceful actions).

Here, the FDIC consistently gave the Bank an overall CAMELS rating of a "2"—a positive overall conclusion and a *higher* rating than the rating at issue in *Franklin*.  In addition, the reports Plaintiff cited reflect additional positive regulatory feedback.  *See* Ex. A, FDIC Report at 3, 7, 15, 22, 45-46, 48, 50, 52- 53; Ex. B, OIG Report at 13; Ex. EE, DFS Report at 26-27.  The FDIC also took no significant action until the unprecedented bank run.  As the Government Accountability Office ("GAO") noted, the "FDIC did not pursue more forceful actions in a timely manner that might have helped the bank correct its liquidity and management issues before its failure in March

2023."  Ex. XXX, GAO, *Preliminary Review of Agency Actions Related to March 2023 Bank Failures*, 26 (Apr. 2023); *see also* Ex. A, FDIC Report at 3 ("communication with SBNY's board and management could have been more effective").  Given the positive CAMELS rating the FDIC consistently assigned the Bank, and the limited nature of the FDIC's actions, the FDIC's feedback does not establish scienter.[8]

Plaintiff's cases are not to the contrary.  Opp. 55.  None involved positive overall feedback, such as a CAMELS rating of 2, and in many of the cases, the regulators were far more demanding than the FDIC was here.  *See Christine Asia Co. v. Ma*, 718 F. App'x 20, 22-23 (2d Cir. 2017) (threatening massive fines if specific actions were not taken); *Karimi v. Deutsche Bank AG*, 607 F. Supp. 3d 381, 397-98 (S.D.N.Y. 2022) ("several . . . government investigations and settlements" occurred without bank remedying deficiencies); *Fryman v. Atlas Fin. Holdings, Inc.*, 2022 WL 1136577, *2-3, 23-24 (N.D. Ill. Apr. 18, 2022) (two states issued reports documenting violations and concluding that company was "not in regulatory compliance").  Finally, in *In re Able Lab'ys Sec. Litig.*, regulator warnings identifying "specific violations" supported an inference of scienter where the defendants had "actively encourag[ed] the misreporting of test results" and falsified "quality control data," and the central defendant had pleaded guilty to securities fraud.  2008 WL 1967509, *16 (D.N.J. Mar. 24, 2008).[9]  Those allegations are far afield of the allegations here.

---

[8] Contrary to Plaintiff's arguments:  (1) in *Alkermes*, the regulator *did* identify specific concerns with the defendants' protocols, *Alkermes*, 523 F. Supp. 3d at 294-95; (2) in *Kuriakose v. Fed. Home Loan Mortg. Corp.*, 897 F. Supp. 2d 168 (S.D.N.Y. 2012), the regulator *did* criticize conduct that related to the alleged misstatements, *id.* at 181-82, 184; (3) in *In re Manulife Fin. Corp. Sec. Litig.*, 2012 WL 4108104 (S.D.N.Y. Sept. 19, 2012), the regulator *did* "raise[] questions about the adequacy of Manulife's risk controls;" and (4) in *Hammer v. Frontier Fin. Corp.*, 2012 WL 13020032 (W.D. Wash. Apr. 20, 2012), the regulator communicated its concerns *before* the defendants made the statements at issue.  *Id.* at *1, 3.  To the extent Plaintiff suggests that *Franklin* is distinguishable because the regulator reports did not reach the defendants, Plaintiff is wrong.  Rather, the court found that the regulator reports did not establish scienter because the FDIC was not sufficiently forceful or effective.  782 F. Supp. 2d at 390-392.

[9] In another one of Plaintiff's cases, a "smoking gun" email contributed to a finding of scienter, but statements affirming the company's "legal and regulatory compliance" amid ongoing investigations for safety violations did not.  *See In re Toyota Motor Corp. Sec. Litig.*, 2011 WL 2675395, *2-3 (C.D. Cal. July 7, 2011).

Lastly, Plaintiff is wrong to argue that the Bank's efforts to address the FDIC's concerns weigh in favor of scienter. Opp. 59. The Bank attempted to limit risk by reducing its digital asset industry deposits and taking various other steps. *See* Mot. 50. Taking remedial steps "is a prudent course of action that weakens rather than strengthens an inference of scienter." *Slayton v. Am. Exp. Co.*, 604 F.3d 758, 777 (2d Cir. 2010); *Lachman v. Revlon, Inc.*, 487 F. Supp. 3d 111, 137 (E.D.N.Y. 2020) (scienter not alleged based upon defendants' involvement in remediation efforts).

## B.  Plaintiff's Fallback Arguments About Actual Knowledge Do Not Establish Scienter

Unable to show that knowledge of the regulator reports suffices to establish scienter, Plaintiff raises a number of fallback arguments. None is persuasive.

- Plaintiff is wrong to assert that Defendants' interactions with regulators the weekend of March 11-12, 2023 support an inference of scienter. Opp. 60-61. Those interactions occurred well *after* the alleged misrepresentations at issue and during the midst of an unprecedent bank run. The Bank's real-time estimates of its liquidity during this crisis say nothing about the liquidity statements made months or years earlier. Finally, rather than showing scienter, the regulator reports show that, during that weekend, Bank management continued to believe that Signature would not fail. Ex. A, FDIC Report at 15.

- Plaintiff fails to establish scienter by arguing that DePaolo and Howell repeated certain types of statements. Opp. 64-65. Even for repeated statements, a plaintiff must allege that the defendant knew of or recklessly disregarded contradictory information. *In re Henry Schein, Inc. Sec. Litig.*, 2019 WL 8638851, *21-22 (E.D.N.Y. Sept. 27, 2019).

- Plaintiff's allegations that DePaolo and Howell sat on committees are insufficient because Plaintiff does not allege that the committees received information that contradicted their statements. As such, Plaintiff's cases are distinguishable. Opp. 65-66.

- Plaintiff fails to establish scienter with regard to two statements relating to the Bank's ICFR and the preparation of its financial statements. Opp. 68. GAAP violations do not give rise to scienter where, as here, the plaintiff does not allege that the defendants intentionally refused to comply with GAAP. *Woolgar v. Kingstone Companies, Inc.*, 477 F. Supp. 3d 193, 239 (S.D.N.Y. 2020). Moreover, the existence of multiple years of clean audit reports undermines scienter where, as here, a plaintiff does not plead particularized facts showing that the defendant had "sound reason" to doubt the audit. *See In re Iconix Brand Grp., Inc.*, 2017 WL 4898228, *18 (S.D.N.Y. Oct. 25, 2017).

- Plaintiff's reliance on the core operations doctrine fails. Courts have "expressed doubts as to the core operations doctrine's continuing import after the passage of the PSLRA." *Hawaii*

*Structural Ironworkers Pension Tr. Fund v. AMC Ent. Holdings, Inc.*, 422 F. Supp. 3d 821, 852 (S.D.N.Y. 2019).  Moreover, the core operations doctrine "typically applies only where the operation in question constitute[s] nearly all of a company's business," which risk management does not.  *Das v. Rio Tinto PLC*, 332 F. Supp. 3d 786, 816-17 (S.D.N.Y. 2018) (rejecting argument that integrity was a core operation).

### C.    Plaintiff Does Not Adequately Plead Scienter Through Motive or Opportunity

Plaintiff argues that the benefits provided under the Bank's long-term incentive plan support a finding of scienter because those benefits were "concrete and personal."  Opp. 73-74.  But the sole case Plaintiff cites, *Manavazian v. ATEC Group, Inc.*, 160 F. Supp. 2d 468 (E.D.N.Y. 2001), did not even involve incentive compensation.  Moreover, Plaintiff does not distinguish any of the relevant incentive compensation cases in the Motion.  Mot. 42.

Plaintiff also claims that DePaolo and Howell's stock sales support scienter because they were "suspiciously timed" to occur "after they were awarded compensation under the LTI plan."  Opp. 75.  Plaintiff does not, however, explain why selling stock after the vesting of compensation awards is suspicious, nor does Plaintiff cite any cases supporting its argument.  Plaintiff's attempt to distinguish *Ressler v. Liz Claiborne, Inc.*, 75 F. Supp. 2d 43 (E.D.N.Y. 1998), is self-defeating.  Plaintiff claims that *Ressler* is inapplicable because there, most stock sales purportedly were "remote in time from any misstatements."  Opp. 76.  But *Ressler* found a sale "remote in time" when it occurred two weeks after an alleged misstatement.  75 F. Supp. 2d at 60.  Here, the time period between most of the sales and alleged misstatements was longer than two weeks.

Plaintiff misses the point with respect to the 2019 sales of vested stock awards by arguing that the 2019 sales were smaller than the 2021 sales.  Opp. 76.  Plaintiff offers no support for its assertion that the difference in volume makes the Class Period sales more suspicious.  Rather, those sales support DePaolo and Howell's inference that they regularly sold stock received through performance-based awards and that the 2021 sales were therefore not suspiciously timed.

Plaintiff's attempt to refute DePaolo and Howell's other arguments fares no better. Contrary to Plaintiff's argument, DePaolo and Howell are not suggesting that "stock sales must have occurred at the ***height*** of [the Bank's] share price to support scienter." Opp. 77. Rather, the facts that: (1) the April 2021 stock sales occurred at a price that was nearly 30% lower than the stock price several months later; (2) the first alleged corrective disclosure did not occur until over a year later; and (3) DePaolo and Howell did not sell when they would have been most incentivized to do so, collectively negate a finding of scienter. *See Ressler*, 75 F. Supp. 2d at 59-60. While Plaintiff points to other sales made in March 2022, those sales likewise did not occur meaningfully close to the alleged corrective disclosures in May 2022. *In re Keyspan Corp. Sec. Litig.*, 383 F. Supp. 2d 358, 385 (E.D.N.Y. 2003) (sales two months before corrective disclosures).

Finally, the acquisition and retention of stock just prior to the collapse of the Bank refutes scienter. Plaintiff cites *In re Fannie Mae 2008 Sec. Litig.*, 2011 WL 13267340, *3 (S.D.N.Y. Apr. 11, 2011), for the proposition that there is no "per se rule that stock purchases negate an inference of scienter." Opp. 78. But whether or not there is a per se rule, no rational executive engaged in a fraud would purchase tens of thousands of shares of stock just days before the Bank collapsed. Lastly, Plaintiff provides no support for its claim that DePaolo's retention of stock does not negate scienter because "[a]s a practical matter, [he] could not have sold all [his] stock." *Id.* Nor does Plaintiff allege facts showing that DePaolo sold more stock than he retained.

## <u>CONCLUSION</u>

For the reasons stated in the Motion and above, Plaintiff's Complaint should be dismissed in its entirety and with prejudice as to DePaolo and Howell.

Dated:     New York, New York
           May 24, 2024

                                        FRIED, FRANK, HARRIS, SHRIVER
                                        & JACOBSON LLP

                                        /s/ Peter L. Simmons
                                        Peter L. Simmons
                                        Harrison D. Polans
                                        One New York Plaza
                                        New York, NY 10004
                                        (212) 859-8000
                                        peter.simmons@friedfrank.com
                                        harrison.polans@friedfrank.com

                                        *Attorneys for Defendant Eric Howell*

                                        DECHERT LLP

                                        Michael Doluisio*
                                        Stuart T. Steinberg*
                                        Bina Peltz
                                        Cira Centre
                                        29 Arch Street
                                        Philadelphia, PA 19104
                                        (215) 994-4000
                                        michael.doluisio@dechert.com
                                        stuart.steinberg@dechert.com
                                        bina.peltz@dechert.com

                                        R. Ryan Dykhouse*
                                        25 Cannon St.
                                        London EC4M 5UB, UK
                                        +44 (0) 20 7184 7000
                                        ryan.dykhouse@dechert.com

                                        *Attorneys for Defendant Joseph J. DePaolo*

                                        *Admitted *Pro Hac Vice*