UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| SJUNDE AP-FONDEN, Individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>-v.-<br><br>JOSEPH J. DEPAOLO, ERIC HOWELL, FRANK SANTORA, JOSEPH SEIBERT, SCOTT A. SHAY, VITO SUSCA, STEPHEN D. WYREMSKI, and KPMG LLP,<br><br>Defendants. | Civil Case No. 1:23-cv-01921-FB-JRC |

**REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF
SCOTT A. SHAY'S MOTION TO DISMISS THE COMPLAINT**

COVINGTON & BURLING LLP
The New York Times Building
620 Eighth Avenue
New York, N.Y. 10018

*Attorneys for Scott A. Shay*

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT ................................................................................................... 1

ARGUMENT .................................................................................................................................. 1

    I.     Plaintiff Fails to Plead a Misstatements or Omissions Claim ................................. 1

          A.     Plaintiff Fails to Show That the Statements Regarding Risk
                Mitigation Controls are False or Misleading. ............................................. 2

          B.     Plaintiff Likewise Fails to Show That The Statements Regarding
                Financial Reporting Controls are False or Misleading. ............................. 5

          C.     The Statement Regarding Prudence in the Deployment of New
                Funds is Inactionable Puffery and Neither False Nor Misleading. ............. 6

    II.    Plaintiff Fails to Adequately Allege Scienter ........................................................ 7

    III.   Plaintiff Fails to Adequately Allege Loss Causation ............................................. 9

    IV.   Plaintiff Fails to Adequately Allege Scheme Liability ........................................ 10

CONCLUSION ............................................................................................................................. 10

## TABLE OF AUTHORITIES

Page(s)

**Cases**

*Acito v. IMCERA Group, Inc.*,
   47 F.3d 47 (2d Cir. 1995) ........................................................................................................7

*Arkansas Tchr. Ret. Sys. v. Bankrate, Inc.*,
   18 F. Supp. 3d 482 (S.D.N.Y. 2014) ........................................................................................4

*Bricklayers & Masons Loc. Union No. 5 Ohio Pension Fund v. Transocean Ltd.*,
   866 F. Supp. 2d 223 (S.D.N.Y. 2012) ......................................................................................4

*ECA, Loc. 134 IBEW Joint Pension Tr. of Chicago v. JP Morgan Chase Co.*,
   553 F.3d 187 (2d Cir. 2009) .....................................................................................................4

*In re Eletrobras Sec. Litig.*,
   245 F. Supp. 3d 450 (S.D.N.Y. 2017) .......................................................................................5

*In re Fannie Mae 2008 Sec. Litig.*,
   2011 WL 13267340 (S.D.N.Y. Apr. 11, 2011) ........................................................................9

*In re Fannie Mae 2008 Sec. Litig.*,
   742 F. Supp. 2d 382 (S.D.N.Y. 2010) ......................................................................................9

*Ferber v. Travelers Corp.*,
   785 F. Supp. 1101 (D. Conn. 1991) .........................................................................................8

*In re Keyspan Corp. Sec. Litig.*,
   383 F. Supp. 2d 358 (E.D.N.Y. 2003) ..................................................................................8, 9

*Manavazian v. ATEC Grp., Inc.*,
   160 F. Supp. 2d 468 (E.D.N.Y. 2001) (Block, J.) ....................................................................7

*In re Moody's Corp. Sec. Litig.*,
   599 F. Supp. 2d 493 (S.D.N.Y. 2009), *opinion corrected on denial of reconsideration*, 612 F. Supp. 2d 397 (S.D.N.Y. 2009) ...........................................................4

*In re Morgan Stanley Info. Fund Sec. Litig.*,
   592 F.3d 347 (2d Cir. 2010) .....................................................................................................6

*Novak v. Kasaks*,
   216 F.3d 300 (2d Cir. 2000) .....................................................................................................8

*Olkey v. Hyperion 1999 Term Tr., Inc.*,
   98 F.3d 2 (2d Cir. 1996) ...........................................................................................................3

*In re Oxford Health Plans, Inc. Sec. Litig.*,
    187 F.R.D. 133 (S.D.N.Y. 1999) ...................................................................................9

*P. Stolz Family P'ship L.P. v. Daum*,
    355 F.3d 92 (2d Cir. 2004) ............................................................................................3

*Plumber & Steamfitters Loc. 773 Pension Fund v. Danske Bank A/S*,
    11 F.4th 90 (2d Cir. 2021) ..........................................................................................10

*Shields v. Citytrust Bancorp, Inc.*,
    25 F.3d 1124 (2d Cir. 1994) .........................................................................................7

*In re Signet Jewelers Ltd. Sec. Litig.*,
    389 F. Supp. 3d 221 (S.D.N.Y. 2019) ...........................................................................4

*In re Synchrony Fin. Sec. Litig.*,
    988 F.3d 157 (2d Cir. 2021) ......................................................................................3, 6

*U.S. Bank Nat. Ass'n v. PHL Variable Ins. Co.*,
    2013 WL 791462 (S.D.N.Y. Mar. 5, 2013) ..................................................................4

*In re Wells Fargo & Co. Sec. Litig.*,
    2021 WL 4482102 (S.D.N.Y. Sept. 30, 2021) ..............................................................4

## PRELIMINARY STATEMENT

Plaintiff's opposition brief does nothing to demonstrate that any of the five alleged misstatements attributed to defendant Scott Shay (only one of which was made personally by Mr. Shay) are actionable. Plaintiff's claims arise out of Signature Bank's alleged lack of liquidity in the face of an indisputably unprecedented bank run. But none of the five statements at issue bear on the sufficiency of the bank's liquidity, and the risks allegedly contributing to the Bank's closure—uninsured deposits, digital asset deposits, and reliance on government funding for liquidity—were amply disclosed, repeatedly, throughout the Class Period.

As demonstrated below, even accounting for the regulatory findings about the Bank on which Plaintiff relies, (1) none of Mr. Shay's statements were false or misleading; (2) in any event, Plaintiff fails to plead scienter; (3) none of the statements are causally related to the alleged factors causing plaintiff's loss; and (4) in the total absence of any other alleged fraudulent acts, alleged misstatements cannot support scheme liability. For these reasons, and the others contained in the Reply in Support of Defendants Joseph J. DePaolo and Eric Howell's Motion to Dismiss Consolidated Class Action Complaint (hereinafter "Joint Reply Brief"), which Mr. Shay incorporates here by reference, the claims against him should be dismissed.

## ARGUMENT

### I. Plaintiff Fails to Plead a Misstatements or Omissions Claim

Plaintiff attributes five statements to Mr. Shay, four of which were made in his capacity as a co-signatory on the Bank's Form 10-Ks—what Plaintiff denominates as "Misstatements" 2-4, 13, and 38. Plaintiff fails to show that any of these statements were false or misleading.

### A. Plaintiff Fails to Show That the Statements Regarding Risk Mitigation Controls are False or Misleading.

Neither of Mr. Shay's statements related to the Bank's risk mitigation controls was false or misleading. First, the statement in the 2020, 2021, and 2022 10-Ks that the Bank "put internal controls in place that help to mitigate the risks that affect our business" and had "policies and procedures that help mitigate risk and regulatory requirements that mandate we evaluate, test and opine on the effectiveness of internal controls"—alleged "Misstatement 2"—was not false. Plaintiff nowhere alleges that the Bank did not have internal controls, that those controls did not help mitigate risk, or that there were not in fact regulatory requirements for internal controls.

In an effort to suggest that these statements were somehow misleading by omission, Plaintiff points to regulatory statements evaluating the Bank's internal controls relating to liquidity risk management. But these regulatory statements have no bearing on the truth of the statement at issue in the 10-K, because the 10-K statement say nothing about the adequacy of—and does not even concern—the Bank's liquidity risk management. To the contrary, the 10-K specifically recites (in text omitted by Plaintiff) that the statement at issue concerns risks *other than* liquidity: "[w]e evaluate the inherent risks that affect our business, including interest rate risk, credit risk, operational risk, regulatory risk, and reputation risk." (Declaration of Peter L. Simmons in Support of Certain Individual Defendants' Motion to Dismiss Consolidated Class Action Complaint, dated February 13, 2024 ("Simmons Decl."), Ex. C[1] at 11; Ex. F at 12; Ex. D at 13). Plaintiff handwaves this additional context by calling this list "non-exhaustive" (Lead Plaintiff's Omnibus Memorandum of Law ("Br.") at 32), but fails to identify anything indicating that this statement referred to *liquidity* risk.

---

[1] "Ex." herein refers to the Exhibits to the Simmons Decl. unless otherwise stated.

2

Plaintiff also points to the FDIC's statements, made after the Bank's closure, claiming the Bank's internal controls were not sufficient. Even assuming that these *post hoc* opinions could bear on the truth of the statements made in the 10-Ks, they do not contradict the statement concerning internal controls. That statement did not make any representation about the *quality* of the Bank's internal controls, and further explicitly warned—in text again omitted by Plaintiff— that "[n]o system of internal control or policies and procedures will ever totally eliminate risk." (Ex. C at 11; Ex. F at 12; Ex. D at 13). Plaintiff cannot selectively edit a statement to excise relevant information, and then claim the disclosure was inadequate. A "proper inquiry requires an examination of defendants' representations, *taken together and in context*." *In re Synchrony Fin. Sec. Litig.*, 988 F.3d 157, 170-71 (2d Cir. 2021) (emphasis added).[2]

Plaintiff's argument regarding the statements in the 2020, 2021, and 2022 10-Ks about stress testing (alleged "Misstatement 3") also fails, for similar reasons. The statement that that the Bank "developed a process to comply with the [relevant] stress testing requirements" and would "continue to monitor and stress test its capital" was not false; Plaintiff makes no allegation that the Bank had not developed a process to comply with capital stress testing requirements. Further, any purported misstatement regarding the adequacy of the Bank's *capital* stress testing, as opposed to liquidity stress testing, is irrelevant to Plaintiff's claims and therefore necessarily immaterial: Plaintiff itself acknowledges that regulators identified the "root cause" of the closure of Signature

---

[2] Plaintiff's argument that the safe harbor for forward-looking statements may not apply to all aspects of the statements at issue does not change the fact that those statements, like all alleged misrepresentations, must be considered in context. *See Olkey v. Hyperion 1999 Term Tr., Inc.*, 98 F.3d 2, 8 (2d Cir. 1996) (finding disclosures must be read "as a whole" and that plaintiffs "conveniently dismiss[ed] as boilerplate anything in the [disclosure] that undermine[d] their argument") In fact, in *P. Stolz Family P'ship L.P. v. Daum*—relied on by Plaintiff for the proposition that a "misrepresentation of present or historical facts cannot be cured by cautionary language" (Br. at 48)—the Second Circuit held that the defendant's representation *was* "neutralized" by surrounding qualifying statements. 355 F.3d 92, 98 (2d Cir. 2004).

3

Bank as "poor *liquidity* management policies" (Br. at 94 (emphasis added))—not capital management policies. Indeed, regulators also stated (in a report cited in the complaint) that the Bank was "well capitalized throughout each examination cycle prior to its failure based on defined capital measures."[3] Accordingly, contrary to Plaintiff's argument that the statement "concerned issues that ultimately destroyed the bank" (Br. at 40), the alleged inaccuracy of the statement regarding capital stress testing has no nexus to the Bank's closure.

Aside from being literally true, the statements regarding the Bank's risk mitigation controls are inactionable puffery. Plaintiff's cases are not to the contrary; all involved statements that were factually concrete and specific, or offered specific qualitative assessments, unlike the vague and broad statements attributable to Mr. Shay.[4] Mr. Shay's statements were quintessential corporate puffery, "too general to cause a reasonable investor to rely upon." *ECA, Loc. 134 IBEW Joint Pension Tr. of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187, 205 (2d Cir. 2009).

Plaintiff's remaining arguments about the various statements that it alleges are false simply do not apply to Mr. Shay. Plaintiff claims Defendants stressed the importance of their statements by repeating them "dozens of times" (Br. at 42), but a total of only five statements are attributed

---

[3] FDIC Office of Inspector General, Material Loss Review of Signature Bank of New York, at ii (Complaint ¶ 117).

[4] *See, Bricklayers & Masons Loc. Union No. 5 Ohio Pension Fund v. Transocean Ltd.*, 866 F. Supp. 2d 223, 243-44 (S.D.N.Y. 2012) (drilling company described its safety and training efforts as "extensive" when in actuality it had failed to adequately train its personnel); *In re Signet Jewelers Ltd. Sec. Litig.*, 389 F. Supp. 3d 221, 229 (S.D.N.Y. 2019) (defendants falsely denied specific allegations about workplace misconduct); *In re Wells Fargo & Co. Sec. Litig.*, 2021 WL 4482102, at *19 (S.D.N.Y. Sept. 30, 2021) (defendants made explicit representations as to conversations with regulators that misrepresented the feedback and potential timeline for resolution); *Arkansas Tchr. Ret. Sys. v. Bankrate, Inc.*, 18 F. Supp. 3d 482, 485 (S.D.N.Y. 2014) (defendants claimed insurance leads were "high quality" when a large percentage were entirely worthless); *In re Moody's Corp. Sec. Litig.*, 599 F. Supp. 2d 493, 508-09 (S.D.N.Y. 2009), *opinion corrected on denial of reconsideration*, 612 F. Supp. 2d 397 (S.D.N.Y. 2009) (Moodys "proclaimed its independence" and listed "verifiable actions it was taking to ensure its independence"); *U.S. Bank Nat. Ass'n v. PHL Variable Ins. Co.*, 2013 WL 791462, at *7 (S.D.N.Y. Mar. 5, 2013) (defendants described insurance policies as "flexible" and "lower premium").

4

to Mr. Shay. Plaintiff also claims that the statements "respond to specific investor concerns or contradict regulator findings about the company's then-present risks and lack of controls" (Br. at 42). But none of Mr. Shay's statements were made in response to investor inquiries and, as explained above, none contradict regulator findings.

### B. Plaintiff Likewise Fails to Show That The Statements Regarding Financial Reporting Controls are False or Misleading.

Plaintiff similarly fails to show that the statements about the Bank's internal controls—that they were "designed to provide reasonable assurance regarding the reliability of financial reporting" (alleged "Misstatement 4")—and certifications of GAAP compliance (alleged "Misstatement 38"), were false or misleading. Again, there is no allegation that the Bank did not have an internal controls process for financial reporting, and the statement did not guarantee the accuracy of its financial reporting.[5]

Plaintiff's argument that the Bank was required to disclose that, at one point, four depositors accounted for 14% of the Bank's deposits (Br. at 7) fails, for several reasons. The Bank repeatedly disclosed tangible risks regarding the Bank's deposit portfolio, including the percentage and volume of uninsured deposits, and that its "depositor base [was] more heavily weighted to larger uninsured deposits than many other banks"—an express disclosure that the Bank's depositor base was concentrated in large deposits. (Ex. C at 53; Ex. F at 54; Ex. D at 52.) Plaintiff offers no support for the argument that the Bank had to disclose the subsidiary facts of the specific depositors or the exact percentage of the Bank's total deposit base attributable to these depositors.

---

[5] Plaintiff cites *In re Eletrobras Sec. Litig.*, 245 F. Supp. 3d 450 (S.D.N.Y. 2017) (Br. at 36), to argue that Defendants failed to disclose known "red flags" and mitigate risks, thus demonstrating a GAAP violation and lack of internal controls.. But there, defendants made statements that their internal controls were "very strong" and that "the Company, through its internal controls and compliance program, did not identify the existence of any episode of fraud and corruption in its projects." *Id.* at 468. These statements were explicitly qualitative and fact-specific, unlike any attributed to Mr. Shay.

5

Making a risk disclosure does not "trigger a generalized duty requiring defendants to disclose the entire corpus of their knowledge." *In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d 347, 366 (2d Cir. 2010). Further, there is no alleged nexus between the concentration of these four depositors and the closure of the Bank, and they therefore necessarily are immaterial.

### C. The Statement Regarding Prudence in the Deployment of New Funds is Inactionable Puffery and Neither False Nor Misleading.

The only statement attributed to Mr. Shay personally—that the Bank "remain[ed] prudent in the deployment of new funds" (alleged "Misstatement 13")—is inactionable puffery. "Prudent" is a quintessential subjective opinion that is not factually verifiable, and "offers only generally optimistic opinions." *In re Synchrony*, 988 F.3d at 170 (bank's statement that that it had "risk management processes [that] are highly disciplined and designed to preserve the integrity of the risk management process" amounted "to no more than 'puffery'"). Plaintiff also fails to support its argument that the bank was not prudent in deploying funds—*i.e.*, that the statement was false or misleading. Plaintiff attempts to support this argument by stating that the Bank's Fund Banking capital call loans provided "billions of dollars less in liquidity than Defendants represented," but this refers to what the Bank estimated to *regulators* on March 11-12, 2023. *See* Br. at 22 (citing Complaint ¶¶ 178-79). Whether a particular asset proved to be worth less than expected under the circumstances of an unprecedented bank run does not demonstrate that the bank's deployment of its funds was not prudent.

Furthermore, Plaintiff offers no legal support for its argument that the Bank's repeated disclosures regarding its capital call loans cannot be considered when evaluating this statement. It is axiomatic that a court must consider "the context provided by the rest of the disclosures." *In re Synchrony*, 988 F.3d at 171 ("[Plaintiff] may not cherry pick certain public statements for its complaint and divorce them from the universe of disclosed information to plausibly allege fraud.")

6

Plaintiff's further argument that the separate disclosure listed only collateral that was "typically" used for Federal Reserve borrowings, thus not excluding capital call loans, is a semantic nitpick: simply put, the disclosure says nothing about capital call loans being used as collateral for Fed borrowings.

**II.     Plaintiff Fails to Adequately Allege Scienter**

Even assuming that Plaintiff could plead falsity, Plaintiff fails to plead facts showing that any statement attributable to Mr. Shay was *knowingly or recklessly* false. Plaintiff mischaracterizes the regulatory reports to argue that Defendants "lied" to regulators. As evidenced by Plaintiff's own citation, regulators did not say the Defendants "lied," but instead called the Bank's liquidity projections unreliable and inconsistent. Br. at 60. In any event, those liquidity projections are not the statements at issue here. Plaintiff further states that regulators "determined" the Bank's pledgeable securities were worth only $900 million, but it was the *Bank* that provided the revised estimate—and thus it was not that the regulators "determined" this, or that the Bank "lied" about it, as Plaintiff argues (*Id.*). And Plaintiff fails to support its argument that Mr. Shay was not entitled to rely on KPMG's unqualified audits of the Bank. (Shay Br. at 18.) Plaintiff thus fails to demonstrate "facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." *Acito v. IMCERA Group, Inc.*, 47 F.3d 47, 52 (2d Cir. 1995) (quoting *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1128 (2d Cir. 1994)).

Plaintiff's arguments that incentive compensation and stock sales evidence scienter are at odds with the law and the facts. Plaintiff relies on *Manavazian v. ATEC Grp., Inc.*, 160 F. Supp. 2d 468, 478 (E.D.N.Y. 2001) (Block, J.), but that decision correctly recognized that "[a] generalized desire for financial benefit does not alone constitute scienter" without showing that a defendant "benefitted in a concrete and personal way from the purported fraud." Here, Plaintiff never identifies any "concrete and personal" benefit other than Mr. Shay's general incentive

7

compensation. (Br. at 73.) Plaintiff thus fails to offer any motive beyond those "possessed by virtually all corporate insiders" and continues to present a theory that would subject almost all corporate insiders to fraud allegations. *See Novak v. Kasaks*, 216 F.3d 300, 307 (2d Cir. 2000); *Ferber v. Travelers Corp.*, 785 F. Supp. 1101, 1107 (D. Conn. 1991). Plaintiff also erroneously asserts that the incentive compensation plan was dependent upon a "lack of corresponding risk management protocols that would have (appropriately) restrained it" (Br. at 74). On the contrary, the incentive compensation plan was explicitly dependent on "Prudent Risk Management" as a factor. (Ex. OOO at 43.)

Plaintiff similarly fails to show that Mr. Shay's stock sales are indicative of scienter; indeed, they squarely undermine it. Plaintiff attempts to make Mr. Shay's 2021 stock sales look unusual by focusing solely on his lack of any sales in 2020, but that ignores that Mr. Shay sold shares in each of 2016, 2017, and 2019. (Shay Br. at 16-17.) Plaintiff also falsely asserts that Mr. Shay sold "approximately 60%" more shares in 2021 as in 2019, 2017, or 2016 (Br. at 76), when in actuality, his 2021 sales (24,357 shares) were *lower* than 2016 (29,194 shares) and only 13% higher than 2017 (21,482 shares). (Sperling Decl. Exs. 1–3, Reply Declaration of Jonathan M. Sperling in Further Support of Scott A. Shay's Motion to Dismiss the Complaint ("Sperling Reply Decl."), Exs. 4–6.) Plaintiff also ignores the fact that Mr. Shay sold no shares in 2022 and early 2023, during the Class Period, when it alleges the share price was inflated. Plaintiff offers no rebuttal to the facts that (i) the timing of Mr. Shay's sales was entirely in line with his sales in previous years, indicating a typical practice, and (ii) the timing of these sales, weeks after any alleged misstatements, weighs against a finding of scienter.[6] (Shay Br. at 16.) Most significantly,

---

[6] Plaintiff fails in its attempt to distinguish *In re Keyspan Corp. Sec. Litig.*, 383 F. Supp. 2d 358 (E.D.N.Y. 2003) (lapse of four to six weeks negated the inference that defendants sought to benefit from a falsely positive statement). Plaintiff argues that defendants in that case *increased* their
(continued…)

8

Plaintiff's exaggerated claim that Mr. Shay "took full advantage of the run-up in the stock price" (Br. at 2) ignores the fact that he owned *more* shares at the end of the Class Period than at the beginning, and still owned nearly 500,000 shares on the last business day before the Bank closed, rendering these shares all but worthless. (*Compare* Sperling Decl. Ex. 3 (488,046 shares) *with* Ex. LLL (499,352 shares).)

Finally, Plaintiff also offers no good response to Mr. Shay's *purchase* of close to $500,000 of stock on the same day the Bank was experiencing an unprecedented run. This remarkable fact strongly refutes any inference of scienter from Mr. Shay's other stock transactions.[7]

### III. Plaintiff Fails to Adequately Allege Loss Causation

The fact that none of the statements attributed to Mr. Shay addressed the sufficiency of the bank's liquidity also dooms Plaintiff's causation argument. As described above, Plaintiff pleads that its loss arose out of alleged misstatements about the Bank's liquidity. None of the statements

---

stock holdings during the class period—but, as stated above, Mr. Shay's stock holdings similarly increased. Plaintiff also notes that the timing of the defendants' sales in that case was not suspicious, but points to no facts suggesting that Mr. Shay's sales *were* suspicious. And Plaintiff states that in that case there "were no scienter allegations based on knowledge or recklessness for the court to consider" (Br. at 78)—but this is false, as plaintiffs in that case *did* argue the defendants had scienter based on their knowledge of information that contradicted their statements due to their high-level positions. *Keyspan*, 383 F. Supp.2d at 387-88.

[7] Plaintiff's reliance on *In re Fannie Mae 2008 Sec. Litig.*, 2011 WL 13267340, at *3 (S.D.N.Y. Apr. 11, 2011), is misplaced. There, the Court declined to reconsider its previous decision finding that defendants' purchase of shares without selling them prior to Fannie's collapse suggested they were "unaware of the aforementioned information" or that they "legitimately believed in Fannie's financial health in spite of the reports," which indicated a lack of motive or opportunity to defraud investors and cut against scienter. *In re Fannie Mae 2008 Sec. Litig.*, 742 F. Supp. 2d 382, 403 (S.D.N.Y. 2010). Further, the Court rejected plaintiffs' argument that stock packages and bonuses were a "concrete and personal" benefit demonstrating scienter. *Id.* Likewise, *In re Oxford Health Plans, Inc. Sec. Litig.*, 187 F.R.D. 133, 140 (S.D.N.Y. 1999), does not support Plaintiff's argument. There, the Court focused on defendants' vested *options*, which were about to expire and may have been exercised at a low price per share, leaving them valuable even if the stock price plummeted. *Id.* This is distinguishable from Mr. Shay's acquisition of *shares* at market price.

9

attributable to Mr. Shay addressed the Bank's liquidity, and thus there is no factual nexus or causal link between any of his statements and Plaintiff's alleged loss.

## IV.   Plaintiff Fails to Adequately Allege Scheme Liability

This Section incorporates the Joint Reply Brief's arguments regarding scheme liability. To state a claim for scheme liability, Plaintiff must plead with particularity as to Mr. Shay's fraudulent conduct beyond any alleged misstatements. But Plaintiff still fails to "specify 'what deceptive or manipulative acts were performed, which defendants performed them, when the acts were performed, and the effect the scheme had on investors in the securities at issue.'" *Plumber & Steamfitters Loc. 773 Pension Fund v. Danske Bank A/S*, 11 F.4th 90, 105 (2d Cir. 2021).

## CONCLUSION

For the above reasons, Mr. Shay respectfully requests that the Court dismiss, with prejudice, both causes of action asserted against him. Plaintiff has had ample time to plead its case, and no further changes would rectify these deficiencies. As such, Plaintiff should not receive a further opportunity to amend its complaint.

Dated:   New York, New York
         May 24, 2024

COVINGTON & BURLING LLP

By:  s/ Alan Vinegrad

Alan Vinegrad
Jonathan M. Sperling
Abigail Kertzman
Giovanni Scarcella
The New York Times Building
620 Eighth Avenue
New York, N.Y. 10018-1405
(212) 841-1000
avinegrad@cov.com
jsperling@cov.com
akertzman@cov.com
gscarcella@cov.com

*Attorneys for Defendant Scott A. Shay*

10